# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Roger Krueger; Jeffrey Olson; Edward Pope; Deborah Tuckner; Bernice Hillukka; and Susan Wones, individually and as representatives of a class of similarly situated persons, and on behalf of the Ameriprise Financial 401(k) Plan, | Case No.  11-CV-02781 (SRN/JSM) |

Plaintiffs,

    v.

Ameriprise Financial, Inc.; Ameriprise Financial, Inc. Employee Benefits Administration Committee; Michelle Rudlong; Ameriprise Financial, Inc. 401(k) Investment Committee; Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc.; Ira D. Hall; Warren D. Knowlton; W. Walker Lewis; Siri S. Marshall; Jeffrey Noddle; Richard F. Powers III; Robert F. Sharpe, Jr.; and John Does 1-60,

Defendants.

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' AMENDED MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................4

    A.    Statutory Scheme .......................................................4

    B.    The Ameriprise Plan ...................................................5

    C.    Plaintiffs' Complaint..................................................11

ARGUMENT ......................................................................................12

  I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE
      PLAINTIFFS' CENTRAL CHALLENGE TO THE
      AMERIPRISE PLAN'S INVESTMENT LINEUP FAILS AS A
      MATTER OF LAW ..................................................12

    A.    The Ameriprise Plan Offers A "Sufficient Mix of
        Investments" As A Matter Of Law .........................13

    B.    The Complaint Alleges No Additional Facts Supporting
        A Plausible Inference That Plaintiffs Are Entitled To
        Relief ...........................................................16

  II.    PLAINTIFFS' COLLATERAL CHALLENGES TO THE
      AMERIPRISE PLAN'S LINEUP MUST BE DISMISSED
      BECAUSE THE ALLEGATIONS FAIL TO STATE A
      CLAIM ..............................................................21

    A.    The Complaint's Prohibited Transaction Claims Fail As
        A Matter Of Law Because ERISA's Prohibited
        Transaction Exemptions Expressly Authorize The Plan's
        Investment In Affiliated Investment Options .................22

    B.    Count VII Fails Because Plaintiffs' Excessive Fees
        Allegation Is Duplicative And Impermissibly Conclusory .....26

    C.    Count V Fails Because ERISA Does Not Regulate
        Ordinary Course Business Decisions Such As
        Ameriprise's Sale Of Its Recordkeeping Business.................28

    D.    Plaintiffs' Monitoring And Co-Fiduciary Claims In
        Counts II And VI Derive From Plaintiffs' Other Claims
        And Are Legally Baseless.......................................29

# TABLE OF CONTENTS
(continued)

**Page**

E.   Plaintiffs' Non-Statutory Claim For Unjust Enrichment Alleged In Count VIII Contravenes ERISA's Enforcement Scheme And Should Be Dismissed ................... 32

CONCLUSION ..................................................................................................... 33

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and this Court's Rule 7.1(b), Defendants submit this Memorandum of Law in Support of Their Amended Motion to Dismiss for Failure to State a Claim.

## INTRODUCTION

Defendant Ameriprise Financial, Inc. ("Ameriprise"), a financial services company headquartered in Minneapolis, has offered its employees a 401(k) retirement benefit plan (the "Plan") since October 2005, when Ameriprise spun off as an independent public company from American Express Company. Ameriprise's sponsorship of the Plan is purely voluntary, and the company has taken great care to enhance the Plan's value to its employees, matching their contributions and giving them a variety of options—including a 6,000-fund-strong brokerage window—in which to invest their retirement accounts. The Plan has proved extraordinarily popular, with roughly 14,000 current or former employees investing almost $1 billion in the Plan. (*See* Decl. of Shannon Barrett in Supp. of Defs' Am. Mot. to Dismiss for Failure to State a Claim ("Barrett Decl."), filed concurrently herewith, Ex. A, 2010 Ameriprise 401(k) Plan Form 5500.)

Yet the Ameriprise Plan is the latest target in a string of at least sixteen lawsuits filed by Plaintiffs' law firm over the past few years challenging the investment lineups of large 401(k) plans. The exact grievances alleged in these actions vary from case to case: some suits attack the investment options as being

too numerous, while others contend they are too few; some take issue with plans offering mutual funds, while others target actively-managed funds.[1]  But whatever the challenged features of a given 401(k) investment lineup, the lawsuits uniformly have alleged that the nature of the lineup caused the plan at issue to incur unreasonable fees resulting from a breach of fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA").  The lawsuits have accordingly proposed that courts prescribe the plaintiffs' preferred investment lineup *post hoc* with the imposition of damages under ERISA's fiduciary rules.

Courts have declined this invitation to micromanage the nation's 401(k) plans, and have instead adopted a pragmatic approach to deal with these cases at the dismissal stage.  Under this approach, a plaintiff's challenges to the composition of a plan's investment lineup should be dismissed if the plan at issue offers a sufficient mix of investments for the plan's participants or if the complaint lacks substantial facts supporting an inference of wrongdoing.

Plaintiffs' complaint should be dismissed because the Ameriprise Plan offers a sufficient mix of investments as a matter of law and Plaintiffs allege no other facts adequate to support an inference of wrongdoing.  Plaintiffs' core claim challenges the inclusion of certain Ameriprise-affiliated investment options in the Plan's lineup.  But this practice is *expressly authorized* by the Department of

---

[1] *See Loomis v. Exelon Corp.*, 658 F.3d 667, 669 (7th Cir. 2011) (citing cases).

Labor, the agency principally responsible for enforcing ERISA. Moreover, the challenged affiliated investment options compose but a fraction of the hundreds— and now thousands—of options the Plan has made available to Plan participants. Indeed, the Plan has always offered a variety of external fund options, and in the five years since the Plan's launch the Plan's fiduciaries have repeatedly revised the investment lineup to include *more* of them. As a result, the Plan's investment lineup has not only continuously covered a range of risk profiles, expense ratios, and investment management philosophies, but has also consistently allowed Plan participants to select among hundreds of non-affiliated investment choices and thus avoid altogether, if they wish, the affiliated investments challenged by Plaintiffs in this suit. There is no serious question that the Ameriprise Plan fiduciaries offered participants a suitably broad and diverse plan lineup in satisfaction of their obligations under ERISA. Plaintiffs' core fiduciary breach claim therefore fails as a matter of law.

Plaintiffs' remaining claims fare no better. Plaintiffs' other theories spring from the allegations of the core claim, and share its deficiency. Each also fails on its own terms. Plaintiffs' prohibited transaction theories, for example, ignore regulatory and statutory exemptions that expressly permit a plan's investment in affiliated funds. Nor does ERISA forbid a plan to offset administrative expenses otherwise payable by the plan with payments from investment funds, as alleged in

the complaint.  No supplemental pleadings or record development could cure the fundamental defects in Plaintiffs' claims.  The complaint should therefore be dismissed in its entirety.

