## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Roger Krueger; Jeffrey Olson; Edward Pope; Deborah Tuckner; Bernice Hillukka; Susan Wones; and Margene Bauhs, individually and as representatives of a class of similarly situated persons, and on behalf of the Ameriprise Financial 401(k) Plan, | Case No. 11-CV-02781 (SRN/JSM) |
| Plaintiffs, | |
| v. | CLASS ACTION COMPLAINT |
| Ameriprise Financial, Inc.; Ameriprise Financial, Inc. Employee Benefits Administration Committee; Michelle Rudlong; Ameriprise Financial, Inc. 401(k) Investment Committee; Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc.; Ira D. Hall; Warren D. Knowlton, W. Walker Lewis; Siri S. Marshall; Jeffrey Noddle; Richard F. Powers III; Robert F. Sharpe, Jr.; John Does 1-60; Jeffrey P. Fox; Phil Wentzel; Jeffrey A. Williams; Martin S. Solhaug; Kristi L. Peterson; Timothy V. Bechtold; and Brent Sabin. | JURY TRIAL DEMANDED ON ALL COUNTS AND ISSUES SO TRIABLE |
| Defendants. | |

## FIRST AMENDED COMPLAINT

1.     Plaintiffs Roger Krueger, Jeffrey Olson, Edward Pope, Deborah Tuckner, Bernice Hillukka, Susan Wones, and Margene Bauhs, individually and as representatives of a class of similarly situated persons, bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3) on behalf of the Ameriprise Financial 401(k) Plan against Defendants Ameriprise Financial, Inc., the

1

Ameriprise Financial, Inc. Employee Benefits Administration Committee and the members and delegates thereof, Michelle Rudlong, the Ameriprise Financial, Inc. 401(k) Investment Committee and the members and delegates thereof, the Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc. and the members and delegates thereof, Ira D. Hall, Warren D. Knowlton, W. Walker Lewis, Siri S. Marshall, Jeffrey Noddle, Richard F. Powers III, Robert F. Sharpe, Jr., John Does 1-60, Jeffrey P. Fox, Phil Wentzel, Martin S. Solhaug, Jeffrey A. Williams, Kristi L. Peterson, Timothy V. Bechtold, and Brent Sabin for breach of fiduciary duties and state the following as their cause of action.

## JURISDICTION AND VENUE

2.      This court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

3.      This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

## PARTIES

### Ameriprise Financial 401(k) Plan

4.      The Ameriprise Financial 401(k) Plan (the "Plan") is sponsored by Ameriprise Financial, Inc. ("Ameriprise").

5.      The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. §1002(2).

6.      The Plan is an "individual account plan" or "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

2

7.      The Plan is a qualified plan under 26 U.S.C. § 401 and is commonly referred to as a "401(k) Plan".

8.      The Plan was established on October 1, 2005.

9.      The Plan covers eligible employees and retirees of Ameriprise and its subsidiaries and affiliates.

10.     Ameriprise Trust Company ("ATC") was the trustee and record-keeper of the Plan through March 31, 2007.

11.     Effective April 1, 2007, following the sale of ATC to Wachovia Bank, the Plan's trustee and record-keeper became Wachovia Bank, NA ("Wachovia").

12.     Wachovia became a part of Wells Fargo & Company effective December 31, 2008.

**Plaintiffs**

13.     Plaintiff Roger Krueger resides in Plymouth, Minnesota and has been a participant in the Plan from October 1, 2005 to the present.

14.     Plaintiff Jeffrey Olson resides in Maple Grove, Minnesota and was a participant in the Plan from at least 2007 through 2010 and is entitled to additional benefits from the Plan based upon the allegations of this action.

15.     Plaintiff Edward Pope resides in Richfield, Minnesota and was a participant in the Plan from October 1, 2005 through at least 2009 and is entitled to additional benefits from the Plan based upon the allegations of this action.

16.     Plaintiff Deborah Tuckner resides in Lake Elmo, Minnesota and has been a participant in the Plan from October 1, 2005 to the present.

17.     Plaintiff Bernice Hillukka resides in Plymouth, Minnesota and was a participant in the Plan from October 1, 2005 through 2011 and is entitled to additional benefits from the Plan based upon the allegations of this action

18.     Plaintiff Susan Wones resides in Andover, Minnesota and was a participant in the Plan from October 1, 2005 until at least 2010 and is entitled to additional benefits from the Plan based upon the allegations of this action.

19.     Plaintiff Margene Bauhs resides in Chaska, Minnesota and has been a participant in the Plan from October 1, 2005 to the present.

**Defendants**

20.     Defendant the Ameriprise Financial, Inc. Employee Benefits Administration Committee (hereafter "EBAC" including its members and delegates described below) has administered the Plan from October 2005 to the present. EBAC members were appointed and supervised by Defendant the Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc. and its members, including Ira D. Hall, Warren D. Knowlton, W. Walker Lewis, Siri S. Marshall, Jeffrey Noddle, Richard F. Powers III and Robert F. Sharpe, Jr from 2005 to 2006. Since 2007, the members of the EBAC are designated as certain corporate officers of Ameriprise and/or one or more of its subsidiaries, including the Vice President Compensation Benefits, the senior most Human Resources Generalist, the Vice President Investment Accounting, the Vice President Finance, and the senior most Client Service Organization executive.

21.     EBAC was and is the "administrator" of the Plan under 29 U.S.C. § 1002(16)(A) and is a fiduciary of the Plan under 29 U.S.C. § 1002(21).

22.     EBAC is also a fiduciary of the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

23.     The members of the EBAC and any individual or entity to whom it delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiffs, are fiduciaries of the Plan under 29 U.S.C. § 1002(21) also because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. The following Defendants, on information and belief, have served as members of the EBAC at times relevant herein and thus are fiduciaries to the Plan:

     a.     Jeffrey P. Fox, as Vice President, Investment Accounting of Ameriprise Financial, Inc.;

     b.     Phil Wentzel, as Vice President, Finance of Ameriprise Financial, Inc..; and

     c.     Martin S. Solhaug, as Vice President Compensation and Benefits.

Because Plaintiffs are currently unaware of all of the identities of the individual members of the EBAC, those individuals are collectively named as John Does 1-10.  Plaintiffs will substitute additional real names of the John Does when they are known to Plaintiffs.

