IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

ROGER KRUEGER, et al.,

*Plaintiffs*,

v.

AMERIPRISE FINANCIAL, INC., et al.,

*Defendants*.

No. 11-CV-02781 (SRN/JSM)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.   The Eighth Circuit standards for stating a claim of breach of ERISA's fiduciary duties. ................................................................................... 2

II.  ERISA's fiduciary duties. .................................................................... 5

III. Plaintiffs' factual allegations of fiduciary breach. ............................... 9

IV.  The complaint states plausible claims upon which relief can be granted. ......... 17

     A.  Count I. ...................................................................................... 17

     B.  Counts III & IV........................................................................... 26

     C.  Count VII..................................................................................... 30

     D.  Counts II & VI............................................................................. 31

     E.  Count V......................................................................................... 34

     F.  Count VIII..................................................................................... 35

V.   The other cases in which Plaintiffs' attorneys have appeared have no bearing on *this* complaint's statement of claims for breach of ERISA's fiduciary duties. .................................................................................... 37

Conclusion ............................................................................................... 39

Plaintiffs allege that Ameriprise Financial, Inc., acting through its officers and subsidiaries named as Defendants herein, put investments in the Ameriprise 401(k) Plan that were poorly rated, unduly expensive, and consequently underperformed prudent investment options, yet provided millions of dollars in revenue to Ameriprise and its subsidiaries. Ameriprise also profited at its employees' expense by having the 401(k) Plan's recordkeeping performed by an Ameriprise subsidiary and, after selling that business to Wachovia, using Wachovia as the Plan's recordkeeper in exchange for kickbacks paid to Ameriprise. Ameriprise's actions cost its employees millions of dollars in unnecessary fees and expenses, nearly all of which went to Ameriprise. The inferior Ameriprise mutual funds cost Ameriprise employees millions more in lost investment returns. Defendants managed the Plan in a self-interested manner in breach of the strict fiduciary duties imposed on them by the Employee Retirement Income Security Act, 29 U.S.C. §§1001 et seq. (ERISA). The First Amended Complaint provides Defendants fair notice of Plaintiffs' claims and the grounds upon which those claims rest. It plausibly shows that Plaintiffs, acting on behalf of their Plan, have a right to recover their Plan's losses and the profits Defendants gained from their breach of duty. Under Eighth Circuit standards, the complaint states claims upon which relief can be granted and cannot be dismissed. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594–98 (8th Cir. 2009).

I.      **The Eighth Circuit standards for stating a claim of breach of ERISA's fiduciary duties.**

The standards for stating an ERISA fiduciary breach claim laid out in *Braden* completely undermine Defendants' arguments for dismissal, which rely almost entirely on cases outside the Eighth Circuit. Plaintiffs' complaint need only present "a short and plain statement of the claim showing that the pleader is entitled to relief", that is, enough factual allegations, accepted as true, to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 594 (quoting Fed.R.Civ.P. 8 and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); quotation marks omitted).

> [T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible. Ultimately, evaluation of a complaint upon a motion to dismiss is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Id.* (quotation marks and citations omitted). A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

That "context-specific task" in an ERISA fiduciary breach action requires that the court bear in mind "ERISA's remedial purpose and evident intent to prevent through private civil litigation misuse and mismanagement of plan assets." *Id.* at 597 (quotation marks and citation omitted). ERISA was enacted "to protect working men and women from abuses in the administration and investment of

2

private retirement plans and employee welfare plans." *Donovan v. Dillingham*,
688 F.2d 1367, 1370 (11th Cir. 1982). "Congress enacted ERISA to regulate
comprehensively certain employee benefit plans and 'to protect the interests of
participants in these plans by establishing standards of conduct, responsibility, and
obligations for fiduciaries.'" *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr.,
Inc.*, 413 F.3d 897, 906−07 (8th Cir. 2005) (quoting *Johnston v. Paul Revere Life
Ins. Co.*, 241 F.3d 623, 628 (8th Cir. 2001)); see also *Varity Corp. v. Howe*, 516
U.S. 489, 513 (1996). "Congress intended that private individuals would play an
important role in enforcing ERISA's fiduciary duties[.]"*Braden*, 588 F.3d at 598.

> The Secretary of Labor, who is charged with enforcing ERISA, *see*
> 29 U.S.C. § 1136(b), depends in part on private litigation to ensure
> compliance with the statute. To that end, the Secretary has expressed
> concern over the erection of "unnecessarily high pleading standards"
> in ERISA cases.

*Id.* at 597 n.8 (citation omitted). Yet, it is just such unnecessarily high pleading
standards that Defendants seek to impose here.

In the "practical context of ERISA litigation", *id.* at 598, the particulars of
how plan fiduciaries performed their duties are hidden from participants and it is
thus improper, as Defendants advocate, to impose too-strict standards of
specificity for pleading an ERISA fiduciary breach. "ERISA plaintiffs generally
lack the inside information necessary to make out their claims in detail unless and
until discovery commences." *Id.*

> Thus, while a plaintiff must offer sufficient factual allegations to
> show that he or she is not merely engaged in a fishing expedition or
> strike suit, we must also take account of their limited access to

3

crucial information. If plaintiffs cannot state a claim without
pleading facts which tend systemically to be in the sole possession of
defendants, the remedial scheme of the statute will fail, and the
crucial rights secured by ERISA will suffer. These considerations
counsel careful and holistic evaluation of an ERISA complaint's
factual allegations before concluding that they do not support a
plausible inference that the plaintiff is entitled to relief.

*Id.*; see also *In re Xcel Energy, Inc., Sec., Derivative, & ERISA Litig.*, 312
F.Supp.2d 1165, 1178−79 (D.Minn. 2004) (Doty, J.) (even conclusory pleadings
as to fiduciary conduct are sufficient to state an ERISA claim because detailed
facts will typically not be available at the pleading stage).

Contrary to Defendants' suggestions otherwise, then, Plaintiffs are not
required "to describe directly the ways in which [defendants] breached their
fiduciary duties." *Braden*, 588 F.3d at 595. They do not have to "plead specific
facts explaining precisely how the defendant's conduct was unlawful." *Id.*
(quotation marks and citation omitted). It is "sufficient for a plaintiff to plead facts
*indirectly* showing unlawful behavior, so long as the facts pled give the defendant
fair notice of what the claim is and the grounds upon which it rests and allow the
court to draw the reasonable inference that the plaintiff is entitled to relief." *Id.*
(quotation and editing marks and citations omitted; emphasis added). A complaint
does not have to "rebut all possible lawful explanations for a defendant's
conduct." *Id.* at 596; see also *id.* at 597 (plaintiff need not "rule out every possible
lawful explanation for the conduct he challenges").

## II.    ERISA's fiduciary duties.

ERISA's fiduciary duties are "'the highest known to the law.'" *Braden*, 588

F.3d at 598 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

"ERISA imposes upon fiduciaries twin duties of loyalty and prudence[.]" *Id.* at

595; *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 143 n.10 (1985). The duty

of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely

in the interest of the participants and beneficiaries and for the exclusive purpose of

providing benefits to participants and their beneficiaries and defraying reasonable

expenses of administering the plan[.]" 29 U.S.C. §1104(a)(1)(A); see also 29

U.S.C. §1103(c)(l);[1] *Braden*, 588 F.3d at 595. Except in circumstances not

applicable to this case, "the assets of a plan shall never inure to the benefit of any

employer[.]" 29 U.S.C. §1103(c)(l). The duty of loyalty requires fiduciaries to act

with an "eye single" to the interests of participants. *Pegram v. Herdrich*, 530 U.S.

