# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Roger Krueger, Jeffrey Olson, Edward Pope, Deborah Tuckner, Bernice Hillukka, Susan Wones, and Margene Bauhs, individually and as representatives of a class of similarly situated persons, and on behalf of the Ameriprise Financial 401(k) Plan, | Case No. 11-cv-02781 (SRN/JSM) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| Ameriprise Financial, Inc., Ameriprise Financial, Inc. Employee Benefits Administration Committee, Michelle Rudlong, Ameriprise Financial, Inc. 401(k) Investment Committee, Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc., Ira D. Hall, Warren D. Knowlton, W. Walker Lewis, Siri S. Marshall, Jeffrey Noddle, Richard F. Powers III, Robert F. Sharpe, Jr., John Does 1-60, Jeffrey P. Fox, Phil Wentzel, Jeffrey A. Williams, Martin S. Solhaug, Kristi L. Peterson, Timothy V. Bechtold, and Brent Sabin, | |
| Defendants. | |

Jerome J. Schlichter, Mark G. Boyko, and Michael A. Wolff, Schlichter Bogard & Denton, 100 South Fourth Street, Suite 900, St. Louis, MO 63102,  Lisa Lamm Bachman, Fafinski Mark & Johnson, P.A., 775 Prairie Center Drive, Suite 400, Eden Prairie, MN 55344, Thomas W. Pahl, Foley & Mansfield, PLLP, 250 Marquette Avenue Suite 1200, Minneapolis, MN 55401, for Plaintiffs.

Stephen P. Lucke and Kirsten E. Schubert, Dorsey & Whitney LLP, 50 South 6th Street Suite 1500, Minneapolis, MN 55402-1498, Benjamin G. Bradshaw and Shannon M. Barrett, O'Melveny & Myers LLP, 1625 Eye Street N.W., Washington, DC 20006, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

This matter is before the Court on Defendants Ameriprise Financial, Inc., Ameriprise

Financial, Inc. Employee Benefits Administration Committee, Michelle Rudlong,

Ameriprise Financial, Inc. 401(k) Investment Committee, Compensation and Benefits

Committee of the Board of Directors of Ameriprise Financial, Inc., Ira D. Hall, Warren D.

Knowlton, W. Walker Lewis, Siri S. Marshall, Jeffrey Noddle, Richard F. Powers III,

Robert F. Sharpe, Jr., John Does 1-60, Jeffrey P. Fox, Phil Wentzel, Jeffrey A. Williams,

Martin S. Solhaug, Kristi L. Peterson, Timothy V. Bechtold, and Brent Sabin's (collectively

"Defendants") Motion to Dismiss the First Amended Complaint for Failure to State a

Claim.  (Doc. No. 57.)  For the reasons stated below, the Court grants in part and denies in

part Defendants' Motion.

## II.      BACKGROUND

### A.      Ameriprise's 401(k) Program

Defendant Ameriprise Financial, Inc. ("Ameriprise") is a holding company that

provides financial planning, insurance, investment funds, and other services to customers

through subsidiaries including Ameriprise Trust Company ("ATC"), RiverSource

Investments LLC ("RiverSource"),[1] Ameriprise Financial Services, Inc., and Ameriprise

Retirement Services.  (Am. Compl., Doc. No. 45,  ¶¶ 43–50.)  Ameriprise was once part of

---

[1]      After the acquisition of Columbia Management from Bank of America in April
2010, the RiverSource subsidiaries were combined with Columbia under the Columbia
brand.  (Am. Compl. ¶ 46.)  Both are referred to in this Order as RiverSource.

American Express Companies ("American Express") and its employees were covered by the American Express retirement plan. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 59 ("Defs.' Mem.") at p. 6; Am. Compl. ¶ 44.) When Ameriprise spun off from American Express in October 2005, the Ameriprise Financial 401(k) retirement benefit plan (the "Plan") "cloned" the American Express 401(k) plan, including all of its investments. (Id.; see also Decl. of Brent Sabin, Doc. No. 60 ("Sabin Decl.), Ex. 1, 2005 Summary Plan Description ("2005 SPD") at p. i; Am. Compl. ¶¶ 7–8.) Ameriprise is now the Plan sponsor and party of interest to the Plan under 29 U.S.C. § 1002(14). (Am. Compl. ¶ 37.)

The Plan is a "defined contribution plan" under 29 U.S.C. § 1002(34) and "employee pension benefit plan" under 29 U.S.C. § 1002(2), meaning that participants contribute to individual accounts, select from a menu of investments for the account assets, and receive their value at retirement. (Am. Compl. ¶¶ 5–6.) The Plan is also a qualified plan under 26 U.S.C. § 401 and is commonly referred to as a "401(k) Plan." (Id. ¶ 7.) It is available to eligible employees and retirees of Ameriprise and its subsidiaries and affiliates, and Ameriprise matches a portion of the participants' contributions. (Id. ¶ 9; 2005 SPD at pp. 1, 4, 36, Sabin Decl. Ex. 6, 2011 Summary Plan Description ("2011 SPD") at p. 5.) Participants are free to move their Plan balances among investment options on a daily basis. (2011 SPD at p. 22; Sabin Decl., Ex. 10 at §§ 6.2(c).)

Two named fiduciary committees have primary responsibility for administering the Plan. Ameriprise's Employee Benefits Administration Committee ("EBAC") is the Plan administrator under 29 U.S.C. § 1002(16)(A) and is responsible for determining benefits eligibility and construing Plan documents. (Am. Compl. ¶¶ 20–21; Sabin Decl. Ex. 10 §§

2.4; 10.3.) EBAC has administered the Plan since October 2005 and its members are appointed by Ameriprise's Compensation and Benefits Committee of the Board of Directors ("CBC"). (Am. Compl. ¶¶ 20, 56.) The CBC also supervises EBAC and has the authority to remove its members. (Id. ¶¶ 32, 121.) The Ameriprise Financial, Inc. 401(k) Investment Committee ("Investment Committee") also administers the Plan by selecting and monitoring the investment options in the Plan lineup. (Am. Compl. ¶¶ 26, 56.) The Investment Committee directs how investment options for the Plan are invested. (Id.)

The Ameriprise Plan document authorizes investment of Plan assets in a wide variety of investment vehicles, including both mutual funds[2] and collective trusts. (Sabin Decl. Ex. 13 § 5.2.) When the Plan was first developed, it offered participants several investment options, including an Ameriprise stock fund, an income fund devoted primarily to government bonds, several mutual funds and collective trusts managed by Ameriprise affiliates and others, and a self-directed brokerage window through which participants could invest in hundreds of other non-affiliated mutual funds. (2005 SPD at pp. 13–23; Am. Compl. ¶¶ 55, 83–86.)

The Plan currently offers three groups of investment options. (Decl. of Shannon Barrett, Doc. No. 61 ("Barrett Decl.") Ex. C.) Tier 1 consists of several "target maturity funds" that are designed for participants who do not wish to put together their own individualized mix of investment options and who have a likely retirement date. (Id.; 2011

---

[2]     "A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund." Jones v. Harris Assocs. L.P., __ U.S. __, 130 S. Ct. 1418, 1422 (2010) (alterations in original and citations omitted).

SPD at 14, 19)  Tier 2 comprises "core investments," including an Ameriprise stock fund, an income fund, and other mutual fund and collective trust options.  (Barrett Decl. Ex. C; 2011 SPD at pp. 15–19.)  Tier 3 is the Plan's Self-Managed Brokerage Account ("SMBA"), through which Plan participants can individually invest in funds offered by a variety of investment managers.  (Id.; 2011 SPD at 320)  In January 2011, the Plan switched brokerage windows, from one managed by Ameriprise that offered approximately 900 investment funds to one managed by Charles Schwab that offers over 6,000 funds.  (Id.; Am. Compl. ¶ 85.)

The 2011 Summary Plan Descriptions ("SPDs") distributed to Plan participants disclose the investment options' objective and historical performance, as well as expense ratios[3] for target maturity funds and core investments.  (2011 SPD at pp. 25–27.)  The SPDs do not describe the SMBA mutual funds or provide performance histories for those funds.  (Cf. id.)

The Plan's assets are held by trustees selected by the Investment Committee.  (Sabin Decl. Ex. 10 §§ 6.1, 12.1.)  ATC was the trustee and record-keeper of the Plan until Ameriprise sold its record-keeping business, including ATC, in March 2007 to Wachovia Corporation, which then became the Plan's trustee and record-keeper.  (Am. Compl. ¶¶ 10–11.)  Wachovia became a part of Wells Fargo & Company ("Wells Fargo") effective December 31, 2008.  (Id. ¶ 12.)  Wells Fargo is currently the trustee and record-keeper for assets invested in the target maturity funds and core investment options, while Charles

---

[3]      An expense ratio is "a percentage of each contributor's assets invested in a particular fund."  Renfro v. Unisys Corp., 671 F.3d 314, 319 (3d Cir. 2011).

