# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

ROGER KRUEGER, et al.,

*Plaintiffs*,

v.

No. 11-CV-02781 (SRN/JSM)

AMERIPRISE FINANCIAL, INC., et al.,

*Defendants*.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS GROUNDS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS .......................................................... 4

    The Ameriprise 401(k) Plan ........................................................................... 4

    Plaintiffs' Backgrounds .................................................................................. 5

    Plaintiffs' Participation In The Plan And Receipt Of Plan Disclosures.................. 7

    Disclosures Regarding The Affiliation of The RiverSource Funds ....................... 9

    Disclosures Concerning Investment Management And Administrative Fees....... 10

    Disclosures Regarding Fund Performance ......................................................... 15

ARGUMENT.......................................................................................................... 17

    I.     ERISA'S STATUTE OF LIMITATIONS BARS PLAINTIFFS'
           CLAIMS BECAUSE PLAINTIFFS HAD ACTUAL
           KNOWLEDGE OF ALL MATERIAL FACTS AT LEAST THREE
           YEARS BEFORE FILING SUIT ................................................ 17

           A.     Plaintiffs' Prohibited Transaction Claims Must Be Dismissed
                  Because Plaintiffs Had Knowledge Of Each Challenged
                  Transactions Well Before September 28, 2008............................... 19

           B.     Defendants Are Also Entitled To Summary Judgment On
                  Limitations Grounds With Respect To Each Of Plaintiffs'
                  Breach Of Fiduciary Duty Claims.................................................. 23

    II.    PLAINTIFFS CANNOT SHOW ANY FRAUDULENT
           CONCEALMENT REQUIRED TO AVOID THE APPLICATION
           OF ERISA'S THREE-YEAR LIMITATIONS PERIOD ......................... 28

CONCLUSION ............................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

CASES

*Angell v. John Hancock Life Ins. Co.*,
  421 F. Supp. 2d 1168 (E.D. Mo. 2006)...................................................... 20, 26

*Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*,
  287 F.R.D. 216 (S.D.N.Y. 2012) ................................................................ 4

*Bergmann v. BMC Industries, Inc.*,
  No. 05-963 (JNE/SRN), 2006 U.S. Dist. LEXIS 4847 (D. Minn. Jan. 20, 2006) ....... 29

*Blanton v. Anzalone*,
  760 F.2d 989 (9th Cir. 1985) ...................................................................... 17

*Brock v. Nellis*,
  809 F.2d 753 (11th Cir. 1987) .................................................................... 17

*Brown v. Am. Life Holdings, Inc.*,
  190 F.3d 856 (8th Cir. 1999) .............................................................. passim

*Brown v. Medtronic, Inc.*,
  628 F.3d 451 (8th Cir. 2010) ...................................................................... 28

*Brown v. Owens Corning Inv. Review Comm.*,
  622 F.3d 564 (6th Cir. 2010) ...................................................................... 18

*Cont'l Assurance Co. v. Cedar Rapids Pediatric Clinic*,
  957 F. 2d 588 (8th Cir. 1992) ..................................................................... 30

*David v. Alphin*,
  817 F. Supp. 2d 764 (W.D.N.C. 2011) .................................................. 4, 23

*Edes v. Verizon Commc'ns, Inc.*,
  417 F.3d 133 (1st Cir. 2005)....................................................................... 18

*Figas v. Wells Fargo & Co.*,
  No. 08-4546 (PAM/FLN), 2010 U.S. Dist. LEXIS 79965 (D. Minn. Apr. 6, 2010) ........................................................................................... 20

*Fink v. Nat'l Sav. & Trust Co.*,
  772 F.2d 951 (D.C. Cir. 1985)..................................................................... 18

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Fuller v. SunTrust Banks, Inc.*,
  No. 1:11-CV-784-ODE, 2012 U.S. Dist. LEXIS 56602
  (N.D. Ga. Mar. 20, 2012)..................................................................... 4, 18, 27

*Gluck v. Unisys Corp.*,
  960 F.2d 1168 (3d Cir. 1992)........................................................................ 17

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ........................................................................ 24

*In re Citigroup ERISA Litig.*,
  662 F.3d 128 (2d Cir. 2011)................................................................... 23, 28

*In re Harley-Davidson, Inc. Sec. Litig.*,
  660 F. Supp. 2d 953 (E.D. Wis. 2009)......................................................... 23

*Maher v. Strachan Shipping Co.*,
  68 F.3d 951 (5th Cir. 1995) .......................................................................... 17

*Martin v. Consultants & Adm'rs, Inc.*,
  966 F.2d 1078 (7th Cir. 1992) ...................................................................... 17

*Reeves v. Airlite Plastics, Co.*,
  No. 8:04CV56, 2005 U.S. Dist. LEXIS 23628 (D. Neb. Sept. 26, 2005) ............. 18, 24

*Ruppert v. Principal Life Ins. Co.*,
  813 F. Supp. 2d 1089 (S.D. Iowa 2010) ......................................................... 18,4, 28

*Schaefer v. Ark. Med. Soc'y*,
  853 F.2d 1487 (8th Cir. 1988) ...................................................................... 28

*Shirk v. Fifth Third Bancorp.*,
  No. 05-CV-049, 2009 U.S. Dist. LEXIS 90775 (S.D. Ohio Sept. 20, 2009) ........ 18, 25

*Wright v. Heyne*,
  349 F.3d 321 (6th Cir. 2003) .......................................................................... 7

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
  550 F. Supp. 2d 416 (S.D.N.Y. 2008)...................................................... 24, 25

**STATUTES**

29 U.S.C. § 1106(a) ......................................................................................... 19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

29 U.S.C. § 1106(b)..................................................................................................... 20

29 U.S.C. § 1113 ............................................................................................... 1, 17, 28

**RULES**

29 C.F.R. § 2520.104b-2 ................................................................................................ 8

## INTRODUCTION

Under ERISA's three-year statute of limitations, any claim alleging a fiduciary breach of any kind (whether it be a prohibited transaction or a breach of loyalty or prudence) is time-barred if plaintiffs had actual knowledge of the alleged breach more than three years before filing suit. *See* 29 U.S.C. § 1113(2). Here, plaintiffs filed their complaint on September 28, 2011,[1] yet repeated, express disclosures that defendants[2] provided to Plan participants, coupled with plaintiffs' own admitted awareness, make clear that plaintiffs had actual knowledge of the relevant facts giving rise to their purported claims well before September 28, 2008. Plaintiffs' claims, thus, fall outside ERISA's three-year limitations period and should be dismissed.

More specifically, in Counts III and IV of their operative complaint, plaintiffs allege that defendants engaged in prohibited transactions in violation of ERISA § 406 by including affiliated RiverSource Funds, which are managed by a wholly-owned subsidiary of Ameriprise, as Plan investment options. Yet, the facts upon which plaintiffs base these allegations were known by plaintiffs well before 2008. In fact, since the Plan's inception in October 2005, plaintiffs have received numerous disclosures, including Summary Plan Descriptions ("SPDs"), prospectuses, and quarterly Investment

---

[1] Plaintiffs filed an Amended Complaint on February 7, 2012.

[2] "Defendants" are Ameriprise Financial, Inc., Ameriprise Financial, Inc. Employee Benefits Administration Committee, Michelle Rudlong, Ameriprise Financial, Inc. 401(k) Investment Committee, Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc., Ira D. Hall, Warren D. Knowlton, W. Walker Lewis, Siri S. Marshall, Jeffrey Noddle, Richard F. Powers III, Robert F. Sharpe, Jr., Jeffrey P. Fox, Phil Wentzel, Jeffrey A. Williams, Martin S. Solhaug, Kristi L. Peterson, Timothy V. Bechtold, and Brent Sabin. "Ameriprise" refers herein to defendant Ameriprise Financial, Inc.

