## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Roger Krueger; Jeffrey Olson; Deborah Tuckner; Susan Wones; and Margene Bauhs, individually and as representatives of a class of similarly situated persons, and on behalf of the Ameriprise Financial 401(k) Plan, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 11-CV-02781 (SRN/JSM) |
| Plaintiffs, | ) | |
| v. | )<br>)<br>) | CLASS ACTION<br>COMPLAINT |
| Ameriprise Financial, Inc.; Ameriprise Financial, Inc. Employee Benefits Administration Committee; Michelle Rudlong; Ameriprise Financial, Inc. 401(k) Investment Committee; Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc.; Martin S. Solhaug; and Brent Sabin. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

1.     Plaintiffs Roger Krueger, Jeffrey Olson,Deborah Tuckner, Susan Wones, and Margene Bauhs, individually and as representatives of a class of similarly situated persons, bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3) on behalf of the Ameriprise Financial 401(k) Plan against Defendants Ameriprise Financial, Inc., the Ameriprise Financial, Inc. Employee Benefits Administration Committee, Michelle Rudlong, the Ameriprise Financial, Inc. 401(k) Investment Committee, the

Compensation and Benefits Committee of the Board of Directors of Ameriprise

Financial, Inc., Martin S. Solhaug, and Brent Sabin for breach of fiduciary duties and

state the following as their cause of action.

## JURISDICTION AND VENUE

2.     This court has exclusive jurisdiction over the subject matter of this action

under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29

U.S.C. § 1132(a)(2) and (3).

3.     This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2)

and 28 U.S.C. § 1391(b) because it is the district in which the subject plan is

administered, where at least one of the alleged breaches took place, and where at least

one defendant may be found.

## PARTIES

### Ameriprise Financial 401(k) Plan

4.     The Ameriprise Financial 401(k) Plan (the "Plan") is sponsored by Ameriprise

Financial, Inc. ("Ameriprise").

5.     The Plan is an "employee pension benefit plan" within the meaning of 29

U.S.C. §1002(2).

6.     The Plan is an "individual account plan" or "defined contribution plan" within

the meaning of 29 U.S.C. § 1002(34).

7.     The Plan is a qualified plan under 26 U.S.C. § 401 and is commonly referred to

as a "401(k) Plan".

8.     The Plan was established on October 1, 2005.

9.      The Plan covers eligible employees and retirees of Ameriprise and its subsidiaries and affiliates.

10.     Ameriprise Trust Company ("ATC"), a wholly owned subsidiary of Ameriprise, was the trustee and record-keeper of the Plan through March 31, 2007.

11.     Effective April 1, 2007, Wachovia Bank, NA doing business as Wachovia Retirement Services ("Wachovia") became the Plan's trustee and recordkeeper after the sale of Ameriprise's and ATC's retirement plan recordkeeping business to Wachovia.

12.     Effective December 31, 2008, Wachovia Bank NA and Wells Fargo Retirement Services was merged into Wells Fargo Bank NA and Wells Fargo Institutional Retirement and Trust, a business unit of Wells Fargo Bank NA ("Wells Fargo").

**Plaintiffs**

13.     Plaintiff Roger Krueger resides in Plymouth, Minnesota and was a participant in the Plan from October 1, 2005 through 2011, and entitled to additional benefits from the Plan based upon the allegations of this action.

14.     Plaintiff Jeffrey Olson resides in Maple Grove, Minnesota and has been a participant in the Plan from at least 2007 to the present.

15.     [intentionally left blank]

16.     Plaintiff Deborah Tuckner resides in Lake Elmo, Minnesota and has been a participant in the Plan from October 1, 2005 to the present.

17.     [intentionally left blank].

3

18.     Plaintiff Susan Wones resides in Rogers, Minnesota and was a participant in the Plan from October 1, 2005 through February 2010 and is entitled to additional benefits from the Plan based upon the allegations of this action.

19.     Plaintiff Margene Bauhs resides in Chaska, Minnesota and has been a participant in the Plan from October 1, 2005 through May 2013 and is entitled to additional benefits from the Plan based upon the allegations of this action.

### Defendants

20.     Defendant the Ameriprise Financial, Inc. Employee Benefits Administration Committee (hereafter "EBAC" including its members and delegates described below) has administered the Plan from October 1, 2005 to the present. The EBAC is a named fiduciary under the document establishing the Plan with the duty to administer the Plan. EBAC members were appointed and supervised by Defendant the Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc. Effective January 1, 2007, the document establishing the Plan designates as the members of the EBAC: the Vice President, Compensation & Benefits; the senior most Human Resources Generalist; the Vice President, Investment Accounting; the Vice President, Finance; and the senior most Client Service Organization executive.

21.     EBAC was and is the "administrator" of the Plan under 29 U.S.C. § 1002(16)(A) and is a fiduciary of the Plan under 29 U.S.C. §1102(a).

22.     EBAC is also a fiduciary of the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's

4

assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

23.     The members of the EBAC and any individual or entity to whom it delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiffs, are fiduciaries of the Plan under 29 U.S.C. § 1002(21) also because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

24.     Defendant Michelle Rudlong is or was at the times relevant herein the Director, Retirement & Deferred Compensation Benefits at Ameriprise. Further, and upon information and belief, Rudlong was a delegate of the EBAC and signed the Plan's Form 5500's, filed with the Department of Labor. Further, and upon information and belief, Rudlong is a fiduciary of the Plan under 29 U.S.C. § 1002(21) also because she exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

25.     [intentionally left blank]

26.     Defendant the Ameriprise Financial, Inc. 401(k) Investment Committee ("Investment Committee" including its members and delegates described below) is a named fiduciary in the document establishing the Plan with the duty to select, monitor,

and remove the Plan's investment options at all times relevant herein. The Investment Committee also was delegated and exercised its responsibility to direct the manner in which investment options unique to the Plan were invested. The document establishing the Plan designates as members of the Investment Committee Ameriprise's: Senior Vice President, Cross-Sell/Strategic Management; Vice President, International Global Compensation & Benefits; Senior Vice President LEO-Finance;  Vice President One Account and Cash; and Vice President of Insurance Products.

