## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Roger Krueger, Jeffrey Olson, Deborah Tuckner, Susan Wones, and Margene Bauhs, individually and as representatives of a class of similarly situated persons, and on behalf of the Ameriprise Financial 401(k) Plan, | Case No. 11-cv-02781 (SRN/JSM) |
| Plaintiffs, | |
| v. | **REDACTED MEMORANDUM OPINION AND ORDER** |
| Ameriprise Financial, Inc., Ameriprise Financial, Inc. Employee Benefits Administration Committee, Michelle Rudlong, Ameriprise Financial, Inc. 401(k) Investment Committee, Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc., Martin S. Solhaug, and Brent Sabin, | |
| Defendants. | |

Jerome J. Schlichter, Michael A. Wolff, Mark G. Boyko, Troy A. Doles, and Heather Lea, Schlichter Bogard & Denton, 100 South Fourth Street, Suite 900, St. Louis, MO 63102; and Thomas W. Pahl and Thomas A. Harder, Foley & Mansfield, PLLP, 250 Marquette Avenue, Suite 1200, Minneapolis, MN 55401, for Plaintiffs.

Stephen P. Lucke and Kirsten E. Schubert, Dorsey & Whitney LLP, 50 South 6th Street, Suite 1500, Minneapolis, MN 55402-1498; and Benjamin G. Bradshaw and Shannon M. Barrett, O'Melveny & Myers LLP, 1625 Eye Street N.W., Washington, DC 20006, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.       INTRODUCTION

This matter is before the Court on Defendants Ameriprise Financial, Inc., Ameriprise

Financial, Inc. Employee Benefits Administration Committee, Michelle Rudlong,

Ameriprise Financial, Inc. 401(k) Investment Committee, Compensation and Benefits

Committee of the Board of Directors of Ameriprise Financial, Inc., Martin S. Solhaug, and

Brent Sabin's (collectively "Defendants")[1] Motion for Summary Judgment on Statute of

Limitations Grounds [Doc. No. 147].  Defendants submitted a supporting memorandum

[Doc. No. 151] and two declarations [Doc. Nos. 149, 152].  Plaintiffs submitted an

opposition memorandum [Doc. No. 164] and two declarations [Doc. Nos. 165, 166].  And,

Defendants filed a reply brief [Doc. No. 170] and declaration [Doc. No. 171].  The matter

was heard on August 20, 2013.  For the reasons stated below, the Court grants in part, and

denies in part, Defendants' motion.

## II.      BACKGROUND

### A.       The Plan

Defendant Ameriprise Financial, Inc. ("Ameriprise") is a financial services

company.  Ameriprise makes available to eligible employees and retirees of Ameriprise and

its subsidiaries and affiliates the Ameriprise Financial 401(k) retirement benefit plan (the

---

[1]       The following individuals were originally among the defendants moving for
summary judgment, but they have since been dismissed from the lawsuit:  Ira D. Hall,
Warren D. Knowlton, W. Walker Lewis, Siri S. Marshall, Jeffrey Noddle, Richard F.
Powers III, Robert F. Sharpe, Jr., Jeffrey P. Fox, Phil Wentzel, Jeffrey A. Williams, Kristi
L. Peterson, and Timothy V. Bechtold.  (Joint Stipulation ¶ 3 [Doc. No. 214].)

"Plan"), and Ameriprise matches a portion of the participants' contributions.  (See Declaration of Brent Sabin dated July 2, 2013 [Doc. No. 152] ("Sabin Decl."), Ex. D (2005 Summary Plan Description ("2005 SPD")) at 1–2, 36.)  The Plan is a defined contribution plan in which participants may direct their Plan balances among different investment options.  (See id. at 1, 10–20.)  The Plan became effective on October 1, 2005.  (Sabin Decl., Ex. A (2005 Ameriprise Financial 401(k) Plan ("2005 Plan")) § 1.2.)

Two named fiduciary committees have primary responsibility for administering the Plan.  Ameriprise's Employee Benefits Administration Committee ("EBAC") is the Plan administrator and is responsible for determining benefits eligibility and construing Plan documents.  (See id. §§ 2.4, 10.3.)  EBAC has administered the Plan since October 2005 and its members are appointed by Ameriprise's Compensation and Benefits Committee of the Board of Directors ("CBC").  (Id. § 10.1.)  The CBC also has the authority to remove the EBAC's members.  (Id.)  In addition, the Ameriprise Financial, Inc. 401(k) Plan Investment Committee ("Investment Committee") administers the Plan by selecting and monitoring the investment options in the Plan lineup.  (Id. § 10.4.)  The Investment Committee also directs how investment options for the Plan are invested.  (See id. § 6.3.)

### B.      The Funds

Ameriprise was once part of American Express Companies ("American Express"), and the Plan duplicated many of the investment options that had been available through the American Express 401(k) plan when Ameriprise spun off from American Express in October 2005.  (See Sabin Decl., Ex. D (2005 SPD) at 1, 10, 13; see id., Ex. A (2005 Plan) §§ 1.1, 1.2.)  When the Plan was first developed, it offered participants several investment

options, including an Ameriprise stock fund, an income fund devoted primarily to government bonds, several mutual funds and collective funds managed by Ameriprise affiliates and others, and a self-directed brokerage window through which participants could invest in hundreds of other non-affiliated mutual funds.  (Sabin Decl., Ex. D (2005 SPD) at 13–24.)  As for Ameriprise-affiliated funds, the Plan offered RiverSource mutual and collective funds, which were managed by Ameriprise and the Ameriprise Trust Company ("ATC"), respectively, as well as the Income Fund, which was also managed by ATC (collectively, the "RiverSource Funds").  (See id. at 13–20, 24.)  The RiverSource mutual funds included the RiverSource Balanced Fund, the RiverSource Diversified Bond Fund, the RiverSource Disciplined Equity Fund, the RiverSource Diversified Equity Income Fund, the RiverSource Global Balanced Fund, the RiverSource Mid Cap Growth Fund, the RiverSource Mid Cap Value Fund, the RiverSource New Dimensions Fund, the RiverSource Stock Fund, and the RiverSource Retirement Plus Series.  (Sabin Decl. ¶ 22.) With the exception of Mr. Olson, each Plaintiff was invested in at least one RiverSource Fund prior to September 28, 2008.  (See Declaration of Shannon Barrett dated July 3, 2013 [Doc. No. 149] ("Barrett Decl."), Exs. AA (Olson Dep.) 48:9-24, BB (Krueger Dep.) 77:16–78:3, HH (Wones Quarterly Statement) at 4, II (Tuckner Quarterly Statement) at 4, LL (Bauhs Quarterly Statement) at 4.)

Plan participants received—relevant to this case—two types of documents regarding the Plan's investment options.  The first type was the Ameriprise Financial Summary Plan Description ("SPD"), which, among other things, describes the Plan's investment options. (See, e.g., Sabin Decl., Ex. D (2005 SPD) at 13–24.)  According to the Vice President of

Benefits at Ameriprise, these SPDs were either mailed or emailed to Plan participants and were available online.  (Sabin Decl. ¶ 9.)  In addition, Plaintiffs Olson, Tuckner, and Bauhs admitted to receiving SPDs.  (See Barrett Decl., Exs. AA (Olson Dep.) 78:23–79:9, CC (Bauhs Dep.) 101:9-24, EE (Tuckner Dep.) 106:6-23.)  At issue in this case are the 2005, 2007, and 2008 SPDs.

The second type of document received by Plan participants was a mutual fund prospectus, which provides detailed information about a specific fund.  Participants in a fund were mailed a prospectus for that fund at the time their investment was made and on an annual basis.[2]  (Sabin Decl. ¶ 20.)  Each Plaintiff testified that he or she either received or reviewed prospectuses for their investments.  (See Barrett Decl., Exs. AA (Olson Dep.) 79:16-23, BB (Krueger Dep.) 85:14-25, CC (Bauhs Dep.) 99:9-15, 130:11–131:1, DD (Wones Dep.) 73:2-21, EE (Tuckner Dep.) 85:18-25.)