## BACKGROUND

### A.    Statutory Scheme

Plaintiffs bring their claims under ERISA, 29 U.S.C. § 1001 *et seq.*, a federal statute establishing ground rules for retirement benefit plans such as the Plan sponsored by Ameriprise for its employees.  In enacting ERISA, Congress declined to compel employers to offer retirement plans, *Conkright v. Frommert*, 130 S. Ct. 1640, 1648 (2010), or to "mandate what kind of benefits employers must provide if they choose to have such a plan," *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).  Congress instead resolved to encourage voluntary plans "by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards."  *Conkright*, 130 S. Ct. at 1649 (quotation omitted).

Because ERISA carefully balances the "fair and prompt enforcement of rights under a plan" against "the encouragement of the creation of such plans," courts applying the statute endeavor to avoid imposing a system so complex, expensive, or risky that employers are "unduly discourage[d] … from offering ERISA plans in the first place."  *Conkright*, 130 S. Ct. at 1649 (quotations and

4

alterations omitted).  Accordingly, while the fiduciaries who oversee benefit plans have various obligations under the statute, courts give wide deference to the fiduciaries' discretionary decisions and do not substitute their own *post hoc* views (or those pressed by plaintiffs) for the judgment exercised by plan fiduciaries.  *See Varity Corp. v. Howe*, 516 U.S. 489, 514-515 (1996); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917-18 (8th Cir. 1994); *Quan v. Computer Scis. Corp.*, 623 F.3d 870, 884-85 (9th Cir. 2010); *Ershick v. United Mo. Bank, N.A.*, 948 F.2d 660, 666 (10th Cir. 1991).

### B.     The Ameriprise Plan

*a. Origin and Operation.*  Ameriprise has been in business for over a century, offering a range of products that includes financial planning, insurance, and investment funds.  The company used to be part of American Express Company and its employees were covered by the American Express retirement plan.  When Ameriprise spun off from American Express in October 2005, it initially "cloned" the American Express 401(k) plan, including all of the investment options, to ensure a smooth transition for participants, most of whom were transferring to the Ameriprise Plan from the former American Express plan. (*See* Ex. 1[2], 2005 Summary Plan Description ("2005 SPD") at i (Sept. 14, 2005); Ex. 7, Ameriprise Financial 401(k) Plan ("2005 Plan Document") §§ 1.1, 1.2 (Oct.

---

[2] Unless otherwise noted, all exhibit citations refer to exhibits attached to the Declaration of Brent Sabin in Support of Defendants' Amended Motion to Dismiss for Failure to State a Claim, filed concurrently herewith.

1, 2005).[3])

The Plan is a "defined contribution plan," meaning participants make contributions to individual accounts, select from a menu of investments for the account assets, and receive their value at retirement.  (*See* Ex. 1, 2005 SPD at 1; Ex. 7, 2005 Plan Document §§ 1.1, 2.23; Compl. ¶¶ 4, 5, 7-9; *see also* 26 U.S.C. § 401; 29 U.S.C. § 1002(34).)  It is available to employees of Ameriprise and its subsidiaries, and Ameriprise matches a portion of participants' contributions.  (*See* Ex. 1, 2005 SPD at 1, 4, 10, 36; Ex. 6, 2011 Summary Plan Description ("2011 SPD") at 5; Ex. 7, 2005 Plan Document §§ 2.23, 3.1 & Articles 4, 6, 8; Ex. 10, Ameriprise Financial 401(k) Plan (2010 Amendment and Restatement) ("2010 Plan Document") § 4.3; Compl. ¶ 6; 29 U.S.C. § 1002(34).)  Participants are free to move their plan balances among investment options on a daily basis.  (*See* Ex. 6, 2011 SPD at 22; Ex. 10, 2010 Plan Document §§ 6.2(c), 6.3, at 38.)

---

[3] In deciding the motion to dismiss, the Court may consider pertinent documents incorporated into Plaintiffs' complaint by reference or of which it may take judicial notice, including documents describing the plan, such as the plan documents, trust documents, and summary plan descriptions.  *See, e.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1141 (2010) (district court properly considered plan documents, summary plan descriptions, trust agreement, and prospectuses in evaluating motion to dismiss ERISA fiduciary breach action); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 322 (2007); *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831-32 (8th Cir. 2003); *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997).  For the Court's convenience, Defendants have submitted a full set of the formal plan documents and summary plan descriptions since the plan's inception.  To the extent Plaintiffs' factual allegations are not foreclosed by plan materials, Defendants accept the allegations as true for purposes of this motion, although Defendants reserve their right to dispute them should this litigation continue.  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).

Two named fiduciary committees have primary responsibility for operating the Plan.  The Employee Benefits Administration Committee ("EBAC") is the Plan administrator, with responsibility for matters such as benefits eligibility and construing the Plan documents.  (Ex. 10, 2010 Plan Document §§ 2.4, 10.3; *see* Ex. 7, 2005 Plan Document §§ 2.4, 10.3; Compl. ¶¶ 19, 20; 29 U.S.C. § 1002(16)(A).)  The 401(k) Investment Committee (the "Investment Committee") selects and monitors the funds offered as investment options in the Plan lineup.  (Ex. 10, 2010 Plan Document §§ 2.36, 10.4 at 13, 59; *see* Ex. 7, 2005 Plan Document §§ 2.32, 10.4, at 12, 52-53; Compl. ¶¶ 25, 52.)  Per the terms of the Plan, the members of each of the two fiduciary committees (EBAC and the Investment Committee) are designated by corporate job title, although initially (from spin-off in 2005 through 2006) EBAC's members were appointed by the Ameriprise Board of Directors' Compensation and Benefits Committee (the "CBC").  (Ex. 10, 2010 Plan Document § 10.1; *see* Ex. 7, 2005 Plan Document § 10.1; Ex. 8, Ameriprise Financial 401(k) Plan (Generally effective as of January 1, 2007) ("2007 Plan Document") § 10.1; *cf.* Compl. ¶ 30 (alleging that the CBC appoints EBAC's members), ¶ 37 (alleging that Ameriprise appoints EBAC's members).)

   *b. The Investment Lineup*.  The Ameriprise Plan document authorizes the investment of Plan assets in a wide variety of investment vehicles, including both mutual funds and collective trusts.  (*See* Ex. 7, 2005 Plan Document § 6.1; Ex. 13,

Ameriprise Financial 401(k) Plan Trust Agreement ("2005 Trust Agreement")

§ 5.2.)  ERISA and implementing regulations issued by the Department of Labor

("DOL") specifically permit a plan to offer affiliated collective trusts and mutual

funds to plan participants.  *See* ERISA § 408(b)(8), 29 U.S.C. § 1108(b)(2); DOL

Prohibited Transaction Exemption 77-3 ("PTE 77-3"), 42 Fed. Reg. 18734, 18734-

75 (1977).  The Investment Committee has selected the Plan's investment options

accordingly.