24.     Defendant Michelle Rudlong, upon information and belief, is or was the Director, Retirement & Deferred Compensation Benefits at Ameriprise. Further, and upon information and belief, Rudlong was a delegate of the EBAC. Further, and upon information and belief, Rudlong signed the Plan's Form 5500's, filed with the Department of Labor, as a delegate of the plan

administrator, or EBAC. Further, and upon information and belief, Rudlong is a fiduciary of the Plan under 29 U.S.C. § 1002(21) also because she exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

25.     Because Plaintiffs are currently unaware of the identities and capacities of the individuals and entities that have been delegated fiduciary functions by the EBAC, those individuals are collectively named as John Does 11-20.  Plaintiffs will substitute the real names of the John Does when they are known to Plaintiffs.

26.     Defendant the Ameriprise Financial, Inc. 401(k) Investment Committee ("Investment Committee" including its members and delegates described below) has had responsibility for the selection and monitoring of the Plan's investment options at all times relevant herein. The Investment Committee also was delegated and exercised its responsibility to direct the manner in which investment options unique to the Plan were invested. The members of the Investment Committee are designated as certain corporate officers of Ameriprise and/or one or more of its subsidiaries, including the Senior Vice President Cross-Sell/Strategic Management, the Vice President International Global Compensation & Benefits, the Senior Vice President LEO-Finance, the Vice President One Account and Cash, and the Vice President Insurance Products.

27.     The Investment Committee is a fiduciary of the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

28.     The members of the Investment Committee and any individual or entity to whom it delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiffs, are fiduciaries of the Plan under 29 U.S.C. § 1002(21) also because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. The following Defendants, on information and belief, have served as members of the Investment Committee at the times relevant herein and thus are fiduciaries to the Plan:

    a.     Jeffrey A. Williams, as Senior Vice President Cross-Sell/Strategic Management of Ameriprise Financial, Inc.;

    b.     Martin S. Solhaug, as Vice President Compensation and Benefits of Ameriprise Financial, Inc.;

    c.     Kristi L. Peterson, as Vice President One Account and Cash of Ameriprise Financial, Inc.; and

    d.     Timothy V. Bechtold, as Vice President Insurance Products of Ameriprise Financial, Inc.

29.     Because Plaintiffs are currently unaware of all of the identities of the individual members of the Investment Committee, those individuals are collectively named as John Does 21-30.  Plaintiffs will substitute additional real names of the John Does when they are known to Plaintiffs.

30.     Defendant Brent Sabin, upon information and belief, is or was the Vice President, Benefits at Ameriprise Financial, Inc. Further, and upon information and belief, Sabin was a delegate of the EBAC and the Investment Committee. Further, and upon information and belief,

Sabin was Secretary of both the EBAC and the Investment Committee at times relevant herein. Sabin is a fiduciary of the Plan under 29 U.S.C. § 1002(21) also because he exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

31.     Because Plaintiffs are currently unaware of all of the identities and capacities of the individuals and entities that have been delegated fiduciary functions by the Investment Committee, those individuals are collectively named as John Does 31-40.  Plaintiffs will substitute additional real names of the John Does when they are known to Plaintiffs.

32.     Defendant the Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc. (the "CBC" including its members and delegates described below) is, upon information and belief, appointed by Ameriprise's Board of Directors. The CBC is a fiduciary of the Plan because it appoints, supervises, and removes the members of the EBAC.

33.     Upon information and belief, the CBC, the members of the CBC, and any individual or entity to whom it has delegated any of its fiduciary functions, have exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries of the Plan under 29 U.S.C. § 1002(21).

34.     The following Defendants, on information and belief, have served as members of the CBC at the times relevant herein:

a.     Ira D. Hall;

b.     Warren D. Knowlton;

8

      c.      W. Walker Lewis;

      d.      Siri S. Marshall;

      e.      Jeffrey Noddle;

      f.      Richard F. Powers III; and

      g.      Robert F. Sharpe, Jr.

35.     Because Plaintiffs are currently unaware of the identities of any additional members of the CBC, those individuals are collectively named as John Does 41-50.  Plaintiffs will substitute the real names of the John Does when they are known to Plaintiffs.

36.     Because Plaintiffs are currently unaware of the identities and capacities of the individuals or entities that have been delegated fiduciary functions by the CBC, those individuals are collectively named as John Does 51-60.  Plaintiffs will substitute the real names of the John Does when they are known to Plaintiffs.

37.     Defendant Ameriprise Financial, Inc. ("Ameriprise") is the Plan sponsor and a party in interest to the Plan under 29 U.S.C. § 1002(14).

38.     Further, and upon information and belief, Ameriprise also provided trustee, record-keeping, and administrative services to the Plan, and was thus a fiduciary to the Plan, under 29 U.S.C. § 1002(21), because it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

39.     Ameriprise, acting by and/or through its Board of Directors, including the CBC, is a fiduciary within the meaning of ERISA, and thus subject to the fiduciary standard of care, because it appoints and removes the members of the EBAC that administers the Plan.

40.     Further, and upon information and belief, Ameriprise, acting by and/or through its Board of Directors, including the CBC, exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. As such, Ameriprise, the Board of Directors, the CBC, and its members are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

41.     Ameriprise, at all applicable times, on information and belief, has exercised control over the activities of its employees, internal departments and subsidiaries that performed fiduciary functions with respect to the Plan, and, on information and belief, can hire or appoint, terminate, and replace such employees at will. Ameriprise is, thus, liable for the fiduciary breaches alleged herein of its employees, internal departments and subsidiaries.

42.     Finally, Ameriprise, as a corporate entity, cannot act on its own without any human counterpart. In this regard, on information and belief, Ameriprise relied directly on the other Defendants, named herein, to carry out its fiduciary responsibilities under the Plan and ERISA and the acts of Ameriprise's officers and employees alleged herein are the acts of Ameriprise.

**Ameriprise Entities**

43.     Ameriprise is a holding company incorporated in Delaware that does business primarily through its subsidiaries.

44.     Ameriprise was previously a subsidiary of American Express Company known as American Express Financial Corporation.

45.     RiverSource Investments, LLC ("RiverSource") n/k/a Columbia Management Investment Advisers, LLC ("Columbia") is a subsidiary of Ameriprise, a related party to

Ameriprise, and served as investment adviser for Ameriprise's Columbia, RiverSource, Seligman, and Threadneedle investment products.

46.    Following the completion of the acquisition of the long-term asset management business of Columbia Management from Bank of America in April 2010, RiverSource was combined with Columbia, under the Columbia brand.

47.    RiverSource Fund Distributors, Inc. n/k/a Columbia Management Investment Distributors, Inc. is a subsidiary of Ameriprise, a related party to Ameriprise, and a broker-dealer that serves as the principal underwriter and distributor for Ameriprise's Columbia, RiverSource, Seligman, and Threadneedle investment products.