211, 235 (2000). "Perhaps the most fundamental duty of a trustee is that he must

display throughout the administration of the trust complete loyalty to the interests

of the beneficiary and must exclude all selfish interest and all consideration of the

interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

The duty of prudence requires fiduciaries to act "with the care, skill, prudence,

and diligence under the circumstances then prevailing that a prudent man acting in

a like capacity and familiar with such matters would use in the conduct of an

---

[1] Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1)(B);

*Braden*, 588 F.3d at 595. The duty of prudence "'is an objective standard…that

focuses on the fiduciary's conduct preceding the challenged decision.'" *Braden*,

588 F.3d at 595 (quoting *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917

(8th Cir. 1994)).

Fiduciaries with potential conflicts of interest have even stricter duties. The

"presence of conflicting interest imposes on fiduciaries the obligation to take

precautions to ensure that their duty of loyalty is not compromised." *Bussian v.*

*RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000).  "Where it might be possible

to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an

intensive and scrupulous independent investigation of their options to insure that

they act in the best interests of the plan beneficiaries." *Leigh v. Engle*, 727 F.2d

113, 125–26 (7th Cir. 1984) (citation omitted); *Howard v. Shay*, 100 F.3d 1484,

1488−89 (9th Cir. 1996) (quoting *Leigh*).

While corporate officers of the plan sponsor can serve as fiduciaries—and thus

in that sense wear two hats, one corporate, one fiduciary—under ERISA that

officer must "wear only one at a time, and wear the fiduciary hat when making

fiduciary decisions." *Pegram*, 530 U.S. at 225; *DiFelice v. U.S. Airways, Inc.*, 497

F.3d 410, 419 (4th Cir. 2007). Fiduciaries must "avoid placing themselves in a

position where their acts as officers or directors of the corporation will prevent

their functioning with the complete loyalty to participants demanded of them as

trustees of a pension plan." *Bierwirth*, 680 F.2d at 271.

6

In addition to the general fiduciary duties of loyalty and prudence, certain transactions are prohibited *per se*. 29 U.S.C. §1106. Section 1106 "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries by categorically barring certain transactions deemed likely to injure the pension plan." *Braden*, 588 F.3d at 600 (quoting *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241−42 (2000); quotation and editing marks omitted). "Congress replaced the 'arm's-length' standard with a per se rule to 'substantially strengthen' the laws governing prohibited transactions." *Westoak Realty & Inv. Co. v. C.I.R.*, 999 F.2d 308, 310 (8th Cir. 1993) (citations omitted).

Section 1106(a) bars transactions between a plan and a party in interest, including the "furnishing of goods, services, or facilities between the plan and a party in interest" and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. §1106(a)(1)(C) & (D). An employer whose employees are covered by the plan is a party in interest. 29 U.S.C. §1002(14)(C). Additionally, any service provider to a plan, such as the subsidiaries of Ameriprise in this case, also is a party in interest. 29 U.S.C. §§1002(14)(B) & (G).

Section 1106(b) bars transactions between the Plan and its fiduciaries.

> A fiduciary with respect to a plan shall not—(1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

7

29 U.S.C. §1106(b). The purpose of §1106(b) is to "prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries." *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (quoting H.R.REP. No. 93-1280 (1974) (Conf. Rep.)). "These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act." 29 C.F.R. §2550.408b-2(e)(1). "In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries." *Id.*

Given "Congress' overriding concern with the protection of plan beneficiaries," the prohibitions of §1106 must be read broadly. *Leigh*, 727 F.2d at 126. Good faith is no defense. *Id.* at 124; *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987). The prohibitions of §1106 apply "regardless of whether the transaction is 'fair' to the plan." *Compton*, 57 F.3d at 288. Fiduciaries are liable under §1106(b) even where there is "'no taint of scandal, no hint of self-dealing, no trace of bad faith[.]'" *Lowen*, 829 F.2d at 1213 (quoting *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir. 1979)).

ERISA imposes joint and several liability upon fiduciaries who breach these duties.

> Any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon

8

> fiduciaries…shall be personally liable to make good to such plan any
> losses to the plan resulting from each such breach, and to restore to
> such plan any profits of such fiduciary which have been made
> through use of assets of the plan by the fiduciary[.]

29 U.S.C. §1109(a); e.g., *Leister v. Dovetail, Inc.*, 546 F.3d 875, 878 (7th Cir.

2008). In addition to liability for his own breach of duty, a fiduciary is liable for

the breaches by other fiduciaries

> (1) if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing such act
> or omission is a breach;
> (2) if, by his failure to comply with section 1104(a)(l) of this title
> in the administration of his specific responsibilities which give rise
> to his status as a fiduciary, he has enabled such other fiduciary to
> commit a breach; or
> (3) if he has knowledge of a breach by such other fiduciary, unless
> he makes reasonable efforts under the circumstances to remedy the
> breach.

29 U.S.C. §1105(a).

Any participant or beneficiary is authorized to bring an action to recover his or

her plan's remedies under §1109(a). 29 U.S.C. §1132(a)(2).[2] Actions under

§1132(a)(2) are "brought in a representative capacity on behalf of the plan as a

whole" and the remedies under § 1109(a) "protect the entire plan." *Braden*, 588

F.3d at 593 (quoting *Russell*, 473 U.S. at 142 & n.9).

## III.    Plaintiffs' factual allegations of fiduciary breach.

Defendants do not dispute that Plaintiffs are current and former participants of

the Ameriprise 401(k) Plan with standing to enforce the §1109(a) remedies of their

---

[2] Because the distinction between a participant and a beneficiary is not at issue in
Defendants' motion, both are referred to herein by "participant." Cf. 29 U.S.C.
§1002(7)–(8).

Plan. See Doc. 45 at 3–4 (¶¶13–19), 26 (¶105) (First Amended Complaint);[3] 29 U.S.C. §1132(a)(2). Defendants also do not dispute Plaintiffs' allegations of their fiduciary status (except in a limited regard as to Ameriprise addressed *infra* at 31). Ameriprise is the Plan sponsor and a party in interest to the Plan because its employees are covered by the Plan. 29 U.S.C. §§1002(16)(B), 1002(14)(C); Doc. 45 at 9 (¶37). Ameriprise primarily does business through its subsidiaries. Doc. 45 at 10 (¶43). These subsidiaries include Ameriprise Trust Company (ATC), RiverSource Investments LLC (RiverSource), RiverSource Fund Distributors Inc., RiverSource Service Corporation, Ameriprise Financial Services Inc., and Ameriprise Retirement Services. *Id.* at 10−11 (¶¶45−50).[4] The Compensation and Benefits Committee of the Ameriprise Board of Directors, and its members and delegates (the CBC), is appointed by Ameriprise's Board of Directors and has fiduciary control over the Plan. *Id.* at 8 (¶32).

The two named fiduciaries of the Plan are the Ameriprise Financial, Inc. Employee Benefits Administration Committee (EBAC) and the Ameriprise Financial, Inc. 401(k) Investment Committee (Investment Committee), including its individual members and delegates. *Id.* at 4 (¶20), 6 (¶26); 29 U.S.C. §1102(a). ATC was the trustee and recordkeeper of the Plan until Ameriprise sold its recordkeeping business, including ATC, in 2007 to Wachovia Corporation, who

---

[3] All Doc. page cites are to the ECF header page.
[4] After the acquisition of Columbia Management from Bank of America in April 2010, the RiverSource subsidiaries were combined with Columbia under the Columbia brand. Doc. 45 at 11 (¶46). Both are referred to herein as RiverSource unless otherwise indicated.

then became the Plan's trustee and recordkeeper. Doc. 45 at 3 (¶¶10–12), 14 (¶59), 35–36 (¶¶142–51).[5]

Defendants had unfettered discretion to select what investments to put in the Plan, outside of Ameriprise stock. *Id*. at 4–10 (¶¶20−42); Doc. 60-1 at 461 (Art. 6.2(b)).[6] Despite the many reasonably priced and well-managed investment options available to large 401(k) plans, Defendants chose to include numerous mutual funds managed by Ameriprise's RiverSource subsidiaries as well as commingled trusts managed by ATC. Doc. 45 at 12−13 (¶¶53−56).[7] The ATC trusts, however, only invested in Ameriprise's RiverSource mutual funds. *Id*. at 20 (¶¶80−81).[8] Of the 15 core investment options in the Plan at its inception, 14 were managed by Ameriprise subsidiaries RiverSource or ATC. Doc. 60-1 at 22−29. Of the 18 core options added to the Plan since its inception, 12 were managed by RiverSource or ATC. Doc. 45 at 23 (¶94).