Schwab is the trustee for assets in the SMBA.  (Sabin Decl. Exs. 11–13; Am. Compl. ¶¶ 10–12.)  Under the Plan's terms, Plan administration and reasonable trustee expenses are to be paid from Plan assets.  (Sabin Decl. Ex. 10 § 10.7.)

### B.     Plaintiffs' Amended Complaint

Plaintiffs are three current and four former participants in the Plan who seek to represent a class of all participants in and beneficiaries of the Plan since its inception in October 2005.  (Am. Compl. ¶ 1, 13–19, 105.)  Plaintiffs allege that the Plan has invested "hundreds of millions of dollars in mutual funds managed by Ameriprise subsidiaries RiverSource . . . as well as, commingled trusts managed by ATC" despite "many investment options available in the market."  (Id. ¶ 53–54.)  Plaintiffs claim that these investment options were "chosen because they were managed by, paid fees to, and generated profits for Ameriprise, its subsidiaries, and Wachovia."  (Id.)  Plaintiffs state that the Plan's investment in RiverSource and ATC averaged approximately $500,000,000 per year from October 1, 2005 to the present.  (Id. ¶ 57.)

Plaintiffs note that Defendants invested in RiverSource mutual funds, which were newly created when the target maturity funds invested in them and had no performance history.  (Id. ¶ 78.)  Indeed, the "Plan was the first investor in the Funds."  (Id.)  Plaintiffs claim "Ameriprise used the retirement assets of [its] employees to seed new and untested mutual funds, which made those funds more marketable to outside investors, thus increasing profits for RiverSource and its parent, Ameriprise."  (Id.)

Plaintiffs further allege that the RiverSource mutual funds that the Plan invested in performed poorly.  The funds underperformed their benchmarks each year by 0.62%,

4.22%, 7.05%, 9.89%, 12.62%. and 1.75%.  (Id. ¶ 68.)  Plaintiffs note that Morningstar,

an independent rating service, gave the funds lower ratings than other comparable funds.

(Id. ¶ 69.)  A web-based investment application called MyPlanIQ rated the risk-adjusted

returns of the Ameriprise Plan's investments in the bottom 2% of defined contribution

plans with respect to fund quality.  (Id. ¶ 70.)  Other RiverSource funds had no rating at

all because they lacked any performance history when placed in the Plan.  (Id. ¶ 79.)

Furthermore, Plaintiffs argue that "prudent" investors left RiverSource funds resulting in

2005 RiverSource stock and bond outflows of $9.3 billion.  (Id. ¶ 71.)  In 2006, there was

an additional $6.9 billion in assets pulled from the fund.  (Id.)

Plaintiffs argue that Plan participants in the target maturity funds paid excessive

fees to invest in RiverSource mutual funds.  (Id. ¶ 73.)  Specifically, they point out that

the RiverSource Retirement Plus funds did not directly invest in stocks, bonds, or money

markets, but rather were required to invest in other RiverSource mutual funds.  (Id.)

Thus, Plaintiffs allege that participants paid fees on the underlying RiverSource funds, in

which RiverSource funds invested, in addition to fees to ATC and RiverSource for

participating in the target maturity funds—effectively paying Ameriprise both for

managing the RiverSource fund and for choosing its RiverSource fund to invest in.  (Id.)

Plaintiffs further contend that other similar funds with established performance

histories—such as Vanguard, Fidelity, and T. Rowe Price—do not charge two levels of

fees for participation in the cheapest share classes of their target date funds.  (Id. ¶ 74.)

Plaintiffs claim that the fees were higher than the median fees for comparable or better-

performing mutual funds, as reported by the Investment Company Institute and

BrightScope, Inc., an independent provider of 401(k) ratings and data.  (Id. ¶ 61.)

Plaintiffs state that Vanguard target maturity fund fees were 65–127 base points ("bps")

lower than the RiverSource mutual fund investments' fees.  (Id.)  According to Plaintiffs,

the excessive fees charged to participants generated "millions of dollars in fees for

RiverSource, RiverSource Fund Distributors, Inc., and RiverSource Service Corporation,

who also diverted a portion of those fees to ATC and other subsidiaries of Ameriprise."

(Id. ¶ 58.)

      Plaintiffs also allege that the core investments were invested in numerous mutual

funds managed by RiverSource as well as commingled trusts managed by ATC (the ATC

trusts only invested in RiverSource mutual funds).  (Id. ¶¶ 53–56.)  Of the 15 core

investment options in the Plan at its inception, 14 were managed by RiverSource or ATC.

(2005 SPD at pp. 22–29.)  Of the 18 core investment options added to the Plan since its

inception, 12 were managed by RiverSource or ATC.  (Am. Compl. ¶ 94)  In 2006, for

example, the Investment Committee added eight target date funds to the Plan.  (Id. ¶ 72.)

At the time, the three largest target date fund families were Vanguard, Fidelity, and T.

Rowe Price, with expense ratios of 20 bps, 76 bps, and 76 bps, respectively.  (Id.)

Instead of choosing one of these funds, the Investment Committee chose to use the in

house Ameriprise and RiverSource target date funds, which charged fees over 90 bps,

and as high as 94 bps.  (Id.)

      Plaintiffs further claim that the Plan participants were only allowed to participate

in the SMBA investment option "if they agreed to rebate a portion of their fees to

RiverSource and/or ATC."  (Id. ¶ 84.)  The Plaintiffs state that the SMBA options

"charged fees higher than those available to institutional investors, such as the Plan, in addition to charging annual account maintenance fees and transfer fees." (Id.) When Ameriprise was still the trustee to the SMBA before the switch to Charles Schwab in 2011, participants were not permitted to contribute directly into the mutual funds in the SMBA. (Id. ¶ 86.) Participants had to accumulate assets in the "core investment" options and transfer those assets once they had accumulated $3,000 (for the initial deposit) and $500 (for subsequent transfers). (Id.) For most transfers, participants were charged a $39.95 transfer fee, in addition to a $25 annual account maintenance fee and the retail-level fees charged by the options in the SMBA, which were paid to Ameriprise and its subsidiaries. (Id. ¶ 86–87.) After the SMBA moved to Charles Schwab, participants were not permitted to take withdrawals directly from the SMBA. (Id. ¶ 89.) Participants had to first move to a core investment option within the Plan. (Id.)

Plaintiffs allege that because there are over 5,000 mutual funds available to individual investors outside the Plan, "Defendants' [initial] inclusion of only 900 of those funds in the SMBA [originally] indicates . . . that those funds were selected not because of their inherent reasonableness and prudence for the Plan, but because those funds paid kickbacks or other compensation to one or more Defendants." (Id. ¶ 86.) Additionally, Plaintiffs claim that the Plan's SPD misrepresented the facts when it stated that the "fees of the Trustee are paid by the Company" because, according to Plaintiffs, the fees of the trustee "were paid by Plan participants though the expense ratios of the mutual funds in the Plan." (Id. ¶ 88.)

Plaintiffs also contend that Defendants selected the more expensive share classes of the RiverSource funds, even though the Plan qualified for shares with lower fees.  (Id. ¶ 62.)  Plaintiffs state that "Defendants used the R4 share class of the RiverSource Mutual Funds, even though Defendants could have used the Mutual Funds' R5 share class, which charged . . . lower [fees] . . . for identical investment management."  (Id.)  Additionally, Plaintiffs claim that the more expensive shares added a fee of "up to 25 bps for 'Plan Administrative Services'" and a "service fee up to 10 bps, even though they provided no additional benefits or services for the participants in the Plan."  (Id. ¶ 63; Pls.' Mem. at p. 14.)  Plaintiffs contend that shareholders outside of the Plan "invested in the R4 share class under terms far more favorable than those provided to Plan participants."  (Id. ¶ 64.)  Indeed, for R4 shareholders outside the plan, a portion of their fees were "rebated or used to directly offset administrative fees and expenses in their plans"—a benefit that was not available to Plan participants, whose fees were retained by Ameriprise affiliates.  (Id. ¶ 64–65)  Plaintiffs conclude that "[b]y investing in the R4 share class of RiverSource Retirement Plus funds, Defendants caused [the funds] in the Plan to pay more than double the additional fees RiverSource received for managing the funds compared to what they would have paid had they been allowed to invest in the R5 share class."  (Id. ¶ 75.)