Performance Information brochures disclosing that Ameriprise and its affiliates distributed and managed the RiverSource Funds. These disclosures also made clear that these funds charged fees for investment management and alerted participants that they could find complete information regarding the various funds' fees in the prospectuses.

It is therefore no surprise that each plaintiff testified to his or her awareness, prior to September 28, 2008, that the RiverSource Funds were affiliated with Ameriprise and that such funds charged and retained fees for their investment management services—knowledge sufficient to bar plaintiffs' prohibited transactions claims. Moreover, because plaintiffs were also aware of these funds' performance histories and expense ratios, this knowledge bars their core breach of fiduciary duty claim as alleged in Count I. Indeed, plaintiffs have testified not only to knowing these underlying facts, but acting on them. For example, plaintiff Jeffrey Olson testified that his concerns regarding the performance of certain RiverSource Funds caused him to reallocate certain investments to a money market account: "I remember putting half of my 401(k) allocation into the money market account because of the sheet of paper we got that listed the performances of the [RiverSource] funds over the last one, three, and five years, almost universally taking losses, and so I—the money market account at least would not lose money."[3] There can be no question that plaintiffs were on notice more than three years before they filed suit as to the facts they now contend establish their claims.

_____

[3] Declaration of Shannon Barrett ("Barrett Decl.") at Ex. AA, May 6, 2013 Deposition of Jeffrey Olson ("Olson Dep.") at 48:9-19. All cites to "Ex. _" herein refer to exhibits to the Barrett Declaration (Exs. AA-AAA) or the Declaration of Brent Sabin ("Sabin Decl.") (Exs. A-U).

Plaintiffs have also alleged prohibited transactions and breaches of fiduciary duties based on the Plan's payment of purportedly excessive fees to affiliate Ameriprise Trust Company ("ATC")—the Plan's recordkeeper until April 2007—and later Wachovia (Count VII) based on Ameriprise's sale of ATC to Wachovia (Count V) at what plaintiffs contend was an inflated price.  Yet, the facts underlying these transactions, including that ATC was the Plan recordkeeper until April 2007 and that RiverSource funds paid fees to the Plan's recordkeeper, were also fully disclosed to plaintiffs through various Plan communications.  Contrary to plaintiff's allegations, the fraudulent concealment doctrine does not apply to save plaintiffs' claims from ERISA's three-year "actual knowledge" limitations period.  Though plaintiffs have alleged certain misrepresentations relating to expenses incurred by the Plan, detailed affirmative disclosures by defendants regarding the same subject matter refute any suggestion that defendants engaged in a course of conduct designed to conceal any alleged breach (as required to satisfy the Eighth Circuit's heightened standard for fraudulent conduct).  These disclosures further demonstrate that plaintiffs cannot raise an issue of material fact as to whether they exercised "due diligence" in uncovering the nature of the alleged breaches and violations.

For these reasons, defendants are entitled to summary judgment as to each of Roger Krueger, Jeffrey Olson, Deborah Tuckner, Susan Wones and Margene Bauhs's claims, as set forth more fully below.[4]

---

[4] Because plaintiffs Bernice Hillukka and Edward Pope have indicated they will be filing a motion to withdraw as named plaintiffs, defendants have not moved for summary judgment as to their claims, which are due to be dismissed.  (Barrett Decl. ¶ 29.) Defendants seek summary judgment as to all claims by the remaining five plaintiffs

<u>S</u>TATEMENT <u>O</u>F <u>U</u>NDISPUTED <u>F</u>ACTS

*The Ameriprise 401(k) Plan*

1.      Ameriprise, a financial services company, was formerly part of American

Express Company.  When Ameriprise became an independent public company, effective

October 1, 2005, Ameriprise established its 401(k) Plan (the "Plan") by duplicating

investment options formerly available through the American Express 401(k) Plan and

transferring the affected American Express 401(k) Plan participants to the new Plan.  (Ex.

D, 2005 SPD at 1-3; Ex. A, Ameriprise Financial 401(k) Plan ("2005 Plan Document")

§§ 1.1, 1.2.)

2.      The Plan is a defined contribution plan that allows participants to direct the

investments in their accounts among different options, which include mutual funds,

collective funds, and a separately managed account (the Income Fund).  (Ex. D, 2005

SPD at 1, 13-20 (listing investment options); Ex. E, 2007 SPD at 19-20; Ex. H, 2008 SPD

at 21-22.)[5]

3.      RiverSource mutual funds were managed by RiverSource Investments,

---

except to the extent that plaintiffs Bauhs and Krueger base their claims on the Plan's
inclusion of the Columbia Contrarian Core Fund which was not added to the Plan lineup
until after September 28, 2008.  (Ex. F, Fund Change Notification.)  Because plaintiffs
Olson, Wones, and Tuckner never invested in that fund, they lack standing to pursue any
claims based on its inclusion.  *See Fuller v. SunTrust Banks, Inc.*, No. 1:11-CV-784-
ODE, 2012 U.S. Dist. LEXIS 56602, at *25-30 (N.D. Ga. Mar. 20, 2012) (plaintiff not
invested in challenged fund lacked standing to challenge inclusion of fund in 401(k)
investment lineup); *see also Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution
Plan v. Bank of N.Y. Mellon Corp.*, 287 F.R.D. 216, 224 (S.D.N.Y. 2012) ("Plaintiff has
not suffered an 'injury-in-fact' with respect to [] notes in which it did not invest"); *David
v. Alphin*, 817 F. Supp. 2d 764, 781 (W.D.N.C. 2011) (to same effect).
[5] The RiverSource Funds were renamed Columbia Funds in 2010.  (Ex. C, Ameriprise
Financial Retirement Program Update (Sept. 27, 2010).)

LLC, a wholly-owned subsidiary of Ameriprise Financial, Inc. (Ex. H, 2008 SPD at 22; Ex. D, 2005 SPD at 24; Ex. E, 2007 SPD at 31.) RiverSource collective funds were managed by ATC (although in 2008, by RiverSource Investments, LLC). (Ex. D, 2005 SPD at 24; Ex. H, 2008 SPD at 22; Ex. B, 10/3/2005 Ameriprise Financial 401(k) Plan Trust Agreement at § 4.5.) The Income Fund was also managed by ATC.[6] (*See* Ex. D, 2005 SPD at 16-17; Ex. E, 2007 SPD at 19-20; Ex. H, 2008 SPD at 21-22.)

4.      The Plan relies on a recordkeeper to provide various administrative services, such as creating and distributing participant statements and processing account distributions. (Ex. H, 2008 SPD at 33, 55; Sabin Decl. ¶ 35.) ATC was the Plan's original recordkeeper. (Ex. B, 10/3/2005 Ameriprise Financial 401(k) Plan Trust Agreement at §§ 1.2(m), 6.2.)

*5.*      In April 2007, as a result of acquiring ATC's recordkeeping business, Wachovia Bank, N.A. ("Wachovia") became the Plan's trustee and recordkeeper. (Sabin Decl. ¶ 35.) While ATC still manages certain collective funds in the Plan's investment lineup, it no longer provides recordkeeping services to the Plan. (*Id.*)

***Plaintiffs' Backgrounds***

6.      Roger Krueger is a former Ameriprise employee who provided customer service support to the Ameriprise investment products sales force. (Ex. BB, May 7, 2013 Deposition of Roger Krueger ("Krueger Dep.") at 27:22-29:16.) While employed at American Express and Ameriprise, Krueger obtained his Series 6 and Series 7 licenses

---

[6] The RiverSource mutual funds, collective funds, and Income Fund are collectively referred to as "RiverSource Funds."

from the Financial Industry Regulatory Authority ("FINRA").  (*Id.* at 38:6-23.)[7]  Krueger

was able to explain at his deposition the various ways that mutual fund managers are paid

for selling mutual funds and knew what share classes and expense ratios were.  (*Id.* at

15:20-16:20, 18:17-24, 21:18-22:5.)  Krueger independently researched fund

performance and fees through Morningstar rankings and other indices for his own

investments in the Plan.  (*Id.* at 50:3-5; 55:7-10.)