27.    The Investment Committee is a fiduciary of the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

28.    The members of the Investment Committee and any individual or entity to whom it delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiffs, are fiduciaries of the Plan under 29 U.S.C. § 1002(21) also because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

29.    [intentionally left blank]

30.    Defendant Brent Sabin is or was at the times relevant herein the Vice President, Benefits at Ameriprise Financial, Inc. Further, and upon information and

6

belief, Sabin was a delegate of the EBAC and the Investment Committee. Further, and upon information and belief, Sabin was Secretary of both the EBAC and the Investment Committee at times relevant herein. Sabin is a fiduciary of the Plan under 29 U.S.C. § 1002(21) also because he exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

31.     [intentionally left blank]

32.     Defendant the Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc. (the "CBC" including its members and delegates described below) is, upon information and belief, appointed by Ameriprise's Board of Directors. The CBC is a fiduciary of the Plan because it appoints, supervises, and removes the members of the EBAC.

33.     Upon information and belief, the CBC, the members of the CBC, and any individual or entity to whom it has delegated any of its fiduciary functions, have exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries of the Plan under 29 U.S.C. § 1002(21).

34.     [intentionally left blank]

35.     [intentionally left blank]

36.     [intentionally left blank]

37.     Defendant Ameriprise Financial, Inc. ("Ameriprise") is the Plan sponsor and a party in interest to the Plan under 29 U.S.C. § 1002(14).

38.     Further, and upon information and belief, Ameriprise, acting through its officers, directors, employees, or agents was a fiduciary to the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

39.     Ameriprise, acting by and/or through its Board of Directors, including the CBC, is a fiduciary within the meaning of ERISA, and thus subject to the fiduciary standard of care, because it appoints and removes the members of the EBAC that administers the Plan.

40.     Further, and upon information and belief, Ameriprise, acting by and/or through its Board of Directors, including the CBC, exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. As such, Ameriprise, the Board of Directors, the CBC, and its members are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

41.     Ameriprise, at all applicable times, on information and belief, has exercised control over the activities of its employees, internal departments and subsidiaries that performed fiduciary functions with respect to the Plan, and, on information and belief,

can hire or appoint, terminate, and replace such employees at will. Ameriprise is, thus, liable for the fiduciary breaches alleged herein of its employees, internal departments and subsidiaries.

42.     Finally, Ameriprise, as a corporate entity, cannot act on its own without any human counterpart. In this regard, on information and belief, Ameriprise relied directly on the other Defendants, named herein, to carry out its fiduciary responsibilities under the Plan and ERISA and the acts of Ameriprise's officers and employees alleged herein are the acts of Ameriprise.

### Ameriprise Entities

43.     Ameriprise is a holding company incorporated in Delaware that does business primarily through its subsidiaries.

44.     Ameriprise was previously a subsidiary of American Express Company known as American Express Financial Corporation.

45.     RiverSource Investments, LLC ("RiverSource") n/k/a Columbia Management Investment Advisers, LLC ("Columbia") is a subsidiary of Ameriprise, a related party to Ameriprise, and served as investment adviser for Ameriprise's Columbia, RiverSource, Seligman, and Threadneedle investment products.

46.      Following the completion of the acquisition of the long-term asset management business of Columbia Management from Bank of America in April 2010, RiverSource was combined with Columbia, under the Columbia brand.

47.     RiverSource Fund Distributors, Inc. n/k/a Columbia Management Investment Distributors, Inc. is a subsidiary of Ameriprise, a related party to Ameriprise, and a

broker-dealer that serves as the principal underwriter and distributor for Ameriprise's Columbia, RiverSource, Seligman, and Threadneedle investment products.

48.    RiverSource Service Corporation n/k/a Columbia Management Investment Services Corp. is a subsidiary of Ameriprise, a related party to Ameriprise, and a transfer agent that processes client transactions for Ameriprise's Columbia, RiverSource, Seligman, and Threadneedle investment products.

49.    Ameriprise Financial Services, Inc. is a subsidiary of Ameriprise and a registered broker-dealer and registered investment adviser.

50.    Ameriprise Retirement Services was and/or is a service group of ATC and Ameriprise Financial Services, Inc.

51.    Additional subsidiaries of Ameriprise include: Ameriprise Financial Services, Inc., Columbia Management Investment Advisers LLC, Columbia Management Investment Services Corp., Ameriprise Trust Company, Ameriprise Bank, FSB, RiverSource Distributors, Inc., J.&W. Seligman & Co., Incorporated, Columbia Management Investment Distributors, Inc., Threadneedle Investments North American LLC, and Columbia Wanger Asset Management, LLC.

52.    Numerous executives of Ameriprise simultaneously served as executives of Ameriprise subsidiaries. For example, Ward D. Armstrong, the Senior Vice President Retirement Services of Ameriprise, was also the Director and Chairman of the Board of ATC, as well as being the Director and Senior Vice President of RiverSource. Additionally, Jacqueline M. Sinjem, the Vice President Plan Sponsor Services of Ameriprise, was also a Vice President of ATC.

10

## THE PLAN'S INVESTMENTS

53.     There is no shortage of reasonably priced and well-managed investment options in the 401(k) plan marketplace.

54.     Despite the many investment options available in the market, the Plan has invested hundreds of millions of dollars in mutual funds managed by Ameriprise subsidiaries RiverSource and Columbia (all such funds will be referenced herein as RiverSource regardless of their later name change to Columbia), as well as, commingled trusts managed by ATC. These investment options were chosen because they were managed by, paid fees to, and generated profits for Ameriprise, its subsidiaries, and Wachovia.

55.     The following RiverSource Mutual Funds were included as investment options in the Plan:

  a. RiverSource Balanced Fund (later merged with the Columbia Balanced Fund) ("Balanced Fund");

  b. RiverSource Diversified Bond Fund (renamed the Columbia Diversified Bond Fund and later merged with Columbia Intermediate Bond Fund) ("Div. Bond");

  c. RiverSource Disciplined Equity Fund (renamed Columbia Large Core Quantitative Fund) ("Disp. Equity");

  d. RiverSource Diversified Equity Income Fund (renamed Columbia Diversified Equity Inc. Fund) ("Div. Equity");

e.    RiverSource Global Balanced Fund (later merged into RiverSource Balanced Fund) ("Global Balanced");

f.    RiverSource Mid Cap Growth Fund ("Mid Growth");

g.    RiverSource Mid Cap Value Fund (renamed Columbia Mid Cap Value Opportunity Fund) ("Mid Value");

h.    RiverSource New Dimensions Fund (later merged with RiverSource Large Cap Equity Fund) ("New Dimension");

i.    RiverSource Stock Fund (later merged with RiverSource Disciplined Equity Fund) ("Riv. Stock Fund");