### C.    Recordkeeping

The Plan's assets are held by trustees selected by the Investment Committee.  (Sabin Decl., Ex. A (2005 Plan) §§ 12.1, 12.2.)  ATC was the original trustee and record-keeper of the Plan.  (Id., Ex. B (Ameriprise Financial 401(k) Plan Trust Agreement) §§ 1.2(m), 6.2; Sabin Decl. ¶ 34.)  Ameriprise sold ATC's record-keeping business to Wachovia Bank, N.A. ("Wachovia") in June 2006, and Wachovia became the Plan's trustee and record-keeper in April 2007.  (Sabin Decl. ¶ 34.)  In addition to the initial $66 million purchase price, Wachovia agreed to make a contingent payment equal to the amount of record-

---

[2]    The annual mail delivery of prospectuses was discontinued in June 2012.  (Sabin Decl. ¶ 20.)

keeping revenues that Wachovia received over the next eighteen months ███████

████   (Declaration of Kurt Struckhoff dated July 24, 2013 [Doc. No. 165] ("Struckhoff

Decl."), Ex. 26 (Asset Purchase Agreement) at 3–5, 13.)  That contingent payment

amounted to $25 million.  (Id., Ex. 45 (Ameriprise Financial Annual Report 2007) at 2.)

Attached to the asset purchase agreement was a schedule detailing the amount of customer

revenues attributable to the trust/custodial relationships with each customer.  (Id., Ex. 26

§ 3.01(G)(1)(B).)  █████████████████████████████████████

███████████████   (Id., Ex. 40 (Schedule 3.01.G.1.B.)

  In March 2007, the Plan's participants were mailed a brochure entitled "Your

Retirement Program is Transitioning to Wachovia."  (Sabin Decl. ¶ 35 & Ex. U.)  The

brochure announced that, as of April 2007, Wachovia rather than ATC would be the Plan's

record-keeper, but the brochure did not announce any details of the underlying transaction.

(Id., Ex. U.)  The brochure was also posted online for Ameriprise employees.  (Sabin Decl.

¶ 35.)  Plaintiff Krueger testified that he knew of the sale in 2007, and Plaintiff Bauhs

testified that she received a document informing her that things were transitioning to

Wachovia.  (See Barrett Decl., Exs. BB (Krueger Dep.) 60:7-14, Ex. CC (Bauhs Dep.)

107:10-19.)

### D.      Plaintiffs' Claims[3]

Plaintiffs Roger Krueger, Jeffrey Olson, Deborah Tuckner, Susan Wones, and

Margene Bauhs (collectively "Plaintiffs") are current and former participants in the Plan.

Each Plaintiff, with the exception of Mr. Olson, participated in the Plan from its inception

in October 2005.  (See Barrett Decl., Exs. BB (Krueger Dep.) 43:10-13, 71:22–72:6,

CC (Bauhs Dep.) 101:22-24, DD (Wones Dep.) 20:17–24:3, EE (Tuckner Dep.) 35:16–

36:9, 46:2-6.)  Plaintiff Olson became a participant in 2007.  (See id., Ex. AA (Olson

Dep.) 46:5-11.)

Plaintiffs filed this lawsuit on September 28, 2011.  In their Second Amended

Complaint, Plaintiffs allege seven counts under the Employee Retirement Income

Security Act ("ERISA") against Defendants.  Count I asserts that Defendants' selection

and retention of the RiverSource mutual funds and ATC-managed investments

constituted breaches of Defendants' duties of loyalty and prudence under 29 U.S.C.

§ 1104(a)(1)(A) and (a)(1)(B).  (Second Amended Complaint [Doc. No. 228] ("2d Am.

Compl.") ¶¶ 107–17.)  Count II alleges that Ameriprise and the CBC breached their

duties of loyalty and prudence by failing to properly monitor and replace the fiduciaries

over whom they had authority or control who caused losses to the Plan.  (Id. ¶¶ 118–25.)

Counts III and IV assert that Defendants engaged in prohibited transactions in violation

---

[3]      At the time Defendants brought their motion for summary judgment, the operative
complaint in this matter was the First Amended Complaint.  On October 29, 2013, while
the motion was pending, Plaintiffs were granted leave to file a Second Amended
Complaint.  Because the Second Amended Complaint is now the operative complaint, the
Court will cite to that document for purposes of this motion.

of 29 U.S.C. §§ 1106(a) and (b), respectively.  (Id. ¶¶ 126–40.)  Count V alleges that

Defendants breached their fiduciary duties of prudence and loyalty, and engaged in a

prohibited transaction, by using ATC as the Plan's record-keeper in order to increase the

ultimate sale price of the ATC record-keeping business to Wachovia.  (Id. ¶¶ 141–51.)

Count VI alleges co-fiduciary liability against Ameriprise, asserting that Ameriprise

knowingly participated in these alleged breaches of fiduciary duties and prohibited

transactions.  (Id. ¶¶ 152–57.)  Count VII alleges that Defendants breached their fiduciary

duties of prudence and loyalty, and engaged in prohibited transactions, by making the

Plan pay excessive fees to its record-keepers.  (Id. ¶¶ 158–67.)  Finally, Plaintiffs contend

that Defendants fraudulently concealed their breaches of fiduciary duties related to the

Plan's payment of excessive fees, as well as their prohibited transactions related to

payments to Ameriprise for administrative services.  (Id. ¶ 176.)

## III.    DISCUSSION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

non-moving party, there is no genuine issue as to any material fact and the moving party

is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322–23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50

(1986).  "Summary judgment procedure is properly regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which

are designed 'to secure the just, speedy, and inexpensive determination of every action.'"

Celotex Corp., 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Id. at 323.  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 256.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248.

As discussed above, Plaintiffs assert claims based on both 29 U.S.C. §§ 1104 and 1106 (the codification of ERISA §§ 404 and 406).  The former provision imposes upon fiduciaries the duties of loyalty and prudence.  See 29 U.S.C. § 1104(a).  The latter provision forbids certain types of "prohibited transactions" that Congress deemed unlikely to inure to the benefit of a plan's participants, such as transactions between a plan and a "party in interest" and transactions between a plan and its fiduciaries.  See id. § 1106.

Defendants argue that summary judgment is appropriate on Plaintiffs' claims[4] because ERISA's three-year statute of limitations bars relief.  Under ERISA:

---

[4]     Defendants seek summary judgment on all of Plaintiffs' claims, "except to the extent that plaintiffs Bauhs and Krueger base their claims on the Plan's inclusion of the Columbia Contrarian Core Fund which was not added to the Plan lineup until after September 28, 2008."  (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. on Statute of Limitations Grounds [Doc. No. 151] ("Defs.' Mem.") at 3 n.4.)  Therefore, those claims are not the subject of Defendants' Motion or this Court's Order.
    Defendants also assert that Plaintiffs Olson, Wones, and Tuckner lack standing to pursue claims based on the inclusion of that fund because they were never invested in it.

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

. . . .

(2)     three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113(2).  In opposition, Plaintiffs argue that they did not have "actual knowledge" of the claimed breaches over three years prior to filing suit and that Ameriprise engaged in fraud and concealment such that the six-year statute of limitations is invoked.[5]

---

(Id.)  That issue has not been fully briefed and is not properly before the Court. Therefore, the Court declines to address it.