When it was first established, the Plan offered participants several

investment options, including an Ameriprise stock fund; an income fund devoted

primarily to government bonds; several mutual funds and collective trusts managed

by Ameriprise affiliates and others; and a brokerage window through which

participants could invest in hundreds of other non-affiliated mutual funds. (*See* Ex.

1, 2005 SPD at 13-23; Ex. 7, 2005 Plan Document § 6.2; Compl. ¶¶ 59, 69-71.)

The Plan investment options have evolved over time.  Today, the Plan offers

three groups of diverse investment options, each with different investment

objectives and risk profiles.  (*See* Barrett Decl., Ex. C (identifying Plan's current

investment lineup).)  Tier 1 consists of several "target maturity funds" which are

designed to supply diversified portfolios tailored according to likely retirement

date for participants who do not wish to put together their own individualized mix

of investment options.  (*See* Ex. 6, 2011 SPD at 14, 19.)  Tier 2 comprises "core

investments," including an Ameriprise stock fund, an income fund (with an expense ratio of 0.00%), and other mutual fund and collective trust options. Five of the 13 core investments in Tier 2 are managed by unaffiliated providers—more than in the Plan's initial October 2005 iteration. (*See* Ex. 6, 2011 at SPD 15-19; Ex. 10, 2010 Plan Document § 6.2.)[4]  Tier 3 is the Plan's self-directed brokerage account.  Effective January 2011, the Plan switched brokerage windows, from one managed by Ameriprise Financial Services, Inc., offering roughly 900 investment funds to one managed by Charles Schwab which offers over 6,000 funds. (*See* Ex. 6, 2011 SPD at 13, 20; Ex. 5, 2010 SPD at 21; Compl. ¶ 71; Ex.11, Directed Employee Benefit Personal Choice Retirement Account Trust Agreement (Dec. 2010) ("PCRA Trust Agreement").)  While the Plan once required certain *de minimis* account and transfer thresholds to be met for investments through the brokerage window (Ex. 1, 2005 SPD at 21 ($3,000 for initial brokerage account investment and $500 for subsequent transfers)), participants may now direct their contributions to their brokerage account like the other investment options (Ex. 6, 2011 SPD at 20).  The Summary Plan Descriptions distributed to Plan participants disclose, *inter alia*, the investment options' objectives and historical performance, as well as their expense ratios, so that participants can direct their investments

---

[4] Specifically, the core investments now consist of eight affiliated funds (the Ameriprise Financial Stock Fund (a unitized fund), five mutual funds, one collective trust, and a separately managed account) and five non-affiliated funds (two mutual funds and three collective trusts), all diversified by investment strategy. (*See* Ex. 6, 2011 SPD at 15-19.)

according to their own needs and tolerance for risk.  (*See, e.g.*, Ex. 6, 2011 SPD at 25-27.)

   *c. Trustees and Recordkeepers*.  The Plan's assets are held by trustees selected by the Investment Committee.  (Ex. 10, 2010 Plan Document §§ 6.1, 12.1.)  Currently, Wells Fargo is the trustee for assets invested in the core investment options or target maturity funds, while Charles Schwab is the trustee for assets invested through the brokerage window.  (*See, e.g.*, Ex. 12, Trustee Removal and Successor Trustee Acceptance Agreement (Jan. 4, 2011) ("TRST Acceptance Agreement"); Ex. 11, PCRA Trust Agreement.)  The Plan also relies for its smooth operation on various administrative services provided by a designated recordkeeper.  For example, the Plan's recordkeeper creates and distributes statements and other information for the Plan and its participants, redeems account holdings and processes account distributions, and mediates participant inquiries.  (*See, e.g.*, Ex. 6, 2011 SPD at 40-43.)

   An Ameriprise affiliate, Ameriprise Trust Company ("ATC"), was the Plan's original recordkeeper.  In April 2007, Wachovia Bank, N.A. ("Wachovia") became the Plan's trustee and recordkeeper after Wachovia acquired ATC's recordkeeping business.  Wells Fargo is Wachovia's successor, and thus today is the Plan's recordkeeper.  (Compl. ¶¶ 10-12; *see* Ex.13, 2005 Trust Agreement; Ex. 12, TRST Acceptance Agreement; *cf.* Compl. ¶ 36 (alleging that Ameriprise also

provides trustee, recordkeeping, and administrative services to the Plan).)  While

ATC no longer provides recordkeeping services to the Plan, it continues to service

the Plan as manager of one of the collective trusts in the Plan's investment lineup.

(*See, e.g.*, Ex. 15, Amended and Restated Declaration of Trust (effective Sept. 19,

2011) ("2011 Declaration of Trust").)   Under the Plan's terms, Plan administration

and trustee expenses are to be paid from Plan assets.  (Ex. 10, 2010 Plan Document

§ 10.7.)

### C.    Plaintiffs' Complaint

Plaintiffs are two current and four former Plan participants who purport to

represent a class of all participants in and beneficiaries of the Plan since its

inception in October 2005.  (Compl. ¶¶ 13-17, 85.)  They are suing Defendants—

Ameriprise, EBAC, the Investment Committee, the CBC, and various individuals

allegedly affiliated with those defendants—on the theory that ERISA forbids the

inclusion of Ameriprise-affiliated investment options in the investment lineup

offered to Plan participants.  (*Id.* ¶¶ 1, 19-40.)

Plaintiffs' chief allegation is that the affiliated mutual funds and collective

trusts charged fees that were excessive relative to those available from allegedly

"comparable" mutual fund alternatives, from other share classes, or from

alternative investments such as separately managed accounts.  (Compl. ¶¶ 57-64,

66.)  Plaintiffs contend that the selection of these affiliated investment options

instead of alternatives available in the market accrued to Ameriprise's benefit, not the Plan's, and constituted a breach of fiduciary duty in violation of 29 U.S.C. § 1104.  (*Id.* ¶¶ 50, 54, 65, 67; *see id.* ¶¶ 88-97 (Count I).)

Plaintiffs' remaining claims spring from that core contention.  Plaintiffs bring several derivative and non-statutory claims arising from their objection to the use of affiliated funds.   (*See* Compl. ¶¶ 99-105 (Count II), 107-11 (Count III), 113-20 (Count IV), 130-34 (Count VI), 145-51 (Count VIII).)  They also target the Plan's initial use of an affiliated recordkeeper to assist with Plan administration. (*See id.* ¶¶ 55, 122-28 (Count V), 136-43 (Count VII).)