48.    RiverSource Service Corporation n/k/a Columbia Management Investment Services Corp. is a subsidiary of Ameriprise, a related party to Ameriprise, and a transfer agent that processes client transactions for Ameriprise's Columbia, RiverSource, Seligman, and Threadneedle investment products.

49.    Ameriprise Financial Services, Inc. is a subsidiary of Ameriprise and a registered broker-dealer and registered investment adviser.

50.    Ameriprise Retirement Services was and/or is a service group of ATC and Ameriprise Financial Services, Inc.

51.    Additional subsidiaries of Ameriprise include: Ameriprise Financial Services, Inc., Columbia Management Investment Advisors LLC, Columbia Management Investment Services Corp., Ameriprise Trust Company, Ameriprise Bank, FSB, RiverSource Distributors, Inc., J.&W. Seligman & Co., Incorporated, Columbia Management Investment Distributors, Inc., Threadneedle Investments North American LLC, and Columbia Wanger Asset Management, LLC.

52.     Numerous executives of Ameriprise simultaneously served as executives of Ameriprise subsidiaries. For example, Ward D. Armstrong, the Senior Vice President Retirement Services of Ameriprise, was also the Director and Chairman of the Board of ATC, as well as being the Director and Senior Vice President of RiverSource. Additionally, Jacqueline M. Sinjem, the Vice President Plan Sponsor Services of Ameriprise, was also a Vice President of ATC.

**THE PLAN'S INVESTMENTS**

53.     There is no shortage of reasonably priced and well-managed investment options in the 401(k) plan marketplace.

54.     Despite the many investment options available in the market, the Plan has invested hundreds of millions of dollars in mutual funds managed by Ameriprise subsidiaries RiverSource and Columbia (all such funds will be referenced herein as RiverSource regardless of their later name change to Columbia), as well as, commingled trusts managed by ATC. These investment options were chosen because they were managed by, paid fees to, and generated profits for Ameriprise, its subsidiaries, and Wachovia.

55.     The following RiverSource Mutual Funds were included as investment options in the Plan:

    a.     RiverSource Balanced Fund (renamed the Columbia Balanced Fund) ("Balanced Fund");

    b.     RiverSource Diversified Bond Fund (renamed the Columbia Diversified Bond Fund) ("Div. Bond");

    c.     RiverSource Disciplined Equity Fund (renamed Columbia Large Core Quantitative Fund) ("Disp. Equity");

d.      RiverSource Diversified Equity Income Fund (renamed Columbia Diversified Equity Inc. Fund) ("Div. Equity");

e.      RiverSource Global Balanced Fund (later merged into RiverSource Balanced Fund ("Global Balanced");

f.      RiverSource Mid Cap Growth Fund (renamed Columbia Mid Cap Growth Opportunity Fund) ("Mid Growth");

g.      RiverSource Mid Cap Value Fund (renamed Columbia Mid Cap Value Opportunity Fund) ("Mid Value");

h.      RiverSource New Dimensions Fund ("New Dimension");

i.      RiverSource Stock Fund ("Riv. Stock Fund");

j.      Columbia Contrarian Core Fund ("Contrarian");

k.      RiverSource 2010 (renamed Columbia Retirement Plus 2010); RiverSource 2015 (renamed Columbia Retirement Plus 2015); RiverSource 2020 (renamed Columbia Retirement Plus 2020); RiverSource 2025 (renamed Columbia Retirement Plus 2025); RiverSource 2030 (renamed Columbia Retirement Plus 2030); RiverSource 2035 (renamed Columbia Retirement Plus 2035); RiverSource 2040 (renamed Columbia Retirement Plus 2040); and RiverSource 2045 (renamed Columbia Retirement Plus 2045) (collectively "Target Date Funds").

56.     The Plan's investments, in which Ameriprise's employees would place their retirement assets, were chosen and retained by or at the direction of Investment Committee and/or, upon information and belief, initially by the CBC and its individual members.

57.     The Plan's investment in RiverSource and ATC managed investments averaged approximately $500,000,000 per year from October 1, 2005 to the present.

58.     The RiverSource Mutual Funds generated millions of dollars in fees for RiverSource, RiverSource Fund Distributors, Inc., and RiverSource Service Corporation, who also diverted a portion of those fees to ATC and other subsidiaries of Ameriprise, all of which fees ultimately provided a financial benefit to Ameriprise.

59.     Defendants hired ATC to be the Plan trustee and record-keeper without, Plaintiffs believe, any competitive bidding process, and even though other entities could have provided the same services at a lower cost to the Plan. Hiring ATC, however, provided a financial benefit to Ameriprise. Ameriprise also profited from later selling its defined contribution record-keeping business, which included recordkeeping their own employees' retirement assets for a fee, to Wachovia in 2006.

60.     The fees paid by the Plan, and Ameriprise employees and retirees, to ATC for recordkeeping, added to the income Ameriprise received for selling its recordkeeping business to Wachovia.

61.     At all times relevant herein, the RiverSource mutual funds in the Plan charged and continue to charge Plan participants and beneficiaries fees that were and are unreasonable for this Plan. The expense ratios of the funds when first included in the Plan is shown in Column B, below. For RiverSource funds that are current Plan investment options, the expense ratio at the end of 2010 is shown in Column C, below. The fees were and are significantly higher than the median fees for comparable mutual funds in 401(k) plans as reported by the Investment Company Institutes, in *The Economics of Providing 401(k) Plans: Services, Fees and Expenses* and by BrightScope, Inc., an independent provider of 401(k) ratings and data, based on its review

of 1,667 large 401(k) plans reported in *Real Facts about Target Date Funds*. The fees, moreover, are and were significantly higher than the fees available from alternative mutual funds, including Vanguard Institutional Funds with similar investment styles that were readily available as Plan investment options throughout the time relevant herein. The amount of excess compared to the fees charged by comparable Vanguard Institutional Funds at the time each option was added to the Plan is shown in Column D below, and the same comparison as of the end of 2010 is shown in Column E for those funds still in the Plan at that time. Measuring fees in basis points ("bps") (where one basis point equals 0.01%):

| Fund | B<br>Fee at Fund Selection | C<br>2010 Fee | D<br>Excess Over Vanguard, 2005 | E<br>Excess Over Vanguard, 2010 |
|---|---|---|---|---|
| **Div. Bond** | 73 bps | 78 bps | 65 bps | 71 bps |
| **Disp. Equity** | 108 bps | 85 bps | 102 bps | 77 bps |
| **Global Balanced** | 134 bps | N/A | 127 bps | N/A |
| **Mid Growth** | 100 bps | 110 bps | 92 bps | 102 bps |
| **Riv. Stock Fund** | 77 bps. | N/A | 68 bps | N/A |
| **New Dimension** | 79 bps | N/A | 70 bps | N/A |
| **Contrarian** | 94 bps (2011) | N/A | N/A | 86 bps (2011) |
| **Balanced Fund** | 85 bps | 102 bps | 77 bps | 94 bps |
| **Target Date Funds** | 94 bps | 84-92 bps | 74 bps (2006) | 74 bps |
| **Div. Equity** | 91 bps | 91 bps | 83 bps | 85 bps |
| **Mid Value** | 97 bps | 90 bps | 89 bps (2009) | 82 bps |

62.     Defendants used the R4 share class of the RiverSource Mutual Funds, even though Defendants could have used the Mutual Funds' R5 share class, which charged fees 17-34 bps lower than the R4 share class, depending on the Fund, for identical investment management.