The RiverSource funds had poor or nonexistent performance histories at the time they were initially selected. *Id*. at 17 (¶68). The funds underperformed their benchmarks by 0.62%, 4.22%, 7.05%, 9.89%, 12.62%, and 1.75%. *Id*.

---

[5] Because the liability of particular Defendants for particular breaches is not at issue in Defendants' motion, this memorandum refers to Defendants collectively.

[6] While the plan document *formally* places discretion over the selection of these funds in the Investment Committee, Doc. 60-1 at 461, which of the Defendants *actually* exercised these fiduciary duties remains hidden and in any case is not pertinent because Defendants do not dispute their fiduciary status.

[7] The RiverSource mutual funds are listed in the complaint. Doc. 45 at 12−13 (¶55).

[8] Since all of the Plan investments in dispute ultimately invested in RiverSource mutual funds, they are generally referred to herein as the RiverSource funds, unless otherwise indicated.

Morningstar, an independent rating service, gave the funds low ratings, including 1-star (out of 5), 2-stars, and 3-stars, when many comparable funds had 4-star and 5-star ratings. *Id.* at 17 (¶69). Other RiverSource funds had no rating at all because they lacked any performance history when placed in the Plan. *Id.* at 20 (¶79). One web-based investment application—MyPlanIQ (www.myplaniq.com)—rated the risk-adjusted returns of the Ameriprise Plan's investments in the *bottom 2 percent* of defined contribution plans. *Id.* at 18 (¶70).

The RiverSource funds also charged unreasonable fees for the services they provided to participants. *Id.* at 14−16 (¶¶58−67). The fees were and are significantly higher than the median fees for comparable and better-performing mutual funds in 401(k) plans, as reported, for example, by the Investment Company Institute[9] and by BrightScope, Inc., an independent provider of 401(k) ratings and data, based on its review of 1,667 large 401(k) plans.[10] *Id.* at 14−15 (¶61). Compared to similar funds offered by other fund families at the time Defendants kept the RiverSource funds in the Plan, such as those offered by Vanguard Institutional Funds, for example, the RiverSource funds overcharged by 65–127 bps (0.65–1.27%). *Id.*

---

[9] *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 12 (September 2007), available at http://www.ici.org/pdf/fm-v16n4.pdf.

[10] *Real Facts About Target Date Funds*, at 7, available at: http://www.brightscope.com/media/docs/whitepapers/BrightScope-Real-Facts-about-Target-Date-Funds.pdf (showing the weighted average expense ratio for target date funds in 401(k) plans with over $100 million in assets is 60 bps).

The core investments, of which the RiverSource funds were the majority, were designed for less sophisticated investors who did not want to (or were not able to) search for investments on their own. In summary plan descriptions (SPDs) and other communications Defendants described the general nature of each core investment and provided performance histories for each investment. See, e.g., Doc. 60-1 at 22–29 (investment descriptions), 34 (performance histories); *id.* at 111–21 (investment descriptions), 126–29 (performance histories). The Self Managed Brokerage Account (SMBA), in contrast, contained other mutual funds sophisticated investors could search for and monitor on their own; the SPDs and other communications did not describe the SMBA mutual funds or provide performance histories for those funds. Doc. 60-1 at 22–29, 34, 111–21, 126–29, 213, 284–85, 339–41, 396–98. As Defendants informed participants, a self-directed account such as the SMBA "does not operate in the same way as the other 401(k) Plan investment options." Doc. 60-1 at 30, 37, 121, 134, 207, 219, 281, 289, 336, 344, 391, 412.[11]

The excessive fees taken from participant investments in these funds generated millions of dollars for Ameriprise subsidiaries RiverSource, RiverSource Funds

---

[11] In the 2011 SPD, Defendants assigned plan investments to different "tiers." Tier 1 investments were "Lifestyle" target date funds for participants who "prefer not to put together their own portfolio mix, or don't have time to review individual investment options." Doc. 60-1 at 385; see *infra* at 14 (Retirement Plus Funds). Tier 2 investments were "Core" investments, most of which were the RiverSource and ATC funds, for which the SPDs provided descriptions and performance histories. *Id.* at 386–90. The SMBA, now called a "Personal Choice Retirement Account, was at Tier 3, for which the SPDs provided no descriptions or performance histories. *Id.* at 391.

Distributors Inc., RiverSource Service Corporation, and ATC, and thus, ultimately, Ameriprise. Doc. 45 at 14 (¶58). These subsidiaries were hired without any competitive bidding. *Id*. at 14 (¶59). Defendants also selected the more expensive share classes of the RiverSource funds, even though the Plan qualified for the R5 classes that had lower fees. *Id*. at 16 (¶62). The more expensive shares added a fee of up to 25 bps for "Plan Administrative Services" and a service fee of up to 10 bps, even though they provided no additional benefits or services for the participants in the Plan. *Id*. at 16 (¶63). These mutual fund fees also were higher than the fees of comparable separately managed accounts, even those managed by the same entities that managed the Plan's RiverSource mutual funds. *Id*. at 16 (¶67).

Some of the RiverSource mutual funds were Retirement Plus Funds. *Id.* at 13 (¶55(k)). They were "lifecycle" or "target date funds" designed around different "target" retirement dates, with the fund intended to invest more conservatively as the target date approached. Doc. 60-1 at 385; see also SEC, Investor Bulletin: Target Date Retirement Funds (http://www.sec.gov/investor/alerts/tdf.htm). Defendants put these Retirement Plus Funds in the Plan in 2006, even though Ameriprise had just created the funds. Doc. 45 at 18–19 (¶¶72, 77−78). Like the ATC trusts, the target date funds invested entirely in other RiverSource mutual funds. *Id*. at 18 (¶73). Plan participants who invested in the target date funds thus paid the excessive fees of the underlying RiverSource funds and an *additional* fee for the Retirement Plus fund, effectively paying Ameriprise both for managing the

14

RiverSource funds and, additionally, for choosing its RiverSource Funds from the universe for available investments. *Id*. In short, they charged fees on fees to an untested manager to choose among his own products. The total fees for the Retirement Plus Funds were 90–94 bps. *Id*. at 18 (¶72). Unlike the Retirement Plus Funds, target date fund families from Vanguard, Fidelity and T.Rowe Price had established performance histories and did not charge an additional layer of fees in their cheapest share classes. *Id*. at 18–19 (¶¶72–74). Those alternatives were also cheaper. *Id*. at 18 (¶72).

The Retirement Plus Funds also were designed for the least sophisticated participants in "Tier 1", those who "prefer not to put together their own portfolio mix, or don't have time to review individual investment options." Doc. 60-1 at 199, 385. The Retirement Plus Funds were the default investment option unless the participant selected otherwise.  *Id*. at 199, 393.

Instead of the untested and expensive Retirement Plus Funds, Defendants could have selected established target date funds from other companies such as Vanguard, Fidelity, and T.Rowe Price. Those funds charged lower fees than the Retirement Plus Funds and had established performance histories. Doc. 45 at 18 (¶72). If Defendants had chosen the established Vanguard target date funds, for example, fees would have been more than 75% lower. *Id*. All three of those other target date fund families also had higher ratings than the Retirement Plus Funds from independent rating agencies such as Morningstar. *Id*. at 19 (¶¶76−77). Defendants also chose the more expensive share class of the Retirement Plus

15

Funds, even though they could have selected the lower-cost R5 share class that would have provided the exact same services to the Plan. *Id*. at 19 (¶¶75, 77).