Plaintiffs also allege that the RiverSource funds selected for the RiverSource Retirement Plus funds have "poor risk adjusted returns."  (Id. ¶ 76.)  For example, a report prepared by Plan Sponsor and Target Date Analytics, LLC, measuring the fees, performance, risk, and organization of "38 target date fund families as of December 31,

2007 . . . gave RiverSource grades of 'D' for both Organization and Fees & Expenses while Vanguard, Fidelity, and T. Rowe Price were given grades of 'A,' 'B,' and 'B' respectively." (Id. ¶ 77.)

Plaintiffs allege that ATC charged excessive fees for serving as the Plans' trustee and record-keeper.  Plaintiffs contend that ATC received revenue sharing kickbacks and other rewards such as "float" for serving as the Plan's record-keeper and trustee, which ultimately benefited Ameriprise at the expense of the Plan.  (Id. ¶ 162–63.)  ATC managed various non-mutual fund investment options in the Plan, many of which included RiverSource funds, which paid fees to Ameriprise and ATC.  (Id. ¶ 80.)  The Plaintiffs claim that each of the ATC managed options invested "some or all of their assets in RiverSource mutual funds," which "had fees at least twice those of comparable prudent alternatives, such as Vanguard." (Id. ¶ 81.)  Plaintiffs further argue that because of the revenue the Plan provided to ATC, Ameriprise was able to sell ATC to Wachovia for a substantial profit.  (Id. ¶ 144–48.)  Additionally, after the sale, Defendants retained Wachovia as the Plan's record-keeper on the same terms "to boost the sale price Ameriprise received and enhance payments from Wachovia to Ameriprise from the sale." (Pls.' Mem. at p. 16.)

Plaintiffs' Amended Complaint alleges eight counts against Defendants.  Count I asserts that Defendants' actions constituted breaches of the duties of loyalty and prudence and seeks to hold Defendants jointly and severally liable for restoring to the Plan the losses alleged caused by the breaches and the profits they gained from their misuse of the Plan assets.  (Id. ¶¶107–17.)  Count II alleges that Ameriprise and the CBC separately

breached their duties of loyalty and prudence by failing to properly monitor and replace

the fiduciaries over whom they had authority or control who caused losses to the Plan.

(Id. ¶¶ 118–125.)  Counts III and IV assert that Defendants' actions constituted prohibited

transactions under 29 U.S.C. §§ 1106(a) and (b).  (Id. ¶¶ 126–140.)  Count V seeks to

recover for the Plan the profits Defendant gained from the breach of duties in using ATC

as the Plan's record-keeper, selling Ameriprise's record-keeping business to Wachovia,

and keeping Wachovia as the Plan record-keeper.  (Id. ¶ 141–151.)  Count VI asserts that

Ameriprise knowingly participated in these breaches of fiduciary duties and prohibited

transactions and therefore is liable to disgorge all revenue received by Ameriprise and its

subsidiaries.  (Id. ¶¶ 152–57.)  Count VII alleges co-fiduciary liability against

Ameriprise.  (Id. ¶¶ 158–67.)  Finally, Count VIII seeks to recover the profits Ameriprise

and the CBC received from the alleged breaches of fiduciary duties under a theory of

federal common law unjust enrichment.  (Id. ¶¶ 168–175.)

## II.   DISCUSSION

### A.   Standard of Review

Federal Rule of Civil Procedure 8 requires that a complaint present "a short and

plain statement of the claim showing that the pleader is entitled to relief."  To meet this

standard, and survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.''  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007)).  Although a complaint is not required to contain detailed

factual allegations, "[a] pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a "sheer possibility." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 593 (2009) (citation omitted).  It is not, however, a "probability requirement."  Id.  (citation omitted).  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'"  Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  Several principles guide courts in determining whether a complaint meets this standard.  First, the court must take the plaintiff's factual allegations as true and grant all reasonable inferences in favor of the plaintiff.  Crooks v. Lynch, 557 F.3d 846, 848 (8th Cir. 2009). This tenet does not apply, however, to legal conclusions or "formulaic recitation of the elements of a cause of action;" such allegations may properly be set aside.  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  In addition, some factual allegations may be so indeterminate that they require "further factual enhancement" in order to state a claim.  Id. (quoting Twombly, 550 U.S. at 557.)  Finally, the complaint "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Braden, 558 F.3d at 594.

Evaluation of the sufficiency of a complaint upon a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. (quoting Iqbal, 556 U.S. at 679).  A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6).  Porous MediaCorp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).

### B.   ERISA

The federal Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U.S.C. § 1001 et seq. ("ERISA"), regulates plans providing employees with fringe benefits.  Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983).  "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."  Shaw, 463 U.S. at 90.  Courts must be "attendant to ERISA's remedial purpose and evident intent to prevent through private civil litigation 'misuse and mismanagement of plan assets.'"  Braden, 588 F.3d at 597 (quoting Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 137, 140 n.8, 142 n.9 (1985)).  "Congress enacted ERISA to regulate comprehensively certain employee benefit plans and 'to protect the interest of participants in these plans by establishing standards of conduct, responsibility, and obligations for fiduciaries.'"  Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc., 413 F.3d 897, 906–07 (8th Cir. 2005) (citations omitted).

Congress intended that private individuals would play an important role in enforcing ERISA's fiduciary duties—duties which have been described as "the highest known to the law."  Braden, 588 F.3d at 598 (quoting Donovan v. Bierwirth, 680 F.2d

263, 272 n.8 (2d Cir. 1982)).[4]  In giving effect to this intent, the Eighth Circuit has stated that courts "must be cognizant of the practical context of ERISA litigation."  Id.  ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.  Id.  Thus, "while a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of their limited access to crucial information."  Id.

"If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer."  Id.  Thus, it is "sufficient for a plaintiff to plead facts indirectly showing unlawful behavior, so long as the facts pled 'give the defendant fair notice of what the claim is and the grounds upon which it rests,' and 'allow the court to draw the reasonable inference' that the plaintiff is entitled to relief."  Id. (quoting Iqbal, 556 U.S. at 678).  These considerations counsel a careful evaluation of an ERISA complaint's factual allegations before determining whether they support a plausible inference that the plaintiff is entitled to relief.

### C.    Breach of Fiduciary Duties of Prudence and Loyalty

Count I alleges that Defendants breached the fiduciary duties of prudence and loyalty imposed upon them by 29 U.S.C. § 1104.  To state a claim under this provision, a

---

[4]    The Secretary of Labor, who is charged with enforcing ERISA, depends in part on private litigation to ensure compliance with the statute.  Braden, 588 F.3d at 597 n.8.  The Secretary has expressed concern over the erection of "unnecessarily high pleading standards" in ERISA cases.  Id.

plaintiff must make a prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused loss to the Plan.  Braden, 588 F.3d at 594 (citations omitted).  Only the issue of breach is disputed here.

ERISA imposes upon fiduciaries twin duties of loyalty and prudence.  ERISA § 404, 29 U.S.C. § 1104, establishes the fiduciary duties owed by a plan fiduciary:

> (a)(1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (A)    for the exclusive purpose of:
> >
> > > (i)    providing benefits to participants and their beneficiaries; and
> > >
> > > (ii)    defraying reasonable expenses of administering the plan;
> >
> > (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> >
> > (C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> >
> > (D)    in accordance with the documents and instruments governing the plan . . . .

Subsection (a)(1)(A) codifies the duty of loyalty and subsection (a)(1)(B) articulates the duty of prudence.

The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of participants.  Pegram v. Herdrich, 530 U.S. 211, 235 (2000).  "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the

interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." Id. at 224 (quotation marks and citations omitted).  Under ERISA, a corporate officer serving as a fiduciary must "wear only one hat at a time, and wear the fiduciary hat when making fiduciary decisions." Pegram, 530 U.S. at 225; DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 419 (4th Cir. 2007).  Fiduciaries must "avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." Donovan v. Biewirth, 680 F.2d 263, 271(2d Cir. 1982).

The duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  The statute's "prudent person standard is an objective standard . . .  that focuses on the fiduciary's conduct preceding the challenged decision." Roth v. Sawyer-Cleater Lumber Co., 16 F.3d 915, 917 (8th Cir. 1994) (citation omitted).  In evaluating whether a fiduciary has acted prudently, the court focuses on the process by which it makes its decisions rather than the results of those decisions.  Id. at 917–18; Schaefer v. Ark. Med. Soc'y, 853 F.2d 1487, 1491 (8th Cir. 1988) (fiduciaries must "investigate all decisions that will affect the pension plan.").  When determining whether a fiduciary has acted with prudence, the court looks at "the totality of the circumstances," including but not limited to, the plan structure and aims and the disclosures made to participants regarding the risks associated with the

investments.  DiFelice, 497 F.3d at 418; see also 29 C.F.R. § 2250.404a–1(b)(1)(i) (a

fiduciary acts prudently when it gives "appropriate consideration to those facts and

circumstances that . . . the fiduciary knows or should know are relevant to the  . . .

investment course of action involved").