7.      Jeffrey Olson also obtained Series 6 and Series 7 licenses from FINRA and

could explain the various types of fees charged by mutual funds, including articulating

what an expense ratio was.  (Ex. AA, Olson Dep. at 10:6-13:20; 20:13-21:2.)  He

performed an independent investigation of the Plan's investment options as soon as he

became eligible to participate by reviewing investment prospectuses to review fees, types

of funds, and fund performance and then going online and comparing publicly-traded

equivalents to nearly every Plan investment option, including RiverSource Funds.  (*Id.* at

45:23-46:25.)

8.      Margene Bauhs worked for American Express from the mid-1980s to mid-

1990s in various positions, often reviewing investment materials including fund

prospectuses.  (Ex. CC, May 7, 2013 Deposition of Margene Bauhs ("Bauhs Dep.") at

19:5-15; 20:17-21:15.)  Bauhs understood the various types of fees charged by mutual

---

[7] A Series 6 license qualifies an investment professional as an Investment Company
Products/Variable Contracts Representative, which enables a professional to discuss
mutual funds with prospective clients.  A Series 7 license enables an investment
professional to discuss general securities.  *See* FINRA, FINRA Administered
Qualification Examinations,
http://www.finra.org/Industry/Compliance/Registration/QualificationsExams/p011096
(last visited July 3, 2013); (*see also* Ex. BB, Krueger Dep. at 10:9-12).

funds, such as front-end load, back-end load, 12b-1, and investment management fees. (*Id.* at 27:11-28:19.)

9.     Susan Wones began working in the financial industry in 1991.  (Ex. DD, May 3, 2013 Deposition of Susan Wones ("Wones Dep.") at 15:13-15.)  She testified that she often researched the funds offered in the Plan when making investment choices (*id*. at 22:17-24), and conducted an annual review of her investments in the Plan (*id.* at 24:14-20, 68:4-24).

10.     Deborah Tuckner's work at Ameriprise involved updating Ameriprise's employee benefit website.  (Ex. EE, May 2, 2013 Deposition of Deborah Tuckner ("Tuckner Dep.") 41:10-23.)

***Plaintiffs' Participation In The Plan And Receipt Of Plan Disclosures***

11.     All plaintiffs, except Jeffrey Olson, participated in the Ameriprise Plan since its inception on October 1, 2005.  (Ex. BB, Krueger Dep. at 27:19-21, 43:10-13, 71:22-72:6; Ex. EE, Tuckner Dep. at 35:16-36:9, 46:2-13; Ex. DD, Wones Dep. at 20:19-22:10; Ex. CC, Bauhs Dep. at 41:3-5, 101:4-24.)  Olson became a Plan participant in 2007 when he joined Ameriprise.  (Ex. AA, Olson Dep. at 27:13-18, 46:5-11.)

12.     In 2005, 2007, and 2008, participants were provided with SPDs which, among other things, describe the investment options in the Plan, show the performance of each investment option, and contain other general Plan information, such as how to obtain a prospectus.  (Ex. D, 2005 SPD at 13-26; Ex. E, 2007 SPD at 12-35; Ex. H, 2008 SPD at 14-31.)

13.     The 2005 SPD was distributed on or about September 2005 to every Plan

participant.  (*See* Ex. D, 2005 SPD at 85 (dated 9/05); Sabin Decl. ¶ 9.)  The 2005 SPD was also made available on Ameriprise's internal intranet site, "Inside," and Ameriprise's website through the retirement services portal.  (Sabin Decl. ¶ 9.)  On or about March 2007, the 2007 SPD was distributed to every Plan participant via mail for inactive participants and by e-mail to active Ameriprise employees.  (Ex. F, 2007 SPD Transmittal Letter, (dated 03/07); Ex. G, 2007 SPD Transmittal e-mail; Sabin Decl. ¶ 10.)  The 2007 SPD was also made available on Ameriprise's internal intranet site, "Inside," and Ameriprise's website through the retirement services portal.  (Sabin Decl. ¶ 10.)  On or about March 2008, the 2008 SPD was distributed to every Plan participant via mail to inactive participants and e-mail to active Ameriprise employees.  (Ex. I, 2008 SPD Transmittal e-mail; Sabin Decl. ¶ 13.)  The 2008 SPD was also made available on Ameriprise's internal intranet site, "Inside," and Ameriprise's website through the retirement services portal.  (Sabin Decl. ¶ 13.)

14.     Plaintiffs Olson, Tuckner, and Bauhs each testified that they received annual SPDs.  (Ex. AA, Olson Dep. at 78:5-79:9; Ex. EE, Tuckner Dep. at 105:11-106:23; Ex. CC, Bauhs Dep. at 63:10-12, 101:9-103:23.)   While plaintiffs Krueger and Wones were unable to recall receiving annual SPDs, they would have received SPDs by virtue of being Plan participants.  (Sabin Decl. ¶ 8); *see also* 29 C.F.R. § 2520.104b-2 (requiring periodic distribution of SPDs to all plan participants).

15.     Ameriprise sends each Plan participant quarterly and annual retirement account statements detailing his or her Plan contributions, asset allocations, and investment performance summaries.  (Sabin Decl. ¶ 16.)  All plaintiffs testified that they

received quarterly statements.  (Ex. AA, Olson Dep. at 63:16-18, 74:5-11; Ex. EE,

Tuckner Dep. at 56:4-25; Ex. CC, Bauhs Dep. at 94:1-95:10; Ex. BB, Krueger Dep. at

76:1-19; Ex. DD, Wones Dep. at 51:11-17.)

16.     Prospectuses for all of the mutual fund investment options in the Plan line-

up, including the RiverSource mutual funds, were mailed or e-mailed to investors in

those funds or made available online prior to September 28, 2008. (*See e.g.*, Ex. DD,

Wones Dep. 73:4-21; Ex. CC, Bauhs Dep. at 99:9-12; Ex. AA, Olson Dep. at 79:16-21

(noting that he found prospectuses online); Ex. E, 2007 SPD at 25, 31; Ex. H, 2008 SPD

at 22, 31 (same); Sabin Decl. ¶ 19.)  All plaintiffs testified that they knew prospectuses

were available and that they received them.  (Ex. BB, Krueger Dep. at 85:14-25; Ex. AA,

Olson Dep. at 79:16-21; Ex. EE, Tuckner Dep. at 85:18-25; Ex. DD, Wones Dep. at 73:4-

21; Ex. CC, Bauhs Dep. at 130:19-22.)

17.     Each plaintiff, except for Olson, was invested in at least one RiverSource

mutual or collective fund prior to September 28, 2008.  (Ex. KK, Krueger Quarterly Stmt

(Q3 ending in Sept. 30, 2007); Ex. BB Krueger Dep. at 74:16-75:1; Ex. AA, Olson Dep.

at 48:9-24; Ex. EE, Tuckner Dep. 87:12-17; Ex. II, Tuckner Quarterly Stmt. (Q1 ending

Mar. 31, 2006) at 4; Ex. DD, Wones Dep. at 81:3-8; Ex. LL, Bauhs Quarterly Stmt. (Q1

ending in Sept. 30, 2007) at 4 (same),  Ex. CC, Bauhs Dep. at 94:1-8.)

***Disclosures Regarding The Affiliation of The RiverSource Funds***

18.     The 2005, 2007, and 2008 SPDs specifically disclosed the affiliation

between the RiverSource Funds and Ameriprise.  (Ex. D, 2005 SPD at 24; Ex. E, 2007

SPD at 31; Ex. H, 2008 SPD at 31.)