j.    Columbia Contrarian Core Fund ("Contrarian");

k.    RiverSource Retirement Plus 2010 Fund (renamed Columbia Retirement Plus 2010 Fund); RiverSource Retirement Plus 2015 Fund (renamed Columbia Retirement Plus 2015 Fund); RiverSource Retirement Plus 2020 Fund (renamed Columbia Retirement Plus 2020 Fund); RiverSource Retirement Plus 2025 Fund (renamed Columbia Retirement Plus 2025 Fund); RiverSource Retirement Plus 2030 Fund (renamed Columbia Retirement Plus 2030 Fund); RiverSource Retirement Plus 2035 Fund (renamed Columbia Retirement Plus 2035 Fund); RiverSource Retirement Plus 2040 Fund (renamed Columbia Retirement Plus 2040 Fund); and RiverSource Retirement Plus 2045 Fund (renamed Columbia Retirement Plus 2045 Fund) (collectively "Retirement Plus Funds")

and the following RiverSource Trust collective investment trusts and separately managed fund, managed by ATC ("ATC managed investments"), were included as investment options in the Plan:

    l.    the RiverSource Trust Equity Income Fund III;

    m.    the RiverSource Trust Small Cap Equity Index Fund I;

    n.    the RiverSource Trust Long-Term Horizon Fund;

    o.    the RiverSource Trust Medium-Term Horizon Fund;

    p.    the RiverSource Trust Short-Term Horizon Fund; and

    q.    the Income Fund.

56.    The Plan's investments, in which Ameriprise's employees would place their retirement assets, were chosen and retained by or at the direction of Investment Committee and/or, upon information and belief, initially by the CBC and its individual members.

57.    The Plan's investment in RiverSource and ATC managed investments averaged approximately $500,000,000 per year from October 1, 2005 to the present.

58.    The RiverSource Mutual Funds generated millions of dollars in fees for RiverSource, RiverSource Fund Distributors, Inc., and RiverSource Service Corporation, who also diverted a portion of those fees to ATC and other subsidiaries of Ameriprise, and the ATC managed investments generated millions of dollars in fees for ATC or its affiliates or subsidiaries, all of which fees ultimately provided a financial benefit to Ameriprise.

59.     Defendants hired ATC to be the Plan trustee and record-keeper without any competitive bidding process and without any negotiation over the compensation to be paid for Plan recordkeeping services, and even though other entities could have provided the same services at a lower cost to the Plan. Hiring ATC, however, provided a financial benefit to Ameriprise. Ameriprise also profited from later selling its defined contribution record-keeping business, which included recordkeeping their own employees' retirement assets for a fee, to Wachovia in 2006.

60.     The fees paid by the Plan, and Ameriprise employees and retirees, to ATC for recordkeeping, added to the income Ameriprise received for selling its recordkeeping business to Wachovia.

61.     At all times relevant herein, the RiverSource Mutual Funds and ATC managed investments charged and continue to charge Plan participants and beneficiaries fees that were and are unreasonable for this Plan. As examples, the expense ratios of the funds when first included in the Plan is shown in Column B, below. For RiverSource funds that were Plan investment options as of 2010, the expense ratio at the end of 2010 is shown in Column C, below. The fees were and are significantly higher than the median fees for comparable mutual funds in 401(k) plans as reported by the Investment Company Institutes, in *The Economics of Providing 401(k) Plans: Services, Fees and Expenses* and by BrightScope, Inc., an independent provider of 401(k) ratings and data, based on its review of 1,667 large 401(k) plans reported in *Real Facts about Target Date Funds*. The fees, moreover, are and were significantly higher than the fees available from alternative mutual funds, including Vanguard Institutional Funds with similar investment styles that

14

were readily available as Plan investment options throughout the time relevant herein.

The amount of excess compared to the fees charged by comparable Vanguard

Institutional Funds at the time each option was added to the Plan is shown in Column D

below, and the same comparison as of the end of 2010 is shown in Column E for those

funds still in the Plan at that time. Measuring fees in basis points ("bps") (where one

basis point equals 0.01%):

| Fund | B<br>Fee at<br>Fund<br>Selection | C<br>2010<br>Fee | D<br>Excess Over<br>Vanguard, 2005 | E<br>Excess Over<br>Vanguard, 2010 |
|---|---|---|---|---|
| **Div. Bond** | 73 bps | 78 bps | 65 bps | 71 bps |
| **Disp. Equity** | 108 bps | 85 bps | 102 bps | 77 bps |
| **Global Balanced** | 134 bps | N/A | 127 bps | N/A |
| **Mid Growth** | 100 bps | N/A | 92 bps | N/A |
| **Riv. Stock Fund** | 77 bps. | N/A | 68 bps | N/A |
| **New Dimension** | 79 bps | N/A | 70 bps | N/A |
| **Contrarian** | 94 bps (2011) | N/A | N/A | 86 bps (2011) |
| **Balanced Fund** | 85 bps | 102 bps | 77 bps | 94 bps |
| **Target Date Funds** | 94 bps | 84-92 bps | 74 bps (2006) | 74 bps |
| **Div. Equity** | 91 bps | 91 bps | 83 bps | 85 bps |
| **Mid Value** | 97 bps | 90 bps | 89 bps (2009) | 82 bps |

62.     Defendants had the Plan use the Y, R4 or K share class of the RiverSource

Mutual Funds, even though Defendants could have had the Plan use I or R5 share classes

with 17-34 bps lower fees, depending on the Fund, or collective investment trust versions of the same RiverSource Mutual Funds, or hire the same investment managers in a separately managed account version of the RiverSource Mutual Funds for even lower fees for identical investment management services.

63.     All of the RiverSource Mutual Funds and the ATC managed investments except the RiverSource Trust Equity Index Fund III shared a portion of the investment's annual fees with ATC and Wachovia putatively to pay for Plan recordkeeping services but far in excess of a reasonable recordkeeping fee in light of the services provided to the Plan, and Defendants selected and retained these investments for the Plan in part because of this revenue sharing system.

64.     Other shareholders, outside of the Plan, invested in the same share class under terms far more favorable than those provided to Plan participants.  A portion of the fees charged to those other shareholders were rebated or used to directly offset administrative fees and expenses in their plans, thus reducing their administrative liabilities. Defendants did not rebate to the Plan or Plan participants any portion of these excessive fees.