[5]     Plaintiffs also briefly argue that the Court should deny Defendants' Motion because Defendants had not provided all of Plaintiffs' requested discovery at the time the motion was filed.  (See Pls.' Mem. in Opp. to Ameriprise's Mot. for Summ. J. [Doc. No. 164] ("Pls.' Opp.") at 1.)  Under Rule 56 of the Federal Rules of Civil Procedure, the Court may deny a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).  Plaintiffs assert that the following allegedly missing information is essential:  information related to fees paid by the Plan, committee materials, contracts and agreements related to servicing of the Plan, documents related to revenue sharing from Plan investments and compensation Defendants received from the Plan, and information related to Ameriprise's other retirement plans.  ("Declaration of Troy Doles dated July 24, 2013 [Doc. No. 166] ("Doles Decl.") ¶¶ 55–62.)  Plaintiffs claim that this information "would support, among other things, Count I."  (Id. ¶ 56.) Plaintiffs also state that the missing information would demonstrate whether Defendants calculated revenue sharing, the amount of fees and compensation and whether the amounts were reasonable, and the nature of the investment selection and fee-setting processes.  (See id. ¶¶ 56–62.)  As discussed in more detail below, Count I survives Defendants' motion, as does Plaintiffs' breach of fiduciary duty claim in Count VII.  In addition, the amount and reasonableness of fees and compensation are not part of their

Plaintiffs filed this lawsuit on September 28, 2011.  Therefore, in order for

Defendants to prevail on their motion, they must demonstrate that Plaintiffs had actual

knowledge of the alleged breaches and violations prior to September 28, 2008, and that

the three-year statute of limitations was not tolled by fraud or concealment.

## A.    Actual Knowledge

The parties disagree as to the proper interpretation of the term "actual knowledge"

in ERISA's three-year statute of limitations.  However, the Eighth Circuit clearly

addressed this issue in Brown v. American Life Holdings, Inc., 190 F.3d 856 (8th Cir.

1999).  In that case, the court stated that, "[b]ecause the statute requires 'actual

knowledge of the breach or violation,' a plaintiff must have 'actual knowledge of all

material facts necessary to understand that some claim exists.'"  Id. at 859 (quoting Gluck

v. Unisys Corp., 960 F.2d 1168, 1177 (3d Cir. 1992)).  The court explained the rule as

follows:

> In most cases, "disclosure of a transaction that is not inherently a statutory
> breach of fiduciary duty . . . cannot communicate the existence of an
> underlying breach."  Therefore, when a fiduciary's investment decision is
> challenged as a breach of an ERISA duty, the nature of the alleged breach is
> critical to the actual knowledge issue.  For example, if the fiduciary made
> an illegal investment—in ERISA terminology, engaged in a prohibited
> transaction—knowledge of the transaction would be actual knowledge of
> the breach.  But if the fiduciary made an imprudent investment, actual
> knowledge of the breach would usually require some knowledge of how the
> fiduciary selected the investment.

Id. (citations omitted).

---

prima facie prohibited transaction claims.  Therefore, the facts that Plaintiffs claim will
be demonstrated by the allegedly missing evidence (i.e., the amount and reasonableness
of fees and compensation, and the investment selection and fee-setting processes) are not

The Eighth Circuit then applied this standard to the plaintiff's § 1104 claims for breaches of the fiduciary duties of loyalty, prudence, and diversification. Id.  The plaintiff was a participant in an employee stock ownership plan ("ESOP") sponsored by his former employer. Id. at 858.  In February 1998, the plaintiff first alleged that the ESOP's fiduciaries breached their duties by investing the ESOP's assets too conservatively and delaying the ESOP's rollover into a group savings plan. Id.  The investment occurred on October 20, 1994, and the plaintiff admitted that he knew in October 1994 how the assets would be invested. Id. at 858–59.  In addition, he stated that the fiduciaries should have rolled the ESOP into the group savings plan by December 31, 1994. Id. at 859.  Based on this evidence, the Eighth Circuit found that the alleged failure to diversify was apparent from October 20, 1994 (i.e., the date of the transaction), and that the failure to timely roll the ESOP over was apparent by the end of December 1994 (i.e., the deadline by which the plaintiff claimed that the funds should have been transferred). Id. at 859–60.  In affirming the district court's dismissal of the claims on statute of limitations grounds, the Eighth Circuit stated:

> When an ERISA fiduciary makes investment decisions of the kind challenged in this case, there may be breaches of duty as to which a plaintiff will not have "actual knowledge" until he or she learns of the reasons for the fiduciary's decision, or the full nature of a complex transaction.  But in this case, the only breach-of-fiduciary-duty theories that [the plaintiff] clearly articulated are time-barred, as the district court concluded.

Id. at 860.

---

essential to their opposition.  Therefore, Plaintiffs' request is denied.

Thus, according to the Eighth Circuit, when a prohibited transaction claim is alleged under § 1106, knowledge of the transaction constitutes actual knowledge of the violation and starts the running of the limitations period.  However, when a breach of fiduciary duty is alleged under § 1104, the nature of the alleged breach dictates when the limitations period begins to run.  If, for example, the alleged breach of fiduciary duty is simply that the fiduciary engaged in a prohibited transaction, then knowledge of the transaction begins the running of the limitations period.  But, if the alleged breach of fiduciary duty is that the fiduciary made an imprudent decision, then actual knowledge likely does not occur until the plaintiff has some knowledge of the fiduciary's decision-making process.

In addition, when a plan participant is provided with plan documents or given instructions on how to access them, "their failure to read the documents will not shield them from having actual knowledge of the documents' terms."  Brown v. Owens Corning Inv. Review Comm., 622 F.3d 564, 571 (6th Cir. 2010) (citation omitted).  As noted by a district court in this Circuit:

> Even though ERISA was enacted to protect the rights of plan participants, any interpretation of the term "actual knowledge" that would allow a participant to refuse to accept and acknowledge information clearly set before him is untenable.  A plaintiff can always disavow actual knowledge, and the inner workings of the plaintiff's mind are impossible for a defendant to prove.

Reeves v. Airlite Plastics, Co., Case No. 8:04CV56, 2005 U.S. Dist. LEXIS 23628, at *17 (D. Neb. Sept. 26, 2005) (finding that the plaintiff had actual knowledge of the

information presented in his account statements even though he did not look at those statements).

The Court finds that Plaintiffs had actual knowledge of the prohibited transaction claims alleged in Counts III, IV, V, and VII, as well as the breach of fiduciary duty claim alleged in Count V, more than three years prior to filing their Complaint. However, there is a genuine issue of material fact as to whether they had actual knowledge of the breach of fiduciary duty claims alleged in Counts I, II, VI, and VII prior to that time.

### 1.   Breach of fiduciary duties claim

As discussed above, Count I alleges that Defendants violated 29 U.S.C. § 1104.[6] Section 1104 establishes the duties owed by a plan fiduciary:

(a)(1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    (A)    for the exclusive purpose of:

        (i)    providing benefits to participants and their beneficiaries; and

        (ii)    defraying reasonable expenses of administering the plan;

    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

    (C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

---

[6]    Counts V and VII also allege violations of § 1104, as discussed in Part III.A.4.

>    (D)   in accordance with the documents and instruments governing
>          the plan . . . .

29 U.S.C. § 1104(a).  Thus, subsection (a)(1)(A) codifies the duty of loyalty and

subsection (a)(1)(B) codifies the duty of prudence.

The duty of loyalty requires fiduciaries to act with an "eye single" to the interests

of participants.  Pegram v. Herdrich, 530 U.S. 211, 235 (2000).  The fiduciary "must

display . . . complete loyalty to the interests of the beneficiary and must exclude all

selfish interest and all consideration of the interests of third persons."  Id. at 224 (citation

and internal quotation marks omitted).  In addition, the duty of prudence requires

fiduciaries to act with care, skill, prudence, and diligence.  29 U.S.C. § 1104(a)(1)(B).