## ARGUMENT

**I.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS' CENTRAL CHALLENGE TO THE AMERIPRISE PLAN'S INVESTMENT LINEUP FAILS AS A MATTER OF LAW.**

Plaintiffs' core allegation is that Defendants breached the general fiduciary duties owed under ERISA § 404, 29 U.S.C. § 1104, by including allegedly imprudent and overly expensive Ameriprise-affiliated investment options in the Plan's investment lineup.  (Compl. ¶¶ 88-97 (Count I).)  Plaintiffs' counsel have lodged similar challenges in over a dozen other cases involving the 401(k) plans of large corporations, giving rise to a well-developed legal framework for evaluating this type of claim.  In particular, courts repeatedly have rejected these attacks where, as here, the plan in question offers participants a broad and diverse menu of

investment options at market prices.  *See, e.g.*, *Renfro v. Unisys Corp.*, __ F.3d __, 2011 WL 3630121 (3d Cir. 2011); *Loomis*, 658 F.3d 667; *Hecker*, 556 F.3d 575; *In re Honda of Am. Mf'g, Inc. ERISA Fees Litig.*, 661 F. Supp. 2d 861 (S.D. Ohio 2009).  Measured against this standard, Count I fails as a matter of law.

### A.   The Ameriprise Plan Offers A "Sufficient Mix of Investments" As A Matter Of Law.

Starting with the Seventh Circuit's decision in *Hecker Deere & Co.*, 556 F.3d 575, in which the court affirmed dismissal of the plaintiffs' complaint, courts have rejected the type of broad attack Plaintiffs bring against the Ameriprise Plan. In *Hecker*, the plaintiffs took aim at their plans' inclusion of 23 retail mutual funds among the 26 core options in the investment lineup, which also provided access through a brokerage window to an additional 2,500 funds.  *See id*. at 586.  The funds had a range of expense ratios (from 0.07% to over 1%), and they were available to the general public, meaning their fees were "set against the backdrop of market competition."  *Id.*  The Seventh Circuit concluded that those facts demonstrated *as a matter of law* that the plans "offered a sufficient mix of investments for their participants," and that the plans' fiduciary had therefore satisfied the claimed duty to provide "an acceptable array of investment vehicles." *Id.*  The court declared it irrelevant that funds with even lower fees might have been available, because "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be

13

plagued by other problems).” *Id.*; *accord* Employee Benefits Sec. Admin., Department of Labor, *401(k) Fiduciary Education Campaign*, *available at* http://www.dol.gov/ebsa/pdf/401kfefm.pdf (“The service provider offering the lowest cost services is not necessarily the best choice for your plan.”).

The Third and Eighth Circuits subsequently adopted the Seventh Circuit’s analytical approach when *Hecker*’s sister cases reached them after dismissal, and the Seventh Circuit itself has reiterated it.  *Loomis*, 658 F.3d at 670 (noting “[t]wo other circuits have agreed with *Hecker*.”)  In *Renfro v. Unisys Corp.*, the Third Circuit held that a complaint challenging an investment lineup of 73 options with “a variety of risk and fee profiles” failed to state a claim.  2011 WL 3630121, at *10; *see also Loomis*, 658 F.3d at 669-70 (Seventh Circuit decision affirming dismissal of a complaint against a plan offering 32 options, 24 of which were publicly-offered mutual funds); *Honda*, 661 F. Supp. 2d at 866-67 (dismissing claim challenging inclusion of 9 mutual funds, which were managed by the plan’s trustee and recordkeeper and comprised 52% of the plan’s assets, in a 24-fund investment lineup).  And in *Braden v. Wal-Mart Stores*, 588 F.3d 585 (8th Cir. 2009), the Eighth Circuit followed that same approach to hold that a plan lineup consisting of just 13 investment options and no self-directed brokerage window could give rise to a plausible claim when supplemented by additional allegations. *See id.* at 596 n.6 (distinguishing *Hecker*, where it was “untenable to suggest that

14

all of the more than 2500 publicly available investment options had excessive

expense ratios," to hold that the "far narrower range of investment options

available in this case makes more plausible the claim that this Plan was

imprudently managed" (quotation omitted)); *see also Renfro*, 2011 WL 3630121,

at *9 ("Taking the same approach as *Hecker*, but arriving at a different conclusion,

the *Braden* court evaluated the complaint's allegations … in light of a plan that had

far fewer available investment options ….").

    Under this standard, Plaintiffs' fiduciary challenge to the Ameriprise Plan's

investment lineup clearly fails to state a cognizable claim.  The Ameriprise Plan

provides participants a variety of affiliated and non-affiliated investment offerings

through three distinct tiers of investment options: a tier of 13 "core" investment

options, including five non-affiliated funds; a tier of eight "target maturity funds";

and a tier of thousands of additional investment options offered through a self-

directed brokerage window—vastly more options than in *any* of the cases tested by

the courts of appeals to date.[5]  (*See* Barrett Decl., Ex. C (identifying Plan's current

investment lineup).)   The core options alone have expense ratios ranging from

0.10% to 1.50% (excluding the Ameriprise Financial Stock Fund and the Income

Fund (a separately managed account), which have expense ratios of 0.00%), with a

---

[5] Plaintiffs allege that 900 funds are available through the brokerage window.  As explained *supra* at 9, that figure is now over 6,000.  But even the figure alleged by Plaintiffs is well above the threshold mix of investment options established in the caselaw as being sufficient as a matter of law.

median expense ratio of 0.78% and an average of 0.74%.  (Ex. 6, 2011 SPD at 26-27.)  The options cover a variety of risk profiles, *see supra* at 8-9, and their returns frequently exceeded (often greatly) the indexes against which each is benchmarked.  (*See, e.g.*, Ex. 6, 2011 SPD at 26-27 (comparing fund and benchmark returns for 2007, 2008, and 2009).)  The options are even "diversified" among investment managers, although ERISA does not require them to be: "[N]o statute or regulation prohibit[s] a fiduciary from selecting funds from one management company." *Hecker*, 556 at 586.[6]  Factoring in the brokerage window, the diversity of investment options expands exponentially.  (Ex. 6, 2011 SPD 13, 20 (noting access to over 6,000 mutual funds); *Braden*, 588 F.3d at 596 n.6.)  The Plan and its fiduciaries have plainly provided participants a "sufficient mix of investments" in satisfaction of § 404.  *Hecker*, 556 F.3d at 586.

### B. The Complaint Alleges No Additional Facts Supporting A Plausible Inference That Plaintiffs Are Entitled To Relief.

The Eighth Circuit's decision in *Braden* exposes still *further* failings in Plaintiffs' complaint.  The *Braden* court allowed an ERISA investment-selection challenge to proceed past dismissal because not only did the plan at issue have a potentially insufficient mix of investments (including no brokerage window), but

---

[6] While the complaint emphasizes the inclusion of affiliated funds in the Plan's investment lineup, the Plan's investment options have never consisted exclusively of those options.  Moreover, as previously noted, Department of Labor rules expressly permit the use of affiliated funds as plan investment options.  *See* PTE 77-3.

the plaintiffs also alleged additional defects that, in their totality, moved the complaint to the threshold of plausibility. *See Braden*, 588 F.3d at 595-96 & n.7. In particular, the *Braden* court stressed that the plan fiduciaries allegedly neglected to revisit the plan's lineup; that the challenged funds allegedly charged pointless fees; and that the challenged funds paid kickbacks to the plan trustee in exchange for being offered to plan participants. *See id.* Here, the question of investment option mix, as explained above, is conclusive: the Ameriprise Plan's lineup is over *400 times* larger than the *Braden* plan's menu of 13 investments and, unlike the *Braden* plan, the Ameriprise Plan offers its participants access to thousands of investments through a brokerage window, much like the plans at issue in *Hecker*. *See supra* at 9. But Plaintiffs' complaint *also* lacks the additional allegations that were necessary to state a fiduciary-breach claim in *Braden*, and thus fails for that reason as well.