63.     In so doing, Defendants forced the Plan to pay up to 25 bps for "Plan Administrative Services" as well as, upon information and belief, an additional service fee of up to 10 bps. These fees were ultimately paid to Ameriprise subsidiaries, including ATC. After Wachovia became the recordkeeper of the Plan, some of these additional fees were also paid to Wachovia.

64.     Other shareholders, outside of the Plan, invested in the R4 share class under terms far more favorable than those provided to Plan participants.  A portion of the fees charged to those other R4 shareholders were rebated or used to directly offset administrative fees and expenses in their plans, thus reducing their administrative liabilities. This direct benefit was unavailable to the Plan's participants because they did not receive such an offset.

65.     In contrast, fee rebates for the Plan's investments in the R4 share class were retained by ATC, Ameriprise, or Wachovia without crediting the Plan.

66.     Upon information and belief, even after merging with the Columbia Funds, the Plan's mutual fund investment options continue to pay sub-accounting and other fees.

67.     Additionally, each mutual fund charged fees in excess of what the Plan could have obtained by purchasing comparable separately managed accounts, even ones purchased from the same RiverSource investment managers managing the Plan's RiverSource mutual funds. As the Department of Labor reports, for plans like Ameriprise's the "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." *Study of 401(k) Plan Fees and Expenses*, April 13, 1998.

68.     Defendants' proprietary mutual funds had a poor or nonexistent performance history at the time it was initially selected as a Plan investment option. Measuring that underperformance in basis points ("bps"): (1) the 2005 prospectus for the Disciplined Equity Fund reports trailing 1 year performance 62 bps (0.62%) below its benchmark; (2) the 2005 prospectus for the RiverSource Stock Fund reports trailing 1 year performance 422 bps (4.22%) below its benchmark; (3) the 2005 prospectus for the New Dimensions Fund reports trailing 1 year performance 705 bps (7.05%) below its benchmark; (4) the 2004 prospectus for the Balanced Fund reports trailing 1 year performance 989 bps (9.89%) below its benchmark; (5) the 2005 prospectus for the Global Balanced Fund reports trailing 1 year performance 1262 bps (12.62%) below its benchmark; (6) the 2005 prospectus for the Diversified Bond Fund reports trailing 5 year performance 175 bps (1.75%) below its benchmark. Additionally, the Mid-Cap Growth Fund underperformed its peer group in both 2004 and 2005; and the Mid-Cap Value Fund underperformed both its benchmark and its peer group in 2008, the year before it was added to the Plan.

69.     The RiverSource Funds in the Plan were poorly rated by Morningstar, the independent rating service, compared to prudent alternatives the Investment Committee could have chosen for inclusion in the Plan. For example, in October, 2005 the RiverSource Balanced Fund was rated a 1-star fund (their lowest rating, out of 5 stars) while the equivalent Vanguard Balanced Index Fund was given a 4-star rating. The RiverSource Diversified Bond Fund, RiverSource Stock Fund, and RiverSource Global Balanced Funds had 2-star ratings even though 4 and 5 star alternatives were available for each fund, such as the Vanguard Total Stock Market Index Fund (4 stars), and the Vanguard Total Bond Market Fund (4 stars). The RiverSource New Dimensions Fund and RiverSource Mid Cap Growth Fund held 3-stars ratings

by Morningstar in October, 2005 even though, again, 4 and 5 star alternatives were readily

available, such as the Vanguard Total Stock Market Index Fund (4 stars).

70.     The web based investment application MyPlanIQ has rated the Plan's investments in

the bottom 2 percent of defined contribution plans with respect to fund quality. To make that

determination, MyPlanIQ analyzed the risk adjusted returns of each of the funds available in the

Plan.

71.     Prudent investors also fled RiverSource Funds. In 2005 RiverSource stock and bond

funds had outflows of $9.3 billion. In 2006, an additional $6.9 billion in assets were pulled from

RiverSource funds.

72.     In 2006, the Investment Committee added eight target date funds to the Plan. At the

time, the three largest target date fund families were Vanguard, Fidelity and T.Rowe Price,

which had expense ratios of 20 bps, 76 bps and 76 bps, respectively. All three funds had proven

track records. Nevertheless, the Investment Committee again chose to use the in house

Ameriprise/RiverSource target date fund family, called RiverSource Retirement Plus, even

though those funds had ***no*** performance history (because the Plan was the first investor in the

Funds) and charged fees over 90 bps, and as high as 94 bps.

73.     The RiverSource Retirement Plus funds did not directly invest in stocks, bonds or

money markets but, rather, were required to and did invest their assets in ***other*** RiverSource

mutual funds. The fees charged to investors in the RiverSource Retirement Plus funds included

not only the unreasonable fees of the underlying mutual funds in which the RiverSource Funds

invested, but also an ***additional*** layer of fees for the benefit of ATC and RiverSource, which was

unreasonable and excessive, particularly in light of the profits RiverSource received from the

underlying fund fees.

74.     The dominant target date alternative fund families, Vanguard, Fidelity and T.Rowe Price, did not charge an additional layer of fees in the cheapest share classes of their target date funds.

75.     By investing in the R4 share class of the RiverSource Retirement Plus funds, Defendants caused the RiverSource Retirement Plus funds in the Plan to pay more than double the additional fees RiverSource received for managing the funds compared to what they would have paid had they been allowed to invest in the R5 share class.

76.     The underlying RiverSource funds selected for the RiverSource Retirement Plus funds had poor risk adjusted returns. The average Morningstar rating of the underlying funds was 2.31 stars, second lowest of the 28 target date fund families Morningstar evaluated.