ATC received revenue sharing kickbacks and other rewards such as float as a result of serving as the Plan's recordkeeper and trustee, which ultimately benefitted Ameriprise at the expense of the Plan. *Id*. at 38 (¶¶162−63). The total amount of compensation ATC received was excessive and unreasonable for the services provided. *Id*. at 38–39 (¶¶162–64). Because of the excessively generous income stream the Plan provided to ATC, Ameriprise was able to sell that business to Wachovia Corporation for a substantial profit. *Id*. at 35−36 (¶¶144−48). After the sale, Defendants retained Wachovia as the Plan's recordkeeper on the same generous terms so as to boost the sale price Ameriprise received and enhance payments from Wachovia to Ameriprise from the sale. *Id*.

Based on these factual allegations, the complaint asserts eight counts against the Defendants. Count I asserts that Defendants' actions described above constituted breaches of the duties of loyalty and prudence and seeks to hold Defendants jointly and severally liable for restoring to the Plan the losses caused by those breaches and all profits they gained from the misuse of Plan assets under 29 U.S.C. §1109(a). *Id.* at 28–31. Count II asserts that the CBC Defendants and Ameriprise separately breached their duties of loyalty and prudence by failing to properly monitor and replace the fiduciaries over whom they had authority or control who caused losses to the Plan at issue in Count I. *Id*. at 31–33.

Counts III and IV assert that Defendants' actions constitute prohibited transactions 29 U.S.C. §1106(a)(1)(C) & (D) and 29 U.S.C. §1106(b), respectively. Doc. 45 at 33–35. Count V seeks to recover for the Plan the profits Defendants gained from the breach of duties in using ATC as the Plan's recordkeeper, selling Ameriprise's recordkeeping business to Wachovia, and keeping Wachovia as Plan recordkeeper for Ameriprise's gain. *Id*. at 35–36. Count VI asserts that Ameriprise knowingly participated in these breaches of fiduciary duty and prohibited transactions and therefore is liable to disgorge all revenue received by Ameriprise and its subsidiaries as a result of their transactions with the Plan, and their earnings thereon under 29 U.S.C. §1132(a)(3). *Id*. at 37.

Count VII asserts that Defendants breached their duties of prudence and loyalty by causing the Plan to pay excessive recordkeeping fees to ATC and Wachovia. *Id*. at 38–39. Count VIII seeks to recover from Ameriprise and the CBC Defendants on alternative grounds the profits they gained from all of the alleged breaches of fiduciary duty. *Id*. at 39–41.[12]

## IV.   The complaint states plausible claims upon which relief can be granted.

### A.  Count I.

Count I of the complaint alleges that Defendants breached their fiduciary duties of loyalty and prudence by using as Plan investment options the

---

[12] This description of Plaintiffs' claims conclusively demonstrates that Plaintiffs are not merely challenging "the composition of a given plan's lineup", as Defendants repeatedly assert in a Procrustean effort to shape this case into a dismissible form.

RiverSource mutual funds and ATC-managed trusts. Doc. 45 at 28−31 (¶¶107−17). "In order to state a claim under this provision, a plaintiff must make a prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan." *Braden*, 588 F.3d at 594 (citations omitted, referring to 29 U.S.C. §1104). As in *Braden*, Defendants here challenge only the issue of breach. *Id.* at 595.[13]

Plaintiffs' allegations plausibly show that Defendants selected the RiverSource and ATC funds to benefit themselves at the expense of participants despite the ready availability of better options, which *Braden* specifically recognizes states a claim for breach of fiduciary duty. 588 F.3d at 596 (citing *Roth*, 16 F.3d at 918–19). The "duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties[.]" *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996). Selecting poor performing or novel investments instead of better alternatives that provide clear benefits to the plan sponsor plausibly raises an inference (at the least) that the process by which Defendants selected these investments was "tainted by failure of

---

[13] Other than in the limited respect described below, Defendants do not challenge their fiduciary status or the poor performance, low ratings, and high fees of the challenged funds. The definition of a fiduciary under ERISA is extensive, including not only those named as such in the plan documents, 29 U.S.C. §1102(a), but any individual or entity who has or exercises fiduciary responsibilities, 29 U.S.C. §1002(21)(A); see *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262 (1993) (ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan"); *Tussey v. ABB, Inc.*, 2012 WL 1113291 at *3–5 (W.D.Mo. Mar. 31, 2012).

effort, competence, or loyalty", *Braden*, 588 F.3d at 596, if not by an outright desire to enrich Ameriprise at the participants' expense.

Plaintiffs also specifically allege that Defendants selected higher-cost share classes of the RiverSource funds when lower-cost share classes were available, which *Braden* and other courts recognize is sufficient to state a claim of breach of loyalty and prudence. *Id.* at 595–96 ("Plan offers only retail class shares, which charge significantly higher fees than institutional shares for the same return on investment"); *Tibble v. Edison Int'l*, 2010 WL 2757153 at *30 (C.D.Cal. July 8, 2010) ("In light of the fact that the institutional share classes offered the exact same investment at a lower fee, a prudent fiduciary acting in a like capacity would have invested in the institutional share classes.").

Plaintiffs allege that Defendants kept the RiverSource funds in the Plan despite their poor performance because of the benefits that provided to Ameriprise, just as the *Braden* plaintiffs alleged their fiduciaries retained underperforming investments for the benefits that provided to the plan trustee. *Braden*, 588 F.3d at 596. Plaintiffs' allegations are far more specific than "a bare allegation that cheaper alternative investments exist in the marketplace." *Id.* at 596 n.7 (distinguishing *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)). In fact, they point to specific prudent alternatives to Defendants' funds, as did the *Braden* plaintiffs. Doc. 45 at 14 (¶61), 18 (¶72); *Braden*, 588 F.3d at 590. As well as *Braden*, numerous courts in other ERISA fiduciary breach cases over excessive

19

fees of mutual fund investment options alone have found even less specific allegations sufficient to state a claim.[14]

Defendants' use of the Retirement Plus funds also plausibly shows a breach of loyalty and prudence on its own, since those funds were wholly unproven and paled in comparison to other non-Ameriprise funds that were readily available to the Plan. Based on the clear superiority of existing non-RiverSource target date funds, it is a plausible inference at the least that Defendants used the retirement assets of its own employees to seed the new and untested Retirement Plus Funds, which made those funds more marketable to outside investors and increased profits for RiverSource and its parent Ameriprise. Doc. 45 at 19 (¶78). In *Tussey*, defendants were found liable under ERISA when they chose a family of Fidelity target date funds that benefited them through revenue sharing at the expense of the plan participants. *Tussey*, 2012 WL 1113291 at *22−24.

---

[14] See *Ruppert v. Principal Life Ins. Co.*, 796 F.Supp.2d 959, 960 (S.D.Iowa 2010) (reversing dismissal of similar allegations in light of *Braden*); *George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 1049 (N.D. Ill. 2009); *Shirk v. Fifth Third Bancorp*, 2008 WL 4449024 at *20−21 (S.D.Ohio Sep. 26, 2008); *Martin v. Caterpillar, Inc.*, 2008 WL 5082981 at * 5 (C.D.Ill. Sep. 25, 2008); *Tibble v. Edison Int'l*, No. 07-5359, Doc. 26 (C.D.Cal. July 16, 2008); *Tussey v. ABB, Inc.*, 2008 WL 379666 at *5 (W.D.Mo. Feb. 11, 2008); *Haddock v. Nationwide Fin. Servs., Inc.*, 514 F.Supp.2d 267 (D.Conn. 2007); *Phones Plus, Inc. v. Hartford Fin. Servs. Group, Inc.*, 2007 WL 3124733 (D.Conn. Oct. 23, 2007); *Beesley v. Int'l Paper Co.*, 2007 WL 2458228 (S.D.Ill. Aug. 24, 2007); *Abbott v. Lockheed Martin Corp.*, 2007 WL 2316485 (S.D.Ill. Aug. 13, 2007); *Kanawi v. Bechtel Corp.*, 2007 WL 5787490 at *5 (N.D.Cal. May 15, 2007); *Spano v. Boeing Co.*, 2007 WL 1149192 (S.D.Ill. Apr. 18, 2007).