Good faith does not provide a defense to a claim of a breach of these fiduciary

duties because "a pure heart and empty head are not enough."  Donovan v. Cunningham,

716 F.2d 1455, 1467 (5th Cir. 1983).  ERISA holds a fiduciary who breaches any of these

duties personally liable for any losses to the plan that result from its breach of duty.  Pfeil

v. State Street Bank & Trust Co., 671 F.3d 585, 591 (6th Cir. 2012); see also 29 U.S.C.

§ 1109(a).

The Eighth Circuit, in Braden, recently addressed whether a plaintiff had stated a

claim for breach of fiduciary duties under § 1104.  588 F.3d at 589.  The plaintiff there

was a Wal-Mart employee who participated in the company's employee retirement plan.

Id.  The plaintiff brought a putative class action against Wal-Mart and various executives

involved in managing the plan, alleging that the defendants had failed to consider the

trustee's interest by including funds that shared fees with the trustee when selecting

mutual funds.  Id. at 590.  According to the plaintiff, some or all of the investment

options included in the plan charged excessive fees.  Id.  Since large plans have

substantial bargaining power in the 401(k) marketplace, the plaintiff alleged that Wal-

Mart's plan should have been able to obtain cheaper institutional shares of mutual funds.

Id.  The plaintiff further alleged that the higher fees charged by the plans funds were not

justified by return on investment since most of them underperformed lower cost
alternatives.  Id.

In reversing the lower court's dismissal of the action, the Eighth Circuit found that
the plaintiff had stated a claim under § 1104.  Id. at 595.  The court held that:

> Taken as true, and considered as a whole, the complaint's allegations can
> be understood to assert that the Plan includes a relatively limited menu of
> funds which were selected by Wal–Mart executives despite the ready
> availability of better options.  The complaint alleges, moreover, that these
> options were chosen to benefit the trustee at the expense of the participants.
> If these allegations are substantiated, the process by which appellees
> selected and managed the funds in the Plan would have been tainted by
> failure of effort, competence, or loyalty.  Thus the allegations state a claim
> for breach of fiduciary duty.

Id. at 596 (citation omitted).  The court further noted that, while plaintiff's assertions
were only inferences, and there may be lawful reasons why the defendants chose the
investment options they did, it was not the plaintiff's responsibility to rebut these
possibilities in his complaint.  Id.

Plaintiffs in this case also rely on Gipson v. Wells Fargo & Co., where participants
in the defendant's 401(k) plan alleged that the plan "impermissibly invested in mutual
funds managed by [the defendant's] affiliate."  No. 08-4546, 2009 WL 702004, at *1–2
(D. Minn. Mar. 13, 2009).  The court in Gipson determined that the plaintiffs plausibly
stated a claim of breach of fiduciary duties under ERISA.  Id. at *5–6.  First, the court
determined that plaintiffs' allegation, that the plan invested in a class of shares with
higher administrative fees when a cheaper class of shares was available, plausibly
demonstrated that defendant breached its fiduciary duties.  Id.  Moreover, the plaintiffs
contended that a cheaper class of shares had a higher return than the higher class of

shares.  Id.  Next, the court determined that plaintiffs' allegation that the defendant's fund

was performing poorly compared to other funds, such as a fund offered by the Vanguard

firm, plausibly demonstrated that defendants breached their fiduciary duties.  Id.  The

court noted that although "discovery [may] reveal that these other funds did not

outperform [defendant's fund]," that is not required at this preliminary stage of the

litigation.  Id.  Finally, the court held that the plaintiffs' allegation that the plan's assets

were used as "seed money" for the defendant's fund, "essentially allowing the funds to

survive and to attract other investors," stated a plausible claim.  Id. at *6.

As in Braden and Gipson, Plaintiffs in this case plausibly allege that Defendants

selected Ameriprise affiliated funds, such as RiverSource mutual funds and non-mutual

funds managed by ATC, to benefit themselves at the expense of participants.  Plaintiffs

claim that, despite many investment options available in the market, the Plan invested in

mutual funds managed by Ameriprise affiliates because they were "managed by, paid

fees to, and generated profits for Ameriprise."  (Am. Compl. ¶ 54.)  Plaintiffs claim that

the affiliated funds that Defendants invested in provided "millions of dollars in fees" for

RiverSource and ATC, all of which resulted in a financial benefit for Ameriprise.  (Id.

¶ 58.)  Specifically, Plaintiffs allege that Defendants hired ATC to be the Plan trustee and

record-keeper without any competitive bidding process even though "other entities could

have provided the same services at a lower cost to the Plan."  (Id. ¶ 59.)  Additionally,

Plaintiffs allege that Defendants chose to invest in RiverSource mutual funds despite the

fact that the fees charged for these funds were significantly higher than the median fees

for comparable mutual funds in 401(k) plans such as funds offered by the Vanguard firm.

(Id. ¶ 61.)  Moreover, Defendants here chose to invest Plaintiffs' assets in the R4 share

class of the RiverSource Mutual Fund, even though Defendants could have invested their

money in the R5 share class, which charged lower fees than R4 share class "for identical

investment management."  (Id. ¶ 62.)  And Plaintiffs contend that Ameriprise used the

retirement assets of its employees to seed new and untested affiliated mutual funds,

which made those funds more marketable to outside investors.  (Id. ¶ 78.)

Taking the facts and all reasonable inferences in the light most favorable to the

Plaintiffs, the Court determines that the Plaintiffs have stated a claim for breach of

fiduciary duty.  Plaintiffs have plausibly pled that Defendants did not discharge their

duties solely in the interest of the participants and beneficiaries of the Plans.  Plaintiffs

allege that Defendants chose investment options with poor or non-existent performance

histories relative to other investment options that were available to the Plan.  Plaintiffs

have also plausibly claimed that Defendants continued to choose novel or poorly

performing affiliated fund investment options for the Plan instead of more established

and better performing alternatives.  Plaintiffs have pointed to prudent alternatives to

Ameriprise affiliated funds that Defendants could have chosen as investment options for

the Plan.  It is also plausible that Defendants may have selected higher-cost share classes

when lower-cost share classes were available because they received benefits for doing so.

Moreover, based on Plaintiffs' allegations, it is also plausible that the process

Defendants used to choose Plan investments was flawed.  The complaint alleges that the

Defendant selected certain investment options for the Plan despite the availability of

better options.  The complaint further alleges that these options were chosen to benefit

Defendants at the expense of Plaintiffs.  If these allegations are substantiated, then the process by which Defendants selected and managed the funds in the Plan would have been tainted "by failure of effort, competence, or loyalty."  Braden, 588 F.3d at 596. Plaintiffs' allegations are similar to Braden and Gipson where the plaintiffs claimed their fiduciaries retained underperforming affiliated investments for the benefits that they provided to them.

Defendants attempt to distinguish Braden factually, primarily based on specific aspects of the plan in that case.  They argue that the plan in Braden was "static," while the Investment Committee in this case "continuously revisited and revised the Plan's core lineup since the formation."  (Defs.' Mem. at pp. 18–19) (emphasis omitted.)  Defendants also contend that, unlike the plan in Braden, they did not charge 12b-1 fees, from which plan participants derived no benefit.  (Id. at pp. 19–20.)  Finally, Defendants assert that, unlike Braden, Plaintiffs do not allege a "revenue sharing" arrangement in which the trustee received kickbacks for including certain investments in the plan lineup.  (Id. at pp. 17–23.)  Defendants also argue that Gipson is distinguishable because the plaintiffs in that case alleged the plan could have invested in cheaper and higher-return share classes of the same funds, while plaintiffs here do not make such an allegation.  (Defs.' Reply Mem. at p. 6 n.2.)

The Court disagrees.  The Eighth Circuit in Braden explicitly stated that the "gravamen" of the plaintiffs' complaint was that the defendants "failed adequately to evaluate the investment options included in the Plan" and as a result chose affiliated investment options that charged excessive fees.  588 F.3d at 589–90.  That is exactly

what the Plaintiffs allege in this action.  Moreover, the court in <u>Braden</u> clarified that Rule

8 does not require a plaintiff to plead "specific facts", explaining precisely how the

defendant's conduct was unlawful, but rather may plead facts indirectly showing

unlawful behavior to "give the defendant fair notice of what the claim is and the grounds

upon which it rests."  <u>Id.</u> at 595 (citation omitted).  The Plaintiffs have satisfied these

requirements.