19.     RiverSource mutual fund prospectuses also disclosed the affiliation between the RiverSource funds and Ameriprise.  (Ex. L, RiverSource Mid Cap Growth Fund Prospectus (Jan. 27, 2006) at 9p; Ex. K, RiverSource Mid Cap Growth Fund Prospectus (Am. October 3, 2005) at 9p.)  Various RVS prospectuses from relevant time periods disclosed, for example, that "RiverSource Investments, LLC . . . is the investment manager to the RiverSource funds, and is a wholly owned subsidiary of Ameriprise Financial, Inc."  (*See* Ex. AAA (prospectus chart).)

20.     Each plaintiff has testified that he or she knew before September 28, 2008 that the RiverSource mutual funds were affiliated with Ameriprise.  (*See* Ex. BB, Krueger Dep. at 45:1-6 (RiverSource funds were "proprietary Ameriprise funds"); Ex. AA, Olson Dep. at 31:4-16 ("RiverSource is a group within Ameriprise that is the owner of the mutual funds"); Ex. EE, Tuckner Dep. at 58:5-9; Ex. DD, Wones Dep. at 58:21-24 (understood RiverSource funds to be associated with Ameriprise as early as 2007); Ex. CC, Bauhs Dep. at 69:17-24 (knew RiverSource funds were affiliated with Ameriprise "by their documents they've sent").)

21.     In addition, all Plan participants, including plaintiffs, were mailed a brochure in or around March 2007 disclosing that ATC had been the Plan's recordkeeper. (*See* Ex. U, Wachovia Sale Brochure; Sabin Decl. ¶¶ 35-37.)

### *Disclosures Concerning Investment Management And Administrative Fees*

22.     Each plaintiff except Tuckner testified that he or she knew before September 28, 2008 that the RiverSource funds charged fees.  (Ex. BB, Krueger Dep. at 47:18-20; Ex. AA, Olson Dep. at 31:7-16; Ex. DD, Wones Dep. at 59:8-22; Ex. CC,

Bauhs Dep. at 28:19.)  Each plaintiff including Tuckner received fund prospectuses and other disclosures alerting participants to the fees charged by the RiverSource funds prior to September 28, 2008.  (*See supra* ¶ 16.)

23.     Krueger stated that "beginning in 2005, [he] understood that the RiverSource funds had fees associated with them."  (Ex. BB, Krueger Dep. at 47:18-20.) Krueger testified that when he decided how to invest in the Plan, he was "aware that there were funds with lower fees and probably better performance outside of the [P]lan."  (*Id*. at 79:6-80:1.)

24.     Bauhs testified that "the entire time [she was] invested in the 401(k) plan either through American Express or Ameriprise [1985 through 2013], [she] understood that there would be fees associated with that," noting that "[i]t helps to run the business." (Ex. CC, Bauhs Dep.at 67:1-5.)  In fact, Bauhs understood from her time working at American Express, which ended in 1997 (Ex. CC, Bauhs Dep. at 38:12-14), that mutual funds charged different sorts of fees, noting "[t]here was a front-end load and there were back-end loads from the clients . . . and then there were management fees . . ."  (*Id*. at 27:11-17.)  She testified that "the people who were making the decisions on the products that were purchased, the stocks that were purchased, have to also get paid."  (*Id*. at 28:15-19.)  Bauhs testified that "there is something that's in the prospectus that talks about management fees," (*id*. at 29:4-10) and that she "paid more attention" to the fee information as opposed to other information in the prospectuses.  (*Id*. at 63:17-22.)

25.     Wones testified that "in early 2007 when [she] invested in [] RiverSource funds," she understood that RiverSource was "charging some type of fees associated with

managing those mutual funds."  (Ex. DD, Wones Dep. at 58:21-59:22.)

26.     Once he became eligible for the Plan in 2007, Olson researched the expense ratios for the RiverSource funds.  When asked how he knew how Ameriprise was compensated for the sale of RiverSource funds, Olson answered that "in reading prospectuses . . . it basically outlines the fees." (Ex. AA, Olson Dep. at 31:7-16.)  Olson testified: "I remember looking at [the expense ratios] and then going online and looking at, as close as I can, to their publicly-traded equivalents and noting the fees were higher typically." (*Id.* at 46:5-25.)

27.     The 2005, 2007, and 2008 SPDs, which were sent to all Plan participants including Tuckner, each urged participants to "consider the Investment objectives, risks, and charges and expenses of the funds" and explained that Participants could obtain a prospectus containing such information.  (Ex. D, 2005 SPD at 24; Ex. E, 2007 SPD at 25, 31; Ex. H, 2008 SPD at 22, 31.)

28.     The 2008 SPD further explained that administrative fees for the Plan were paid from fees associated with the Plan's investment options, stating that "[m]ost of the cost of administering the 401(k) Plan, including the fees of the trustee, recordkeeper, and investment managers, are paid from fees associated with the investment options offered under the 401(k) Plan." (Ex. H, 2008 SPD at 55.)

29.     Prospectuses for the RiverSource mutual funds each contain a section marked "Fees and Expenses," which disclose that "[f]und investors pay various expenses," and breaks those various expenses down into a chart organized by share class and type of fee, including management fees and other expenses.  (*See* Ex. AAA

(prospectus chart).)  The prospectuses further disclosed that "the Fund pays RiverSource Investments a fee for managing its assets," that the funds paid administrative fees, and that the Plan paid these fees to Plan recordkeepers.  (*See id.*)

30.     All plaintiffs except for Olson were invested in RiverSource mutual funds at times when the prospectuses for those funds disclosed that "[f]und investors pay various expenses" and included a chart that itemized the fees by 1) management fees; 2) distribution (12-b1) fees; and 3) other expenses.  (*See id.*; *see also supra* ¶ 17.)  These prospectuses also provided examples of fees "intended to help you compare the cost of investing in the Fund with the cost of investing in other mutual funds."  (*See* Ex. AAA (prospectus chart); *see also supra* ¶ 17)

31.     All plaintiffs except for Olson were invested in RiverSource mutual funds at times when the prospectuses for those funds disclosed that "Ameriprise Trust Company is paid for certain transaction fees and out-of-pocket expenses incurred while providing services to the funds" and RiverSource "may make additional cash payments out of their own resources to financial intermediaries, such as . . . recordkeepers."  (*See* Ex. AAA (prospectus chart); *see also supra* ¶ 17.)

32.     Tuckner, Wones, Krueger, and Bauhs were also invested in RiverSource collective funds.  (Ex. II, Tuckner Quarterly Stmt. (Q1 ending Mar. 31, 2006) at 4; Ex. EE, Tuckner Dep. at 73:14-74:24, 99:20-15; Ex. HH, Wones Quarterly Stmt. (Q1 ending Mar. 31, 2006) at 4; Ex. DD, Wones Dep. at 54:1-17; Ex FF, Krueger Quarterly Stmt. (Q1 ending Mar. 31, 2006) at 4; Ex. BB, Krueger Dep. at 76:1-19; Ex. GG, Bauhs Quarterly Stmt. (Q1 ending March 31, 2006) at 4; Ex. CC, Bauhs Dep. at 94:1-8.)  Plan

participants can obtain fact sheets for collective funds.  (Sabin Decl. ¶ 28.)  Fact sheets

disclosed the collective funds' expense ratios, in addition to other information about the

funds, including that they are managed by Ameriprise Trust Company.  (Ex. Q,

RiverSource Trust Equity Index Fund III Fact Sheets; Ex. R, RiverSource Trust Long-

Term Horizon Fund Fact Sheets; Ex. S, RiverSource Trust Medium-Term Horizon Fund

Fact Sheets; Ex. T, RiverSource Trust Short-Term Horizon Fund Fact Sheets; Sabin Decl.

¶ 28.)  In addition, Krueger, Olson, Wones and Bauhs were invested in the Income Fund.