65.     In contrast, fee rebates for the Plan's investments in the R4, Y or K share classes were retained by ATC, Ameriprise, or Wachovia without crediting the Plan.

66.     [intentionally left blank]

67.     Additionally, each mutual fund charged fees in excess of what the Plan could have obtained by purchasing comparable separately managed accounts, even ones purchased from the same RiverSource investment managers managing the Plan's RiverSource mutual funds. As the Department of Labor reports, for plans like

Ameriprise's the "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." *Study of 401(k) Plan Fees and Expenses*, April 13, 1998.

68.    Many of the RiverSource Mutual Funds had a poor or nonexistent performance history at the time they were initially selected as a Plan investment options. For example, measuring that underperformance in basis points ("bps"): (1) the 2005 prospectus for the Disciplined Equity Fund reports trailing 1 year performance 62 bps (0.62%) below its benchmark; (2) the 2005 prospectus for the RiverSource Stock Fund reports trailing 1 year performance 422 bps (4.22%) below its benchmark; (3) the 2005 prospectus for the New Dimensions Fund reports trailing 1 year performance 705 bps (7.05%) below its benchmark; (4) the 2004 prospectus for the Balanced Fund reports trailing 1 year performance 989 bps (9.89%) below its benchmark; (5) the 2005 prospectus for the Global Balanced Fund reports trailing 1 year performance 1262 bps (12.62%) below its benchmark; (6) the 2005 prospectus for the Diversified Bond Fund reports trailing 5 year performance 175 bps (1.75%) below its benchmark. Additionally, the Mid-Cap Growth Fund underperformed its peer group in both 2004 and 2005.

69.    Many of the RiverSource Mutual Funds were poorly rated by Morningstar, the independent rating service, compared to prudent alternatives the Investment Committee could have chosen for inclusion in the Plan. For example, in October, 2005 the RiverSource Balanced Fund was rated a 1-star fund (their lowest rating, out of 5 stars) while the equivalent Vanguard Balanced Index Fund was given a 4-star rating. The RiverSource Diversified Bond Fund, RiverSource Stock Fund, and RiverSource Global

17

Balanced Funds had 2-star ratings even though 4 and 5 star alternatives were available for each fund, such as the Vanguard Total Stock Market Index Fund (4 stars), and the Vanguard Total Bond Market Fund (4 stars). The RiverSource New Dimensions Fund and RiverSource Mid Cap Growth Fund held 3-stars ratings by Morningstar in October, 2005 even though, again, 4 and 5 star alternatives were readily available, such as the Vanguard Total Stock Market Index Fund (4 stars).

70.     The web based investment application MyPlanIQ has rated the Plan's investments in the bottom 2 percent of defined contribution plans with respect to fund quality. To make that determination, MyPlanIQ analyzed the risk adjusted returns of each of the funds available in the Plan.

71.     Prudent investors also fled RiverSource Mutual Funds. In 2005 RiverSource stock and bond funds had outflows of $9.3 billion. In 2006, an additional $6.9 billion in assets were pulled from RiverSource funds.

72.     In 2006, the Investment Committee added the Retirement Plus Funds to the Plan without considering non-proprietary target date fund investments and without engaging in any process to determine the prudence of those Funds for the Plan. At the time, the three largest target date fund families were Vanguard, Fidelity and T.Rowe Price, which had expense ratios of 20 bps, 76 bps and 76 bps, respectively. All three funds had proven track records. Nevertheless, the Investment Committee again chose to use the in house Ameriprise/RiverSource target date fund family even though those funds had *no* performance history (because they were first offered for investment on April 24, 2006 and the Plan was the first investor or among the first investors in the Funds),

18

charged fees over 90 bps, and even though the Plan would be an imprudently large shareholder in the Funds.

73.     The Retirement Plus Funds did not directly invest in stocks, bonds or money markets but, rather, were required to and did invest their assets in ***other*** RiverSource mutual funds. The fees charged to investors in the Retirement Plus Funds included not only the unreasonable fees of the underlying mutual funds in which the Retirement Plus Funds invested, but also an ***additional*** layer of fees for the benefit of Ameriprise, which was unreasonable and excessive, particularly in light of the profits Ameriprise received from the underlying fund fees.

74.     The dominant target date alternative fund families, Vanguard, Fidelity and T.Rowe Price, did not charge an additional layer of fees in the cheapest share classes of their target date funds.

75.     By investing in the Y share class of theRetirement Plus Funds, Defendants caused the Retirement Plus Funds in the Plan to pay more than double the additional fees RiverSource received for managing the funds compared to what they would have paid had they been allowed to invest in the R5 share class.

76.     Defendants engaged in no process to determine the prudence to the Plan of the underlying RiverSource mutual funds used by the Retirement Plus Funds and those funds were imprudent in light of the alternatives in the same investment categories and because they had poor risk adjusted returns and Morningstar ratings of 2.31 stars, second lowest of the 28 target date fund families Morningstar evaluated.

77.     Soon after their creation and addition to the Plan, the Retirement Plus Funds were widely known among investment professionals as poor investment choices. For example, a joint report prepared by Plan Sponsor and Target Date Analytics, LLC measuring the fees, performance, risk and organization of 38 target date fund families as of December 31, 2007, including the dominant alternatives of Vanguard, Fidelity and T.Rowe Price, gave the Retirement Plus Funds grades of "D" for both Organization and Fees & Expenses while Vanguard, Fidelity and T.Rowe Price were given grades of "A", "B" and "B" respectively. This is even more striking because the report graded the cheapest share class of the Retirement Plus Funds, the R5 share class, but Defendants included the more expensive Y share class in the Plan. Yet, Defendants continued to retain the Retirement Plus Funds in the Plan.

78.     The Plan was the first investor or among the first investors in the Retirement Plus Funds, and was the largest investor in the Retirement Plus Funds and, accordingly, Ameriprise used the retirement assets of Ameriprise employees to seed new and untested mutual funds to make those funds marketable to outside investors and increase profits for RiverSource and its parent, Ameriprise.

79.     Because they had no performance histories, the Retirement Plus Funds did not have Morningstar ratings.

80.     [intentionally left blank]

81.     The Income Fund invested in the RiverSource Trust U.S. Government Securities Fund, the RiverSource Trust Government Income Fund, and the RiverSource Trust Stable Capital Fund. Each of the Horizon Funds invested in multiple Ameriprise

affiliated mutual funds and non-mutual funds. Upon information and belief, Plan assets were invested in RiverSource options which ATC chose for these collective trusts had fees at least twice those of comparable prudent alternatives, such as Vanguard.