ERISA's "prudent person standard is an objective standard . . .  that focuses on the

fiduciary's conduct preceding the challenged decision."  Roth v. Sawyer-Cleater Lumber

Co., 16 F.3d 915, 917–18 (8th Cir. 1994) (citation omitted).  In evaluating whether a

fiduciary has acted prudently, the court focuses on the process by which it makes its

decisions rather than the results of those decisions.  Id.  When determining whether a

fiduciary has acted with prudence, the court looks at "the totality of the circumstances,"

including but not limited to, the plan structure and aims and the disclosures made to

participants regarding the risks associated with the investments.  DiFelice v. U.S.

Airways, Inc., 497 F.3d 410, 418 (4th Cir. 2007).

Count I alleges that Defendants breached the fiduciary duties of prudence and

loyalty imposed upon them by § 1104.  Specifically, Plaintiffs allege that Defendants did

not discharge their duties solely in the interest of the Plan participants and beneficiaries—

but rather in the interest of Ameriprise—when they selected and retained the RiverSource

mutual funds and ATC-managed investments despite their poor or non-existent

performance histories and high expenses relative to other available investment options.

(2d Am. Compl. ¶ 112.)  Plaintiffs contend that Ameriprise engaged in this conduct "to

seed new and untested mutual funds to make them more marketable to the general public,

as well as to provide itself unreasonable compensation."  (Pls.' Opp. at 8–9.)  For these

same reasons, Plaintiffs allege that Defendants failed to discharge their duties with the

requisite skill, prudence, and diligence.  (See 2d Am. Compl. ¶ 113.)  In addition,

Plaintiffs allege that Defendants failed to engage in a prudent selection process in

choosing the investment options.  (Id. ¶ 114.)

Plaintiffs assert that, in order to have actual knowledge of these claims for

purposes of starting the three-year statute of limitations, they would have had to have

known:

> what process (or lack thereof) Ameriprise used to select and retain these
> funds, what better-performing and lower-cost alternatives were available to
> the Plan, whether Ameriprise even considered those alternatives, whether
> the Plan qualified for the lower-cost share classes of the selected
> proprietary funds, whether the Plan was the initial and/or largest investor in
> newly-hatched funds and thus improperly seeded these funds, and whether
> Ameriprise derived compensation from this scheme in excess of what it
> reasonably would have earned through loyal and prudent management of
> the Plan.

(Pls.' Opp. at 9.)  According to Plaintiffs, nearly all of these facts were unknown to

participants over three years before the lawsuit was commenced.  (See id.)

Indeed, while the Court will not evaluate the merits of this breach of fiduciary

duties claim at this juncture, much of the evidence Plaintiffs rely upon to illustrate the

16

breaches is of the type likely to be in Defendants' sole possession.  For example,

Plaintiffs argue that the Investment Committee's meeting minutes do not indicate that any

investigation into the availability of lower-cost versions of, or non-proprietary

alternatives to, the selected investments was undertaken, or that there was a discussion

regarding the rationale for using the more expensive investments.  (See id. at 11–12.)

Similarly, Plaintiffs point to documents dated June 2006 and prepared by Ameriprise's

consultant which purportedly inform the Investment Committee that the Disciplined

Equity Fund failed the criteria for inclusion in the Plan and should be removed.  (Id. at

14.)  Plaintiffs assert that the Investment Committee's meeting minutes do not explain the

Committee's subsequent decision to retain the fund in the Plan or to move more assets

into that fund.  (Id.)  As a final example, Plaintiffs point to Investment Committee

meeting minutes and emails from 2010 that supposedly demonstrate the Committee's

deference to Ameriprise's corporate interests.  (Id. at 16–17.)

      Plaintiffs argue that the nature of their claims mirrors the claim in Maher v.

Strachan Shipping Co., 68 F.3d 951 (5th Cir. 1995).  (Pls.' Opp. at 29.)  In that case, the

defendant fiduciaries informed plan participants that the plan was being reorganized and

then purchased an annuity contract from Executive Life to cover the participants'

benefits.  68 F.3d at 953.  On November 1, 1987, Executive Life began paying monthly

benefits to participants, using checks that identified Executive Life as the payor.  Id.

Other participants received Executive Life Annuity Certificates and a memo in May 1989

that informed them of the purchase.  Id.  In 1991, Executive Life was placed into

conservatorship, and the payments were reduced.  Id.  The plaintiffs filed a class action in

August 1992, alleging a breach of fiduciary duties under § 1104.  Id.  The district court

found that the claim was barred by ERISA's three-year statute of limitations because the

plaintiffs had actual knowledge of the alleged breach when they had knowledge that the

defendants had purchased the annuities.  Id. at 953–54.  However, the Fifth Circuit

disagreed:

> We . . . reject [the defendant's] argument that knowledge of the transaction,
> i.e. the purchase of Executive Life Annuities, is enough by itself to trigger
> the three-year statute of limitations.  In as much as [the plaintiffs] are
> challenging the actual selection of Executive Life, they must have been
> aware of the process utilized by [the defendants] in order to have had actual
> knowledge of the resulting breach of fiduciary duty.

Id. at 956 (citation omitted) (emphasis added).  Therefore, the court reversed the entry of

summary judgment.  Id. at 957.

Defendants argue, on the other hand, that the only facts material to Plaintiffs'

claim for breach of fiduciary duties are Plaintiffs' allegations that the RiverSource mutual

funds had poor or nonexistent performance histories, that those funds had high expenses,

and that Ameriprise received benefits for selecting those funds as investment options.

(Defs.' Mem. at 25.)  Defendants claim that the Plan disclosures informed Plaintiffs of all

of these facts more than three years before Plaintiffs brought their claims.  (Id.)  For

example, Defendants assert that the Investment Performance Information Sheets, which

were provided to Plaintiffs on a quarterly basis, provided the historical performance data

for all funds.  (Id.)  Defendants also argue that the fund prospectuses disclosed the

associated fees and expenses, the affiliation between Ameriprise and the RiverSource

funds, and that a portion of the fees went toward an "administration services fee."   (Id. at 25–26.)

In addition to Brown, Defendants primarily rely on Young v. General Motors Investment Management Corp., 550 F. Supp. 2d 416 (S.D.N.Y. 2008), aff'd on other grounds, 325 Fed. App'x 31 (2d Cir. 2009), for the proposition that Plaintiffs had notice of their claim of a flawed fiduciary process by virtue of their knowledge of the characteristics of the RiverSource funds.   (Defs.' Mem. at 24–27.)   In Young, the plaintiffs alleged that the plan's fiduciaries breached their duties by allowing the plan to invest in certain funds that had higher fees than similar investment options.   550 F. Supp. 2d at 418.   The district court granted the defendants' motion to dismiss on statute of limitations grounds, finding that the fees, which "form[ed] the central basis of th[e] claim," were apparent from the plan disclosures that had been provided to participants more than three years before the plaintiffs filed suit.   Id. at 420.

The Court finds that Plaintiffs' Count I survives summary judgment on statute of limitations grounds.   Even if Plaintiffs did have knowledge prior to September 28, 2008, of the selected funds' performance histories, related expenses, and affiliation with Ameriprise, that is not sufficient to constitute "actual knowledge" of this breach of fiduciary duty claim.   In this Count, Plaintiffs are not alleging simply that Defendants breached their fiduciary duties by making an investment selection that was disloyal because it caused the Plan to furnish goods or services to a party in interest (i.e., a prohibited transaction) or imprudent because its fees were too high.   Rather, Plaintiffs maintain that choosing these particular investments was disloyal and imprudent because

19

the fiduciaries failed to engage in a prudent <u>selection process</u>.  Like the claim in <u>Maher</u>,

Plaintiffs' Count I questions the selection process used by Defendants in choosing the

Plan's investment options and, therefore, it is more complicated than the claims at issue

in <u>Brown</u> and <u>Young</u>.  Because there are genuine issues of material fact in dispute as to

Plaintiffs' knowledge, if any, prior to September 28, 2008, of facts relating to the

selection process, summary judgment is denied as to Count I.