First, the Ameriprise Plan lineup has not been static. The *Braden* court emphasized that the defendants had allegedly failed to alter the plan's options over time even though most of them underperformed their market index benchmarks. *See id.* at 596. Here, in contrast, the Plan's fiduciaries have *continuously* revisited and revised the Plan's core lineup over the Plan's brief six-year existence. This includes removing affiliated funds, adding external funds, and substantially increasing the overall number of options available to participants—as the Plan

17

documents show.  (*Compare, e.g.*, Ex. 1, 2005 SPD at 13-20, *with* Ex. 2, 2007 SPD

at 16-25, *and* Ex. 4, 2009 SPD at 15-22.)

Second, Plaintiffs do not allege that the challenged funds charged 12b-1 fees

from which plan participants derived no benefit, as the *Braden* plan investments

allegedly did.  *See Braden*, 588 F.3d at 595-96.[7]  On the contrary, the complaint

itself asserts that the mutual fund fees paid by the Plan in this case (which

Plaintiffs do not allege included 12b-1 fees) financed *both* the investment

management services associated with the funds themselves *and* Plan administrative

services.  (*See, e.g.*, Compl. ¶¶ 139-40.)  And while Plaintiffs allege in conclusory

fashion that the Plan's recordkeepers received "unreasonable" fees for providing

those administrative services, Plaintiffs make no effort to compare fees paid by

Plan participants with the value of services they received in return, making it

impossible to conclude that those fees were excessive relative to the services

provided.  *See infra* at 27-28; *see also Hecker v. Deere & Co.*, 569 F.3d 708, 711

(7th Cir. 2009) (denying reh'g) (noting that the nature of the services a participant

receives can justify the selection of higher-cost investment options).

Finally, Plaintiffs do not plausibly allege that undisclosed "kickbacks"

motivated the Plan's choice of investments.  In *Braden*, the court permitted the

---

[7] "12b-1 fees" are a class of mutual fund fees payable by investment funds to distributors of their shares, pursuant to SEC Rule 12b-1 under the Investment Company Act of 1940.  *See* 17 C.F.R. § 270.12b-1.

complaint to proceed based in significant part on the defendants' alleged kickback scheme, wherein the funds offered by the plan allegedly made confidential revenue sharing payments to the plan's trustee as a *quid pro quo* for inclusion in the lineup, not as compensation for services rendered, benefiting the trustee at the participants' expense. *Braden*, 588 F.3d at 590, 596. While the complaint here employs the term "kickback" liberally, (*e.g.*, Compl. ¶ 139), Plaintiffs do not allege *facts* plausibly suggesting a kickback scheme of any kind, nor could they.

As to the Plan's first trustee and recordkeeper, ATC, any "kickback" contention is patently illogical. Both ATC and the entities responsible for operating the challenged affiliated funds are Ameriprise affiliates. Thus, what Plaintiffs are describing as "kickbacks" amounts to nothing more than the internal reallocation among corporate siblings of revenues already received by the Ameriprise business enterprise—a process that has no consequence on the total revenues received by the Ameriprise as a whole. *Cf. Hecker*, 556 F.3d at 585-86 (concluding that allocation of revenues among corporate affiliates violated no statute or regulation and was not material to individual investment decisions).

Nor does the mere fact that affiliated funds are offered as options in the Plans' investment lineup amount to a "kickback" scheme. The Department of Labor specifically *authorizes* the use of affiliated funds in plan lineups. *See* PTE 77-3. The plan's engagement in a lawful and expressly authorized practice does

19

not substantiate the nefarious scheme hypothesized by Plaintiffs. *See Iqbal*, 129 S. Ct. at 1949.

Plaintiffs' contention that Wachovia had a supposed "kick-back arrangement" when it took over as Plan recordkeeper and trustee is likewise unfounded, because Plaintiffs do *not* allege that Wachovia controlled or influenced the selection of the Plan's investment options. Plaintiffs do not even allege that payments to Wachovia were "not made in exchange for services rendered," *Braden*, 588 F.3d at 596. In fact, they allege *the opposite*, expressly asserting that payments to Wachovia financed a "significant portion" of Wachovia's "compensation from the Plan *for its administrative services*." (Compl. ¶ 139 (emphasis added).)[8] Thus, Plaintiffs' allegation that Wachovia's compensation derived from the administrative services it provided the Plan stands in direct contrast to the improper *quid pro quo* alleged in *Braden*. *Braden*, 588 F.3d at 596; *see Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007), *amended for other reasons by* 2007 U.S. App. LEXIS 7209 (7th Cir. Mar. 28, 2007) ("A complaint can … alleg[e] facts that preclude recovery.").

Plaintiffs' final kickback theory—that Defendants engaged in a kickback scheme involving the Plan's self-directed brokerage window—is on its face pure

---

[8] There also is nothing inherently suspect about a mutual fund or its investment adviser making an asset-based contribution toward the cost of participant-level account administration (what Plaintiffs call "revenue sharing"). As the Seventh Circuit expressly held in *Hecker*, that arrangement "violates no statute or regulation" and is not actionable under ERISA. *Hecker*, 556 F.3d at 585.

speculation.  Plaintiffs cast improper motives on the unremarkable fact that the

brokerage window at one time provided access to "only" 900 of the roughly 5,000

funds allegedly available on the open market. (Compl. ¶ 71.)[9]  There is zero legal

support for the suggestion that ERISA makes unlawful an investment lineup that is

populated with only a subset of all investment options available in the entire

market.  In fact, the 2,500-fund brokerage window in *Hecker* also comprised a

subset of the mutual fund market (by Plaintiffs' estimate), and many 401(k) plans

offer far fewer funds in their lineups, *see supra* at 13-15.  Plaintiffs' sinister

characterization of perfectly lawful conduct does not satisfy their pleading burden.

*See Braden*, 588 F.3d at 597; *see Iqbal*, 129 S. Ct. at 1949.