77.     Soon after their creation and addition to the Plan, the RiverSource Retirement Plus Funds were widely known among investment professionals as poor investment choices. For example, a joint report prepared by Plan Sponsor and Target Date Analytics, LLC measuring the fees, performance, risk and organization of 38 target date fund families as of December 31, 2007, including the dominant alternatives of Vanguard, Fidelity and T.Rowe Price, gave Riversource grades of "D" for both Organization and Fees & Expenses while Vanguard, Fidelity and T.Rowe Price were given grades of "A", "B" and "B" respectively. This is even more striking because the report graded the cheapest share class of the RiverSource Retirement Plus Funds, the R5 share class, but Defendants included the more expensive R4 share class in the Plan.

78.     The Plan was the first investor in the Funds, and, accordingly, Ameriprise used the retirement assets of Ameriprise employees to seed new and untested mutual funds, which made those funds more marketable to outside investors, thus increasing profits for RiverSource and its parent, Ameriprise.

79.    Because they had no performance histories, the RiverSource Retirement Plus funds did not have Morningstar ratings.

80.    ATC managed various non-mutual fund investment options in the Plan, including the RiverSource Trust Equity Income Fund III, RiverSource Trust Small Cap Equity Index I, RiverSource Trust Long-Term Horizon Fund, RiverSource Trust Medium-Term Horizon Fund, RiverSource Trust Short-Term Horizon Fund and the Income Fund. Each of these non-mutual fund investment options paid fees to Ameriprise and ATC.

81.    Upon information and belief, each of the ATC managed options invested some or all of their assets in RiverSource mutual funds. For example, the Income Fund invested in the RiverSource Trust U.S. Government Securities Fund, the RiverSource Trust Government Income Fund, and the RiverSource Trust Stable Capital Fund. Additonally, each of the Horizon Funds invested in multiple Ameriprise affiliated mutual funds and non-mutual funds. Upon information and belief, Plan assets were invested in RiverSource options which ATC chose for these collective trusts had fees at least twice those of comparable prudent alternatives, such as Vanguard.

82.    ATC (and, later, Wachovia) also received profits from the management of assets in the Income Fund by, among other things, paying a lower interest / dividend rate than the assets should have earned given the risk characteristics of the investment.

83.    Additionally, plan participants invested a portion of their 401(k) assets in a Self-Managed Brokerage Account ("SMBA").

84.    The SMBA included a limited group of funds which, upon information and belief, were allowed into the SMBA only if they agreed to rebate a portion of their fees to RiverSource and/or ATC. The options in the SMBA charged fees far higher than those available to

institutional investors, such as the Plan, in addition to charging annual account maintenance fees and transfer fees.

85.     Prior to January, 2011, Ameriprise was trustee to the SMBA. After January 2011, Charles Schwab became the trustee of the SMBA.

86.     Before the switch, participants were not permitted to make contributions directly into the mutual funds in the SMBA. Instead, participants had to accumulate assets in the "core" investment options and transfer those assets once they had accumulated $3,000 (for the initial deposit) and $500 (for subsequent transfers). For most transfers, participants were charged a $39.95 transfer fee, in addition to a $25 annual account maintenance fee and the retail-level fees charged by the options in the SMBA. Since there are over 5000 mutual funds available to individual investors outside of the Plan, Defendants' inclusion of only 900 of those funds in the SMBA indicates, and Plaintiffs allege, that those funds were selected not because of their inherent reasonableness and prudence for the Plan, but because those funds paid kickbacks or other compensation to one or more Defendants, or other subsidiaries of Ameriprise, that ultimately benefitted Ameriprise but not the participants and beneficiaries.

87.     The transfer fee and annual account maintenance fees were also paid to Ameriprise and its subsidiaries.

88.     According to the Plan's SPD, "The fees of the Trustee are paid by the Company". Upon information and belief, the fees of the trustee were not paid by Ameriprise. Rather, they were paid by Plan participants through the expense ratios of the mutual funds in the Plan.

89.     Both before and after the SMBA moved to Charles Schwab, participants were not permitted to take withdrawals directly from the SMBA. Instead, a participant wishing to get take

SMBA-invested money out of the Plan had to first move to a core investment option within the Plan. This requirement was not in the interest of, or for the benefit of, participants.

90.     After the switch, Plan participants still were not allowed to invest directly into the options in the SMBA with the regular contributions. Additionally, many services, such as loans to participants, were not allowed from the SMBA. Instead, participants were required to place their money first in the core investment options.

91.     Plan participants invested significant assets in each of the "core" investment options in the Plan.  For example, by December 31, 2005 the following amounts were invested in each Plan option:

    a.      RiverSource New Dimensions Fund - $89,433,234;

    b.      RiverSource Diversified Bond Fund - $22,502,959;

    c.      RiverSource Balanced Fund - $22,150,651;

    d.      RiverSource Stock Fund - $48,033,778;

    e.      RiverSource Global Balanced Fund - $12,906,690;

    f.      RiverSource Mid Cap Growth Fund - $49,534,214;

    g.      RiverSource Trust Short-Term Horizon - $2,273,670;

    h.      RiverSource Trust Medium-Term Horizon - $24,559,147;

    i.      RiverSource Trust Long-Term Horizon - $13,719,528;

    j.      RiverSource Trust Small Cap Equity - $39,519,689;

    k.      RiverSource Trust Equity Index Fund - $38,008,535; and

    l.      Income Fund - $87,448,302.

92.     Tens of millions of dollars were also invested by Plan participants in the RiverSource Retirement Plus Funds, the RiverSource Diversified Equity Income Fund, the RiverSource

Disciplined Equity Fund, the Columbia Contrarian Core Fund and the RiverSource Mid-Cap Value Fund after they become available in the Plan.

93.     Plan participants invested less than 10 percent of the Plan's assets in the SMBA.

94.     During the six year history since the inception of the Plan and the original fund lineup, Defendants added 18 investment options to the Plan's core investments, of which 12 were managed by Ameriprise affiliates.

**ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS**

95.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

96.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  29 U.S.C. § 1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participants knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)        if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)        if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

97.    Under ERISA, fiduciaries that exercise discretionary authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

98.    The Department of Labor has explained:

> To act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Adv. Op. No. 88-16A.

99.    A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries.  As the Department of Labor repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

DOL Adv. Op. No. 98-04A; DOL Ad. Op. No. 88-16A.