Judge Magnuson, in this District, found a complaint sufficient to state an ERISA fiduciary breach claim that alleged, among other things, that the plan sponsor (Wells Fargo) included its own mutual funds in the plan to provide those funds "seed money" and grow its investment management business, but were overpriced and underperformed available alternatives. *Gipson v. Wells Fargo & Co.*, 2009 WL 702004 at *5–6 (D.Minn. Mar. 13, 2009). As Judge Magnuson noted, the allegation alone that the plan fiduciaries "should have invested in other funds that outperformed the Wells Fargo funds...is plainly sufficient to withstand a motion to dismiss." *Id.* at 6. Plaintiffs' complaint here clearly satisfies that standard.

Plaintiffs' allegations that Defendants used as Plan investment options untested, overpriced, and poorly performing funds for the benefits they provided to Ameriprise are not "precisely the result one would expect" from a prudent and loyal fiduciary acting *exclusively* for benefit of plan participants. Cf. *Braden*, 588 F.3d at 597 (an "inference pressed by the plaintiffs is not plausible if the facts he points to are precisely the result one would expect from lawful conduct in which the defendant is known to have engaged"). Therefore, the inference that the process by which Defendants selected and managed funds in the Plan was "tainted by failure of effort, competence, or loyalty", *id.* at 596, is as plausible here as it was in *Braden*.

Despite this overwhelming authority in support of the sufficiency of the complaint, Defendants assert there are plausible, lawful reasons why they used

these funds. That is not a basis for dismissing a complaint, because "Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct." *Id*. at 596.

Defendants contend that *Braden* is off point because the Wal-Mart plan did not include a self-directed account option, as did the Deere plan in *Hecker*. *Braden* did not indicate that difference was the *sine qua non* to its decision. Instead, *Braden* stated in a footnote only that "the far narrower range of investment options available in this case makes *more plausible* the claim that this Plan was imprudently managed." *Braden*, 588 F.3d at 596 n.6 (emphasis added). Plaintiffs' allegations of self-dealing here are enough by themselves to make plausible the claim that this Plan was imprudently and disloyally managed. And whereas *Hecker* found it "untenable to suggest that all of the more than 2500 publicly available investment options had excessive expense ratios", *id.* (quoting *Hecker*, 556 F.3d at 581 (referring to the brokerage window)), Plaintiffs here do not challenge the expenses of the mutual funds in this Plan's SMBA brokerage window.

 The more fundamental flaw in Defendants' reliance on other Plan investments to remove the taint from their selection of imprudent investments is that most courts have expressly rejected that argument. *Pfeil v. State Street Bank & Trust Co.*, 671 F.3d 585, 597 (6th Cir. 2012) ("fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options"); *id.* at 597 ("the fiduciary's designation of a single

imprudent investment offered as part of an otherwise prudent menu of investment choices amounts to a breach of fiduciary duty"); *DiFelice*, 497 F.3d at 423 ("the prudence of investments or classes of investments by a plan must be judged individually"; quotation marks and citation omitted); *id*. at 423 ("a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds, which individuals may or may not elect to combine with [an imprudent option] could theoretically, in combination, create a prudent portfolio.").

Even the Seventh Circuit, including the *Hecker* panel, has rejected Defendants' suggestion here that merely providing a mix of investments—some prudent, some not—satisfies their fiduciary duties because it is enough to let participants avoid imprudent funds. *Hecker v. Deere*, 569 F.3d 708, 711 (7th Cir. 2009) (a fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them."); *Howell v. Motorola, Inc.*, 633 F.3d 552, 567 (7th Cir. 2011) ("It is instead the fiduciary's responsibility, as the Secretary puts it, to screen investment alternatives and to ensure that imprudent options are not offered to plan participants."), cert. denied sub nom., *Lingis v. Dorazil*, 132 S.Ct. 96 (2011); *Spano v. Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011) ("It is entirely possible, after all, that out of the 11 options a particular plan might offer, 10 were sound and one was ill-advised and should

never have been offered.").[15]

The Sixth Circuit aptly describes why that is the law. "If the rule were otherwise, a fiduciary administering any 401(k) where participants direct their own investments could always argue that the participant's decision to hold the imprudent investment was an intervening cause and avoid any liability." *Pfeil*, 671 F.3d at 598. A contrary standard, even *Hecker* notes, "would place an unreasonable burden on unsophisticated plan participants who do not have the resources to pre-screen investment alternatives." 569 F.3d at 711.

The SMBA was for sophisticated investors who could research mutual fund prospectuses on their own to construct a prudent retirement portfolio. Defendants' reliance on the SMBA as the means for participants to avoid the imprudent RiverSource funds is especially inapt for the following reasons. First, as Defendants noted, the SMBA "does not operate in the same way as the other 401(k) Plan investment options." E.g., Doc. 60-1 at 30. Second, it was not a fit alternative for Tier 2 participants who relied on SPDs to provide them descriptions

---

[15] It is thus simplistic, at best, for Defendants to contend that the Seventh Circuit reduced ERISA's fiduciary duties to merely providing a "sufficient mix of investments[.]" E.g., Doc. 59 at 5. Although addressing *Hecker*, *Braden* did not adopt *Hecker*'s "sufficient mix" terminology. *Hecker* itself warned that its decision was "tethered closely to the facts" before it, in which the plaintiffs "never alleged that any of the 26 investment alternatives that Deere made available to its 401(k) participants was unsound or reckless[.]" 569 F.3d at 711. That clearly is not the case here, as shown above. The other Seventh Circuit decision Defendants heavily rely on only concerned a broad claim of imprudence from using retail mutual funds and not the specific allegations Plaintiffs make here. *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011) (affirming dismissal where "district court decided that the current suit is a replay of *Hecker*") .

24

and performance histories of the core funds because the SPDs provide no descriptions or performance histories of the funds included in the SMBA. Third, the SMBA particularly was not an alternative for Retirement Plus Fund investors, who Defendants acknowledged "prefer not to put together their own portfolio mix, or don't have time to review individual investment options." Doc. 60-1 at 385. To use the SMBA, investors *had* to put together their own portfolio mix and *had* to have the time to review individual investment options. Fourth, the SMBA imposed additional burdens on participant use of that option. Funds destined for the SMBA first had to be invested in a core investment option, nearly all of which were RiverSource funds. Doc. 45 at 21 (¶86). Only when that fund reached $3,000 could a participant transfer into the SMBA. *Id*. Participants had to invest a minimum of $500 in each subsequent SMBA transaction. *Id*.

Apart from the much greater complexity of the SMBA, it also had very high fees and layers of them. The SMBA had an additional $25 annual maintenance fee and included only high-fee retail class mutual fund shares, even though a multi-billion dollar plan such as this could have provided participants institutional class shares at a much lower fee. Doc. 60-1 at 31. The SMBA also charged "Account Transfer Fees," "Transaction Fee Funds," "Transaction Fee Early Redemption," and "Other Expenses." *Id*.[16] So this was not an inexpensive alternative to what

---

[16] Although Defendants claim that the requirement for participants to have their assets in one of the Ameriprise "core" funds before the SMBA is no longer the case under the Schwab PCRA as of January 2011, the PCRA can still charge "transaction fees" of $8.95 to $74.95 depending on the fund and the circumstance.