Defendants further rely on <u>Hecker v. Deere & Co.</u>, 556 F.3d 575, 578 (7th Cir.

2009) (hereinafter "<u>Hecker I</u>") and <u>Renfro v. Unisys Corp.</u>, 671 F.3d 314, 317 (3d Cir.

2011) to argue that they did not breach their fiduciary duty to Plaintiffs because the Plan

offers "a broad and diverse menu of investment options at market prices."  (Def.s' Mem.

at pp. 13–14.)  In <u>Hecker I</u>, the plaintiffs were employees of Deere & Co. ("Deere") and

participants in an ERISA qualified pension plan sponsored by Deere.  <u>Id.</u>  The trustee and

record-keeper of the plan was Fidelity Management Trust Co. ("Fidelity Trust") and the

investment advisor was Fidelity Management & Research Co. ("Fidelity Research").  <u>Id.</u>

The plan offered 27 specific investment options to participants—23 Fidelity-affiliated

mutual funds, two investment funds managed by Fidelity Trust, and one fund devoted to

Deere stock—and a Fidelity-affiliated brokerage facility that enabled participants to

access approximately 2,500 other, independent funds.  <u>Id.</u>

The plaintiffs sued Deere,[5] claiming that it breached its fiduciary duty because: (1)

the fees charged by Fidelity Research were excessive and unreasonable; (2) Deere and

---

[5]     The plaintiffs also sued Fidelity Trust and Fidelity Research, but the court
determined that they were not fiduciaries under ERISA.  <u>Hecker I</u>, 556 F.3d at 584.

Fidelity Trust selected investment options with unreasonably high fees; and (3) Deere failed to properly monitor the Fidelity companies' conduct and to disclose revenue-sharing practices to participants. Id. at 579.  The Seventh Circuit concluded that Deere had no duty to disclose to plan participants information about Fidelity's revenue sharing program because the participants "were told about the total fees imposed by the various funds." Id.  at 585.  Additionally, the court concluded that the plan "offered a sufficient mix of investments for their participants" and that there were "a wide range of expense ratios among" the investment options.  Id. at 586.  The court determined that "[t]he fact that it is possible that some other funds might have had even lower ratios [was] beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund."  Id.

The Secretary of Labor then filed an amicus brief in support of the Plaintiffs' request for a rehearing en banc stating that Hecker I "could be read as a sweeping statement that any Plan fiduciary can insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio."  Hecker v. Deere & Co., 569 F.3d 708, 711 (7th Cir. 2009) (hereinafter "Hecker II").  The Seventh Circuit issued an order clarifying that Hecker I was not intended to give a "green light" to recklessness or imprudence in the selection of investments.  Id.  Rather, Hecker I "was tethered closely to the facts before the court."  Id.  The court noted that "[p]laintiffs never alleged that any of the 26 investment alternatives that Deere made available to its 401(k) participants was unsound or reckless, nor did they attack the BrokerageLink facility on that theory."  Id.  The court stated that its holding was based on the plaintiffs' allegations

that Deere decided to "accept 'retail' fees and did not negotiate presumptively lower 'wholesale' fees." Id.

In Renfro, the plaintiffs were participants in a 401(k) defined contribution plan and alleged the defendants had inadequately selected a mix and range of investment options to include in the plan. 671 F.3d at 317–18. Specifically, the plaintiffs claimed that the administrative fees governed by the trust agreement and fees associated with the retail mutual fund were excessive compared to the services rendered and the performance of other less expensive investment options not included in the plan. Id. at 319. The plaintiffs' allegations centered on the fact that the plan used retail mutual funds even though the fiduciaries could have selected institutional investments with lower fees. Id.

The court in Renfro analyzed Hecker and Braden and stated that "the range of investment options and the characteristics of those included options . . . are highly relevant and readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's mix and range of investment options should be measured." Id. at 327. The Renfro court found that the defendant's plan included a reasonable mix of investment options and was similar to the plan in Hecker. Id. The Court specifically distinguished Braden and noted that the plaintiff's allegations "are directed exclusively to the fee structure and are limited to contentions that [defendant] should have paid per-participant fees rather than fees based on a percentage of assets in the plan." Id. The court concluded that the plaintiffs failed to state a claim that the defendant breached its duty to prudently and loyally select and maintain the plan's mix and range of investment options. Id. at 327–28.

The Court finds that Defendants' reliance on <u>Hecker</u> and <u>Renfro</u> is misplaced. Unlike in <u>Hecker</u> and <u>Renfro</u>, the Plaintiffs here allege that Defendants chose to invest in affiliated funds even though they had no performance history and charged higher fees than better performing funds in the market.  Plaintiffs' claims do not rest on an allegation that Defendants chose retail funds and did not negotiate for lower wholesale fees.  Rather, Plaintiffs here plausibly allege that the Defendants selected Ameriprise affiliated funds to benefit themselves at the expense of Plan participants.

Moreover, the Sixth, Fourth, and Seventh Circuits have found that merely including a sufficient mix of prudent investments along with imprudent options does not satisfy a fiduciary's obligations under ERISA.  In <u>Pfeil</u>, the Sixth Circuit stated:

> A fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options.  Much as one bad apple spoils the bunch, the fiduciary's designation of a single imprudent investment offered as part of an otherwise prudent menu of investment choices amounts to a breach of fiduciary duty, both the duty to act as a prudent person would in a similar situation with single-minded devotion to the plan participants and beneficiaries, as well as the duty to act for the exclusive purpose of providing benefits to plan participants and beneficiaries.

671 F.3d at 587.  Similarly, the Fourth Circuit in <u>DiFelice</u>, stated that "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio."  497 F.3d 410, 423 (4th Cir. 2007); <u>see also</u> <u>Howell v. Motorola, Inc.</u>, 633 F.3d 552, 567 (7th Cir. 2011) ("It is

. . . the fiduciary's responsibility . . . to screen investment alternatives and to ensure that imprudent options are not offered to plan participants.").[6]

Defendants next argue that Plaintiffs' "core claim" is that Defendants improperly invested in Ameriprise affiliated investment options in the Plan lineup, (Defs.' Mem. at p. 3), despite the fact that such a practice is "expressly authorized" by the Department of Labor and that the challenged affiliated funds were "but a fraction of the hundreds—now thousands—of options that the Plan has made available to Plan participants." (Id.) (emphasis omitted.) In support of their argument, Defendants cite ERISA § 408(b)(8), codified at 29 U.S.C. § 1108(b)(8), which permits plans under certain circumstances to invest in affiliated funds. Specifically, ERISA § 408(b)(8) exempts a plan's purchase or sale of an interest in a common or collective trust fund maintained by a regulated bank or trust company or a pooled investment fund of an insurance company maintained by a party in interest if the transaction is expressly permitted by the plan's governing

---

[6]     Defendants also attempt to argue that <u>Braden</u> mandates that if there is a sufficient mix of investment options in a plan, then there can be no breach of fiduciary duty. 588 F.3d at 596 n.6. Defendants rely on a footnote in <u>Braden</u> where the court distinguished the plan in that case from the plan in <u>Hecker</u> and stated, "the far narrower range of investment options available [in <u>Braden</u> as compared to <u>Hecker</u>] . . . makes more plausible the claim that this Plan was imprudently managed." <u>Id.</u> While the Eighth Circuit recognized that a plan with more limited options may be more likely to sustain a breach of fiduciary duty claim, the court did not hold that a plan can inoculate itself from liability by including some prudent investments along with imprudent ones. Rather, the court's holding in <u>Braden</u> focused on plaintiffs' allegations that the defendants had failed to adequately evaluate investment options included in the plan that provided a benefit to the trustee despite performing poorly.

documents and the bank, trust company, or insurance company receives no more than reasonable compensation.[7]

ERISA § 408(b)(8) was enacted to allow "banks, trust companies and insurance companies" to continue their "common practice" of investing their plans' assets in their own pooled investment funds.  See H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5096; see also U.S. Dep't of Labor Adv. Op. 82-022 A, 1982 ERISA LEXIS 47 (May 12, 1982) (§ 408(b)(8) exempts fees charged for managing investments in pooled separate accounts and collective trusts).  As the Department of Labor has recognized, it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor."  Notice of Proposed Rulemaking, Participant Directed Individual Account Plans, 56 Fed. Reg. 10724 (Mar. 13, 1991).