(Ex. JJ, Olson Quarterly Stmt. (Q4 ending Dec. 31, 2007); Ex. AA, Olson Dep. at 71:14-

73:7; Ex. NN, Tuckner Quarterly Stmt. (Q2 ending June 30, 2007) at 4; Ex. EE, Tuckner

Dep. at 73:14-74:24; Ex. HH, Wones Quarterly Stmt. (Q1 ending Mar. 31, 2006) at 4; Ex.

DD, Wones Dep. at 54:1-17; Ex. FF, Krueger Quarterly Stmt. (Q1 ending Mar. 31, 2006)

at 4; Ex. BB, Krueger Dep. at 76:1-19; Ex. GG, Bauhs Quarterly Stmt. (Q1 ending March

31, 2006) at 4; Ex. CC, Bauhs Dep. at 94:1-8.)  Information regarding the Income Fund,

including its performance, and that it was managed by Ameriprise Trust Company, was

contained in the SPDs.  (Ex. D, 2005 SPD at 15; Ex. E, 2007 SPD at 19; Ex. H, 2008

SPD at 21.)

     33.    Since Ameriprise became an independent company in 2005, Wones, Bauhs,

and Tuckner held separate investment accounts with Ameriprise outside of their Plan

investments and received quarterly and annual account statements that expressly

disclosed that Ameriprise received revenue from the sale of RiverSource investment

products.  (Ex. OO, Bauhs Statement of Financial Accounts (Feb. 16, 2006) at 11; Ex.

CC, Bauhs Dep. at 122:19-25; Ex. PP, Tuckner Statement of Financial Accounts (Jan. 31,

2005) at 7; Ex. EE, Tuckner Dep. at 120:12-22; Ex. QQ, Wones Statement of Financial

Accounts (Nov. 30, 2005) at 17; Ex. DD, Wones Dep. at 86:21-87:22.)

34.    When Ameriprise sold its recordkeeping business, it notified Plan

participants prior to Wachovia becoming Plan recordkeeper through a brochure entitled

"Your Retirement Program is Transitioning to Wachovia." (Ex. U, Wachovia Sale

Brochure at 1; Sabin Decl. ¶ 36.) The brochure explained that as of April 3, 2007, ATC

would no longer be the Plan recordkeeper and that Wachovia would now provide

"recordkeeping and administrative services" for the Plan. (Ex. U, Wachovia Sale

Brochure at 1-2.)

35.    Ameriprise sent this brochure to all plaintiffs by virtue of their participation

in the Plan. (Sabin Decl. ¶ 36.) Bauhs retained a version of the brochure and produced it

as part of the litigation. (Ex. UU, Bauhs Wachovia Brochure; Ex. CC, Bauhs Dep. at

107:10-108:13.) Wones specifically testified that she recognized the document. (Ex.

DD, Wones Dep. at 75:20-25.) Krueger testified that he was aware that Ameriprise sold

its recordkeeping business to Wachovia in 2007. (Ex. BB, Krueger Dep. at 60:7-14;

89:16-19.)

### *Disclosures Regarding Fund Performance*

36.    The SPDs disclosed the performance of the Plan's investment options,

containing comprehensive charts showing one-year, five-year, and ten-year returns. (Ex.

D, 2005 SPD at 25-26; Ex. E, 2007 SPD at 30-35; Ex. H, 2008 SPD at 27-31.)

37.    The quarterly and annual retirement account statements that Plaintiffs

received also included Investment Performance Information sheets, which show the

performance of each fund the participant invested in against the performance of a benchmark fund. (Ex. RR, Investment Performance Information – Period Ending Dec. 31, 2006; Ex. SS, Investment Performance Information – Period Ending Mar. 31, 2007; Ex. TT, Investment Performance Information – Period Ending Sept. 30, 2006.) In 2007, investment performance information was integrated into the quarterly statements themselves. (Ex. LL, Bauhs Quarterly Stmt. (Q3 ending Sept. 30, 2007) at 4-5; Ex. CC, Bauhs Dep. at 94:1-8); Ex. KK, Krueger Quarterly Stmt. (Q3 ending Sept. 30, 2007) at 4-5; Ex. BB, Krueger Dep. at 76:1-19; Ex. JJ, Olson Quarterly Stmt. (Q4 ending Dec. 31, 2007) at 2-3; Ex. AA, Olson Dep. at 71:14-73:7; Ex. NN, Tuckner Quarterly Stmt. (Q2 ending Jun. 30, 2007) at 4-5; Ex. EE, Tuckner Dep. at 73:14-74:24; Ex. MM, Wones Quarterly Stmt. (Q2 ending Jun. 30, 2007) at 4-5; Ex. DD, Wones Dep. at 54:1-17.)

38.     Olson and Bauhs specifically recall reviewing these sheets to obtain performance information about their investments. (Ex. AA, Olson Dep. at 49:25-50:5; Ex. CC, Bauhs Dep. at 90:20-91:22.) Olson, for example, testified that performance information "provided by Ameriprise listed the fund performances, both in the one-, three-, and five-year, if I remember correctly, and against their index, and almost universally the numbers were negative and below the performance of the index." (Ex. AA, Olson Dep. at 49:25-50:5.)

39.     Krueger testified that the RiverSource funds' performance was "average" and that "there's Morningstar rankings; there weren't a lot of five stars, which are the best funds." (Ex. BB, Krueger Dep. at 49:10-12.) Krueger also accessed the Ameriprise website to review the "pricing and performance" of his Plan investments in addition to

fund prospectuses, at minimum, bi-weekly.  (*Id.* at 84:11-85:25.)

<u>A</u><u>RGUMENT</u>

I.   **ERISA'S STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIMS
      BECAUSE PLAINTIFFS HAD ACTUAL KNOWLEDGE OF ALL
      MATERIAL FACTS AT LEAST THREE YEARS BEFORE FILING SUIT.**

ERISA § 413(2), 29 U.S.C. §1113(2), provides that an action must be brought

within three years after the plaintiff acquires "actual knowledge" of the breach or

violation.[8]  The majority of courts addressing the issue have held that the statute begins

running when plaintiff has knowledge of the material facts constituting the alleged

violation, regardless of when or whether plaintiff realized those facts constituted a breach

or gave rise to a claim.  *See, e.g.*, *Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003);

*Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992); *Blanton v.

Anzalone*, 760 F.2d 989, 992 (9th Cir. 1985); *Brock v. Nellis*, 809 F.2d 753, 755 (11th

Cir. 1987).[9]

Here, since 2005, plaintiffs have repeatedly received SPDs, quarterly and annual

account statements, and other materials containing information about the Plan's

investment options, including specific funds' performance and expenses.  Courts have

---

[8] 29 U.S.C. §1113 provides that: "[n]o action may be commenced under this subchapter
with respect to a fiduciary's breach of any responsibility, duty, or obligation under this
part, or with respect to a violation of this part, after the earlier of (1) six years after (A)
the date of the last action which constituted a part of the breach or violation, or (B) in the
case of an omission the latest date on which the fiduciary could have cured the breach or
violation, or (2) three years after the earliest date on which the plaintiff had actual
knowledge of the breach or violation; except that in the case of fraud or concealment,
such action may be commenced not later than six years after the date of discovery of such
breach or violation."