82.    ATC  also received profits from the management of assets in the Income Fund by, among other things, paying a lower interest / dividend rate than the assets should have earned given the risk characteristics of the investment.

83.    Additionally, plan participants invested a portion of their 401(k) assets in a Self-Managed Brokerage Account ("SMBA").

84.    The SMBA included a limited group of funds which, upon information and belief, were allowed into the SMBA only if they agreed to rebate a portion of their fees to RiverSource and/or ATC. The options in the SMBA charged fees far higher than those available to institutional investors, such as the Plan, in addition to charging annual account maintenance fees and transfer fees.

85.    Prior to January 2011, Ameriprise was trustee to the SMBA. After January 2011, Charles Schwab became the trustee of the SMBA.

86.    Before the switch, participants were not permitted to make contributions directly into the mutual funds in the SMBA. Instead, participants had to accumulate assets in the "core" investment options and transfer those assets once they had accumulated $3,000 (for the initial deposit) and $500 (for subsequent transfers). For most transfers, participants were charged a $39.95 transfer fee, in addition to a $25 annual account maintenance fee and the retail-level fees charged by the options in the SMBA. Since there are over 5000 mutual funds available to individual investors outside of the

Plan, Defendants' inclusion of only 900 of those funds in the SMBA indicates, and Plaintiffs allege, that those funds were selected not because of their inherent reasonableness and prudence for the Plan, but because those funds paid kickbacks or other compensation to one or more Defendants, or other subsidiaries of Ameriprise, that ultimately benefitted Ameriprise but not the participants and beneficiaries.

87.     The transfer fee and annual account maintenance fees were also paid to Ameriprise and its subsidiaries.

88.     According to the Plan's 2005 and 2007 Summary Plan Descriptions, "The Company [Ameriprise] currently pays the cost of administering the 401(k) Plan, including the fees of the Trustee...". The fees of the trustee and Plan recorkeeping fees, however, were not paid by Ameriprise. Rather, they were paid by Plan participants through the expense ratios of the RiverSource Mutual Funds and ATC managed investments and other investments in the Plan.

89.     Both before and after the SMBA moved to Charles Schwab, participants were not permitted to take withdrawals directly from the SMBA. Instead, a participant wishing to get take SMBA-invested money out of the Plan had to first move to a core investment option within the Plan. This requirement was not in the interest of, or for the benefit of, participants.

90.     After the switch, Plan participants still were not allowed to invest directly into the options in the SMBA with the regular contributions. Additionally, many services, such as loans to participants, were not allowed from the SMBA. Instead, participants were required to place their money first in the core investment options.

91.     Plan participants invested significant assets in each of the "core" investment options in the Plan.  For example, by December 31, 2005 the following amounts were invested in each Plan option:

a.      RiverSource New Dimensions Fund - $89,433,234;

b.      RiverSource Diversified Bond Fund - $22,502,959;

c.      RiverSource Balanced Fund - $22,150,651;

d.      RiverSource Stock Fund - $48,033,778;

e.      RiverSource Global Balanced Fund - $12,906,690;

f.      RiverSource Mid Cap Growth Fund - $49,534,214;

g.      RiverSource Trust Short-Term Horizon - $2,273,670;

h.      RiverSource Trust Medium-Term Horizon - $24,559,147;

i.      RiverSource Trust Long-Term Horizon - $13,719,528;

j.      RiverSource Trust Small Cap Equity - $39,519,689;

k.      RiverSource Trust Equity Index Fund - $38,008,535; and

l.      Income Fund - $87,448,302.

92.     Tens of millions of dollars were also invested by Plan participants in the Retirement Plus Funds, the RiverSource Diversified Equity Income Fund, the RiverSource Disciplined Equity Fund, the Columbia Contrarian Core Fund and the RiverSource Mid-Cap Value Fund after they become available in the Plan.

93.     Plan participants invested approximately 10 percent of the Plan's assets in the SMBA.

94.     During the six year history since the inception of the Plan and the original fund lineup, Defendants added 17 investment options to the Plan's core investments, of which 11 were managed by Ameriprise affiliates.

**ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS**

95.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

96.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  29 U.S.C. § 1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participants knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his

status as a fiduciary, he has enabled such other fiduciary to commit a
breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he
makes reasonable efforts under the circumstances to remedy the
breach.

97.     Under ERISA, fiduciaries that exercise any authority or control over plan

assets, including the selection of plan investments and service providers, must act

prudently and solely in the interest of participants in the plan. Thus, "the duty to conduct

an independent investigation into the merits of a particular investment" is "the most basic

of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420,

435 (3d Cir. 1996).

98.     The Department of Labor has explained:

> To act prudently, a plan fiduciary must consider, among other factors, the
> availability, riskiness, and potential return of alternative investments for his or
> her plan. [Where an investment], if implemented, causes the Plan to forego
> other investment opportunities, such investments would not be prudent if they
> provided a plan with less return, in comparison to risk, than comparable
> investments available to the plan, or if they involved a greater risk to the
> security of plan assets than other investments offering a similar return.

DOL Adv. Op. No. 88-16A.

99.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of

plan participants and beneficiaries.  As the Department of Labor repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest
> of, and for the exclusive purpose of providing benefits to, participants and
> beneficiaries as prohibiting a fiduciary from subordinating the interests of
> participants and beneficiaries in their retirement income to unrelated
> objectives. Thus, in deciding whether and to what extent to invest in a
> particular investment, a fiduciary must ordinarily consider only factors relating
> to the interests of plan participants and beneficiaries in their retirement income.
> A decision to make an investment may not be influenced by [other] factors

25

unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

DOL Adv. Op. No. 98-04A; DOL Ad. Op. No. 88-16A.

100.   The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered "*per se*" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)      sale or exchange, or leasing, or any property between the plan and a party in interest;
>
> * * *
>
> (C)      furnishing of goods, services, or facilities between the plan and a
party in                         interest;
>
> (D)      transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) provides, in pertinent part, that:

> [A] fiduciary with respect to the plan shall not –
>
> (1)            deal with the assets of the plan in his own interest or for his
own account,
>
> (2)      in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse  the interest of the plan or the interest of its participants or beneficiaries, or

(3)      receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

101.   ERISA's prohibited transaction provisions thus prohibit fiduciaries, such as the Defendants here, from causing plans to engage in transactions with the plan sponsor, here Ameriprise, including causing the plan to invest assets in the investment management and other products offered by a party in interest or plan fiduciary and the payment of investment management or other fees in connection with such investments.