### 2.    Failure to monitor claim

Count II alleges that Ameriprise and the CBC breached their fiduciary duties by

failing to adequately monitor the Plan's managers.  (<u>See</u> 2d Am. Compl. ¶¶ 118–25.)

"ERISA opinions and the position of the Department of Labor make clear that the power

to appoint and remove plan fiduciaries implies the duty to monitor appointees 'to ensure

that their performance is in compliance with the terms of the plan and statutory

standards.'"  <u>In re ADC Telecomms., Inc.</u>, No. 03-2989, 2004 WL 1683144, at *7 (D.

Minn. July 26, 2004) (citations omitted).  However, the duty to monitor is also quite

narrow and "does not include a duty 'to review all business decisions of Plan

administrators' because 'that standard would defeat the purpose of having [fiduciaries]

appointed to run a benefits plan in the first place.'"  <u>Johnson v. Evangelical Lutheran</u>

<u>Church in Am.</u>, No. 11-23 (MJD/LIB), 2011 WL 2970962, at *5 (D. Minn. July 22,

2011) (quoting <u>Howell v. Motorola, Inc.</u>, 633 F.3d 552, 573 (7th Cir. 2011)).

Defendants' only argument in regard to Count II is that a failure to monitor claim

cannot survive if the claim constituting the underlying breach is dismissed.  (Defs.' Mem.

at 28 n.29.)  Thus, Defendants argue, Count II must fail because it is predicated upon

Count I, which is time-barred.  However, because the Court finds that Count I is not time-barred, Defendants' argument fails, and their motion for summary judgment is denied as to Count II.

### 3.       Prohibited transaction claims

As discussed above, Counts III and IV allege that Defendants violated 29 U.S.C. § 1106.[7]  This provision "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'"  Harris Trust & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 241–42 (2000) (quoting Comm'r v. Keystone Consol. Indus., Inc., 508 U.S. 152, 160 (1993)).  Relevant to this case, § 1106(a) prohibits certain transactions between a plan and a "party in interest":

> Except as provided in section 1108 of this title:
>
> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> . . . .
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or]
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

29 U.S.C. § 1106(a)(1).  These prohibitions are subject to a number of statutory and regulatory exemptions.  For example, § 1108 exempts the purchase or sale of an interest

---

[7]       Counts V and VII also allege violations of § 1106, as discussed in Part III.A.4.

in a "common or collective trust fund . . . maintained by a party in interest," provided that the party receives only "reasonable compensation" and the transaction is permitted by the plan documents or by a fiduciary with authority over plan assets.  29 U.S.C. § 1108(b)(8); see Prohibited Transaction Exemption 77-3, Employee Benefit Plans, Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute, 42 Fed. Reg. 18,734, 18,735 (Mar. 31, 1977).  In addition, § 1106(b) prohibits certain transactions between a plan and a fiduciary:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

As noted above, Brown dictates that, in the context of a § 1106 claim, knowledge of the facts of the underlying transaction—without more—equals "actual knowledge" of the violation for purposes of starting the limitations period.  For example, in Figas v. Wells Fargo & Co., Civ. No. 08-4546 (PAM/FLN), 2010 U.S. Dist. LEXIS 79965 (D. Minn. Apr. 6, 2010), a court within this District analyzed the ERISA statute of limitations for a plaintiff participant's claim that the plan engaged in a prohibited transaction by investing in affiliated funds and paying related fees.  Id. at *3, *7.  The court applied the

22

Eighth Circuit's standard and found that knowledge that the defendants were acting for their own benefit was not part of the plaintiff's prima facie case.  Id. at *8–9.  Therefore, because the plaintiff knew about the investments and related fees outside of the limitations period, the court granted summary judgment in favor of the defendants.  Id. at *9.  Similarly, after quoting Brown, the U.S. District Court for the Western District of New York, in Zang v. Paychex, Inc., found that "disclosure of the fact of [§ 1106(b)(2) or (b)(3)] transactions alone is enough to give actual notice of the alleged ERISA violation." 728 F. Supp. 2d 261, 267 (W.D.N.Y. 2010).  Thus, because the fact and nature of an allegedly prohibited revenue-sharing arrangement had been disclosed more than three years prior to the plaintiff filing his lawsuit, the claim was time-barred.  Id.

Applying this standard here, the facts show that Counts III and IV must be dismissed on statute of limitations grounds.

### a.  Count III

In Count III, Plaintiffs allege that the investment of Plan assets in affiliated investments amounts to a prohibited transaction in violation of § 1106(a).  Specifically, Plaintiffs assert that, "[a]s Plan Sponsor, Ameriprise, and its subsidiaries, including RiverSource and ATC, were parties in interest."  (2d Am. Compl. ¶ 129.)  Plaintiffs contend that Defendants violated § 1106(a) because they:

> caused the Plan to use RiverSource Mutual Funds (and ATC managed investments) as investment options when they knew or should have known those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

(Id. ¶ 128 (emphases added).)

Defendants have demonstrated that Plaintiffs had knowledge of these transactions—i.e., the Plan's use of the Ameriprise-affiliated RiverSource mutual funds and ATC-managed investments as investment options—prior to September 28, 2008. For example, the 2005, 2007, and 2008 SPDs describe the various RiverSource mutual fund and ATC-managed investment options available in the Plan. They also state that the RiverSource mutual funds are distributed and managed by Ameriprise, or by a company that is "part of Ameriprise Financial, Inc." (See Sabin Decl., Exs. D (2005 SPD) at 24, E (2007 SPD) at 31, H (2008 SPD) at 31.) These SPDs were either mailed or emailed to Plan participants and were available online, and Plaintiffs Olson, Tuckner, and Bauhs admittedly received SPDs. And, each Plaintiff participated in the Plan since its inception in October 2005, with the exception of Mr. Olson, who became a participant in 2007.

In addition, Defendants have demonstrated that participants in a particular fund were mailed a fund prospectus at the time their investment was made and on an annual basis. And, Defendants point to several RiverSource mutual fund prospectuses that each contain the following language:

> Ameriprise Financial provides administrative services to the Fund and is the parent company of the Fund's investment manager, RiverSource Investments, LLC; the Fund's distributor, Ameriprise Financial Services, Inc. . . . ; the Fund's transfer agent, RiverSource Service Corporation . . . ; and the Fund's custodian, Ameriprise Trust Company . . . .
>
> . . . .
>
> RiverSource Investments, LLC . . . is the investment manager to the RiverSource funds, and is a wholly owned subsidiary of Ameriprise Financial, Inc. . . .
>
> . . . .

This Fund, along with the other RiverSource funds, is distributed by Ameriprise Financial Services, Inc. . . . .

(Sabin Decl., Exs. K (January 2005 RiverSource Mid Cap Growth Fund Prospectus), M (October 2005 RiverSource Disciplined Equity Fund Prospectus), N (November 2005 RiverSource Stock Fund Prospectus), O (October 2005 RiverSource New Dimensions Fund Prospectus).)  With the exception of Mr. Olson, each Plaintiff was invested in at least one RiverSource Fund prior to September 28, 2008.  And, each Plaintiff testified that he or she either received or reviewed prospectuses for his or her investments.