**II.     PLAINTIFFS' COLLATERAL CHALLENGES TO THE
         AMERIPRISE PLAN'S LINEUP MUST BE DISMISSED BECAUSE
         THE ALLEGATIONS FAIL TO STATE A CLAIM.**

Plaintiffs fill out the remainder of their complaint with seven counts deriving

from their central challenge to the Plan's investment lineup.  Plaintiffs repackage

their basic allegations as alleged prohibited transactions (Counts III and IV), an

excessive fee challenge (Count VII), a claim to the proceeds of Ameriprise's sale

of its recordkeeping business (Count VI), a failure to monitor (Count II), a co-

fiduciary obligation (Count VI), and a newly-minted non-statutory unjust

---

[9] Plaintiffs do not identify the basis for their suggestion that there are approximately 5,000 funds available on the market.  As the dismissal record shows, however, Plaintiffs' estimate of the entire mutual funds market is less than the 6,000 funds the Plan currently offers.  *See supra* at 9.

enrichment claim (Count VIII).  But none of these collateral legal theories

succeeds in curing the fundamental deficiencies of Plaintiffs' core challenge to the

fiduciaries' investment selections, and each suffers from its own additional

failings.  The complaint therefore should be dismissed in its entirety.

> **A.    The Complaint's Prohibited Transaction Claims Fail As A Matter Of Law Because ERISA's Prohibited Transaction Exemptions Expressly Authorize The Plan's Investment In Affiliated Investment Options.**

In Counts III and IV, Plaintiffs allege that the investment of plan assets in

two types of affiliated investments—mutual funds and collective trusts—

amounted to a prohibited transaction in violation of ERISA §§ 406(a) and (b).  (*See*

Compl. ¶¶ 107-11 (Count III, alleged against all Defendants); *id.* ¶¶ 113-20 (Count

IV, alleged against Ameriprise and the CBC Defendants).)  Section 406(a)

prohibits certain transactions, such as the "furnishing of … services," with "parties

in interest," which the statute defines to include persons "providing services" to the

plan.  29 U.S.C. § 1106(a); *id.* § 1002(14)(B).  Section 406(b) forbids a fiduciary to

deal with plan assets in his own interest or to act adversely to the plan's interests.

*See* 29 U.S.C. § 1106(b).  But §§ 406(a) and (b) do not state absolute bans.  Rather,

their prohibitions are subject to important exemptions carving out activity

determined by Congress and DOL to be expressly authorized under the statute,

including the investment of plan assets in affiliated funds and collective trusts.  *See*

*generally* 29 U.S.C.§ 1108(a).  Counts III and IV fail because Plaintiffs do not

allege that the Ameriprise Plan's offering of affiliated mutual funds and collective trusts falls outside these statutory and regulatory exemptions and therefore comes within ERISA's prohibited transaction ban.

ERISA specifically shelters a plan's investment in affiliated mutual funds and collective trusts under two distinct exemptions.  The offering of affiliated mutual funds is addressed by PTE 77-3, which provides that § 406 does not extend to the purchase or sale of mutual fund shares by a plan covering employees of the mutual fund or an affiliate thereof, provided the plan does not pay any exceptional fees or invest on terms less favorable than those offered to ordinary investors.  *See* 42 Fed. Reg. 18,734-35 (Mar. 31, 1977).  The offering of affiliated collective trusts is addressed by the statute itself—ERISA § 408(b)(8) states that the prohibitions of § 406 do not apply to the purchase or sale of shares in a "common or collective trust fund … maintained by a party in interest," provided that the party receives only reasonable compensation and the transaction is permitted by the plan documents or by a fiduciary with authority over plan assets.  *See* 29 U.S.C. § 1108(b)(8).

Although the affiliated mutual fund and collective trust exemptions are distinct, their basic operation is the same: a plan's decision to offer affiliated mutual funds or collective trusts to participants is not prohibited by § 406 *unless* the plan does not comply with PTE 77-3 or § 408(b)(8), respectively.  *See, e.g.*, 29

23

U.S.C. § 1108(a), (b) ("The prohibitions provided in section 406 shall not apply to [the enumerated] transactions.").  Multiple courts therefore have held that a prohibited transaction challenge to a plan's use of affiliated investment options or service providers fails as a matter of law unless the plaintiff specifically pleads noncompliance with PTE 77-3 and § 408(b).  *See Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2001) (dismissing prohibited transaction claim challenging affiliated investment of plan assets because plaintiffs had not alleged "that the fees paid by the Plans are not in compliance with the requirements of PTE 77-3, or that the Plans have had dealings with the [funds] on terms that are less favorable than are offered to other shareholders"); *Leber v. Citigroup, Inc.*, 2010 U.S. Dist. LEXIS 25097, at *25-*32 (S.D.N.Y. 2010) (dismissing challenge to affiliated investments and services that similarly failed to plead around the requirements of PTE 77-3 and § 408(b)); *cf. Gipson v. Wells Fargo & Co.*, 2009 U.S. Dist. LEXIS 20740, at *10-*11 (D. Minn. 2009) (noting, but not deciding, the question).

The Eighth Circuit has not had occasion to squarely consider the issue decided in *Mehling* and *Leber*; namely, whether a plaintiff must plead nonapplication of an exemption that otherwise plainly applies on the face of the complaint.  The *Braden* Court allowed a prohibited transaction claim to proceed past dismissal.  But the *Braden* plaintiff *did* allege that the revenue sharing

payments he was challenging were not exempted by § 408(b)(2).  The *Braden* Court thus determined that he did not have to plead further facts showing the payments were unreasonable relative to the services rendered.  *See* 588 F.3d at 600-01.

Here, Plaintiffs have made no allegations that PTE 77-3 and § 408(b)(8) do not apply to the Ameriprise Plan's offering of affiliated mutual funds or collective trusts.  Plaintiffs do not allege, as they must, that the Plan paid exceptional fees in connection with the purchase of fund shares, or that the Plan invested on terms less favorable than those offered to ordinary investors, or that the transactions are not permitted by the Plan document.  Their only objection is that the funds were expensive investments relative to others available in the marketplace, and thus were inappropriate options for this Plan.  (*See* Compl. ¶¶ 57-68.)  That allegation is irrelevant to ERISA's prohibited transaction prohibitions for affiliated funds, which ask only whether the investments were made under the conditions specified in PTE 77-3 and § 408(b)(8).  Because the application of those conditions is not called into question by this complaint, Plaintiffs "allege[] the very type of activity that the exemption[s] expressly allow[] to occur," and they therefore fail to "allege a course of conduct actionable under the … statute."  *Leber*, 2010 U.S. Dist. LEXIS, at *27-*29.[10]

---

[10] To the extent Counts III and IV also challenge the Plan's investment in the

### B.  Count VII Fails Because Plaintiffs' Excessive Fees Allegation Is Duplicative And Impermissibly Conclusory.

Plaintiffs challenge the Plan's administrative expenses in Count VII, alleging that the Plan paid excessive fees to its recordkeepers, which a prudent fiduciary purportedly would have avoided.  (Compl. ¶¶ 136-43.)  But this ERISA fiduciary claim simply repackages Plaintiffs' basic objection to the Plan's investment lineup, because the administrative fees paid by the Plan are directly tied to that lineup.  As the complaint admits, the Plan was designed so that the recordkeeper's compensation would be driven by the Plan participants' actual investments, which in turn are delineated by the Plan's investment menu.  (*See, e.g.*, Compl. ¶ 139.)  As the Seventh Circuit has recognized, there is nothing wrong with this design for ERISA purposes, *Hecker*, 556 F.3d at 585, and the decision to structure the Plan in this way is not subject to scrutiny under ERISA's fiduciary rules.  *See, e.g.*, *Loomis*, 658 F.3d at 671 ("[T]he participants in Exelon's Plan [argue] that the Plan should have paid the expenses directly, allowing participants to reap the gross rather than the net return.  But whether to cover these expenses is a question of plan design, not of administration.").