100.    The general duties of loyalty and prudence imposed by 29 U.S.C. § 1004 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered "*per se*" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)     sale or exchange, or leasing, or any property between the plan and a party in interest;
>
> * * *
>
> (C)     furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) provides, in pertinent part, that:

> [A] fiduciary with respect to the plan shall not –
>
> (1)     deal with the assets of the plan in his own interest or for his own account,
>
> (2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse the interest of the plan or the interest of its participants or beneficiaries, or
>
> (3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

101.    ERISA's prohibited transaction provisions thus prohibit fiduciaries, such as the Defendants here, from causing plans to engage in transactions with the plan sponsor, here Ameriprise, including causing the plan to invest assets in the investment management and other products offered by a party in interest or plan fiduciary and the payment of investment management or other fees in connection with such investments.

25

102.     29 U.S.C. § 1132(a)(3) provides a cause of action against a party in interest, such as Ameriprise, for participating in the breach of a fiduciary.

103.     29 U.S.C. § 1105(a) provides a cause of action against a fiduciary, such as Ameriprise, for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

## CLASS ALLEGATIONS

104.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a).

105.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan from October 1, 2005 through date of judgment and to represent that class. This action is certifiable as a class action for the following reasons:

    a.    The Class includes over 10,000 members and is so large that joinder of all its members is impracticable.

    b.    There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and acted as alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the

Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action.

d.      Plaintiffs will adequately protect the interests of the Class because they have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class. Plaintiffs' attorneys have agreed to advance the costs of this action contingent upon the outcome and are aware that no fee can be awarded without the Court's approval.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a) and (B) adjudications by individual participants and beneficiaries regarding these breach of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore this action should be certified as a class action under Fed.R.Civ.P. 23(b)(1)(A) or (B).

106.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Fed.R.Civ.P. 23(b)(3) if it cannot be certified under Fed.R.Civ.P. 23(b)(1)(A) or (B).

## COUNT I

### Disloyalty and Imprudence.

107.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

108.    This Count alleges breach of fiduciary duties against each of the Defendants.

109.    As alleged above, the EBAC was the named fiduciary pursuant to 29 U.S.C. § 1102(a)(1), and each of the Defendants were fiduciaries within the meaning of 29 U.S.C. § 1002(21).

110.    Defendants are bound by the duties of loyalty, exclusive purpose, and prudence.

111.    As alleged above, the scope of the fiduciary duties and responsibilities of the Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Defendants are directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, evaluating the merits for the Plan's

investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

112.     Because of their poor or non-existent performance histories and high expenses relative to other investment options that were readily available to the Plan on and after October 2005, and because of the benefits those Mutual Funds provided to Ameriprise and its subsidiaries in selecting and retaining the RiverSource Mutual Funds as Plan investment options, and on Plaintiffs' information and belief failing to consider investment other than RiverSource Mutual Funds for these Plan investment options, Defendants did not discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan and instead acted for the purpose of benefitting Ameriprise through the revenues out of the Plan provided to Ameriprise subsidiaries. Defendants therefore breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A).

113.     Because of their poor or non-existent performance histories and high expenses relative to other investment options that were readily available to the Plan on and after October 2005, and because of the benefits those Mutual Funds provided to Ameriprise and its subsidiaries, in selecting and retaining the RiverSource Mutual Funds as Plan investment options, and on Plaintiffs' information and belief failing to consider investment other than RiverSource Mutual Funds for these Plan investment options, Defendants did not discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(B).

114.    Defendants failed to engage in a prudent process for the selection of Plan investment options. Instead, Defendants chose more expensive funds with inferior performance histories in order to generate revenue for RiverSource and ATC and ultimately to benefit Ameriprise. Such an investigation would have revealed to a reasonably prudent fiduciary that the RiverSource, and ATC managed investment options investing in RiverSource mutual funds, were imprudent and that the RiverSource mutual funds and all ATC managed investment options were selected for reasons other than the best interest of the Plan and plan participants and beneficiaries and were and are causing the Plan to waste tens of millions of dollars of participants' retirement savings.

115.    As a consequence of their breach of fiduciary duties alleged herein, Defendants caused the Plan to suffer over $20 million in losses as a result of the excessive fees and expenses of the RiverSource Mutual Funds (and ATC managed commingled trust that invested in RiverSource Mutual Funds) and in the underperformance of the Funds relative to prudent alternatives.

116.    Each Defendant is personally liable, and the Defendants are jointly and severally liable, under 29 U.S.C. § 1109(a) to make good to the Plan the losses to the Plan resulting from the aforementioned breaches and to restore to the Plan any profits of such Defendant made through the use of Plan assets. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

117.   Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendants are liable to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits they received as a result of the breaches of fiduciary duties alleged in this Count, and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Monitor Fiduciaries

118.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

119.   This Count alleges breach fiduciary duties against the following Defendants: The CBC and its members and delegates (collectively the "CBC Defendants"), and Ameriprise (collectively the "Monitoring Defendants").

120.   As alleged above, the Monitoring Defendants are fiduciaries pursuant to 29 U.S.C. § 1002(21). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

121.   As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants includes the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries.

122.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

123.   The Monitoring Fiduciaries breached their fiduciary monitoring duties by, among other things:

a.     failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the Plan;

b.     failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the widespread use of proprietary funds from which RiverSource/Ameriprise received profits in violation of ERISA;

c.     failing to ensure that the monitored fiduciaries appreciated the ready availability of comparable and better performing Plan fund options that charged significantly lower fees and expenses than the Plan's RiverSource options; and

d.     failing to remove appointees whose performance was inadequate in that they continued to maintain the imprudent, and proprietary, options for participants' retirement savings in the Plan during the Class Period, and who breached their fiduciary duties under ERISA.

124.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered substantial losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiffs and the other Class members, lost tens of millions of dollars of retirement savings.

125.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

### 29 U.S.C. § 1106(a) Prohibited Transactions

126.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

127.     This Count alleges prohibited transactions against all Defendants.

128.     Defendants caused the Plan to use RiverSource Mutual Funds (and ATC Funds) as investment options when they knew or should have known those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

129.     As Plan Sponsor, Ameriprise, and its subsidiaries, including RiverSource and ATC, were parties in interest.

130.     As a direct and proximate result of these prohibited transaction violations, the Plan, directly or indirectly, paid millions of dollars in investment management and other fees that were prohibited by ERISA and suffered millions of dollars in losses.

131.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and disgorge all revenues received and/or earned by Ameriprise from the fees paid by the Plan to Ameriprise and its subsidiaries and affiliates as well as appropriate equitable relief.

## COUNT IV

### 29 U.S.C. § 1106(b) Prohibited Transactions

132.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

133.    This Count alleges prohibited transactions against Ameriprise and the CBC Defendants.

134.    Ameriprise and the CBC Defendants dealt with the assets of the plan in their own interest and for their own account when they caused the Plan to use RiverSource Mutual Funds (and ATC Funds) as investment options.