Plaintiffs allege were unduly expensive funds. Plaintiffs also allege that when Ameriprise managed the SMBA, only funds that paid kickbacks or other compensation to one or more Defendants or other subsidiaries of Ameriprise were allowed into the SMBA. Doc. 45 at 21 (¶86). So this also was not an alternative for avoiding Defendants' self-dealing. Defendants' reliance on the SMBA to cure their breach this is without merit.

**B. Counts III & IV.**

To state a claim of prohibited transactions under ERISA, a plaintiff need only allege facts that show a violation of the terms of §1106. *Braden*, 588 F.3d at 601. That is sufficient to then "shift the burden" to Defendants to prove that the transaction is exempted under 29 U.S.C. §1108. *Id.*

> The transactions prohibited by § 1106 tend to be those in which a fiduciary might be inclined to favor [a party in interest] at the expense of the plan's beneficiaries…[and the] settled law is that in such situations the burden of proof is always on the party to the self-dealing transaction to justify its fairness.

*Id*. at 602 (quotation marks and citations omitted); see also *Ruppert*, 796 F.Supp.2d at 973 (*Braden* applies to prohibited transaction claims under both §1106(a) and §1106(b)).

Defendants do not challenge whether Plaintiffs have alleged facts supporting a prima facie case of prohibited transactions under §1106. Instead, Defendants' sole argument is that Plaintiffs do not allege facts to rebut the §1108 affirmative

---

Doc. 60-1 at 392. Even then, the 2011 SPD states that there could be even more fees and participants must look to a "complete fee schedule" online. *Id.*

defenses they claim apply to this case, specifically §1108(b)(8) and Prohibited

Transaction Exemption 77-3 (PTE 77-3), 42 Fed. Reg. 18734, 18734 (Mar. 31,

1977), adopted under authority of 28 U.S.C. §1108(a). *Braden* expressly rejects

Defendants' argument that Plaintiffs must plead around the §1108 defenses in

order to state a claim under §1106.

"[T]he statutory exemptions established by § 1108 are defenses which must be

proven *by the defendant*." *Braden*, 588 F.3d at 601 (citation omitted; emphasis

added).

> [A] plaintiff need not plead facts responsive to an affirmative
> defense before it is raised...[e]ven if Braden's allegation of
> unreasonableness were seen as raising the exemption for pleading
> purposes, that does not mean he thereby assumes the burden of proof
> on the issue.

*Id.* at 601 n.10 (citations omitted). Thus, in *Braden* the plaintiffs were not required

to "plead sufficient facts to show that the payments were unreasonable" in order to

avoid the defendant's exemption defense under 29 U.S.C. §1108(b)(2). 588 F.3d at

601. The same reasoning applies to the other exemption defenses under §1108 that

Defendants assert in this case.[17] As *Braden* notes, the facts supporting *Defendants'*

affirmative defense are in *Defendants'* possession. "It would be perverse to require

plaintiffs bringing prohibited transaction claims to plead facts that remain in the

---

[17] Defendants' contention that the "Eighth Circuit has not had occasion to
squarely consider…whether a plaintiff must plead nonapplication of an exemption
that otherwise plainly applies on the fact of the complaint", Doc. 59 at 29, plainly
is incorrect.

27

sole control of the parties who stand accused of wrongdoing." *Id.* at 602 (citing *Lowen*, 829 F.2d at 1215).

For their contrary argument, Defendants rely on two district court decisions outside the Eighth Circuit. Doc. 59 at 28–29 (citing *Mehling v. N.Y. Life Ins. Co.*, 163 F.Supp.2d 502, 510–11 (E.D.Pa. 2001), and *Leber v. Citigroup, Inc.*, 2010 WL 935442 at *10 (S.D.N.Y. Mar. 16, 2010).[18] These two decisions contradict *Braden* and thus are of no effect. Indeed, *Leber* itself expressly notes that its holding contradicts *Braden*. 2010 WL 935442 at *9. In rejecting *Mehling*, another court noted the decision "contains no reasoning that might persuade this Court to depart from the well-reasoned precedent, acknowledged by Defendants, that §1108 provides an affirmative defense, with the burden of evidence upon the Defendants." *Goldenberg v. Indel, Inc.*, 741 F.Supp.2d 618, 632 (D.N.J. 2010).

Far from admitting that either exemption applies to these transactions, the complaint alleges facts that undermine at least one element of each exemption. Both PTE 77-3 and §1108(b)(8) require that the transaction provide the fiduciaries or parties in interest no more than reasonable compensation.  PTE 77-3 part (iv), 42 Fed. Reg. at 18735 (plan must not "have dealings with the fund on terms any less favorable to the plan than such dealings are to other shareholders."); 29 U.S.C. §1108(b)(8)(ii)(B) (the trust company must receive "no[] more than reasonable compensation."). When Defendants failed to select the lowest-cost

---

[18] Defendants call these two cites "[m]ultiple courts", Doc. 59 at 28, which while technically correct (as in "more than one") is a misleading overstatement.

share class of the RiverSource funds, Doc. 45 at 16 (¶¶62−63), 19 (¶75), the Plan was not treated the same as other similarly situated institutional shareholders, who could have and did invest in the lower cost institutional shares, *id.* at 16 (¶64). *Gipson v. Wells Fargo & Co.*, 2009 WL 702004 at *4 (D.Minn. 2009) (Magnuson, J.) (allegation that a plan was not put in the cheapest share class of a mutual fund states a claim despite defendants' claim of a PTE 77-3 exemption). Plaintiffs also allege that the fees of the collective trusts, and the affiliated mutual funds they invested in, are unreasonable. Doc. 45 at 14−16 (¶¶61−67), 20 (¶¶80−81). Because under Plaintiffs' allegations the fees that Ameriprise's funds deducted from participant investments were unreasonable under 29 U.S.C. §§1103(c)(1) and 1104(a)(1)(A)(ii), those funds could not have provided only reasonable compensation as required by 29 U.S.C. §1108(b)(ii)(B). See also *Shirk*, 2008 WL 4449024 at *15−16 (allegations that defendants "engaged in self-interested transactions, profited from the management of Plan assets to the detriment of the Plan, its participants, and beneficiaries, and entered into agreements under which the Plan paid unreasonable fees and expenses" was sufficient to avoid PTE 77-3 defense).[19]

---

[19] As *Braden* notes, such allegations do not "put the exemption in play." 588 F.3d at 601 n.10. "Even if Braden's allegation of unreasonableness were seen as raising the exemption for pleading purposes, that does not mean he thereby assumes the burden of proof on the issue." *Id.*

## C. Count VII.

Count VII asserts Defendants breached their duties of loyalty and prudence and engaged in §1106(a)(1)(C) prohibited transactions by causing the Plan to pay the Plan's recordkeepers—ATC and Wachovia—excessive compensation for the services they provided to the Plan. Doc. 45 at 38–39. At the inception of the Plan, Defendants retained ATC, an Ameriprise subsidiary, to be the Plan's recordkeeper. *Id.* at 38 (¶160). Ameriprise later sold the ATC recordkeeping business to Wachovia Corporation (now Wells Fargo) and then kept Wachovia as the Plan's recordkeeper. *Id.* at 38 (¶161). ATC and Wachovia received revenue sharing and related kick-backs from the Plan's investment managers as well as interest earned on Plan assets as they moved in and out of the participants' accounts ("float"). *Id.* at 38 (¶¶162–63). Defendants failed to have a prudent process for evaluating the reasonableness of the recordkeepers' compensation and failed to obtain reasonably priced recordkeeping agreements through market competition. *Id.* at 39 (¶165).