---

[7]     The statute provides that the following is not a prohibited transaction:

(8)  Any transaction between a plan and (i) a common or collective trust fund or pooled investment fund maintained by a party in interest which is a bank or trust company supervised by a State or Federal agency or (ii) a pooled investment fund of an insurance company qualified to do business in a State, if—

(A)  the transaction is a sale or purchase of an interest in the fund,

(B)  the bank, trust company, or insurance company receives not more than reasonable compensation, and

(C)  such transaction is expressly permitted by the instrument under which the plan is maintained, or by a fiduciary (other than the bank, trust company, or insurance company or an affiliate thereof) who has authority to manage and control the assets of the plan.

ERISA § 408(b)(8), 29 U.S.C. § 1108(b)(8).

The Defendants also cite to Prohibited Transaction Exemption ("PTE") 77-3, which provides that employers who offer their own proprietary funds to their employees in a 40(k) Plan are only permitted to charge the plan a single investment management fee. Employee Benefit Plans, Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute, 42 Fed. Reg. 18,734, 18,735 (Mar. 31, 1977) (hereinafter "PTE 77-3"). This prevents employers from abusing their fiduciary relationship with the plan by "double" or "triple-dipping" on their investment management fees. Shirk v. Fifth Third Bancorp, No. 05-049, 2008 WL 4449024, at *15 (S.D. Ohio Sept. 26, 2008). PTE 77-3 applies so long as the plan does not: (a) pay any fees to the investment adviser except via the investment company's payment of its standard advisory and other fees; (b) pay a redemption fee to any party other than the investment company itself; (c) pay a sales commission; and (d) have dealings with the investment company on terms that are less favorable than between the investment company and any other shareholder. PTE 77-3 further states that a fiduciary still has the obligation to "discharge his duties respecting the plan solely in the interest of the plan's participants and beneficiaries and in a prudent fashion." Id.

Plaintiffs have plausibly argued—as they are required to do at this juncture—that Defendants breached their fiduciary duties when they invested in affiliated funds that charged fees that were excessive relative to those available from comparable mutual funds, from other share classes, or from alternative investments such as separate managed accounts. Plaintiffs have plausibly demonstrated that the benefits of selecting these affiliated investment options accrued to Ameriprise and not to the Plan. While the

Department of Labor regulations permitted the Defendant to select affiliated investment options for the Plan, the Defendant still has a fiduciary duty to act with an "eye single" towards the participants in the Plan, which Plaintiffs plausibly allege the Defendants failed to do.

ERISA charges fiduciaries like the Defendant with "the highest duty known to the law," which includes the duty to prudently select investment options and to act in the best interest of the plans.  Plaintiffs' Amended Complaint plausibly demonstrates that Defendants failed to live up to their fiduciary obligations under ERISA.  For this reason, the Court denies Defendants' Motion to Dismiss Count I of Plaintiffs' Amended Complaint.

### D.    Prohibited Transactions

In Counts III and IV of Plaintiffs' Amended Complaint, Plaintiffs allege that the investment of Plan assets in two types of affiliated investments—mutual funds and collective trusts—amount to prohibited transactions in violation of ERISA § 406(a) and (b), codified at 29 U.S.C. § 1106.  ERISA § 406 "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'"  Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 241–42 (2000) (quoting Comm'r v. Keystone Consol. Indus., Inc., 508 U.S. 152, 160 (1993)).  ERISA prohibits two kinds of transactions that Congress deemed unlikely to inure to the benefit of Plan participants.  Transactions are prohibited where they involve parties who are likely to be chosen because they are affiliated with the Plan's fiduciaries, service providers, or associated parties.  29 U.S.C. § 1106(a).

ERISA also prohibits fiduciaries from managing the Plan in their own interests or in the interests of a party with interests adverse to the Plan.  Id. § 1106(b).

These prohibitions are subject to a number of statutory and regulatory exemptions. As relevant here, § 408(b)(8) exempts the purchase or sale of shares in a "common or collective trust fund . . . maintained by a party in interest," provided that the party receives only "reasonable compensation" and the transaction is permitted by the plan documents or by a fiduciary with authority over plan assets.  See 29 U.S.C. § 1108(b)(8). Similarly, PTE 77-3 exempts purchase or sales of mutual fund shares by a plan covering employees of the mutual fund or an affiliate, provided the plan does not pay any exceptional fees or invest on terms less favorable than those offered to ordinary investors. 42 Fed. Reg. 18,734, 18,735 (Mar. 31, 1977).

The Eighth Circuit addressed whether plaintiffs had stated a claim for engaging in prohibited transactions in Braden.  There, the plaintiffs alleged that the defendants violated ERISA § 406(a) by causing the plan to engage in prohibited transactions with the trustee.  588 F.3d at 600.  The district court concluded that plaintiffs' claims failed because they had not plead facts "raising a plausible inference that the payments were unreasonable in relation to the services provided by [the trustee] and thus had failed to show they were not exempted by § 1108."  Id.  The Eighth Circuit reversed, holding that "the statutory exemptions established by § 1108 are defenses which must be proven by the defendant."  Id. (citations omitted).  The court stated that the plaintiff "does not bear the burden of pleading facts showing that the revenue sharing payments were unreasonable in proportion to the services rendered."  Id.  The court concluded that the

facts alleged by the plaintiffs were sufficient to shift the burden to the defendants to prove the § 1108 exemption applied.  Id.

The court also found, in Gipson, that the plaintiffs had stated a claim for engaging in prohibited transactions in Gipson based on the plaintiffs' allegation that the plan had improperly invested in affiliated mutual funds.  2009 WL 702004, at *4–5.  The defendants contended that the amended complaint failed to allege that they did not comply with PTE 77-3.  Id.  The court held that "[e]ven if Defendants are correct that the elements of PTE 77-3 are part and parcel of a claim under § 406 . . . construing the Amended Complaint in the light most favorable to Plaintiffs . . . [they] have alleged at least that the Defendants did not comply" with PTE 77-3.  Id.

Like in Braden and Gipson, the Court determines that Plaintiffs have stated a claim under § 406.  They allege that investing the Plan assets in RiverSource and ATC funds was a prohibited transaction under both § 406(a) and (b) because the funds are affiliated with Ameriprise.  (Am. Compl. ¶ 128.)  Ameriprise, as the Plan sponsor, and its subsidiaries, including RiverSource and ATC, were "part[ies] in interest" within the meaning of § 406.  29 U.S.C. § 1002(14).  Plaintiffs contend that Defendants violated § 406(a) because they "knew or should have known those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation."  (Id. ¶ 128.)  Moreover, Plaintiffs allege that Ameriprise and the CBC violated § 406(b) because they "knew or should have known that the transfer of Plan assets to the investment options selected and maintained in the Plan by Ameriprise, the CBC, and the Committees allowed Ameriprise to benefit both financially, through

fees paid by the options to Ameriprise, and commercially, by increasing the assets under management for the Ameriprise-managed investment options."  (Id. ¶ 138.)

Further, Plaintiffs pled in their Amended Complaint that the exceptions in § 408(b)(8) and PTE 77-3 do not apply in this action.  Both § 408(b)(8) and PTE 77-3 require that the transaction provide the fiduciaries or parties in interest no more than reasonable compensation.  PTE 77-3, part (d) 42 Fed. Reg. at 18735 (plan must not have dealings with the fund on terms any "less favorable to the plan than such dealings are to other shareholders"); 29 U.S.C. § 1108(b)(8)(ii)(B) (the trust company must receive "no[] more than reasonable compensation").  Plaintiffs claim that when Defendants failed to select the lowest-cost share class of RiverSource funds, the Plan was not treated the same as other similarly situated institutional shareholders, who could have invested in lower cost shares.  (Am. Compl. ¶¶ 62–64, 75.)  Plaintiffs also alleged that the fees of the collective trusts, and the affiliated mutual funds they invested in, are unreasonable.  (Id. ¶¶ 61–67, 80–81.)  The Court finds that Plaintiffs' allegation that Defendants engaged in self-interested transactions, profited from the management of Plan assets to the detriment of participants, and entered into agreements under which the Plan paid unreasonable fees and expenses is sufficient to state a claim under ERISA § 406.