[9] *But see Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992); *Maher v. Strachan
Shipping Co.*, 68 F.3d 951, 957-58 (5th Cir. 1995).

repeatedly held that the distribution of such plan materials establishes "actual knowledge" of the document's contents for the purposes of Section 1113(2).  *See, e.g., Brown v. Owens Corning Inv. Review Comm.,* 622 F.3d 564, 571 (6th Cir. 2010) ("Actual knowledge does not require proof that the individual Plaintiffs actually saw or read the documents . . . .  When a plan participant is given specific instructions on how to access plan documents, their failure to read the documents will not shield them from having actual knowledge of the documents' terms.") (internal citations and quotations omitted); *Fink v. Nat'l Sav. & Trust. Co.*, 772 F.2d 951, 959 (D.C. Cir. 1985) ("The Forms 5500 sufficiently disclosed these transactions to bring into play ERISA's three year limitations period."); *Fuller*, 2012 U.S. Dist. LEXIS 56602, at *37 (N.D. Ga. Mar. 20, 2012) (holding quarterly investment performance report and prospectus "are sufficient to give Plaintiff actual knowledge of the essential facts of her claim more than three years prior to filing suit"); *Ruppert v. Principal Life Ins. Co.*, 813 F. Supp. 2d 1089, 1102 (S.D. Iowa 2010) (citing *Fink* with approval); *Shirk v. Fifth Third Bancorp.*, No. 05-CV-049, 2009 U.S. Dist. LEXIS 90775, at *11-12 (S.D. Ohio Sept. 20, 2009) (holding Plan disclosures, including newsletters, prospectuses, and brochures, disclosed sufficient information to confer actual knowledge because "a plaintiff may not avoid commencement of the statute of limitations merely by refusing to read or examine information disclosing relevant facts").[10]

---

[10] *See also Edes v. Verizon Commc'ns, Inc*., 417 F.3d 133, 142 (1st Cir. 2005) ("[W]e do not think Congress intended the actual knowledge requirement to excuse willful blindness by a plaintiff."); *Reeves v. Airlite Plastics, Co.*, No. 8:04CV56, 2005 U.S. Dist. LEXIS 23628, at *17 (D. Neb. Sept. 26, 2005) ("any interpretation of the term 'actual

Because the content of the materials disseminated to plaintiffs and other Plan participants informed them of the basis for each of their alleged claims well before September 28, 2008, and because plaintiffs have each admitted actual knowledge of the relevant facts, plaintiffs' claims are barred.

### A.     PLAINTIFFS' PROHIBITED TRANSACTION CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS HAD KNOWLEDGE OF EACH CHALLENGED TRANSACTION WELL BEFORE SEPTEMBER 28, 2008.

Counts III, IV, V, and VII each allege, in whole or in part, that defendants engaged in prohibited transactions in violation of ERISA § 406, which provides that certain transactions between plans and fiduciaries or other statutorily defined "parties in interest" are *per se* prohibited.  *See* 29 U.S.C. § 1106(a)-(b).  Plaintiffs' prohibited transactions claims are based on the allegation that defendants included affiliated RiverSource and ATC managed funds in the Plan.  (F.A.C. ¶¶ 126-140.)  Plaintiffs allege that "[d]espite the many investment options available in the market, the Plan has invested hundreds of millions of dollars in mutual funds managed by Ameriprise subsidiaries RiverSource … as well as, commingled trusts managed by ATC.  These investment options were chosen because they were managed by, paid fees to, and generated profits for Ameriprise, its subsidiaries and Wachovia."  (*Id*. ¶ 54.)  Additionally, plaintiffs allege that payment of fees to ATC for Plan recordkeeping was a prohibited transaction.  (*Id*. ¶¶ 158-167.)  As a

---

knowledge' that would allow a participant to refuse to accept and acknowledge information clearly set before him is untenable. A plaintiff can always disavow actual knowledge, and the inner workings of the plaintiff's mind are impossible for a defendant to prove.").

result, plaintiffs contend Ameriprise sold ATC to Wachovia at a sale price that was "boosted" because of such recordkeeping fees.  (*Id*. ¶¶ 141-151.)

In *Brown v. American Life Holdings, Inc.*, the Eighth Circuit held that in the case of an "illegal investment," *i.e.,* an ERISA "prohibited transaction," knowledge of the transaction itself constitutes knowledge of the violation for statute of limitations purposes.  190 F.3d 856, 858-59 (8th Cir. 1999) (affirming district court's dismissal of certain ERISA claims on statute of limitations grounds); *see also Angell v. John Hancock Life Ins. Co.*, 421 F. Supp. 2d 1168, 1173 (E.D. Mo. 2006) ("The 3-year statute, however, is not triggered by knowledge of the applicable law; it is triggered by knowledge of the relevant facts.")  Judge Magnuson's application of the *Brown* decision in *Figas v. Wells Fargo & Co.*, No. 08-4546 (PAM/FLN), 2010 U.S. Dist. LEXIS 79965 (D. Minn. Apr. 6, 2010), is instructive.  In *Figas*, plaintiff alleged that defendant Wells Fargo engaged in a prohibited transaction in violation of Section 406 by causing its 401(k) plan to invest in Wells Fargo-controlled funds and by paying management and other fees in connection with those investments.  *Id.* at *7.  The Court found that Figas had actual knowledge of the prohibited transaction because "she admits that she knew about those investments and, further, that she knew that investment management fees were paid as a result of [those] investments."  *Id.* at *8.  Accordingly, the Court dismissed Figas's prohibited transactions claim with prejudice on limitations grounds.  *Id.* at *9.

The same result should be reached here.  Each named plaintiff knew, before September 28, 2008, that the RiverSource Funds were affiliated with Ameriprise and charged management fees.  The Plan communications, which each plaintiff has admitted

to receiving regularly in the mail or accessing online,[11] repeatedly disclosed that the

RiverSource Funds were affiliated with Ameriprise.[12]  Plan disclosures also made clear

that management fees were associated with the RiverSource Funds.[13]  While

dissemination of these disclosures, without more, would have given plaintiffs actual

knowledge for limitations purposes, each named plaintiff has specifically admitted to

receiving and/or reviewing these disclosures.[14]  Moreover, each admitted that he or she

knew before September 28, 2008, that the RiverSource funds were affiliated with

Ameriprise[15] and all, except Tuckner, knew that that fees were charged for the

management of the funds.[16]

Because there can be no dispute that Olson, Tuckner, Bauhs, Wones, and Krueger

had actual knowledge before September 28, 2008, three years before filing suit, that the

RiverSource funds were affiliated with Ameriprise and that management fees were

charged in connection with such funds, their prohibited transactions claims in Counts III

and IV must necessarily be dismissed as untimely.

The prohibited transactions claims asserted in Counts V and VII fare no better.

Plaintiffs allege in Count VII that the Plan's administrative committee, EBAC, and the

Plan's investment committee, KIC, engaged in prohibited transactions by retaining

affiliated ATC to provide record-keeping and administrative services to the Plan in

---

[11] *See supra* ¶¶ 12-16.
[12] Ex. AAA (prospectus chart).
[13] *See* Ex. D, 2005 SPD at 42; Ex. E, 2007 SPD at 57; Ex. H, 2008 SPD at 55.
[14] *See supra* ¶¶ 12-16.
[15] *See supra* ¶ 20.
[16] *See supra* ¶ 22.

exchange for fees.  (F.A.C. ¶ 164.)  Similarly, Count V alleges that EBAC, KIC, Ameriprise, and the CBC leveraged the recordkeeping fees that the Plan paid to ATC to obtain a higher sale price when Ameriprise sold its recordkeeping arm to Wachovia.  (*Id.* ¶ 145.)  That is, plaintiffs claim the presence of the Plan's considerable assets in ATC's management portfolio enabled Ameriprise to fetch a higher sale price from Wachovia than they might have otherwise obtained.  (*Id.* ¶ 146.)  Plaintiffs complain that defendants' receipt of profits from leveraging the Plan's recordkeeping business was a prohibited transaction.  (*Id.* ¶ 150.)

Yet well before September 28, 2008, Plan communications expressly disclosed that ATC was the Plan recordkeeper;[17] RiverSource funds paid fees to the Plan recordkeepers[18]; ATC acted as the Plan trustee[19]; and that ATC provided custodial services to the Plan.[20]  Plaintiffs also admitted that, prior to September 28, 2008, they had personal knowledge that defendants sold the ATC recordkeeping business to Wachovia, and that Wachovia began providing recordkeeping services to the Plan.[21]  Since these disclosures were made and plaintiffs had actual knowledge of the underlying facts well before three years prior to the filing of plaintiffs' suit, this claim is time-barred.  *See Brown*, 190 F.3d at 859 (stating that were a plaintiff alleges that a fiduciary engaged in a

---

[17] Ex. U, Wachovia Sale Brochure.