102.   29 U.S.C. § 1132(a)(3) provides a cause of action against a party in interest, such as Ameriprise, for participating in the breach of a fiduciary.

103.   29 U.S.C. § 1105(a) provides a cause of action against a fiduciary, such as Ameriprise, for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

## CLASS ALLEGATIONS

104.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a).

105.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan from October 1, 2005 through date of judgment and to represent that class. This action is certifiable as a class action for the following reasons:

27

a.   The Class includes over 10,000 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and acted as alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

c.   Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action.

d.   Plaintiffs will adequately protect the interests of the Class because they have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class. Plaintiffs' attorneys have agreed to advance the costs of this action contingent upon the outcome and are aware that no fee can be awarded without the Court's approval.

e.   Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A)

28

inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a) and (B) adjudications by individual participants and beneficiaries regarding these breach of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore this action should be certified as a class action under Fed.R.Civ.P. 23(b)(1)(A) or (B).

106.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Fed.R.Civ.P. 23(b)(3) if it cannot be certified under Fed.R.Civ.P. 23(b)(1)(A) or (B).

## COUNT I

### Disloyalty and Imprudence.

107.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

108.    This Count alleges breach of fiduciary duties against each of the Defendants.

109.    As alleged above, the EBAC and the Investment Committee were named fiduciaries under 29 U.S.C. § 1102(a)(1), and each of the Defendants were fiduciaries under 29 U.S.C. § 1002(21).

110.    Defendants are bound by the duties of loyalty, exclusive purpose, and prudence.

111.    As alleged above, the scope of the fiduciary duties and responsibilities of the Defendants includes managing the assets of the Plan for the sole and exclusive bene fit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Defendants are directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, evaluating the merits for the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

112.    Because of their poor or non-existent performance histories and high expenses relative to other investment options that were readily available to the Plan on and after October 2005, and because of the benefits to Ameriprise and its subsidiaries in selecting and retaining the RiverSource Mutual Funds and ATC managed investments as Plan investment options, and failing to consider lower cost investments, non-proprietary

options or to select better-performing non-proprietary investments for these Plan investment options, Defendants did not discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan and instead acted for the purpose of benefitting Ameriprise through the revenues out of the Plan provided to Ameriprise subsidiaries and the Plan's funding of new Ameriprise investment products. Defendants therefore breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A).

113.    Because of their poor or non-existent performance histories and high expenses relative to other investment options that were readily available to the Plan on and after October 2005, and because of the benefits to Ameriprise and its subsidiaries, in selecting and retaining the RiverSource Mutual Funds and ATC managed investments as Plan investment options, and failing to consider lower cost investments, non-proprietary options or to select better-performing non-proprietary investments for these Plan investment options, Defendants did not discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims and the Plan's funding of new Ameriprise investment products. Defendants therefore breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(B).

114.    Defendants failed to engage in a prudent process for the selection of Plan investment options. Instead, Defendants chose more expensive funds with inferior

performance histories in order to generate revenue for RiverSource and ATC and ultimately to benefit Ameriprise. Such an investigation would have revealed to a reasonably prudent fiduciary that the RiverSource Mutual Funds and ATC managed investments were imprudent and selected and retained for reasons other than the best interest of the Plan and plan participants and beneficiaries and were and are causing the Plan to waste tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

115.   As a consequence of their breach of fiduciary duties alleged herein, Defendants caused the Plan to suffer over $20 million in losses as a result of the excessive fees and expenses of the RiverSource Mutual Funds and ATC managed investments and in the underperformance of the Funds relative to prudent alternatives that were available to the Plan at the time those funds were first selected and throughout the time Defendants retained them in the Plan.

116.   Each Defendant is personally liable, and the Defendants are jointly and severally liable, under 29 U.S.C. § 1109(a) to make good to the Plan the losses to the Plan resulting from the aforementioned breaches and to restore to the Plan any profits of such Defendant made through the use of Plan assets. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any

reasonable effort under the circumstances to remedy the breach, and thus is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

117.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendants are liable to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits they received as a result of the breaches of fiduciary duties alleged in this Count, and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Monitor Fiduciaries

118.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

119.    This Count alleges breach fiduciary duties against the following Defendants: The CBC and its members and delegates (collectively the "CBC Defendants"), and Ameriprise (collectively the "Monitoring Defendants").

120.    As alleged above, the Monitoring Defendants are fiduciaries pursuant to 29 U.S.C. § 1002(21). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

121.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants includes the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries.

122.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and

holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

123.   The Monitoring Fiduciaries breached their fiduciary monitoring duties by, among other things:

a.   failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the Plan;

b.   failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the widespread use of proprietary funds from which RiverSource/Ameriprise received profits in violation of ERISA;

c.   failing to ensure that the monitored fiduciaries appreciated the ready availability of comparable and better performing Plan fund options that charged significantly lower fees and expenses than the Plan's RiverSource options; and

d.   failing to remove appointees whose performance was inadequate in that they continued to maintain the imprudent, and proprietary, options for participants' retirement savings in the Plan during the Class Period, and who breached their fiduciary duties under ERISA.

124.   As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered substantial losses.  If the Monitoring Defendants had discharged their

fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiffs and the other Class members, lost tens of millions of dollars of retirement savings.

125.   Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

### 29 U.S.C. § 1106(a) Prohibited Transactions

126.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

127.   This Count alleges prohibited transactions against all Defendants.

128.   Defendants caused the Plan to use RiverSource Mutual Funds (and ATC managed investments) as investment options when they knew or should have known those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

129.   As Plan Sponsor, Ameriprise, and its subsidiaries, including RiverSource and ATC, were parties in interest.

130.   As a direct and proximate result of these prohibited transaction violations, the Plan, directly or indirectly, paid millions of dollars in investment management and other fees that were prohibited by ERISA and suffered millions of dollars in losses.

131.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and disgorge all revenues received and/or earned by Ameriprise from the fees paid by the Plan to Ameriprise and its subsidiaries and affiliates as well as appropriate equitable relief.