Plaintiffs do not contest these facts or argue that they did not know prior to September 28, 2008, that the RiverSource Funds were affiliated with Ameriprise.  Rather, Plaintiffs assert that their claim is "not limited merely to the facts that the Plan had Ameriprise fee-paying proprietary investment options."  (Pls.' Opp. at 32.)  According to Plaintiffs, their prohibited transaction claims "hinge on . . . infirmities in the selection process for investments and recordkeeping compensation," (id. at 32–33), and the facts material to their claim include that the transactions at issue were "for more than reasonable compensation," as pled in their Complaint, (id. at 31).  Therefore, Plaintiffs argue, Brown does not apply because that case only discussed an action alleged to be a fiduciary breach on its face.  (Id. at 30.)  And, because there is no demonstration that they knew prior to September 28, 2008, how much compensation Ameriprise received or whether that amount was reasonable, the statute of limitations could not have started running prior to that date.  (Id. at 32.)

Plaintiffs' arguments are unpersuasive. First, while the claim at issue in <u>Brown</u> was made pursuant to § 1104 for a breach of fiduciary duties, the Eighth Circuit noted that when such claims are based on an underlying "<u>illegal</u> investment—in ERISA terminology, . . . a prohibited transaction—knowledge of the transaction would be actual knowledge of the breach." 190 F.3d at 859. There is no reason to assume that knowledge of such a transaction would constitute actual knowledge for purposes of a breach of fiduciary duty claim based on that transaction but would not constitute actual knowledge for purposes of a prohibited transaction claim based on that same transaction.

Second, § 1106(a) prohibits a fiduciary from causing a plan to engage in a transaction that constitutes the furnishing of goods or services by a plan to a party in interest or the transfer of a plan's assets to a party in interest. On the other hand, "the statutory exemptions established by § 1108 are defenses which must be proven by the defendant." <u>Braden v. Wal-Mart Stores, Inc.</u>, 588 F.3d 585, 600 (8th Cir. 2009) (citations omitted). While the § 1108 exemptions may not be "traditional" affirmative defenses in the sense that they focus on the defendant's conduct rather than the plaintiff's conduct, they are—nevertheless—affirmative defenses. Accordingly, Plaintiffs do not bear the burden of proving, for example, that the compensation received by a party in interest was unreasonable. Therefore, whether the transactions at issue in Count III were for "reasonable compensation" is not part of Plaintiffs' claim, despite the allegations pled in the Complaint. Likewise, while the selection process is relevant to Plaintiffs' § 1104 breach of fiduciary duty claims, it is not relevant to their § 1106 prohibited transaction claims.

26

Plaintiff's claim in Count III mirrors the plaintiff's claim in <u>Figas</u>.  Similarly, because Plaintiffs were presented with information in the form of SPDs and prospectuses prior to September 28, 2008, that detailed the affiliation between Ameriprise, RiverSource, and ATC and the fact that the Plan offered the RiverSource Funds and ATC-managed investments as investment options, Plaintiffs had actual knowledge of their prohibited transaction claim outside of the three-year limitations period.  Therefore, Plaintiffs' Count III is time-barred.

### b.  Count IV

In Count IV, Plaintiffs allege that, in causing the plan to use RiverSource mutual funds and ATC-managed investments, Defendants Ameriprise and the CBC violated § 1106(b) because they dealt with the Plan assets in their own interest and acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the Plan's interests.  (2d Am. Compl. ¶¶ 134–35.)  Plaintiffs also allege that Ameriprise and the CBC violated § 1106(b) because they received consideration for their own personal account from RiverSource and ATC in connection with their transactions involving the Plan's assets.  (<u>Id.</u> ¶ 136.)  Finally, Plaintiffs allege that Ameriprise and the CBC "knew or should have known that the transfer of Plan assets to the investment options selected and maintained in the Plan by Ameriprise, the CBC, and the Committees allowed Ameriprise to benefit both financially, through fees paid by the options to Ameriprise, and commercially, by increasing the assets under management for the Ameriprise-managed investment options."  (<u>Id.</u> ¶ 138.)

Thus, the same transaction that Plaintiffs claimed was a breach of § 1106(a ) in

Count III—causing the Plan to use RiverSource funds and ATC-managed investments—

is also the basis of their § 1106(b) claim in Count IV.  As discussed in Part III.A.3.a,

Defendants have demonstrated that Plaintiffs had knowledge, prior to September 28,

2008, of the fact that those investment options were chosen, and that they were

distributed and managed by Ameriprise or by a company affiliated with Ameriprise.

Relevant to Count IV, Defendants have also demonstrated that Plaintiffs knew prior to

that date that there were fees associated with the funds.  For example, the 2008 SPD,

which was distributed in March 2008 to participants via mail or email and posted on

Ameriprise's internal and external websites, states that "[m]ost of the cost of administering

the 401(k) Plan, including fees of the trustee, recordkeeper, and investment managers, are

paid from the fees associated with the investment options offered under the 401(k) Plan."

(Sabin Decl. ¶ 14 & Ex. H (2008 SPD) at 55.)  Each Plaintiff was a Plan participant prior

to 2008, and they do not contend that they did not receive this document.

In addition, Defendants again point to several RiverSource mutual fund

prospectuses that each contain the following language:

> Fund investors pay various expenses.  The table below describes the fees
> and expenses [including "Management" and "Distribution" fees and "Other
> expenses"] that you may pay if you buy and hold shares of the Fund. . . .

> . . . .

> The Fund pays RiverSource Investments a fee for managing its assets.
> Under the Investment Management Services Agreement . . . , the fee for the

28

most recent fiscal year was 0.49%[8] of the Fund's average daily net assets . . . .[9]

. . . .

Ameriprise Trust Company is paid for certain transaction fees and out-of-pocket expenses incurred while providing services to the funds. Fees paid by the Fund for these services are included under "Other expenses" in the expense table . . . .

(Id., Exs. K (January 2005 RiverSource Mid Cap Growth Fund Prospectus), L (January 2006 RiverSource Mid Cap Growth Fund Prospectus), M (October 2005 RiverSource Disciplined Equity Fund Prospectus), N (November 2005 RiverSource Stock Fund Prospectus), O (October 2005 RiverSource New Dimensions Fund Prospectus).) Again, participants in a particular fund were mailed a fund prospectus at the time their investment was made and on an annual basis, and each Plaintiff, with the exception of Mr. Olson, was invested in at least one RiverSource Fund prior to September 28, 2008.

Plaintiffs do not contest these facts. Rather, they argue that their claim is based on more than just the fact of the transaction. They claim that the facts material to their claim include that the transactions at issue caused an "increase in assets under management (and hence asset-based fees)" for Ameriprise's benefit. (Pls.' Opp. at 31–32.) However, the essence of their claim, nonetheless, is that Ameriprise and the CBC chose

---

[8]     This percentage varies in the different prospectuses.

[9]     The November 2005 RiverSource Stock Fund Prospectus and the October 2005 RiverSource New Dimensions Fund Prospectus contain a slight variation on this language: "The Portfolio pays RiverSource Investments a fee for managing [its] assets. The Fund pays its proportionate share of the fee. Under the Investment Management Services Agreement . . . , the fee for the most recent fiscal year was [0.48% and 0.45%, respectively] of the Portfolio's average daily net assets . . . ." (Sabin Decl., Exs. N at 11 & O at 11.)

Ameriprise-affiliated investment options from which Ameriprise received benefits.

Therefore, because Plaintiffs were presented with information in the form of an SPD[10]

and prospectuses prior to September 28, 2008, that detailed the affiliation between

Ameriprise, RiverSource, and ATC, and the fact that the funds paid trustee,

recordkeeping, and management fees, Plaintiffs had actual knowledge of their prohibited

transaction claim outside of the three-year limitations period.  Therefore, Plaintiffs'

Count IV is time-barred.

### 4.    Record-keeping claims

In Counts V and VII, Plaintiffs bring claims under both § 1104(a) and § 1106

based on the Plan's record-keeping fees.