The only relevant fiduciary decision affecting the administrative expenses paid by the Plan was thus the selection of the Plan's investment menu.  And

---

Income Fund, the transaction does not come within the prohibitions of § 406 because neither the Plan nor its participants bear expenses for that fund, which has an expense ratio of 0.00%.  (*See, e.g.*, Ex. 6, 2011 SPD at 27.)

because the Plan offered participants a sufficient mix of investments as a matter of law, the defendants fulfilled their fiduciary obligations in creating the Ameriprise Plan lineup, as discussed *supra* at 13-16.  Plaintiffs' excessive-fees allegations therefore fail alongside their core fiduciary challenge to the fiduciaries' investment selections.  *See Hecker*, 556 F.3d at 586 (rejecting excessive-fees challenge based on revenue sharing because Plan offered a sufficient mix of investments, with expense ratios ranging from 0.07% to over 1%); *Renfro*, __ F.3d __, 2011 WL 3630121, at *10 (same conclusion on same reasoning).[11]

Moreover, Count VII is impermissibly conclusory.  Plaintiffs allege no facts about either the cost of ATC's and Wachovia's Plan administration or what constituted "reasonable" compensation for the services they provided.  Indeed, the complaint does not discuss the recordkeepers' actual services *at all*.  Yet the nature of such services is critical to evaluating an excessive-fee claim on a motion to dismiss, as the Seventh Circuit has explained.  *Hecker*, 569 F.3d at 711.  A complaint must establish more than "a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 129 S. Ct. at 1949, and couching the legal conclusion of

---

[11] Plaintiffs seemingly attempt to leave open the possibility that ATC and Wachovia received compensation other than fees based on the investment funds' expense ratios and the assets actually invested by Plan participants in them.  (*See* Compl. ¶ 139 (a "*significant portion* of [the recordkeepers'] compensation" came from such fees (emphasis added).)  But the complaint does not identify what any such compensation might be, and the Court therefore should not consider the suggestion.  *See Iqbal*, 129 S. Ct. at 1949 (a complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement" (quotation omitted)).

"excessiveness" as a factual allegation does not satisfy Plaintiffs' pleading burden.

*See id.* at 1950.  It is impossible to discuss the reasonableness of the recordkeeping

expenses incurred by the Plan without identifying what Plan participants were

getting in return.  Count VII is legally deficient, and should be dismissed.[12]

### C.    Count V Fails Because ERISA Does Not Regulate Ordinary Course Business Decisions Such As Ameriprise's Sale Of Its Recordkeeping Business.

In Count V, Plaintiffs cast their sights on Ameriprise's 2006 sale of its

recordkeeping business to Wachovia, claiming an interest in the proceeds on the

theory that the value of Ameriprise's recordkeeping business was enhanced by that

business's work for the Plan.  (*See* Compl. ¶¶ 124-27 (Count V).)  But ERISA

provides no basis for this novel claim of relief.  ERISA is categorically

unconcerned with ordinary corporate business transactions, like the sale of a

subsidiary, that do not involve plan assets.  *See, e.g.*, *Hickman v. Tosco Com.*, 840

F.2d 564, 566 (8th Cir. 1988) (ERISA "does not prohibit an employer from acting

in accordance with its interests as employer when not administering the plan or

investing its assets," and "does not require that day-to-day corporate business

---

[12] Plaintiffs also suggest without elaboration that the recordkeeping arrangements amounted to a prohibited transaction.  (*See* Compl. ¶ 140.)  Even if this unadorned allegation did not fall short of the pleading standard, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions"), it still would fail for the reasons discussed *supra* at 22-25 (Counts III and IV).  Plans may enlist the aid of parties in interest to provide plan services if their compensation is reasonable, *see* 29 U.S.C. § 1108(b)(2), and because Plaintiffs have not adequately alleged unreasonableness they have not alleged a prohibited transaction cognizable under ERISA § 406(a).

transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants" (quotations omitted)).[13]  Ameriprise was not acting in a fiduciary capacity in selling the recordkeeping business and disposing of the sale proceeds, and thus cannot have breached any fiduciary duty to the Plan in doing so.[14]  And because the Wachovia sale did not involve the Plan or Plan assets in any way, it cannot have amounted to a prohibited transaction.  (Compl. ¶ 127.)  *See* 29 U.S.C. § 1106(a), (b).

Plaintiffs contend that the sale harmed the Plan by costing it millions in excessive fees paid to Wachovia.  (Compl. ¶ 127.)  But Plaintiffs do *not* allege that the sale committed the Plan to using Wachovia as its recordkeeper.  The sale of the recordkeeping business thus did not itself commit the Plan to pay *any* fees— excessive or otherwise—to Wachovia.[15]

**D.    Plaintiffs' Monitoring And Co-Fiduciary Claims In Counts II And VI Derive From Plaintiffs' Other Claims And Are Legally Baseless.**

Counts II and VI assert causes of action that derive from Plaintiffs' other

---

[13] *See also, Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998) ("courts have typically distinguished between employer actions that constitute 'managing' or 'administering' a plan and those that are said to constitute merely 'business decisions' that have an effect on an ERISA plan; the former are deemed 'fiduciary acts' while the latter are not").

[14] The other Defendants, lacking even alleged control over that decision, were not acting in *any* capacity at all.

[15] Plaintiffs' excessive fee allegations fail on their own terms in any event, as discussed *supra* at 26-27 (Count VII).

claims, and fall with them.  In Count II, Plaintiffs allege that the CBC Defendants

and Ameriprise had appointment and removal authority over the other fiduciary

Defendants and failed to adequately monitor their conduct.  (*See* Compl. ¶¶ 99-

105.)  But when fiduciaries have "compli[ed] with the terms of the plan and

statutory standards," their appointing fiduciary need not exercise its removal

authority.  29 C.F.R. § 2509.75-8 (2011) (DOL interpretive bulletin).  Courts thus

recognize that a claim for breach of the duty to monitor cannot proceed absent a

cognizable underlying breach of fiduciary duty.[16]  It is likewise well-settled that

co-fiduciary liability (alleged in Count VI) depends on an underlying violation.[17]

Lacking the requisite predicates, *see supra* at 13-16, Counts II and VI fail.