135.    In causing the Plan to use RiverSource Mutual Funds (and ATC Funds) as investment options, Defendants acted in a transaction involving the plan on behalf of Ameriprise, a party whose interest were adverse to the interests of the plan, its participants and beneficiaries.

136.    Further, Ameriprise and the CBC Defendants received consideration for their own personal account from RiverSource and ATC in connection with those subsidiaries' transactions involving the assets of the plan.

137.    For the reasons discussed above, Ameriprise and the CBC Defendants were fiduciaries and parties in interest with respect to the Plan.

138.    Ameriprise and the CBC Defendants knew or should have known that the transfer of Plan assets to the investment options selected and maintained in the Plan by Ameriprise, the CBC, and the Committees allowed Ameriprise to benefit both financially, through fees paid by the options to Ameriprise, and commercially, by increasing the assets under management for the Ameriprise-managed investment options.

139.     As a direct result of these prohibited transaction violations, the Plan, directly or indirectly, paid millions of dollars in investment management and other fees that were prohibited by ERISA and suffered millions of dollars in losses.

140.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Ameriprise and the CBC Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and disgorge all revenues received by Ameriprise from the fees paid by the Plan to Ameriprise and its subsidiaries and affiliates, as well as other appropriate equitable relief.

## COUNT V

### Sale of Record-Keeping Arm to Wachovia

141.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142.     This Count alleges breach of fiduciary duties against the EBAC and its members and delegates, and the Investment Committee and its members and delegates (collectively the "Committee Defendants"), Ameriprise, and the CBC Defendants.

143.     Defendants hired and retained ATC as the Plan's trustee and record-keeper for the purpose of providing that subsidiary revenues that boosted its ultimate sale price for Ameriprise.

144.     On or about May 3, 2006, Ameriprise announced the sale of its defined contribution record-keeping business, Ameriprise Retirement Services, including ATC, to Wachovia Corporation ("Wachovia"). The sale was completed on June 1, 2006.

145.     The sale price of $66 million was, upon information and belief, based on the annual fees generated by ATC, including fees from the Plan and Plan investments.

146.     The sale also provided for additional payments based on the assets under management during the first 18 months following the sale.

147.    The price Wachovia paid to Ameriprise for Ameriprise's record-keeping business was materially higher because of the compensation the Plan, directly or indirectly, through revenue sharing and other sources, paid to ATC as a result of Defendants' breach of fiduciary duties in hiring and retaining ATC as trustee and record-keeper and because the record-keeping compensation was and remained unreasonable.

148.    Ameriprise also benefited financially from choosing Wachovia for the Plan's recordkeeper for at least 18 months following the sale.

149.    Ameriprise did not provide to the Plan any share of the profits it received from selling the record-keeping business.

150.    Failing to rebate to the Plan these profits, and making profits from the leveraging of the Plan's record-keeping business as part of the sale, constituted a breach of the duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a) and a prohibited transaction under 29 U.S.C. § 1106 and cost the Plan millions of dollars in excessive fees charged by Wachovia while Ameriprise received millions of dollars in exchange for their agreement to sell Wachovia the record-keeping contract for the Plan.

151.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Defendants are personally liable to make good to the Plan any losses to the Plan resulting from this breach, and to restore to the Plan any revenue Ameriprise received through their commitment to sell the Plan's record-keeping contract to Wachovia, as well as any other equitable or remedial relief the Court deems appropriate.

## COUNT VI

**Ameriprise Knowingly Participated in Breaches of Fiduciary Duties**

**and Prohibited Transactions**

152.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

153.     This Count alleges co-fiduciary liability against Ameriprise.

154.     At all relevant times, Ameriprise was a party in interest to the Plan. Ameriprise was also a fiduciary to the Plan for all the reasons stated above, including the facts that through the CBC Defendants, Ameriprise appointed and monitored the members of the EBAC.

155.      Ameriprise, by its actions in participating in and abetting fiduciary breaches and prohibited transactions, caused the Plan to invest in RiverSource and ATC managed investment options, to retain ATC (and later Wachovia and Wells Fargo) as plan service providers, and to pay excessive investment management and other fees in connection therewith, to Ameriprise subsidiaries and affiliates.

156.     As a direct result of Ameriprise's violations of ERISA, the Plan, and the Plan's participants and beneficiaries, including Plaintiffs, lost millions of dollars to Ameriprise fees and inferior returns.

157.     Pursuant to 29 U.S.C. § 1132(a)(3) Ameriprise is liable to disgorge all revenues received by Ameriprise and its subsidiaries as a result of their transactions with the Plan, and their earnings thereon.

## COUNT VII

### Excessive Recordkeeping Fees

158.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

159.    This Count alleges breach of fiduciary duties against all Defendants.

160.    When the Plan was created, Defendants selected ATC as a plan service provider to

perform certain administrative services such as record-keeping and trustee services.

161.    On or about May 3, 2006, Ameriprise announced the sale of its defined contribution

record-keeping business to Wachovia Corporation ("Wachovia"). The Plan began being record-

kept by Wachovia on April 1, 2007.

162.    ATC, and later Wachovia, received compensation from the Plan for its administrative

services, including recordkeeping. A significant portion of that compensation came in the form

of revenue sharing and related kick-back arrangements in which managers for the Plan's

investment options deducted assets from the value of those options and used their proceeds to

pay ATC and Wachovia.

163.    Other compensation was received through interest earned on assets as they travelled

into and out of participants' accounts ("float") and through the management of the Income Fund,

which credited a lower rate of return for participants' assets than the rate Defendants and

Wachovia received as a result of managing the Fund.

164.    The compensation that ATC, and later Wachovia, received for its record-keeping and

administration of the Plan was excessive and unreasonable, and the Committee Defendants

breached their fiduciary obligations under 29 U.S.C. § 1104(a) to ensure that ATC and

Wachovia's compensation was no more than reasonable and engaged in prohibited transactions under 29 U.S.C. § 1106(a)(1)(C).

165.    The Committee also failed to have a prudent process for evaluating the reasonableness of this compensation. Instead of evaluating the cost of these services in the marketplace, the Committee permitted ATC, and later Wachovia, to administer and perform the record-keeping for the Plan without meaningful market competition.

166.    Failing to do so constituted a breach of the duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a), and cost the Plan millions of dollars in excessive fees charged directly by Wachovia and ATC or collected by Wachovia and ATC from the Plan's investment options through revenue sharing.