Retaining plan service providers on an apparent no-bid basis for the benefits that provided to Ameriprise at the cost to participants of higher than necessary recordkeeping expenses plausibly suggests a fiduciary process "tainted by failure of effort, competence, or loyalty." *Braden*, 588 F.3d at 596. Even the Seventh Circuit has recognized that such a claim survives *summary judgment* where there is evidence alone of excessive recordkeeping fees and a failure to put out recordkeeping services to competitive bidding. *George v. Kraft Foods Global,*

30

*Inc.*, 641 F.3d 786, 798−800 (7th Cir. 2011) (reversing summary judgment for defendants). The Western District of Missouri entered judgment for plan participants on similar claims. *Tussey*, 2012 WL 1113291 at *9–13 (failure to monitor recordkeeping fees from all sources is a breach of duty); *id.* at *32–35 (retention of float interest on plan assets is a breach of duty). Plaintiffs' allegations here are even more probative of a fiduciary breach than *George* and *Tussey* because those cases, unlike this case, did not concern a fiduciary who was a subsidiary of the plan sponsor or who paid the plan sponsor for that business, which raises clear conflicts of interest that only bolster the plausibility of Plaintiffs' claims of fiduciary breach and prohibited transactions. Further, while it is true that there is nothing *per se* wrong with using mutual fund fees to pay for recordkeeping services, Doc. 59 at 15, as the court in *Tussey* points out "if a plan sponsor opts for revenue sharing as its method of paying for recordkeeping services, it must not only comply with its governing plan documents, it must also have gone through a deliberative process for determining why such a choice is in *the Plan's and participants' best interest*." 2012 WL 1113291 at *16 (emphasis added); see also DOL Advisory Opinion 97-15A, May 22, 1997.[20]

### D. Counts II & VI.

Count II asserts that the CBC, its members and delegates, and Ameriprise breached their fiduciary duties by failing to adequately monitor and remove breaching fiduciaries over whom they had authority or control. Doc. 45 at 31−32

---

[20] Available at http://www.dol.gov/ebsa/programs/ori/advisory97/97-15a.htm.

(¶¶118−25). An appointing fiduciary has a duty to monitor its appointees and is thus a discretionary fiduciary under 29 U.S.C. §1002(21)(A). 29 C.F.R. §2509.75-8 (D4 and FR-17); 29 U.S.C. §1105(a)(2) (a fiduciary is liable if by failure to comply with duties of prudence and loyalty "he has enabled such other fiduciary to commit a breach"). Count VI asserts co-fiduciary liability against Ameriprise for the breaches committed by the other fiduciaries in which Ameriprise participated knowingly or knew of and failed to remedy through reasonable efforts. Doc. 45 at 37 (¶¶152−57); 29 U.S.C. §1105(a)(1) and (3). Defendants argue that since the fiduciary breach claims against the underlying fiduciaries fail, these derivative claims must fail. Doc. 59 at 35. Because, as indicated above, the allegations as to the underlying fiduciaries *do* state claims for fiduciary breach, this argument fails.[21]

Defendants also argue Ameriprise should be dismissed because Plaintiffs have failed to allege sufficiently specific facts to show that Ameriprise had "appointing authority obligating them to monitor the committees charged with overseeing the Plan[.]" Doc. 59 at 36. *Braden* makes clear, however, that Plaintiffs are not required to plead specific facts about the actual fiduciary process, because they are not privy to that information. 588 F.3d at 595–96. As another court has

---

[21] Defendants improperly cite *Crocker v. K.V. Pharm. Co.*, 782 F.Supp.2d 760, 787−88 (E.D.Mo. 2010), to suggest that court dismissed an ERISA monitoring claim because plaintiffs "failed to plead sufficient facts" regarding the monitoring process. Doc. 59 at 36. The *Crocker* court dismissed the monitoring claim only because it had concluded that there was no underlying breach by the appointed fiduciaries. *Crocker*, 782 F.Supp.2d at 787−88.

recognized, how each defendant performed its fiduciary duties is hidden and

plaintiffs cannot be expected to discover it at the pleading stage.

> [T]he manner in which each defendant, which are in the universe of
> possible decision makers, operated is for now something of a black
> box. To expect a plaintiff to be able to turn on the light and point to
> the particular individuals who exercised decision making authority is
> simply too much to require at this stage of the case.

*Rankin v. Rots*, 278 F.Supp.2d 853, 879 (E.D.Mich. 2003).

   That Ameriprise controlled who were the fiduciaries of its Plan is shown by

the fact that all of the fiduciaries were committees or appointees of Ameriprise's

own Board of Directors. See Doc. 45 at 4 (¶20). Even when Plan fiduciary

committee members were merely designated officers of Ameriprise, the

corporation still controlled who became fiduciaries of the Plan by controlling who

became those officers. *Id*. at 4 (¶20), 6 (¶26). Since those acting for Ameriprise

(whether the Board or delegees of the Board) knew that the individuals appointed

to certain corporate offices would automatically become Plan fiduciaries, they had

an obligation to exercise prudence and loyalty under §1104(a)(1) in making those

appointments and in retaining those individuals in those offices despite known

breaches by those individuals of their fiduciary duties to the Plan. Allowing a plan

document to designate fiduciaries by corporate office and absolve the corporation

from disloyally and imprudently maintaining in that office an individual in breach

of his ERISA fiduciary duties completely contradicts ERISA's purpose in

protecting participants from fiduciary misuse and mismanagement of plan assets,

*Braden*, 588 F.3d at 597, particularly when that misuse and mismanagement

benefits the corporation itself.

### E. Count V.

Count V seeks to restore to Plaintiffs' Plan the profits of the Defendants "which have been made through the use of the assets of the plan by the fiduciary", 29 U.S.C. §1109(a), specifically, the profits from the sale of Ameriprise's recordkeeping business to Wachovia and the retention of Wachovia as recordkeeper to boost that sale price. Doc. 45 at 35–36. Plaintiffs allege that that sale price was based on the imprudent and disloyal selection of ATC and Wachovia as the Plan's recordkeeper and the excessive recordkeeping fees that the Plan paid as a result. *Id.* at 35–36 (¶¶145–48). Plaintiffs also allege that Ameriprise received earn-out payments for 18-months following the sale based on the fiduciaries' decision to allow Wachovia to recordkeep the Plan without competitive bidding or meaningful fiduciary review. *Id.* at 35–36 (¶¶146, 148). Based on the facts described above, this is a plausible claim and is sufficiently pleaded in light of the hidden nature of the details of this transaction. *Braden*, 588 F.3d at 597.

Defendants assert that it was a corporate decision, not a fiduciary decision, to sell its recordkeeping business, and Plaintiffs do not dispute that. However, that does not mean Defendants are allowed to keep the profits from that sale that resulted from the unlawful use of Plan assets by channeling Plan funds to ATC and then Wachovia through excessive recordkeeping fees. Indeed, §1109(a) states the opposite. Moreover, 29 U.S.C. §1132(a)(3) authorizes "action for restitution

34

against a transferee of tainted plan assets," regardless of whether the transferees were themselves fiduciaries to the plan. *Harris Trust*, 530 U.S. at 253. Plaintiffs need only show "the transferee ... had actual or constructive knowledge of the circumstances that rendered the transaction unlawful", *id.* at 251, and may obtain "restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom", *id.* at 250. It was a breach of ERISA to use ATC as the Plan's recordkeeper and to allow ATC to move its business to Wachovia, without competitive bidding or fiduciary review, in order to increase the sale price Ameriprise received for its recordkeeping business, including its 18-month earn-out payments. Doc. 45 at 35–36 (¶¶145–48). Ameriprise knew of these breaches of 29 U.S.C. §§1104 and 1106 and is, accordingly, liable to restore to the Plan the portion of the sale-related revenue Ameriprise received as a result of the Plan's use of ATC and Wachovia. *Id*. at 36 (¶151).