Defendants contend that Plaintiffs' prohibited transaction claims fail because there is no allegation that the Plan's offering of affiliated mutual funds and collective trusts falls outside the prohibited transaction exemption in § 408(b)(8).  Defendants cite Mehling v. New York Life Ins. Co., 163 F. Supp. 2d 502, 510 (E.D. Pa. 2001), which dismissed a complaint based on an § 408 exemption when the plaintiffs had failed to

"allege that the fees paid by the Plans are not in compliance with the requirements of PTE 77-3." Defendants also rely on Leber v. Citigroup, Inc., No. 07-9329, 2010 WL 935442, at *10 (S.D.N.Y. Mar. 16, 2010), which explicitly states that its holding contradicts the holding of the Eighth Circuit in Braden. Moreover, since Mehling did not discuss or attempt to distinguish any precedent identifying § 408 and PTE 77-3 exemptions as affirmative defenses, it does not provide any reason to depart from Gipson and Braden. See also, e.g., Goldenberg v. Indel, Inc., 741 F. Supp. 2d 618, 632 (D.N.J. 2010) (holding that Mehling was not persuasive authority to depart from "well-reasoned precedent" determining that § 408 provides an affirmative defense); Shirk, 2008 WL 4449024, at *15–16 (same).

The Court therefore finds that, under Braden, § 408 provides an affirmative defense, with the burden of proof upon Defendants. Accordingly, the Court denies Defendants' Motion to Dismiss Counts III and IV of Plaintiffs' Amended Complaint.

### E.    Failure to Monitor Fiduciaries

Count II alleges that those Defendants with oversight responsibility failed to adequately monitor the Plan's managers and that they are liable for the breaches of their co-fiduciaries pursuant to 29 U.S.C. § 1105(a). "ERISA opinions and the position of the Department of Labor make clear that the power to appoint and remove plan fiduciaries implies the duty to monitor appointees to ensure that their performance is in compliance with the terms of the plan and statutory standards." In re ADC Telcomms., Inc., No. 03-2989, 2004 WL 1683144, at *7 (D. Minn. July 26, 2004); see also Crocker v. KV Pharm. Co., 782 F. Supp. 2d 760, 787 (E.D. Mo. 2010) ("Under ERISA, fiduciaries who have

appointed other fiduciaries have a continuing duty to monitor the actions of the appointed fiduciaries.") (citation omitted).  However, the duty to monitor is also quite narrow and does not include a duty "to review all business decisions of Plan administrators" because "that standard would defeat the purpose of having [fiduciaries] appointed to run a benefits plan in the first place."  Johnson v. Evangelical Lutheran Church in Am., No. 11-23, 2011 WL 2970962, at *5 (D. Minn. July 22, 2011) (quoting Howell, 633 F.3d at 573).

To state a claim for failure to monitor under ERISA, a plaintiff must "allege facts that the (1) entity charged with the breach was responsible for appointing and removing fiduciaries responsible for [sic] fiduciary conduct in question; and (2) entity charged with this duty to monitor also had knowledge of or participated in fiduciary breaches by the appointees."  Crocker, 782 F. Supp. 2d at 787.  "[C]ourts have been unwilling to delineate and probe the scope of defendants' monitoring duties on motions to dismiss, and have permitted such claims to proceed forward to discovery."  In re ADC Telecomms., 2004 WL 1683144, at *7; see also In re Sears Roebuck & Co. ERISA Litig., No. 02-8324, 2004 U.S. Dist. LEXIS 3241, at *22–23 (N.D. Ill. Mar. 3, 2004); In re Electronic Data Sys. Corp. "ERISA" Litig., 305 F. Supp. 2d 658, 670–71 (E.D.Tex. 2004).

Here, Plaintiffs allege that the CBC, its members and delegates, and Ameriprise (collectively the "Monitoring Defendants"), had the authority to appoint and remove trustees, the members of the EBAC, and Investment Committee.  (Am. Comp. ¶ 121.) Plaintiffs argue that the Monitoring Defendants had a duty to monitor the conduct of these entities and individuals to ensure that they were performing their duties consistently with the requirements of ERISA.  (Id. ¶¶ 20, 26, 56, 118–125.)  Plaintiffs further allege

that because the Monitoring Defendants knew (or should have known) of the failures of the trustee, EBAC, and Investment Committee to fulfill their fiduciary responsibilities, they breached their fiduciary responsibility by failing to replace the trustees and members of these committees with persons who would act to protect the Plan and its participants. (<u>Id.</u> ¶ 123.)  As a consequence of these failures, Plaintiffs allege the Plan suffered losses. (<u>Id.</u> ¶ 124.)

Defendants first argue that this claim should be dismissed because there can be no liability for failure to monitor without an underlying breach of fiduciary duty by an appointed fiduciary.  But the Court has held that Plaintiffs have pleaded viable claims for breach of fiduciary duty against the appointed fiduciaries, and thus the Court cannot dismiss the monitoring claim on this basis.

Defendants also argue Ameriprise should be dismissed because Plaintiffs have failed to allege sufficient facts to show that Ameriprise had "appointment authority obligating them to monitor the committees charged with overseeing the Plan."  (Defs. Mem. at p. 33.)  But Plaintiffs have alleged that Ameriprise controlled those who were the fiduciaries of its Plan.  All the fiduciaries were committees or appointees of Ameriprise's own Board of Directors.  (Am. Compl. ¶ 20.)  Plaintiffs claim that when Ameriprise appointed officers of the company, some officers would automatically become Plan fiduciaries, therefore granting Ameriprise control over the appointment of the individuals who served on EBAC or the Investment Committee.  (<u>Id.</u> ¶¶ 20, 26.)

Accordingly, the Court finds that Plaintiffs have stated a claim for breach of duty to monitor and therefore denies Defendants' Motion to Dismiss Count II of Defendants'

Amended Complaint.

### F.      Co-Fiduciary Liability

Count VI asserts co-fiduciary liability against Ameriprise for the breaches

committed by the other fiduciaries in which Ameriprise participated knowingly or knew

of and failed to remedy through reasonable efforts.  (Am. Compl. ¶¶ 152–157.)  Section

1105 of ERISA provides:

> In addition to any liability which he may have under any other provisions
> of this part, a fiduciary with respect to a plan shall be liable for a breach of
> fiduciary responsibility of another fiduciary with respect to the same plan in
> the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to
> > conceal, an act or omission of such other fiduciary, knowing such act
> > or omission is a breach;
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in
> > the administration of his specific responsibilities which give rise to
> > his status as a fiduciary, he has enabled such other fiduciary to
> > commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless
> > he makes reasonable efforts under the circumstances to remedy the
> > breach.

29 U.S.C. § 1105(a).  A "claim of co-fiduciary liability . . . must co-exist with some

breach by a fiduciary of their duties under ERISA."  Crocker, 782 F. Supp. 2d at 788

(quoting In re Bausch & Lomb Inc. ERISA Litig., No. 06–CV–6297, 2008 WL 5234281,

*11 (W.D.N.Y. Dec. 12, 2008)).

Plaintiffs allege that at all relevant times, Ameriprise was a party in interest to the

Plan and was a fiduciary because it had the power, through the CBC Defendants, to

appoint and monitor members of EBAC.  (Am. Compl. ¶ 154.)  Plaintiffs further claim

that Ameriprise, by participating and abetting fiduciary breaches and prohibited transactions, caused the Plan to invest assets in RiverSource and ATC managed investment options, to retain ATC as the plan service provider, and to pay excessive fees in connection with the investments.  (Id. ¶ 155.)  Accordingly, the Court determines that at this juncture, Plaintiffs have stated a claim upon which relief can be granted and will therefore deny Defendants Motion to Dismiss Count VI of the Amended Complaint.

### G.    Excessive Recordkeeping Fees

Count VII alleges that Defendants violated § 1104(a) by making the Plan pay excessive fees to its recordkeepers which a prudent fiduciary would have avoided.  (Id. ¶¶ 158–167.)  Plaintiffs also allege in Count VII that Defendants engaged in a § 1106(a)(1)(C) prohibited transaction by causing the Plan to pay its recordkeepers— ATC and Wachovia—excessive compensation for the services they provided to the Plan. (Id.)

Plaintiffs claim that Defendants initially hired an Ameriprise subsidiary, ATC, as the Plan trustee and record-keeper to provide ATC "revenues that boosted its ultimate sale price for Ameriprise."  (Id. ¶¶ 143, 160.)  In May 2006, Ameriprise sold ATC to Wachovia (now Wells Fargo) and kept Wachovia as the Plan's recordkeeper.  (Id. ¶ 161.) Plaintiffs allege that ATC and Wachovia received "revenue sharing and related kick- backs" from the Plan's investment managers as well as interest earned on the Plan assets as they moved funds in and out of the participants' accounts ("float").  (Id. ¶¶ 162–63.) Furthermore, Plaintiffs claim that ATC and Wachovia obtained compensation through management of the Income Fund, which credited a lower rate of return for participants'

assets than the rate Defendants and Wachovia received from managing the Fund.  (Id. ¶

163.)  Plaintiffs further claim that Defendants failed to have a prudent process for

evaluating its recordkeeping services, which resulted in the Plan paying excessive and

unreasonable fees for these services.