[18] Ex. AAA (prospectus chart).

[19] Ex. E, 2007 SPD at 76; *see also* Ex. D, 2005 SPD at 76.

[20] Ex. M, RiverSource Disciplined Equity Fund Prospectus (Oct. 3, 2005) at 11p.

[21] *See supra* ¶ 35.

prohibited transaction, "knowledge of the transaction would be actual knowledge of the breach").[22]

## B.  DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON LIMITATIONS GROUNDS WITH RESPECT TO EACH OF PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIMS.

In addition to asserting prohibited transactions claims, plaintiffs also contend that including the RiverSource mutual funds in the Plan investment lineup was a breach of the fiduciary duties of loyalty and prudence under ERISA § 404 because those funds had inferior performance and higher fees relative to comparable funds.  (F.A.C. ¶¶ 107-17.) Plaintiffs ask the Court to infer without any specific factual allegations or evidence that defendants "fail[ed] to consider investment[s] other than RiverSource Mutual Funds" for the Plan, because these funds' performance histories and expenses would have made them inherently unappealing to any appropriately diligent fiduciary that a deficient process could be presumed.  (*Id.* ¶ 112.)  Plaintiffs also allege a breach of fiduciary duty based on essentially the same facts that form the basis of their prohibited transactions claims with respect to the purportedly excessive recordkeeping fees as well as the sale of Ameriprise Recordkeeping Services/ATC to Wachovia.  (F.A.C. ¶ 152-57.)[23]

---

[22] Because Count VI for co-fiduciary liability against Ameriprise is premised upon time-barred Counts I, III, IV, V and VII, it must also be dismissed.  *See, e.g., David v. Alphin*, 817 F. Supp. 2d 764, 783 (W.D.N.C. 2011) (dismissing co-fiduciary liability claim where underlying claims of breach were time-barred); *see also In re Citigroup ERISA Litig.*, 662 F.3d 128, 145 (2d Cir. 2011) (parties did not dispute that claim for co-fiduciary liability cannot stand if underlying breach allegations dismissed); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 953, 968-69 (E.D. Wis. 2009).

[23] To the extent Count VII also claims that defendants breached their fiduciary duties in using Wachovia as the Plan recordkeeper because Wachovia charged excessive fees, that claim also fails.  (F.A.C. ¶ 164.)  As discussed, plaintiffs had actual knowledge of the

In the Eighth Circuit, a plaintiff is deemed to have actual knowledge sufficient to trigger the statute of limitations as to a breach of fiduciary duty when he becomes aware of "all material facts necessary to understand that some claim exists." *Brown*, 190 F.3d at 859 (quoting *Gluck*, 960 F.2d at 1177). "The plaintiff does not have to 'have actual knowledge of every last detail of a transaction, or knowledge of its illegality." *Ruppert*, 813 F. Supp. 2d at 1102 (*citing Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420, 428 (E.D. Va. 2009)). *See also Reeves*, 2005 U.S. Dist. LEXIS 23628, *15-17 (dismissing ERISA claim on limitations grounds because plaintiff had actual knowledge of breach of fiduciary duty through information disclosed in plan statement, even though plaintiff threw away statements without reading or reviewing them).

   *Young v. General Motors Investment Management Corp.*, 550 F. Supp. 2d 416 (S.D.N.Y. 2008), is instructive. There, plaintiffs alleged that including Fidelity mutual funds in the company's 401(k) plan was a breach of fiduciary duty because those funds charged higher fees than similar products available to large institutional investors like the plan. *Id.* at 418. The court observed that prospectuses had disclosed that "the Plans offered the Fidelity Funds as investment options and the quarterly performance summaries provided to Plan participants clearly disclosed the fees and expenses

---

total fees charged by the funds which, as they also knew, included recordkeeping and administrative fees. Defendants did not need to disclose, and plaintiffs did not need to know, anything more. *See Hecker v. Deere & Co.*, 556 F.3d 575, 565 (7th Cir. 2009) ("The only question is thus whether the omission of information about the revenue-sharing arrangement is material. Deere disclosed to the participants the total fees for the funds and directed the participants to the fund prospectuses for information about the fund-level expenses. This was enough. The total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio . . .").

associated with the Fidelity Funds, including the fact that the expense ratios for some of

the Fidelity Funds were higher than those for alternative investment options." *Id.* at 420.

Accordingly, the court dismissed plaintiffs' breach of fiduciary duty claim based on the

allegedly imprudent investment in the Fidelity funds as time-barred. *Id.*

This result is similarly appropriate here. According to plaintiffs, the specific facts

from which they ask the Court to infer the breach of defendants' fiduciary duties are the

"poor or non-existent performance histories" and/or the "high expenses" of the

RiverSource mutual funds and the benefits Ameriprise received for selecting the

RiverSource mutual funds as Plan investment options. (F.A.C. ¶¶ 112-13.) However, the

Plan disclosures, which the plaintiffs have all acknowledged receiving and reviewing,

clearly informed plaintiffs of all of the material facts relating to these claims. Plaintiffs

received Investment Performance Information sheets on a quarterly basis, which provide

historical performance data for all funds in the investment lineup, including the

RiverSource mutual funds.[24] Fund prospectuses also disclosed the fees and expenses

associated with the RiverSource mutual funds[25], and numerous Plan documents expressly

refer plan participants to prospectuses to find full information regarding fees. Such

disclosures alerting Plan participants to the availability of information about fees are

sufficient to confer actual knowledge. *See Shirk*, 2009 U.S. Dist. LEXIS 90775, at *23-

24 (finding actual knowledge of fund fees and expenses where a brochure "plainly

---

[24] *See* Ex. RR, Investment Performance Information – Period Ending 12/31/06; *see also*
Ex. SS, investment Performance Information – Period Ending 3/31/07; Ex. TT,
Investment Performance Information – Period Ending 9/30/06.
[25] Ex. AAA (prospectus chart).

informed Plaintiffs that they could find fee and expense information for each new fund in the prospectus" and "[i]n each of these communications, Plaintiffs were also explicitly warned that investors should read the prospectus carefully before investing").

Any Plan participant had access to information regarding how the RiverSource mutual funds fees compared to fees of other funds by requesting a fund prospectus. Indeed, all plaintiffs in this case admitted to receiving the prospectuses containing fee information.[26] *See, e.g., Angell*, 421 F. Supp. 2d at 1174 (breach of fiduciary duty claim accrued "at the time [plaintiff] should have had knowledge of the fiduciary breach"). With respect to the benefit that the RiverSource mutual funds provided to Ameriprise in the form of compensation, each plaintiff knew, as discussed above, that the RiverSource mutual funds were affiliated with Ameriprise and that Plan participants paid management fees to RiverSource.  (*See supra* at ¶¶ 18-35.)  Likewise, the prospectuses also disclosed that a portion of the fees assessed by each fund went toward an "administration services fee."[27]

While plaintiffs allege that the investment selection process itself constituted a breach of fiduciary duty, they offer no factual allegations directly addressing the manner in which the Plan's fiduciaries selected or monitored Plan investments.  Rather, plaintiffs ask this Court to infer a flawed process from indirect facts, such as the performance, fees,

---

[26] *See supra* ¶ 16.

[27] Ex. L,  RiverSource Mid Cap Growth Fund Prospectus (Jan. 27, 2006) at 7p; Ex. K, RiverSource Mid Cap Growth Fund Prospectus (Jan. 28, 2005, Am. Oct. 3, 2005) at 7p; Ex. M, RiverSource Disciplined Equity Fund Prospectus (Oct. 3, 2005) at 7p; Ex. N, RiverSource Stock Fund Prospectus (Nov. 29, 2005) at 8p; Ex. O, RiverSource New Dimensions Fund Prospectus (Oct. 17, 2005) at 8p.

and affiliated status of the funds selected.  (F.A.C. ¶¶ 68-77; Pl. Opp. to MTD Dkt. No.

63 at 18-19 ("Selecting poor performing or novel investments instead of better

alternatives that provide clear benefits to the plan sponsor plausibly raises an inference

(at the least) that the process by which Defendants selected these investments was tainted

by failure of effort, competence or loyalty.").)[28]  Because the characteristics of the

RiverSource funds from which plaintiffs infer a flawed fiduciary process were clearly

known to them before September 28, 2008, their claims are untimely.  As the Eighth

Circuit held in *Brown*, "there may be breaches of duty as to which a plaintiff will not

have 'actual knowledge' until he or she learns of the reasons for the fiduciary's decision

… [b]ut in this case, the only breach-of-fiduciary-duty theories that Brown clearly

articulated are time-barred."  *Brown*, 190 F.3d at 860; *see also Fuller*, 2012 U.S. Dist.

LEXIS 56602, at *37 (holding that plaintiff had actual knowledge from fee and

performance disclosures, and stating, "Plaintiff claims knowledge of the [fund]

monitoring process is required to trigger the limitations period, [but] Plaintiff was aware

of relevant facts underlying its alleged breach of duty sufficient to trigger the limitations

period").  Likewise here, because the only factual bases for their claims that plaintiffs

---

[28] Illustrative of the extent to which plaintiffs allege that a flawed process can be inferred
from characteristics of the Plan itself is the fact that plaintiffs allege that even the mere
presence of certain investments in the lineup gives rise to an inference that a breach has
occurred.  (F.A.C. ¶ 72 (alleging that, despite the availability of other target date fund
families, "the Investment Committee again chose to use the in house
Ameriprise/RiverSource target date fund family . . . even though those funds had no
performance history"); *see also id.* ¶ 94 ("During the six year history since the inception
of the Plan and the original fund lineup, Defendants added 18 investment options to the
Plan's core investments, of which 12 were managed by Ameriprise affiliates.").)

have clearly articulated were known to them before September 28, 2008, their claims for

breach of fiduciary duty must be dismissed.[29]

## II. PLAINTIFFS CANNOT SHOW ANY FRAUDULENT CONCEALMENT REQUIRED TO AVOID THE APPLICATION OF ERISA'S THREE-YEAR LIMITATIONS PERIOD.

While 29 U.S.C. § 1113 provides that "in the case of fraud or concealment, [a]n

action may be commenced not later than six years after the date of discovery of such

breach or violation," there is no evidence to warrant tolling the otherwise applicable

three-year limitations period here.  To establish fraudulent concealment for ERISA

statute of limitations purposes, the Eighth Circuit requires a plaintiff to show that (1)

defendants engaged in a course of conduct designed to conceal evidence of their alleged

wrongdoing and that (2) the plaintiffs were not on actual or constructive notice of that

evidence, despite (3) the plaintiffs' exercise of due diligence.  *See Schaefer v. Ark. Med.

Soc'y*, 853 F.2d 1487, 1491-92 (8th Cir. 1988) (applying three-year statute of limitations

because plaintiffs failed to exercise due diligence to discover breach); *see also Ruppert*,

813 F. Supp. 2d at 1104 n.11 (noting Eighth Circuit's heightened requirements for

showing fraudulent concealment).

---

[29] Count II alleges that Ameriprise and the CBC failed to monitor other Plan fiduciaries as they engaged in the alleged breaches complained of in Count I.  (F.A.C. ¶ 123.)  A failure to monitor claim, however, cannot survive if the claim constituting the underlying breach is dismissed.  *See, e.g., Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010) (claim for breach of fiduciary to duty to properly appoint, monitor and inform plan fiduciaries cannot "survive without a sufficiently pled theory of an underlying breach"); *see also In re Citigroup ERISA Litig.*, 662 F.3d 1at 145 (same).  Because Count I is time-barred, Count II, which is predicated upon Count I, must also be dismissed.

Here, plaintiffs allege that "Defendants fraudulently concealed their breaches of fiduciary duty with respect to excessive fees paid by the Plans, and prohibited transactions with respect to the payments to Ameriprise for administrative services including trustee and recordkeeping services."[30]  In support of this allegation, plaintiffs cite a single representation in public filings with the Department of Labor ("DOL") that "all administrative expenses incurred with regard to the Plan are borne by the Company," to support their fraudulent concealment claims.[31]  However, the 2008 SPD makes clear that most of the cost of administering the Plan "are paid from the fees associated with the investment options offered under the 401(k) Plan."[32]  Moreover, plaintiffs regularly received prospectuses showing that a portion of the fees assessed by each fund went toward an "administrative services fee."[33]  Not only do these disclosures refute any suggestion that defendants' filings were part of a course of conduct "designed to conceal" any alleged breach, the disclosure that the Plan paid "administration services fees" would have put any plaintiff exercising due diligence on notice that administrative fees for the Plan were being paid from the Plan's investment options.  *See Bergmann v. BMC Industries, Inc.*, No. 05-963 (JNE/SRN), 2006 U.S. Dist. LEXIS 4847 (D. Minn. Jan. 20, 2006) (criteria for fraudulent concealment not satisfied where plaintiffs possessed a

---

[30] F.A.C. ¶ 176.

[31] No plaintiff alleges having reviewed this disclosure or otherwise being aware of its contents.  (F.A.C. ¶ 176.)

[32] Ex. H, 2008 SPD at 55.

[33] Ex. L,  RiverSource Mid Cap Growth Fund Prospectus (Jan. 27, 2006) at 7p; Ex. K, RiverSource Mid Cap Growth Fund Prospectus (Jan. 28, 2005, Am. Oct. 3, 2005) at 7p; Ex. M, RiverSource Disciplined Equity Fund Prospectus (Oct. 3, 2005) at 7p; Ex. N, RiverSource Stock Fund Prospectus (Nov. 29, 2005) at 8p; Ex. O, RiverSource New Dimensions Fund Prospectus (Oct. 17, 2005) at 8p.

prospectus that referred to a more comprehensive set of plan information that plaintiffs never requested, thus "highlight[ing] Plaintiffs' failure to allege facts demonstrating the exercise of due diligence"); *Cf. Cont'l Assurance Co. v. Cedar Rapids Pediatric Clinic*, 957 F. 2d 588, 593 (8th Cir. 1992) (finding fraud and concealment where "[t]he evidence at trial showed that Morton actively concealed his theft from plaintiffs by sending them statements on CAC letterhead indicating their accounts were intact.")

Accordingly, the fraudulent concealment doctrine is inapplicable here and the three-year statute of limitations applies to bar plaintiffs' claims.


## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant defendants' motion for summary judgment in its entirety.

Dated: July 3, 2013             s/ Benjamin G. Bradshaw

                                            Benjamin G. Bradshaw (admitted *pro hac vice*)
                                            bbradshaw@omm.com
                                            Shannon Barrett (admitted *pro hac vice*)
                                            sbarrett@omm.com
                                            O'Melveny & Myers LLP
                                            1625 Eye Street, NW
                                            Washington, D.C. 20006-4001
                                            (202) 383-5300

                                            Stephen P. Lucke (#154210)
                                            lucke.steve@dorsey.com
                                            Kirsten E. Schubert (#388396)
                                            Schubert.kirsten@dorsey.com
                                            Dorsey & Whitney LLP
                                            50 South Sixth Street, Suite 1500
                                            Minneapolis, MN 55402-1498
                                            (612) 340-2600

*Attorneys for Defendants*
*Ameriprise Financial, Inc. et al.*