## COUNT IV

### 29 U.S.C. § 1106(b) Prohibited Transactions

132.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

133.    This Count alleges prohibited transactions against Ameriprise and the CBC Defendants.

134.    Ameriprise and the CBC Defendants dealt with the assets of the plan in their own interest and for their own account when they caused the Plan to use RiverSource Mutual Funds (and ATC managed investments) as investment options.

135.    In causing the Plan to use RiverSource Mutual Funds (and ATC managed investments) as investment options, Defendants acted in a transaction involving the plan on behalf of Ameriprise, a party whose interest were adverse to the interests of the plan, its participants and beneficiaries.

136.    Further, Ameriprise and the CBC Defendants received consideration for their own personal account from RiverSource and ATC in connection with those subsidiaries' transactions involving the assets of the plan.

137.   For the reasons discussed above, Ameriprise and the CBC Defendants were fiduciaries and parties in interest with respect to the Plan.

138.   Ameriprise and the CBC Defendants knew or should have known that the transfer of Plan assets to the investment options selected and maintained in the Plan by Ameriprise, the CBC, and the Committees allowed Ameriprise to benefit both financially, through fees paid by the options to Ameriprise, and commercially, by increasing the assets under management for the Ameriprise-managed investment options.

139.   As a direct result of these prohibited transaction violations, the Plan, directly or indirectly, paid millions of dollars in investment management and other fees that were prohibited by ERISA and suffered millions of dollars in losses.

140.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Ameriprise and the CBC Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and disgorge all revenues received by Ameriprise from the fees paid by the Plan to Ameriprise and its subsidiaries and affiliates, as well as other appropriate equitable relief.

### COUNT V

### Sale of Record-Keeping Arm to Wachovia

141.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142.   This Count alleges breach of fiduciary duties against the EBAC and its members and delegates, and the Investment Committee and its members and delegates (collectively the "Committee Defendants"), Ameriprise, and the CBC Defendants.

37

143.   Defendants hired and retained ATC as the Plan's trustee and record-keeper for the purpose of providing that subsidiary excessive compensation as alleged in Count VII that boosted its ultimate sale price for Ameriprise.

144.   On or about May 5, 2006, Ameriprise executed an Asset Purchase Agreement with Wachovia Bank NA by which it sold its defined contribution record-keeping business, Ameriprise Retirement Services to Wachovia  for $66 million at closing and a contingent payment based on float income and revenue sharing fees from Plan investment options that Wachovia received in the following 18 months. The sale closed on June 1, 2006.

145.   The sale price of $66 million was, upon information and belief, based, at least in part, on the annual fees received by ATC from the Plan and Plan investments.

146.   The sale also provided for additional payments based on the assets under management during the first 18 months following the sale.

147.   The price Wachovia paid to Ameriprise for Ameriprise's record-keeping business was materially higher because of the compensation the Plan, directly or indirectly, through revenue sharing and other sources, paid to ATC as a result of Defendants' breach of fiduciary duties in hiring and retaining ATC as trustee and record-keeper of the Plan and from Defendants' selection and retention of Plan investment options that paid ATC excessive recordkeeping fees through revenue sharing.

148.   Defendants retained Wachovia as the Plan's trustee and record-keeper and maintained the excessive revenue-sharing investment options in the Plan for 18 months after closing in order to ensure Wachovia continued to receive sufficient float income and

revenue sharing fees to boost the contingent payment to Ameriprise under the Asset Purchase Agreement. Ameriprise therefore benefited financially from choosing and retaining Wachovia for the Plan's recordkeeper for at least 18 months following the sale.

149.   At the end of 2007, Wachovia paid Ameriprise a contingent payment under the Asset Purchase Agreement of $25 million, due significantly to the excessive recordkeeping fees the Plan paid to Wachovia as a result of the excessive fees and revenue sharing of the Plan's investment options. Ameriprise did not provide to the Plan any share of the profits it received from this sale.

150.   These actions are breaches of the duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a) and a prohibited transaction under 29 U.S.C. § 1106, cost the Plan millions of dollars in excessive fees and underperformance of imprudent investments and resulted in profits to Ameriprise from this abuse of Plan assets.

151.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are personally liable to make good to the Plan any losses to the Plan resulting from this breach, and to restore to the Plan  Ameriprise's profits from this abuse of Plan assets, as well as any other equitable or remedial relief the Court deems appropriate.

## COUNT VI

### Ameriprise Knowingly Participated in Breaches of Fiduciary Duties

### and Prohibited Transactions

152.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

153.   This Count alleges co-fiduciary liability against Ameriprise.

154.   At all relevant times, Ameriprise was a party in interest to the Plan. Ameriprise was also a fiduciary to the Plan for all the reasons stated above, including the facts that through the CBC Defendants, Ameriprise appointed and monitored the members of the EBAC.

155.   Ameriprise, by its actions in participating in and abetting fiduciary breaches and prohibited transactions, caused the Plan to invest in RiverSource and ATC managed investment options, to retain ATC (and later Wachovia and Wells Fargo) as plan service providers, and to pay excessive investment management and other fees in connection therewith, to Ameriprise subsidiaries and affiliates.

156.   As a direct result of Ameriprise's violations of ERISA, the Plan, and the Plan's participants and beneficiaries, including Plaintiffs, lost millions of dollars to Ameriprise fees and inferior returns.

157.   Pursuant to 29 U.S.C. § 1132(a)(3) Ameriprise is liable to disgorge all revenues received by Ameriprise and its subsidiaries as a result of their transactions with the Plan, and their earnings thereon.

## COUNT VII

### Excessive Recordkeeping Fees

158.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

159.   This Count alleges breach of fiduciary duties against all Defendants.

160.    When the Plan was created, Defendants selected ATC as a plan service provider to perform certain administrative services such as record-keeping and trustee services.

161.    As of April 1, 2007, Defendants allowed Wachovia to take over as trustee and record-keeper as part of the sale of Ameriprise's recordkeeping business to Wachovia.

162.    ATC,  Wachovia, and Wells Fargo received compensation from the Plan for its administrative services, including recordkeeping in the form of revenue sharing and related kick-back arrangements in which managers for the Plan's investment options annually deducted fees from investment assets and paid those fees to ATC, Wachovia, and Wells Fargo.

163.    Other compensation was received through interest earned on assets as they travelled into and out of participants' accounts ("float"), through the management of the Income Fund, which credited a lower rate of return for participants' assets than the rate ATC received as a result of managing the Fund, and through revenue sharing and other payments from the Plan's self-managed brokerage account and personal choice retirement account.

164.    The compensation that ATC, Wachovia, and Wells Fargo received for its record-keeping and administration of the Plan was excessive and unreasonable, and Defendants breached their fiduciary obligations under 29 U.S.C. § 1104(a)(1)(A) and 1103(c)(1) to ensure that ATC's, Wachovia's, and Wells Fargo's compensation was no more than reasonable and engaged in prohibited transactions under 29 U.S.C. § 1106(a)(1)(C).

165.    Defendants failed to monitor the revenue sharing payments Plan recordkeepers received from Plan investments to ensure that those payments provided no more than reasonable compensation, failed to recover for the Plan the amount of that revenue sharing that exceeded a reasonable recordkeeping fee, failed to negotiate a specific recordkeeping fee for the Plan that was reasonable for the services rendered, failed to determine the prudence of this revenue sharing system to pay for Plan recordkeeping instead of a fixed per-participant fees, and failed to put the Plan's recordkeeping services out for competitive bidding. Defendants  also failed to have a prudent process for evaluating the reasonableness of this compensation. Instead of evaluating the cost of these services in the marketplace, Defendants permitted ATC,  Wachovia, and Wells Fargo to administer and perform the record-keeping for the Plan without meaningful market competition. Indeed, while the Plan's recordkeeping expenses were excessive, Ameriprise's defined benefit plans had below-market recordkeeping expenses and were administered by the same trustee and recordkeeper, indicating that the Plan's excessive fees were subsidizing Ameriprise's defined benefit plans and providing Ameriprise an improper indirect benefit at the cost and expense of Plan participants.

166.    Defendants breached their duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a), and cost the Plan millions of dollars in excessive recordkeeping fees paid to ATC, Wachovia, and Wells Fargo.

167.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Defendants are personally liable to make good to the Plan any losses to the Plan resulting from this breach, and to restore to the Plan any revenues received by Ameriprise or its affiliates

through funds collected from the Plan and Plan participants and paid to ATC, as well as any other equitable or remedial relief the Court deems appropriate.

168.    [paragraphs 168-175 intentionally left blank – dismissed by Court. Doc. 67.]

## FRAUD AND CONCEALMENT

176.    Defendants fraudulently concealed their breaches of fiduciary duty with respect to excessive fees paid by the Plans, and prohibited transactions with respect to the payments to Ameriprise for administrative services including trustee and recordkeeping services. In public filings to the Department of Labor (including the Plan's 2005 and 2006 Form 5500) and to the Securities Exchange Commission (including the Plan's 11-K), Defendants represented that "***all administrative expenses incurred with regard to the Plan are borne by the Company.***" Similarly, in the 2005 and 2007 summary plan descriptions, Defendants misrepresented to Plan participants, "The Company currently pays the cost of administering the 401(k) Plan, including the fees of the Trustee, auditors, counsel, and investment managers."  In reality, most of the administrative expenses were paid by the Plan, and Plan participants, through revenue sharing of the annual expenses deducted from Plan investments.

177.    Plaintiffs did not discover these breaches until 2011.

178.    Plaintiffs could not have discovered these breaches until, at the earliest, when Defendants revised their statement concerning the payment of Plan expenses in the Plan's 11-K and Form 5500s. The 2007 Form 5500 was not filed until on or after July 11, 2008. The Plan's 11-K for 2007 was not filed until on or after June 1, 2007. Those documents, for the first time, disclosed that "[t]he majority of the cost of administering the Plan,

including fees of the trustee, recordkeeper, and investment managers, are paid from the fees associated with the investment options offered under the Plan… Fees paid out of the fund reduce the return of that fund."

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

179.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. § 1109. Section 1109 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…" Section 1109 also authorizes "such other equitable or remedial relief as the court may deem appropriate…"

180.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained their investments in the challenged investments and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investments available to them. The Court should adopt the measure of loss most advantageous to the Plan. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

181.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to make good to the Plan the losses resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by

44

29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3); (c) injunctive and other appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorneys' fees and expenses, as provided by 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

182.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## JURY TRIAL DEMANDED

183.    Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

184.    Find and declare that the Defendants have breached their fiduciary duties as described above;

185.    Find and adjudge that Defendants are personally liable to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

186.    Find and adjudge that Defendants must disgorge all revenues received from, or in respect of, the Plan;

187.    Award actual monetary losses to the Plan;

188.    Impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies, including monies from the sale of their retirement business, and return them to the Plan;

189.    Order equitable restitution and other appropriate equitable monetary relief against Defendants;

190.    Order the permanent removal of Defendants from any positions of trust with respect to the Plan;

191.    Order Defendants to render an accounting;

192.    Surcharge against Defendants and in favor of the Plan all amounts involved in transactions that such accounting reveals were or are improper, excessive and/or in violation of ERISA;

193.    Enjoin Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

194.    Order the appointment of an independent fiduciary to administer the Plan;

195.    Order rescission of the Plan's investments in Ameriprise Funds and a bidding process for the selection of investment options in the Plan;

196.    Order rescission of the Plan's contracts with Wells Fargo/Wachovia for administrative services to the Plan and a bidding process for selection of a Plan record-keeper;

197.    Enjoin Defendants from causing the Plan to invest in Ameriprise Funds;

198.    Order that this action be certified as a class action and that the Class be designated to receive the amounts restored or disgorged to the Plan by Defendants and a constructive trust be established for distribution to the extent required by law;

199.    Award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the Common Fund doctrine;

200.    Order the payment of interest to the extent it is allowed by law; and

201.    Award such other and further relief as the Court deems equitable and just.

Respectfully Submitted,

Dated: October 29, 2013          **SCHLICHTER, BOGARD & DENTON**

By:  /s/ Jerome J. Schlichter
Jerome J. Schlichter (admitted *pro hac vice*)
Michael A. Wolff (admitted *pro hac vice*)
Troy A. Doles (admitted *pro hac vice*)
Heather Lea (admitted *pro hac vice*)
Mark G. Boyko (admitted *pro hac vice*)
100 South Fourth Street, Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (Fax)
jschlichter@uselaws.com
mwolff@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
mboyko@uselaws.com
*Lead Counsel for Plaintiffs*

**FOLEY & MANSFIELD PLLP**
Thomas W. Pahl (#0243012)
250 Marquette Avenue, Suite 1200
Minneapolis, MN 55401
(612) 338-8788
(612) 338-8690 (Fax)
tpahl@foleymansfield.com
*Local Counsel for Plaintiffs*