### a.    Count V

In Count V, Plaintiffs seek to recover profits Defendants obtained from the sale of

the ATC record-keeping business to Wachovia and the retention of Wachovia as a

record-keeper.  (2d Am. Compl. ¶¶ 141–51.)  Plaintiffs assert that Defendants chose

ATC, an Ameriprise subsidiary, as the Plan's record-keeper and trustee for the purpose of

providing ATC excessive compensation that increased the ultimate sale price for

Ameriprise.  (Id. ¶ 143.)  Ameriprise sold the record-keeping business to Wachovia for

$66 million plus a contingent payment based on fees received by Wachovia for servicing

---

[10]     Plaintiffs claim that the 2005 and 2007 SPDs erroneously state that "the
Company" paid the fees.  (Pls.' Opp. at 23.)  However, those disclosures do not change
the fact that the 2008 SPD states that the fees are paid from the fees associated with the
investment options.  Whether the statements in the 2005 and 2007 SPDs constitute fraud
or concealment, such that the six-year statute of limitations is invoked, is discussed below
in Part III.B.

the assets under management for the first 18 months following the sale.  (Id. ¶¶ 144–46.)

Thus, Plaintiffs claim that:

> The price Wachovia paid to Ameriprise for Ameriprise's record-keeping business was materially higher because of the compensation the Plan, directly or indirectly, through revenue sharing and other sources, paid to ATC as a result of Defendants' breach of fiduciary duties in hiring and retaining ATC as trustee and record-keeper of the Plan and from Defendants' selection and retention of Plan investment options that paid ATC excessive recordkeeping fees through revenue sharing.

(Id. ¶ 147.)  According to Plaintiffs, these actions constitute a prohibited transaction under § 1106 and breaches of the duties of prudence and loyalty in violation of § 1104(a).

(Id. ¶ 150.)

In regard to the prohibited transaction claim, Defendants argue that Plaintiffs had actual knowledge prior to September 28, 2008, of all of the material facts relevant to these claims—i.e., that ATC was the Plan's record-keeper and trustee, the RiverSource Funds paid record-keeping fees, and Ameriprise sold the record-keeping business to Wachovia.  (See Defs.' Mem. at 22.)  And, Defendants have demonstrated these facts. As discussed above, the SPDs and prospectuses disclose the affiliation between Ameriprise, RiverSource, and ATC.  In addition, the 2008 SPD states:  "Most of the cost of administering the 401(k) Plan, including fees of the trustee, recordkeeper, and investment managers, are paid from the fees associated with the investment options offered under the 401(k) Plan."  (Sabin Decl., Ex. H (2008 SPD) at 55.)  Finally, the Plan's participants were provided in March 2007 with a brochure announcing the transition of the record-keeping services to Wachovia.

Plaintiffs argue that they did not have actual knowledge of all material facts prior to September 28, 2008, because the brochure announced the sale but did not announce the terms, including the fact of the contingent payment.  (Pls.' Opp. at 29.)  Again, however, those facts are not material to their claim.  Rather, the heart of Plaintiffs' claim is that because Defendants used ATC as the Plan's record-keeper, Ameriprise benefitted not only by virtue of ATC receiving record-keeping fees as alleged in Count VII, but also by receiving an increased sale price when it sold ATC's record-keeping business to Wachovia.  Thus, Plaintiffs had actual knowledge of their claim when they had knowledge of the affiliation between Ameriprise and ATC, that ATC received record-keeping fees from the Plan's investments, and that the sale had occurred.  Because Defendants have demonstrated that Plaintiffs had knowledge of these facts prior to September 28, 2008, Plaintiffs' prohibited transaction claim under Count V is barred.

Likewise, Plaintiffs' breach of fiduciary duty claim under Count V is barred.  Unlike their other breach of fiduciary duty claims, here Plaintiffs do not allege an imprudent selection or retention process.  Rather, they claim only that Defendants breached their duties by "hiring and retaining ATC as trustee and recordkeeper" and by their "selection and retention of Plan investment options that paid ATC excessive recordkeeping fees."  (2d Am. Comp. ¶ 147.)  As the Eighth Circuit made clear in Brown, there will be situations in a § 1104 case in which "actual knowledge" occurs upon knowledge of the transaction underlying the alleged breach of fiduciary duty.  That is the case here.  The fact that ATC was hired and retained as the Plan's record-keeper, and the

fact that affiliated investment options were selected and retained, do not involve knowledge of the processes used.

Accordingly, because the same facts that form the basis of the prohibited transaction claim also form the basis of the breach of fiduciary duties claim, Brown dictates that knowledge of the transaction is knowledge of the breach. Defendants have demonstrated that Plaintiffs had knowledge of the transaction prior to September 28, 2008, as discussed above. Therefore, Plaintiffs' breach of fiduciary duty claim under Count V is also barred by the three-year statute of limitations.

### b.    Count VII

In Count VII, Plaintiffs allege that Defendants violated § 1104(a)(1)(A) by making the Plan pay excessive and unreasonable fees to its record-keepers, which a prudent fiduciary would have avoided.[11]  (2d Am. Compl. ¶ 164.)  Specifically, Plaintiffs allege that ATC and Wachovia received "revenue sharing and related kick-back[s]" from the Plan's investment managers as well as interest earned on the Plan assets as they moved funds in and out of the participants' accounts ("float").  (Id. ¶¶ 162–63.)  Furthermore, Plaintiffs claim that ATC and Wachovia obtained compensation through management of the Income Fund, which credited a lower rate of return for participants' assets than the rate Defendants and Wachovia received from managing the Fund.  (Id. ¶ 163.)  Thus,

---

[11]    In their Second Amended Complaint, Plaintiffs added an allegation that Defendants' conduct also violated § 1103(c)(1).  (2d Am. Compl. ¶ 164.)  Because this specific allegation was not included in the allegations upon which Defendants moved for summary judgment, and because the parties have not discussed when the statute of limitations should accrue for purposes of a claim under that statutory provision, the Court will not address that claim.

Plaintiffs allege that Defendants breached their fiduciary duties under § 1104(a)(1)(A) and engaged in a § 1106(a)(1)(C) prohibited transaction by causing the Plan to pay its record-keepers—ATC and Wachovia—excessive compensation for the services they provided to the Plan.  (Id. ¶ 164.)  Plaintiffs further claim that Defendants breached their fiduciary duties under § 1104(a) by failing to have a prudent process for evaluating the reasonableness of the record-keeping fees.  (Id. ¶ 165.)  As alleged by Plaintiffs, Defendants hired ATC without any competitive bidding process or negotiation over compensation.  (Id. ¶ 59.)

In regard to the prohibited transaction claim, Defendants argue that Plaintiffs had actual knowledge of all of the material facts prior to September 28, 2008—i.e., that ATC was the Plan's record-keeper and that the RiverSource Funds paid fees to the Plan's record-keeper.  (Defs.' Mem. at 22.)  Plaintiffs do not expressly contest either of these facts.  Rather, they argue that many of the prospectuses and SPDs did not make it clear that the expenses paid by the funds were for Plan record-keeping fees rather than for mutual fund expenses.  (See Pls.' Opp. at 23.)  They also assert that they lacked knowledge of all material facts because (1) the amount of record-keeping expenses was not disclosed and (2) the manner by which record-keeping expenses were paid (e.g., revenue sharing) was not disclosed.  (See id. at 21–25.)  Thus, they argue, they could not have determined prior to September 28, 2008, whether the amount paid was reasonable. (See id.)

Plaintiffs' arguments are unpersuasive.  First, the 2008 SPD,[12] at the very least, clarifies that the expenses paid by the funds were for <u>Plan</u> record-keeping fees:  "Most of the cost of administering the 401(k) Plan, including fees of the trustee, recordkeeper, and investment managers, are paid from the fees associated with the investment options offered under the 401(k) Plan."  (Sabin Decl., Ex. H (2008 SPD) at 55.)  Second, as discussed above, § 1106(a)(1)(C) prohibits a fiduciary from causing a plan to engage in a transaction that constitutes the furnishing of goods or services by a plan to a party in interest, and the § 1108 exemptions are affirmative defenses.  Therefore, the amount[13] of the expenses—and whether the amount was "unreasonable" or "excessive"—is not part of Plaintiffs' prima facie case, regardless of the manner in which the claim was pled.  Again, Plaintiffs' claim is similar to that in <u>Figas</u>, and for the same reasons stated in that case, Plaintiffs' claim is time-barred.  Plaintiffs were presented prior to September 28, 2008, with a SPD and prospectuses that detailed the affiliation between Ameriprise, RiverSource, and ATC, as well as the fact that ATC was the Plan's record-keeper and that the investments paid record-keeping fees.  Therefore, they had knowledge of the prohibited transaction claim in Count VII outside of the three-year limitations period.[14]

---

[12]    As discussed above, this SPD was distributed to participants and posted on Ameriprise's internal and external websites in March 2008.  Each Plaintiff was a Plan participant prior to 2008, and they do not assert that they did not receive this document.

[13]    Plaintiffs' argument that the 2008 SPD erroneously states that "most," rather than "all," of the record-keeping fees were paid by the funds, (<u>see</u> Pls.' Opp. at 24), is simply another argument about disclosure of the <u>amount</u> of fees that fails for the reasons stated above.

[14]    Plaintiffs allege that ATC, Wachovia, and Wells Fargo received excessive and unreasonable record-keeping fees.  (2d Am. Compl. ¶ 164.)  Only the allegations related to ATC could amount to a prohibited transaction under § 1106(a)(1)(C) because ATC is

As for the breach of fiduciary duties claim, Plaintiffs have questioned the <u>process</u> that Defendants used to select the Plan's record-keeper and to evaluate and determine the record-keeping fee.  For example, they argue that the EBAC meeting minutes do not show that any decision-making process was used to determine whether to hire or retain ATC or to determine the manner and amount of record-keeping compensation.  (Pls.' Opp. at 20.)  As with the fiduciary duty claims in Count I, these claims are more complicated than those at issue in <u>Brown</u> and <u>Young</u>.  Because Defendants have not demonstrated that there is no genuine issue of material fact that Plaintiffs had knowledge of such facts prior to September 28, 2008, summary judgment is not proper as to this portion of Count VII.

### 5.    Co-fiduciary liability claim

Count VI asserts co-fiduciary liability against Ameriprise for the purported breaches committed by the other fiduciaries in which Ameriprise allegedly participated knowingly or knew of and failed to remedy through reasonable efforts.  (2d Am. Compl. ¶¶ 152–157.)  Section 1105 of ERISA governs co-fiduciary liability and provides:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act

---

the only entity of those three that is alleged to be a "party in interest."  Because ATC's record-keeping services were transferred to Wachovia (Wells Fargo) in 2007, it does not appear that any prohibited transactions involving payment of excessive record-keeping fees could have occurred thereafter.

or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).  "A claim of co-fiduciary liability . . . must co-exist with some breach by a fiduciary of their duties under ERISA."  Crocker v. KV Pharm. Co., 782 F. Supp. 2d 760, 788 (E.D. Mo. 2010) (citation and internal quotation marks omitted).

As with Count II, Defendants' sole argument in regard to Count VI is that it must fail because it is premised upon Counts I, III, IV, V, and VII, which are time-barred. (Defs.' Mem. at 23 n.22.)  However, as discussed herein, the Court finds that Counts I and VII (to the extent that it is based on a breach of fiduciary duty under § 1104) are not time-barred.  Therefore, Count VI survives summary judgment to the extent that it is based on those Counts.

## B. Fraud or Concealment

Plaintiffs allege that, rather than the three-year statute of limitations based on actual knowledge, ERISA's six-year statute of limitations for cases involving fraud or concealment should apply to their breach of fiduciary duty claims based on the allegedly excessive fees paid by the Plan, as well as their prohibited transaction claims based on the payments received by Ameriprise for trustee and record-keeping services.  (2d Am. Compl. ¶ 176; Pls.' Opp. at 39–40.)  ERISA's statute of limitations provision

37

"incorporates 'the fraudulent concealment doctrine,' which requires 'that plaintiffs show (1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) they were not on actual or constructive notice of that evidence, despite (3) their exercise of due diligence.'"  Schaefer v. Ark. Med. Soc'y, 853 F.2d 1487, 1491–92 (8th Cir. 1988) (quoting Foltz v. U.S. News & World Report, Inc., 663 F. Supp. 1494, 1537 & n.66 (D.D.C. 1987)).

In support of their claim of fraud and concealment, Plaintiffs point to five documents that state that "the Company" paid the administrative expenses associated with the Plan:  the Plan's 2005 and 2006 Form 5500, filed with the Department of Labor; the Plan's 2007 11-K, filed with the SEC; and the 2005 and 2007 SPDs.  (2d Am. Compl. ¶ 176; see Pls.' Opp. at 39.)  Plaintiffs contend that these documents are evidence of a course of conduct designed to conceal knowledge of Defendants' breaches.  (Pls.' Opp. at 39.)  Defendants argue that the single representation in these documents does not suggest a course of conduct designed to conceal wrongdoing, especially in light of the disclosures in the 2008 SPD and the various 2005 and 2006 fund prospectuses that the Plan's administrative expenses were paid from the fees associated with the funds.  (Defs.' Mem. at 29.)  Moreover, Defendants argue that the disclosures in the prospectuses "would have put any plaintiff exercising due diligence on notice that administrative fees for the Plan were being paid from the Plan's investment options."  (Id.)  In response, Plaintiffs raise their previous argument that a participant would not have been able to determine from the statements in the prospectuses that the fees associated with the funds paid for the Plan's expenses rather than for the particular fund's expenses, as well as an argument that a

38

participant would not have understood that language to trump the SPD statements.  (Pls.'
Opp. at 39–40.)

The Court finds that there is no genuine issue of material fact regarding fraud or
concealment.  Even if Defendants' disclosures to the Department of Labor and SEC could
be considered to be "a course of conduct designed to conceal evidence of their alleged
wrongdoing," Defendants have set forth undisputed facts that demonstrate that Plaintiffs
had actual or constructive notice of the Plan's payment of the fees at issue by virtue of
the prospectuses.  On the other hand, Plaintiffs have not set forth specific facts
demonstrating that there is a genuine issue of material fact.  Plaintiffs have not argued—
let alone put forth evidence demonstrating—that they were unable to determine from the
statements in the prospectuses that the fees associated with the funds paid for the Plan's
expenses rather than for the particular fund's expenses, or that they would not have
understood that language to trump the SPD statements, despite their exercise of due
diligence.  See Bergmann v. BMC Indus., Inc., No. Civ. 05-963 (JNE/SRN), 2006 WL
487864, at *5 (D. Minn. Jan. 20, 2006) (finding that a failure to investigate the
implications of disclosed information "highlight[ed] [the plaintiffs'] failure to allege facts
demonstrating the exercise of due diligence").  Therefore, the Court finds that ERISA's
six-year statute of limitations for instances of fraud or concealment does not apply in this
case.

## IV.   ORDER TO SHOW CAUSE

Various submissions of the parties were filed under seal.  If the parties believe that
any portion of this Order warrants redaction, the Court orders the parties to show cause

ten days from the date of this Order, stating why the Order should not be unsealed and

specifying any portion of the order warranting redaction.

### V.     ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment on Statute of Limitations Grounds
   [Doc. No. 147] is **GRANTED IN PART and DENIED IN PART** as detailed
   herein; and

2. The parties are ordered to show cause ten days from the date of this Order why the
   Order should not be unsealed, and to specify any portion warranting redaction.


Dated:  March 20, 2014                    s/Susan Richard Nelson
                                          SUSAN RICHARD NELSON
                                          United States District Judge