Count II suffers from a pleading deficiency as well—the duty to monitor

extends only to the appointing fiduciary.[18]  But the complaint does not establish

that Ameriprise and the CBC Defendants had appointment authority obligating

---

[16] *See, e.g.*, *Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010); *In re Citigroup ERISA Litig.*, 662 F.3d 128, 145 (2d Cir. 2011); *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003); *Pedraza v. Coca-Cola Co.*, 456 F. Supp. 2d 1262, 1277-78 (N.D. Ga. 2006); *In re Calpine Corp. ERISA Litig.*, No. C-03-1685-SBA, 2005 U.S. Dist. LEXIS 9719, at *19-*20 (N.D. Cal. Mar. 31, 2005).

[17] *See, e.g.*, *In re Citigroup ERISA Litig.*, 662 F.3d at 145 ; *In re Harley-Davidson, Inc. Securities Litig.*, 660 F. Supp. 2d 953, 968-69 (E.D. Wis. 2009); *In re Sears, Roebuck & Co. ERISA Litig.*, No. 02-C-8324, 2004 U.S. Dist. LEXIS 3241, at *23-*24 (N.D. Ill. Mar. 3, 2004); *In re Coca-Cola Enters. ERISA Litig.*, No. 1:06-CV-0953 (TWT), 2007 U.S. Dist. LEXIS 44991, at *50 (June 20, 2007).

[18] *See, e.g.*, *Martin v. Feilen*, 965 F.2d 660, 669-70 (8th Cir. 1992); *Howell v. Motorola, Inc.*, 633 F.3d 552, 562 (7th Cir. 2011), *cert. denied*, 2011 U.S. LEXIS 6964 (2011); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996).

them to monitor the committees charged with overseeing the Plan.  Plaintiffs do not allege *any* appointment authority over the Investment Committee.  Nor could they.  The Investment Committee's membership has always been dictated by the Plan's terms, which identify the members by corporate title.  (*See, e.g.*, Ex. 7, 2005 Plan Document § 10.1; Ex. 10, 2010 Plan Document § 10.1.)

And Plaintiffs' allegation that the Defendants exercised appointment authority over EBAC (Compl. ¶¶ 30, 37) is substantially contravened by the Plan documents: since January 1, 2007, EBAC's membership also has been dictated by job title, per the Plan's terms.  (*See* Ex. 8, 2007 Plan Document § 10.1.)  While the CBC Defendants briefly had the power to appoint EBAC's members before then (Ex. 7, 2005 Plan Document § 10.1, at 50), the complaint alleges *nothing* about the CBC's monitoring process and the supposed shortcomings in it, resting instead on nonspecific alleged "failings."  (Compl. ¶ 103.)  As other courts faced with nothing more than conclusory monitoring claims have recognized, "formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555; *see Crocker v. KV Pharm.l Co.*, 782 F. Supp. 2d 760, 787-88 (E.D. Mo. 2010) (dismissing monitoring claim that "failed to plead sufficient facts"); *Balsley v. Delta Star Emp. Stock Ownership*, No. C09-2952-THE, 2009 WL 4823196, at *6 (N.D. Cal. Dec. 10, 2009) (same).

**E.     Plaintiffs' Non-Statutory Claim For Unjust Enrichment Alleged
In Count VIII Contravenes ERISA's Enforcement Scheme And
Should Be Dismissed.**

In Count VIII, Plaintiffs abandon all pretense of fitting their allegations

within ERISA's borders and propose a new-fangled federal common-law ERISA

cause of action for "unjust enrichment."  (*See* Compl. ¶¶ 145-51.)  But as the

Eighth Circuit has recognized, ERISA's "carefully crafted and detailed

enforcement scheme provides strong evidence that Congress did not intend to

authorize other remedies."  *Travelers Casualty v. IADA Servs., Inc.*, 497 F.3d 862,

865 (8th Cir. 2007) (quotation omitted).  Courts therefore generally do not tinker

with ERISA's enforcement scheme "by extending remedies not specifically

authorized by its text."  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S.

204, 209 (2002) (quotation omitted).  Accordingly, courts have rejected efforts,

like Plaintiffs', to graft an unjust enrichment remedy on the statute.  *See, e.g.*,

*Protective Life Ins. Co. v. Kemp*, No. 4:06-CV-112, 2006 U.S. Dist. LEXIS 35328,

at *8 (E.D. Mo. May 31, 2006) (quoting *Knudson* in dismissing federal common

law claim for unjust enrichment).

Indeed, the creation of new common law ERISA claims is particularly

unjustified when Congress has already addressed the particular harm.  *See, e.g.*,

*See Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1018 (3d Cir. 1997) ("Because

[the plaintiff] brought a claim under § 502(a)(3), the district court correctly

dismissed his federal common law unjust enrichment claim because it was not needed to fill in interstices of ERISA." (quotation omitted)).  ERISA § 502(a)(2) and (a)(3) specifically authorize remedies against persons who cause plan losses or profit at a plan's expense, 29 U.S.C. § 1132(a)(2), (a)(3).  Plaintiffs rely on those provisions to bring their *other* statutory claims.  (*See* Compl. ¶¶ 97, 105, 111, 120, 128, 134, 143.)  But § 502(a)(2) and (a)(3) are expressly bounded: section 502(a)(2) requires a breaching fiduciary, while § 502(a)(3) allows only "appropriate equitable relief."  *See, e.g.*, *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 254 (2008) (§ 502(a)(2) limited to particular fiduciary breaches); *Knudson*, 534 U.S. at 209 (appropriate equitable relief means "*something* less than *all* relief" (quotation omitted)).  Plaintiffs' effort to upset that balance, with a catch-all unjust enrichment remedy giving them a claim even if their statutory causes of action fall short, impermissibly "tamper[s] with [the] enforcement scheme embodied in the statute," *Knudson*, 534 U.S. at 209 (quotation omitted), and should be rejected.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiffs' complaint be dismissed.

Dated:  January 17, 2012          O'MELVENY & MYERS LLP

                                  By:   s/ Benjamin G. Bradshaw
                                        Benjamin G. Bradshaw (admitted *pro hac vice*)
                                        bbradshaw@omm.com
                                        Shannon Barrett (admitted *pro hac vice*)
                                        sbarrett@omm.com
                                  1625 Eye Street, N.W.
                                  Washington, D.C. 20006
                                  Telephone: (202) 383-5300
                                  Facsimile: (202) 383-5414

                                        and

                                  DORSEY & WHITNEY LLP
                                        Stephen P. Lucke (#154210)
                                        lucke.steve@dorsey.com
                                        Kirsten E. Schubert (#0388396)
                                        schubert.kirsten@dorsey.com
                                  50 South Sixth Street, Suite 1500
                                  Minneapolis, MN 55402-1498
                                  Telephone: (612) 340-2600
                                  Facsimile: (612) 340-2868

                                  *Attorneys for Defendants*
                                  *Ameriprise Financial, Inc. et al.*