167.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Defendants are personally liable to make good to the Plan any losses to the Plan resulting from this breach, and to restore to the Plan any revenues received by Ameriprise or its affiliates through funds collected from the Plan and Plan participants and paid to ATC, as well as any other equitable or remedial relief the Court deems appropriate.

## COUNT VIII

### Unjust Enrichment

168.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

169.    This Count alleges unjust enrichment against Ameriprise and the CBC Defendants, including members of the CBC.

170.    Ameriprise, though its agents and employees, the CBC and CBC members and delegates, knowingly and intentionally steered the Committees and the Plan participants to

investment options that maximized the total compensation Ameriprise (through RiverSource and ATC) could derive from the Plan. Such funds were those with which RiverSource and ATC received investment management and other fees, and options, including those funds available in the SMBA, which paid revenue sharing and other kickbacks to ATC.

171.    The amount of compensation Ameriprise subsidiaries received from the Plan investment options far exceeded the value of the services that the subsidiaries provided and constituted unreasonable compensation, which Ameriprise could not have received but for its status as the Plan Sponsor and its role with respect to the Plan.

172.    The excess compensation received by Ameriprise and its subsidiaries constitutes the receipt of something of value, to which Ameriprise was not reasonably entitled, and that it in good conscience should have repaid to the Plan.

173.    Defendants actively and deliberately concealed from the Plan participants the total amount of the fees collected from the Plan, directly and indirectly, as a result of its control of Plan assets, thereby collecting fees that Plan participants did not reasonably expect Ameriprise and its subsidiaries to receive. For example, Defendants did not disclose that the Plan, and not Ameriprise, paid the vast majority of administrative costs until, at the earliest, 2007. Instead, Defendants falsely stated in Form 5500s filed with the Department of Labor that "all administrative expenses incurred with regard to the Plan are borne by the Company."

174.    Ameriprise profited unjustly from the foregoing conduct, extracting and retaining millions of dollars of fees as a result of its control of Plan assets over and above any amount that could be considered reasonable compensation for the services provided by Ameriprise and its subsidiaries to the Plan. These excess fees are directly traceable to Ameriprise in connection with the Plan.

175.     Under the federal common law, the Plan and its participants are entitled to equitable restitution from Ameriprise of the excess amounts paid to RiverSource and ATC by the Plan, the Plan investment options, and any other source due to Ameriprise's control of the Plan, as well as other appropriate relief to remedy Ameriprise's unjust enrichment.

### FRAUD AND CONCEALMENT

176.     Defendants fraudulently concealed their breaches of fiduciary duty with respect to excessive fees paid by the Plans, and prohibited transactions with respect to the payments to Ameriprise for administrative services including trustee and recordkeeping services.  In public filings to the Department of Labor (including the Plan's 2005 and 2006 Form 5500) and to the Securities Exchange Commission (including the Plan's 11-K), Defendants represented that "***all administrative expenses incurred with regard to the Plan are borne by the Company.***"  In reality, most of the administrative expenses were paid by the Plan, and Plan participants, to Ameriprise as part of the expense ratio of the Plan investment options.

177.     Plaintiffs did not discover these breaches until 2011.

178.     Plaintiffs could not have discovered these breaches until, at the earliest, when Defendants revised their statement concerning the payment of Plan expenses in the Plan's 11-K and Form 5500s. The 2007 Form 5500 was not filed until on or after July 11, 2008. The Plan's 11-K for 2007 was not filed until on or after June 1, 2007. Those documents, for the first time, disclosed that "[t]he majority of the cost of administering the Plan, including fees of the trustee, recordkeeper, and investment managers, are paid from the fees associated with the investment options offered under the Plan… Fees paid out of the fund reduce the return of that fund."

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

179.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. § 1109. Section 1109 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…" Section 1109 also authorizes "such other equitable or remedial relief as the court may deem appropriate…"

180.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained their investments in the challenged investments and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investments available to them. The Court should adopt the measure of loss most advantageous to the Plan. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

181.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to make good to the Plan the losses resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3); (c) injunctive and other appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorneys' fees and expenses, as provided by 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

182.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## JURY TRIAL DEMANDED

183.    Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

184.    Find and declare that the Defendants have breached their fiduciary duties as described above;

185.    Find and adjudge that Defendants are personally liable to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

186.    Find and adjudge that Defendants must disgorge all revenues received from, or in respect of, the Plan;

187.    Award actual monetary losses to the Plan;

188.    Impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies, including monies from the sale of their retirement business, and return them to the Plan;

189.    Order equitable restitution and other appropriate equitable monetary relief against Defendants;

190.    Order the permanent removal of Defendants from any positions of trust with respect to the Plan;

191.    Order Defendants to render an accounting;

192.    Surcharge against Defendants and in favor of the Plan all amounts involved in transactions that such accounting reveals were or are improper, excessive and/or in violation of ERISA;

193.    Enjoin Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

194.    Order the appointment of an independent fiduciary to administer the Plan;

195.    Order rescission of the Plan's investments in Ameriprise Funds and a bidding process for the selection of investment options in the Plan;

196.    Order rescission of the Plan's contracts with Wells Fargo/Wachovia for administrative services to the Plan and a bidding process for selection of a Plan record-keeper;

197.    Enjoin Defendants from causing the Plan to invest in Ameriprise Funds;

198.    Order that this action be certified as a class action and that the Class be designated to receive the amounts restored or disgorged to the Plan by Defendants and a constructive trust be established for distribution to the extent required by law;

199.    Award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the Common Fund doctrine;

200.    Order the payment of interest to the extent it is allowed by law; and

201.    Award such other and further relief as the Court deems equitable and just.

        JURY TRIAL DEMANDED

Respectfully Submitted,

Dated: February 7, 2012

**SCHLICHTER, BOGARD & DENTON**

By:  /s/ Jerome J. Schlichter
     Jerome J. Schlichter (admitted *pro hac vice*)
     Michael A. Wolff (admitted *pro hac vice*)
     Mark G. Boyko (admitted *pro hac vice*)
     100 South Fourth Street, Suite 900
     St. Louis, Missouri 63102
     (314) 621-6115
     (314) 621-7151 (Fax)
     jschlichter@uselaws.com
     mwolff@uselaws.com
     mboyko@uselaws.com

     *Lead Counsel for Plaintiffs*

**FOLEY & MANSFIELD PLLP**

By:  /s/ Thomas W. Pahl
     Thomas W. Pahl (#0243012)
     250 Marquette Avenue, Suite 1200
     Minneapolis, MN 55401
     (612) 338-8788
     (612) 338-8690 (Fax)
     tpahl@foleymansfield.com

     *Local Counsel for Plaintiffs*