### F.  Count VIII.

Count VIII states a claim of unjust enrichment under federal common law against Ameriprise and the CBC as an alternative to their ERISA-based claim for restitution under §1109(a). Doc. 45 at 39–40 (¶¶168−75). To state a claim for unjust enrichment under federal common law, a plaintiff must allege that the defendant received money it was not entitled to, that it was obligated to transfer that money to its rightful owner, and that it did not do so. See *Am. Cleaners & Laundry Co. v. Textile Processors Union Local 161*, 482 F.Supp.2d 1103, 1115–

35

16 (E.D.Mo. 2007) (elements of federal common law unjust enrichment in the context of overpayments into an ERISA plan by an employer). Plaintiffs allege that Ameriprise and the CBC, through RiverSource, ATC, and other subsidiaries, were unjustly enriched as a result of their roles as service provider, Trustee, and recordkeeper for the Plan. Specifically, Ameriprise received payments from Wachovia based in part on the business of recordkeeping the Plan. Ameriprise and the CBC knew these payments were improper because they had steered Plan fiduciaries to select ATC as recordkeeper, to continue to use Wachovia during the 18-month earn-out period and to select RiverSource and Ameriprise funds that paid fees, revenue sharing and other kickbacks to Ameriprise. See 29 U.S.C. §1104(a) (the duty of loyalty requires a fiduciary to act "for the exclusive purpose of providing benefits to participants and their beneficiaries…"). Because Ameriprise knew that Plan fiduciaries committed prohibited transactions and breaches of the duties of prudence and loyalty by having the Plan recordkept by ATC and Wachovia, Ameriprise must disgorge their profits from the Plan's role in that sale back to the Plan under both 29 U.S.C. §1109 and federal common law.

Where "no cause of action [is] stated under an ERISA provision, and the parties are not claiming that a particular ERISA section expressly governs the issue…, [courts] are compelled to look to federal common law." *Mohamed v. Kerr*, 53 F.3d 911, 913 (8th Cir. 1995), abrogated on other grounds by *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285 (2009). The Eighth Circuit and numerous district courts have found that unjust enrichment is available. *Young*

36

*Am., Inc. v. Union Cent. Life Ins. Co.*, 101 F.3d 546, 548 (8th Cir. 1996)

(employer had federal common law action for restitution of mistaken payments to

an ERISA plan); *Greater St. Louis Const. Laborers Welfare Fund v. Park-Mark,*

*Inc.*, 2011 WL 5239668 at *3 (E.D.Mo. Nov. 1, 2011) (recognizing federal

common law of right of action for unjust enrichment); *St. Paul Warehouse*

*Employees Welfare Fund v. SPS Cos.*, 2008 WL 239521 at *4 (D.Minn. Jan. 29,

2008) (Montgomery, J.) (recognizing federal common law restitution and/or unjust

enrichment claim); *Am. Cleaners*, 482 F.Supp.2d at 1115–16 (upholding unjust

enrichment claim in context of ERISA plan to remedy overpayments to

defendants). Plaintiffs can plead claims in the alternative. *Garman v. Griffin*, 666

F.2d 1156, 1157 n.1 (8th Cir. 1981).

## V.   The other cases in which Plaintiffs' attorneys have appeared have no bearing on *this* complaint's statement of claims for breach of ERISA's fiduciary duties.

In an attempt to divert attention from the facts of *this* case, Defendants point to

other cases in which participants were represented by the same attorneys who

represent Plaintiffs here. But they fail to point out the difference in the claims of

those cases and this case. They also fail to point out the numerous successes in

those other cases, particularly a judgment from the Western District of Missouri

finding unlawful self-dealing by plan fiduciaries and excessive recordkeeping fees

and ordering the defendant fiduciaries to restore $36.9 million in plan losses and

issuing substantial injunctive relief designed to prevent ABB from benefitting

from the plan's contracts with service providers. *Tussey v. ABB, Inc.*, 2012 WL

1113291 (W.D.Mo. Mar. 31, 2012).[22] They also fail to point out that another

district court found it to be a breach of fiduciary duty to select the more expensive

of two share classes of the same mutual fund without good cause, just as Plaintiffs

allege occurred in their plan. *Tibble v. Edison Int'l*, 2010 WL 2757153 at *30

(C.D.Cal. July 8, 2010), appeal pending Nos. 10-56406 and 10-56415 (9th Cir.).[23]

In another case involving self-dealing by defendants' improper use of their own

mutual funds as plan investment options, the defendants settled for $18.5 million

on the eve of appellate argument, despite having obtained summary judgment in

their favor. *Kanawi v. Bechtel Corp.*, No. 06-5566 Docs. 795-1 at 6, 827 (N.D.Cal.

Mar. 1, 2011). The Settlement Agreement in that case further requires, among

other affirmative relief, that defendants had to avoid self-dealing, including

"knowingly own[ing] in material part any investment manager or service provider

to the Plan." *Id*. at 23; see also *id.* at 23−25. The Seventh Circuit has even reversed

summary judgment for fiduciary defendants on claims of excessive recordkeeping

fees and an imprudently managed investment option, despite what Defendants

here claim is a supposed blanket indemnity for plans that have a sufficient number

of options and range of fees. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786

(7th Cir. 2011). Other cases have settled or are in the process of settling similar

claims of fiduciary breach. *Will v. Gen. Dynamics Corp.*, No. 06-698 Doc. 238-1

at 32–33, Doc. 261 (S.D.Ill. Nov. 22, 2010) ($15,150,000 million plus affirmative

---

[22] Defendants' attorneys here also were defendant attorneys in *Tussey*.
[23] Defendants' attorneys here also represented the defendants in *Tibble*.

relief); *Martin v. Caterpillar, Inc.*, No. 07-1009, Doc. 152-1 at 5, 22–23, Doc. 192

(C.D.Ill. Aug. 12, 2010) ($16.5 million plus affirmative relief); *George v. Kraft*

*Foods Global, Inc.*, No. 07-1713 Doc. 327-1 at 5, Doc. 336 (N.D.Ill. Feb 29,

2012) and *George v. Kraft Foods Global, Inc.*, No. 08-3799 Doc. 328 at 5, Doc.

335 (N.D.Ill. Feb 29, 2012) (both actions preliminarily settled for $9.5 million

plus affirmative relief). Collectively, cases brought by Plaintiffs' counsel on behalf

of other 401(k) plans have dramatically altered the landscape and furthered

protection of employees and retirees.[24]   These cases support denial of Defendants'

motion.

The issue before the court is not the other cases Plaintiffs' attorneys have

litigated. The issue is the facts of *this* case. Under the facts Plaintiffs allege and the

Eighth Circuit's standards for stating claims, Defendants' motion to dismiss is

without merit and should be denied.

## CONCLUSION

Plaintiffs request that the Court deny Defendants' Motion to Dismiss.

---

[24] See, e.g., Anne Tergesen, *Will 401(k)s Abandon Revenue Sharing?*,
SMARTMONEY BLOGS (May 2, 2012), available at
http://blogs.smartmoney.com/encore/2012/05/02/will-401ks-abandon-revenue-
sharing/.

Respectfully Submitted,

Dated: May 15, 2012

SCHLICHTER, BOGARD & DENTON
LLP
By:/s/ Jerome J. Schlichter
Jerome J. Schlichter
(admitted pro hac vice, MO #32225)
Michael A. Wolff
(admitted pro hac vice, MO #38207)
Mark G. Boyko
(admitted pro hac vice, MO #57318)
100 South Fourth Street, Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (fax)
jschlichter@uselaws.com
mwolff@uselaws.com
mboyko@uselaws.com

*Lead Counsel for Plaintiffs*

FOLEY & MANSFIELD PLLP
By:/s/ Thomas W. Pahl
Thomas W. Pahl
(MN #0243012)
250 Marquette Avenue, Suite 1200
Minneapolis, Minnesota 55401
(612) 338-8788
(612) 338-8690 (fax)
tpahl@foleymansfield.com

*Local Counsel for Plaintiffs*

40