Plaintiffs cite Tussey v. ABB, Inc., No. 06-04305, 2012 WL 1113291, at *16

(W.D. Mo. Mar. 31, 2012), where the court determined that "if a plan sponsor opts for

revenue sharing as its method of paying for recordkeeping services, it must not only

comply with its governing plan documents, it must also have gone through a deliberative

process for determining why such a choice is in the Plan's and participants' best interest."

Defendants argue that Tussey is distinguishable because the court's finding in that case

was based on "factual findings not alleged here, including a finding than an outside

consultant told the plan's sponsor that 'it was overpaying for recordkeeping.'" (Defs.'

Reply at p. 10.)

Defendants' attempt to distinguish Tussey is misplaced as the court's decision

there was made after a "four week" trial and not on a motion to dismiss.  Plaintiffs are

entitled to obtain discovery to undercover facts relating to this Count.  While the

Defendants' claim that the Plaintiffs have not alleged facts regarding the amount of the

recordkeeping fees, the services provided, or how the fees charged to the Plan were

excessive in light of those services—the Court finds that these are the types of facts that

Plaintiffs can pursue in the course of discovery.  Accordingly, the Court denies

Defendants' Motion to Dismiss Count VII of Plaintiffs' Amended Complaint.

### H.      Sale of Recordkeeping Business to Wachovia

Count V of Plaintiffs' Amended Complaint seeks to recover the profits Defendants

obtained from the sale of its recordkeeping business to Wachovia and the retention of

Wachovia as a recordkeeper.  (Am. Compl. ¶¶ 141–151.)  Plaintiffs claim that

Defendants' failure to rebate the Plan for the profits of its sale of ATC to Wachovia was a

breach of fiduciary duty pursuant to § 1104(a) and a prohibited transaction under § 1106.

(Id. ¶ 150.)  Plaintiffs also allege that 29 U.S.C. § 1132(a)(3) authorizes "action[s] for

restitution against a transferee of tainted plan assets."  (Pls.' Mem. at p. 35.)  Plaintiffs

claim that under Harris Trust they only need to show that "the transferee . . . had actual or

constructive knowledge of the circumstances that rendered the transaction unlawful," and

may obtain "restitution of the property (if not already disposed of) or disgorgement of the

proceeds (if already disposed of), and disgorgement of the third person's profits derived

therefrom."  530 U.S. 238, 250–51 (2000).

Plaintiffs assert that Defendants chose an Ameriprise subsidiary, ATC, as the

Plan's recordkeeper and trustee "for the purpose of providing [ATC] revenues that

boosted . . . its ultimate sale price for Ameriprise."  (Id. ¶ 143.)  Ameriprise sold ATC to

Wachovia for $66 million and provided payments to Wachovia for recordkeeping

services for the "first 18 months following the sale."  (Id. ¶¶ 145–146.)  Plaintiffs claim

that the decision to keep Wachovia as the Plan's recordkeeper following the sale was

made "without competitive bidding or meaningful fiduciary review."  (Pls.' Mem. at p.

34.)  As such, Plaintiffs argue that because the fiduciaries breached §§ 1104 and 1106,

they are liable to "restore to the Plan the portion of the sale-related revenue Ameriprise

received as a result of the Plan's use of ATC and Wachovia."  (Id. at p. 35.)

Defendants argue that its decision to sell ATC to Wachovia was a business decision and that "ERISA is categorically unconcerned with ordinary corporate business transactions, like the sale of a subsidiary, that do not involve plan assets."  (Defs.' Mem. at p. 31.)  Defendants claim that, because they were not acting in a fiduciary capacity in selling the recordkeeping business, they could not have breached any fiduciary duty to the Plan participants.  (Id.)  While the corporate business decision to sell ATC to Wachovia is not subject to ERISA regulation, Defendants are not entitled to keep profits that may have resulted from the unlawful use of Plan assets to prop up ATC for its ultimate sale to Wachovia.  Accordingly, the Court determines that Plaintiffs have stated a claim upon which relief can be granted and denies Defendants' Motion to Dismiss Count V of Plaintiffs' Amended Complaint.

## I.    Unjust Enrichment

In Count VIII of Plaintiffs' Amended Complaint, Plaintiffs allege, in the alternative, a claim of federal common law unjust enrichment.  (Am. Compl. ¶¶ 168–175.)  Plaintiffs rely on authority that holds that, because there is no affirmative right for an employer to seek a refund for overpayments under ERISA, an employer can allege a federal common law claim for unjust enrichment.  See Young Am., Inc. v. Union Cent. Life. Ins. Co., 101 F.3d 546, 548 (8th Cir. 1996) ("[W]e agree with the district court that an employer has a federal common law action for restitution of mistakenly made payments to an ERISA plan."); Greater St. Louis Const. Laborers Welfare Fund v. Park-Mark, Inc., No. 10-2197, 2011 WL 5239668, at *3 (E.D. Mo. Nov. 1., 2011) ("Although

there is no affirmative right for an employer to seek a refund for alleged overpayments under ERISA, the Eighth Circuit Court of Appeals has held that employers can have a federal common law right of action for unjust enrichment to recover those contributions."); St. Paul Warehouse Emps. Welfare Fund v. SPS Cos., No. 07-235, 2008 WL 239521, at *4 (D. Minn. Jan. 29, 2008) (same); Am. Cleaners & Laundry Co. v. Textile Processors Union Local 161, 482 F. Supp. 2d 1103, 1115–16 (E.D. Mo. 2007) (same).  Plaintiffs argue that, because courts have found that claims for federal common law unjust enrichment are available when ERISA does not provide a remedy, that they have properly stated an alternative claim that gives them a basis for relief.

Defendants respond that Plaintiffs are urging the Court to sanction a non-statutory claim for federal common law unjust enrichment based on cases involving a specific scenario—employers seeking to recover mistaken overpayments from plans.  They argue that Plaintiffs cannot rely on the reasoning in those cases, which allowed restitutionary claims, because ERISA itself contains no rights for an employer to seek relief when it mistakenly makes overpayments to a plan.  Defendants further contend that ERISA specifically provides the rights and remedies applicable to the conduct alleged by Plaintiffs.  ERISA § 502(a)(2) and (a)(3) specifically authorize remedies against persons who cause plan losses or profits at a plan's expense.  29 U.S.C. § 1132(a)(2), (a)(3).  The remedies provided in § 205(a)(2) and (a)(3) are bounded: section 504(a)(2) requires a breaching fiduciary, while § 502(a)(3) allows only "appropriate equitable relief."  See, e.g., LaRue v. DeWolff, Boberg & Assoc., 552 U.S. 248, 254 (2008) (§ 502(a)(2) is limited to particular fiduciary breaches); Mertens v. Hewitt Assocs., 508 U.S. 248, 256

(1993) (appropriate equitable relief means "those categories of relief that were <u>typically</u> available in equity") (emphasis in original).

The Eighth Circuit has recognized that ERISA's "carefully crafted and detailed enforcement scheme provides strong evidence that Congress did not intend to authorize other remedies." <u>Travelers Cas. V. IADA Servs., Inc.</u>, 497 F.3d 862, 865 (8th Cir. 2007) (quotation and citations omitted).  Courts must be "especially 'reluctant to tamper with [the] enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text." <u>Knudson</u>, 534 U.S. at 209 (citation omitted and alteration in original).  Therefore, the Court grants Defendants' Motion to Dismiss Count VIII of Plaintiffs' Amended Complaint.  Plaintiffs' alternative unjust enrichment remedy has not been recognized by the Eighth Circuit, and it undermines the enforcement scheme already recognized by ERISA.

### III.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendants' Motion to Dismiss (Doc. No. 57)  is **GRANTED IN PART and DENIED IN PART**;

2.  Defendants' Motion to Dismiss  Count I is **DENIED**;

3.  Defendants' Motion to Dismiss Count II is **DENIED**;

4.  Defendants' Motion to Dismiss Count III is **DENIED**;

5.  Defendants' Motion to Dismiss Count IV is **DENIED**;

6.  Defendants' Motion to Dismiss Count V is **DENIED**;

7. Defendants' Motion to Dismiss Count VI is **DENIED**;

8. Defendants' Motion to Dismiss Count VII is **DENIED**;

9. Defendants' Motion to Dismiss Count VIII is **GRANTED**.


Dated: November 20, 2012                    s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge