## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

ROGER KRUEGER, et al.,

*Plaintiffs*,

v.

AMERIPRISE FINANCIAL, INC., et al.,

*Defendants*.

No. 11-CV-02781 (SRN/JSM)

Hearing Date: December 5, 2014

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants respectfully move for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on two separate bases. In Part A, defendants seek summary judgment on plaintiffs' claims that defendants breached their fiduciary duties under ERISA by failing to remove certain affiliated investment options from the Ameriprise Financial, Inc. 401(k) Plan at some point after their initial selection. In Part B, defendants seek summary judgment as to all claims against two of the individual defendants, Michelle Rudlong and Brent Sabin.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if—after viewing the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party—the record shows that there is no genuine issue of material fact related to the moving party's arguments. *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr.*, 154 F.3d 812, 818 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply

show there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and must go beyond the pleadings by using depositions, answers to interrogatories, or other evidence to designate specific facts that show there is a genuine issue for trial. *Givens v. Wilson Trailer Co*., 2014 U.S. Dist. LEXIS 141130, *7-8 (N.D. Iowa Sept. 30, 2014), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Evidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis County*, 447 F.3d 569, 578 (8th Cir. 2006) (quotations omitted). Where the non-moving party's theory is implausible, the moving party is entitled to summary judgment. *Corcoran v. Land O' Lakes, Inc.*, 39 F. Supp. 2d 1139, 1153 (N.D. Iowa 1999); *see also Sphere Drake Ins. PLC v. Trisko*, 24 F. Supp. 2d 985, 996 (D. Minn. 1998) ("We cannot say that the Plaintiffs' theory of loss . . . is so implausible as to preclude its submission to the Jury . . .") Accordingly, where plaintiffs fail to point to any plausible evidence or inferences supporting their claim—especially where common sense weighs strongly against plaintiffs' claim—summary judgment should be granted.

Further, at this juncture, plaintiffs should be held to their claims as described in their complaint and their responses to defendants' interrogatories. *Schaller Tel. Co. v. Golden Sky Sys.,* 298 F.3d 736, 746 (8th Cir. 2002) (leaving in place the district court's finding that the plaintiff "was bound to the allegations in its sworn interrogatory answers" at the summary judgment stage of the case); *see also Greyhound Lines, Inc. v. Miller,* 402 F.2d 134, 143 (8th Cir. 1968) ("The purpose of our modern discovery procedure is to narrow the issues, to eliminate surprise, and to achieve substantial justice."); *Am. Med. Sys. v. Laser Peripherals*, *LLC*, 712 F. Supp. 2d 885, 901 (D. Minn. 2010) (holding that

where an expert "did not opine at all" about the obviousness of a patent that the other party "would be harmed if required to respond to expert opinions not yet disclosed"). Plaintiffs may not provide vague discovery responses to "hide the ball about the nature of [their] claims or theory of recovery until the summary judgment phase of the proceedings." *Schaller Tel. Co. v. Golden Sky Sys.*, 139 F. Supp. 2d 1071, 1103 (N.D. Iowa 2001), *aff'd*, 298 F.3d 736 (8th Cir. 2002).  Thus, where a claim as described in plaintiffs' discovery responses is not factually supported, that claim may not survive summary judgment.  *McDonald v. City of St. Paul*, 679 F.3d 698, 706–07 (8th Cir. 2012) (affirming the grant of summary judgment for defendants of a conspiracy claim as described in an interrogatory response).

## PART A

### INTRODUCTION

Even though the ERISA statute and regulations expressly permit financial services companies to include affiliated funds in their own 401(k) plans, plaintiffs assert two separate breach of fiduciary duty claims against Ameriprise for allowing its employees the option of investing their accounts in the Ameriprise 401(k) Plan (the "Plan") in affiliated Ameriprise funds.  First, plaintiffs allege that defendants[1] acted imprudently and disloyally in violation of ERISA's fiduciary duty obligations when they ***selected***

---

[1] "Defendants" are Ameriprise Financial, Inc., Ameriprise Financial, Inc. Employee Benefits Administration Committee, Michelle Rudlong, Ameriprise Financial, Inc. 401(k) Investment Committee, Compensation and Benefits Committee of the Board of Directors of Ameriprise Financial, Inc., Martin S. Solhaug, and Brent Sabin.

affiliated funds for inclusion in the Plan's investment menu.  Second, plaintiffs purport to pursue the distinct theory that defendants separately breached their fiduciary duties by ***failing to remove*** the affiliated investment funds from the Plan's line-up at some later time after their selection.

For plaintiffs to state a distinct failure to remove claim, plaintiffs must offer evidence of ***post-selection*** events, attributes, or changed circumstances that rendered a given affiliated investment option unsuitable for the Plan.  Here, after being ordered by the Court to define their failure to remove contentions, plaintiffs allege that defendants breached their fiduciary duties on "***day two*** of the Plan's investment option's inclusion in the Plan line-up and each day thereafter" and the "earliest date" defendants failed to remove the option was the date of the next meeting of the 401(k) plan investment committee ("KIC"), which, in most cases was less than three weeks later.[2]  There is no set of facts that might support these claims, nor have plaintiffs or their experts attempted to identify any.  At most, plaintiffs have offered only the vague suggestions from one of their experts that prudent fiduciaries would have removed the RiverSource Balanced Fund and Retirement Plus Funds after certain periods of underperformance and other events all well after "day two."  But even if plaintiffs are released from their interrogatory responses and allowed to rely on their expert's suggestions, the undisputed evidence shows that the Plan and participants suffered no losses from the retention of these funds

---

[2] Ex. A, Pls.' Second Supplemental Interrog. Answers (emphasis added).  Exhibit references are to the Declaration of Benjamin Bradshaw, filed herewith.

after the date of the purported failure to remove.  Defendants are accordingly entitled to

summary judgment.[3]

## STATEMENT OF FACTS

That plaintiffs are asserting two distinct legal theories within Count I—an

***imprudent selection*** claim and a ***failure to remove*** claim—has not always been clear.

Plaintiffs' Second Amended Complaint ("SAC") includes no specific allegations or facts

about plaintiffs' failure to remove claims.[4]  (Dkt. No. 228, SAC.)  The SAC does not

even identify the date on which each of the affiliated funds (if judged to have been

prudently selected) somehow became imprudent due to later developments.  Defendants

---

[3] Defendants are not moving for summary judgment on plaintiffs' selection claims, *i.e.*, plaintiffs' contention that in ***initially selecting*** affiliated investment options for the Plan's line-up, defendants violated ERISA's fiduciary duty requirements.  Nor are defendants moving for summary judgment on plaintiffs' claims—closely analogous to their initial selection claims—that defendants breached duties in deciding to retain affiliated funds that the Plan inherited at the time of its creation on October 1, 2005, by virtue of the spin-off from American Express, or that entered the Plan by virtue of a fund merger.  For these carryover funds, there was no initial selection decision by Plan officials—the initial fiduciary action was to retain the funds; defendants acknowledge that plaintiffs claim that the fiduciaries should have removed these carryover funds at their first opportunity (*i.e.*, the very next KIC meeting), or for the RiverSource Balanced Fund in approximately 2006, and defendants do not seek summary judgment on such claims.  However, to the extent plaintiffs purport to pursue alternative claims that—even if defendants' initial decision to retain the carryover funds is judged prudent—later circumstances should have caused defendants to remove those funds, defendants seek summary judgment on those alternative claims on the grounds set forth in this motion.

[4] Plaintiffs represented to the Court that these claims have always been in their complaint, pointing to paragraphs 94, 114, and 115 of the SAC.  These paragraphs, however, make no reference to a retention or "failure to remove claim."  (Dkt. No. 228, SAC.)

accordingly served contention interrogatories seeking whether, among other things, plaintiffs intended to bring a failure to remove claim and information regarding the contours of that claim, including the period in which each of the funds was purportedly "maintained" in the Plan in violation of ERISA.  (Dkt. No. 432-1, Def.'s Second Set of Interrogs. to All Pls.)

Plaintiffs objected to the interrogatories as "premature," arguing that they should not be required to reveal their contentions "until discovery is completed."  (Dkt. No. 231-1, Pls. Answers to Defs.' Second Set of Interrogs. to All Pls.)  Discovery proceeded over many months and on April 10, 2014, once discovery was nearly complete, defendants again conferred with plaintiffs, reminding them that:

> [Defendants] are also entitled to know, assuming the court were to reject plaintiffs' contention that a given option was imprudently **added** to the Plan's lineup, plaintiffs contend that option was imprudently **retained** in the Plan's lineup—and, if so, when plaintiffs contend a prudent fiduciary would have removed the previously selected option.

(Dkt. No. 432-2, April 10, 2014 Letter to Pls (emphasis in original).)

Plaintiffs never challenged defendants' characterization of the interrogatories, nor sought to meet and confer to clarify the request.  (Dkt. No. 431-0, Decl. of Brian Boyle In Support of Mot. to Compel ("Boyle Decl.").)  Instead, plaintiffs quietly agreed to supplement their responses at a later date after the close of the discovery.  (*See id.*; *see also* Dkt. No. 421, Fifth Am. Pretrial Scheduling Order (ordering close of discovery on July 1, 2014 and plaintiffs' supplementation on July 7, 2014).)

Plaintiffs supplemented their responses on July 7, 2014.  In their responses, plaintiffs listed the ***entire period*** for which every fund—affiliated and non-affiliated[5]— was in the Plan's investment line-up as the period for which they claimed the options were imprudently maintained in the Plan.  Plaintiffs' response did not identify any distinct failure to remove claims that plaintiffs would pursue if their initial selection claims were rejected.  (Dkt. No. 432-3, Pls.' Supplemental Objections and Answers to Defs.' Second Set of Interrogs. to All Pls.)  On July 9, 2014, defendants wrote plaintiffs, observing that these answers "appear to describe a singular claim."  (Dkt. No. 432-4, July 9, 2014 Letter to Pls.)  Plaintiffs rejected this notion, insisting that they "are alleging both the imprudent selection and the imprudent retention of Plan investments, among other claims."  (Dkt. No. 432-5, July 11, 2014 Letter to Defs.)  Nevertheless, plaintiffs refused to provide any further information about the claims, including the dates on which they contend that any previously selected affiliated funds became imprudent due to changes in circumstance.  (*Id*.)  Given the impasse, defendants moved to compel plaintiffs to provide specific information about their failure to remove claims.  (Dkt. No 430, Mem. in Support of Defs.' Mot. to Compel.)

At oral argument on defendants' motion to compel, plaintiffs confirmed to Judge Mayeron that they were pursuing distinct ***initial selection*** and ***failure to remove*** claims. In response to Judge Mayeron's clarifying statement:  "It sounds like what you've just

---

[5] Plaintiffs' initial complaint did not challenge the selection or retention of non-affiliated funds in the Plan.  The Court has denied plaintiffs' motion for leave to file a third amended complaint.  (*See* Dkt. No. 508.)

said to me is, yes, you're making both claims . . . that separately you will be arguing at some point along the way each and every one of these options should have been removed from the Plan [assuming the initial inclusion was prudent]," counsel for plaintiffs said "[c]orrect, Your Honor."  (Ex. G, Hr'g Tr. 45:15–23 (emphasis added); *see also id*. at 47:1–4  (Judge Mayeron:  "you're telling me you have alternative claims in your complaint, you have a selection claim and you have a retention claim"; plaintiffs' response: "We do, yes.").)  Thus, for example, "even if [selection] wasn't [judged] improper in September 2006," plaintiffs confirmed that they plan to assert that "at X date it was improper to maintain those particular items in the plan and here are the various reasons why."  (*Id*. at 43:12–20 (responding affirmatively to court question).)  Plaintiffs promised that they could present "evidence of when additional facts, material information arose where prudent fiduciaries should have taken action." (*Id*. at 47:4–8)

With that understanding of plaintiffs' failure to remove claim, the Court ordered plaintiffs to "provide the earliest date that [plaintiffs] are claiming that a prudent fiduciary . . . would have removed that previously selected option," assuming "***that the selection was proper***, meaning there was no breach of fiduciary duties with respect to the selection."  (*Id*. at 54:3–12 (emphasis added).)  Put differently, "if selection is deemed to be not a violation of ERISA and you're going to claim that at some point any of these options should have been removed under any of the duties under ERISA, tell us the date." (*Id*. at 56:21–57:5; *see also* Dkt. No. 449, Order Granting In Part and Denying In Part Defs.' Mot. to Compel.)

In response to the Court's order granting in part defendants' motion to compel, plaintiffs supplemented their interrogatory responses by stating that "for each investment option identified below [including all affiliated funds except the Stable Value Fund], the date that Defendants subsequently breached their duties following the date the Plan investment option was available to the Plan is **day two** of the Plan investment option's inclusion in the Plan lineup and each day thereafter." (Ex. A, Pls.' Second Supplemental Interrog. Answers, at 14, 27 (emphasis added).) Plaintiffs then provided a chart in which they identified the date of the next scheduled KIC meeting occurring after the affiliated fund's inclusion in the Plan—none more than 40 days and most less than 19 days later— as the "Court ordered 'earliest date' of breach for failure to remove." (*Id*. at 15–18, 28– 31.)

Plaintiffs offered no evidence—as part of their interrogatory responses or their experts' reports—to support their "day two" failure to remove claims. Nowhere did they describe facts showing any post-selection change of circumstances for any of the affiliated funds within the one-month—let alone one-day—period stated in their answers to interrogatories. Plaintiffs were similarly silent on damages related to their failure to remove claims. Plaintiffs' expert, Dr. Steve Pomerantz, calculated purported damages for the Plan and participants only from the date of selection (or, in the case of carryover funds or funds added by merger, the date of their introduction into the Plan) through the end of the fund's tenure in the Plan, or through the latest date covered by available transactional data. (*See* Ex. B, Pomerantz Report, Exs. 2–3 (showing calculations through 2013).) No plaintiffs' expert has disclosed damages calculations for any distinct

failure to remove claim, either from "day two" of the fund's tenure or from the day of the

next KIC meeting.  And although one plaintiffs' expert, William E. Fender, discussed in

his report defendants' purported failure to monitor and replace imprudent investment

options, he did so for only the RiverSource Balanced Fund and the Retirement Plus

Funds, ███████████████████████████████████████████████████████████

██████████.  (Ex. C, Fender Report ¶¶ 180, 201, 217.)  Defendants' expert, Dr. Jennifer

Conrad, however, has testified without contradiction that retention of the RiverSource

Balanced Fund ██████████████████████████████████████████████████████

████████████████████████████████████████████.  (Ex. F, Conrad Report, ¶¶

14, 43, Ex. 3.)

## ARGUMENT

I.   **PLAINTIFFS HAVE FAILED TO IDENTIFY ANY FACTS THAT PLAUSIBLY SUPPORT THE FAILURE TO REMOVE CLAIMS DESCRIBED IN THEIR INTERROGATORY RESPONSES.**

After being ordered by the Court, plaintiffs have asserted failure to remove claims

that are premised on the contention that defendants breached their fiduciary duties by

failing to remove the Plan's affiliated investment products immediately after their

selection.  To assert such a claim, plaintiffs cannot simply rely on the continued offering

of the investment options in the Plan or on evidence related to the investment options'

selection.  Instead, a separate claim seeking liability for the failure to remove a fund from

the Plan's investment line-up requires plaintiffs to produce evidence that immediately

following selection, circumstances changed such that what was a prudent selection

suddenly became an imprudent failure to remove.  This evidence must be separate and

distinct from the evidence relating to the funds' initial selection.  Otherwise, plaintiffs'

failure to remove claim is nothing more than another challenge to the initial selection of

the Plan's affiliated investment options.  Plaintiffs have failed to identify any such

evidence, and in fact there is none.

A.     **A Distinct Claim for Failure to Remove a Plan Investment Option Requires Facts Showing a Material Change in Circumstances Distinct From Those Prevailing at the Time of Selection.**

Imprudent fund selection claims and claims of imprudent failure to remove are

separate theories that turn on distinct evidence.  For the first, plaintiffs must show that

fiduciaries failed to act prudently when considering and initially selecting investment

options for the Plan.[6]  For the second, plaintiffs must show that the fiduciaries breached

"a duty to monitor [the investment manager's performance] with reasonable diligence

and to withdraw the investment if it became clear or should have become clear that the

investment was no longer proper for the Plan."  *Whitfield v. Cohen*, 682 F. Supp. 188,

196 (S.D.N.Y. 1988).

Circuit courts routinely acknowledge the separate and distinct nature of these two

claims and have repeatedly rejected failure to remove claims that are based on the same

allegations as time-barred imprudent selection claims.  In *Fuller v. Suntrust Banks, Inc.*,

the Eleventh Circuit held that where allegations concerning the failure to remove claims

are identical to the allegations concerning the selection of the funds, the plaintiffs had

---

[6] Plaintiffs' expert, Mr. Fender, acknowledged the different prudence standards for the initial selection and the retention of an investment option in a 401(k) Plan investment line-up.  (*See, e.g.,* Ex. D, Fender Dep. 79:8–23; 157:24–158:20, Sept. 19, 2014.)

failed to bring a separate failure to remove claim and barred the claim under the statute of repose because the selection occurred more than six years prior to the filing of the complaint.  744 F.3d 685, 701 (11th Cir. 2014).  The Ninth Circuit similarly found that "[c]haracterizing the mere continued offering of a plan option, ***without more***, as a subsequent breach would render section 413(1)(A) [of ERISA] meaningless."  *Tibble v. Edison Int'l*, 729 F.3d 1110, 1120 (9th Cir. 2013) (emphasis added) (internal quotation omitted), *cert. granted*, 83 U.S.L.W 3183 (U.S. Oct. 2, 2014) (No. 13-550).  And the Fourth Circuit held the same, basing its decision that plaintiffs' failure to remove claim was untenable on the fact that plaintiffs' claim was "based on attributes of the funds that ***existed at the time of their initial selection***," and thus the claim was "at its core, simply another challenge to the initial selection of the funds to begin with."  *David v. Alphin*, 704 F.3d 327, 341 (4th Cir. 2013) (emphasis added).

Consistent with these authorities, Judge Mayeron's rulings distinguished between plaintiffs' theories of imprudent selection and failure to remove.  Plaintiffs initially asserted in their interrogatory responses that the affiliated investment options were disloyally maintained from the day that the options were added until the day that they were removed.  (Dkt. No. 432-3, Pls.' Supplemental Objections and Answers to Defs.' Second Set of Interrogs. to All Pls.)  The Court recognized that plaintiffs' interrogatory responses could mean one of two things:  either plaintiffs were asserting only a categorical claim that the investments had been selected imprudently and therefore should not have been in the Plan; or plaintiffs were asserting two claims, one for

imprudent and disloyal selection of the funds[7] and a separate claim for failure to remove the funds when events or circumstances occurring after the fiduciaries' initial action on the funds supposedly made them imprudent.  (*See* Ex. G, Hr'g Tr. 42:16–21.)

The Court expressed "concern" that "if there's going to be an alternative contention to selection, then I want to find out where it is that -- well, first of all I want to find out if there is [one] . . ." (*Id*.)  Once plaintiffs confirmed that it was indeed their intention to bring a failure to remove claim, the Court ordered plaintiffs to supplement their responses, requiring plaintiffs to identify "the earliest date that plaintiffs contend a loyal and prudent fiduciary would have removed each of the previously selected options. . . assuming that the Court were to reject plaintiffs' contention that the initial selection or addition of an option to the Plan's line-up was a violation of the fiduciaries' duties of loyalty and prudence."  (Dkt. No. 449, Order at 1–2.)

In short, if plaintiffs wish to bring failure to remove claims, they must do more than show that an affiliated fund was imprudently selected and then remained in the Plan after selection.  Otherwise, that allegation is merely "another challenge" to the imprudent selection, as the Fourth Circuit held in *Alphin*, 704 F.3d 327, and as this Court suggested

---

[7] As noted earlier, defendants understand plaintiffs to challenge defendants' ***initial retention*** of funds that were carried over from the American Express plan at the time of Ameriprise's spin-off from American Express, or that were introduced to the Plan by merger, without an initial selection decision by defendants.  Defendants group these initial retention claims as to the carryover funds in the same category as plaintiffs' initial selection claims, since plaintiffs are challenging the prudence of defendants' initial fiduciary action with respect to the funds.  Plaintiffs' challenge to defendants' initial action on such funds is not within the scope of this Motion.

in requiring plaintiffs to answer defendants' interrogatories by assuming that the affiliated funds had been prudently selected or added to the Plan.  To prove the failure to remove claims, plaintiffs must point to evidence that is not bound up in their selection claim that would plausibly support a distinct failure to remove breach by Plan fiduciaries: specifically, material changes in circumstances occurring post-selection that caused the affiliated funds to become improper for the Plan.

**B.      Plaintiffs Cannot Prove—and Indeed Have Not Even Alleged—Facts Plausibly Establishing a Material Change in Circumstances Between the Initial Selection of the Challenged Affiliated Funds and the Next KIC Meeting.**

Plaintiffs' failure to remove claims are ripe for summary judgment because there are no facts to support them—let alone facts sufficient to create a dispute for trial.

Plaintiffs' "day two" failure to remove claim is utterly implausible.  Plaintiffs' own expert, Mr. Fender, could not identify any facts in the record to support a "day two" claim and had difficulty even hypothesizing situations or events that could render a prudently selected fund an imprudent investment on the very next day.  He would need to be "really imaginative" or "creative," he said, to come up with such a scenario.  (Ex. D, Fender Dep. 277:21–78:16.)  The few situations that Mr. Fender did come up with as potential events that could lead an initially prudent selection to become immediately imprudent were "the portfolio manager leaves the next day" (*Id*. at 275:25–76:10), "[t]he organization gets sold" (*Id*. at 276:11–13), or "the co-party that's guaranteeing the investment goes bankrupt" where there is co-party liability (*Id*. at 278:17–79:7).  None of these potential triggers—or anything remotely similar—is present in the record.

Plaintiffs' "next KIC meeting" failure to remove claims fare no better because plaintiffs have not offered any facts separate and distinct from those that make up their imprudent and disloyal selection claims.  For over half of the KIC-selected funds, the next KIC meeting fell only five days after the inclusion of the funds in the Plan.[8]  (Ex. A, Pls.' Second Supplemental Interrog. Answers at 15–18.)  For all but one of the rest, the next KIC meeting fell only 11 days later.[9]  (*Id.* at 15–18.)  The last of the "next KIC meeting" failure to remove claims—that asserted against the Columbia Contrarian Core Fund—posits that fiduciaries should have removed the fund only 30 days after it was included in the Plan.  There are no facts in the record that show any change in circumstances occurring for any of these funds within the first month, let alone the more aggressive five- and 11-day removal windows plaintiffs define for the majority of the funds.

Any "post-KIC meeting" failure to remove claims that plaintiffs may belatedly attempt to manufacture should also be rejected.  The only failure to remove theories identified in plaintiffs' Court-ordered supplemental interrogatory responses are that defendants breached their duties by retaining previously selected funds beyond "day two" of their tenure, and beyond the date of the first KIC meeting following the selection.  It is

---

[8] These were the Columbia Trust Balanced Fund I, the Columbia Trust Intermediate Bond Fund A, the Columbia Trust Contrarian Core Fund I, and the Columbia Trust Diversified Equity Fund I.

[9] These were the Retirement Plus Funds, the Mid Cap Value Fund, and the Diversified Equity Income Fund.

far too late for plaintiffs to abandon their "earliest date" of breach theories and replace them. *Am. Med. Sys.* 712 F. Supp. 2d at 901 (holding that where an expert "did not opine at all" about the obviousness of a patent that the other party "would be harmed if required to respond to expert opinions not yet disclosed" during summary judgment). Plaintiffs have had ***three separate opportunities*** to define the contours of their failure to remove claims and are now "bound to the allegations in [their] sworn interrogatory answers." *Schaller*, 298 F.3d at 746 (affirming summary judgment). Plaintiffs chose arbitrary dates designed to capture as much of the class period (and corresponding damages) as possible, and they must be held to that strategic choice.

Plaintiffs have compounded their evidentiary omissions by failing to develop and disclose injury or damages testimony corresponding to their separate failure to remove claims. Plaintiffs' expert, Dr. Pomerantz, calculated alleged damages only from the date of each fund's selection (or initial inclusion in the Plan) to the present; he made no effort to identify later dates by which defendants should have removed the funds (even if prudently selected), and no effort to establish that the Plan experienced economic injury from retention of the funds beyond those dates—much less provide calculations of damage from those dates. (Ex. B, Pomerantz Report, ¶¶ 47–50.) Even after defendants' damages expert, Dr. Conrad, submitted calculations showing that plaintiffs suffered no losses from the defendants' maintenance of various funds in the Plan after certain dates, Dr. Pomerantz left his omission unrectified. (Ex. E, Pomerantz Rebuttal Report.) *See Voegeli v. Lewis*, 568 F.2d 89, 97 (8th Cir. 1977) ("Discovery of expert opinion must not be allowed to degenerate into a game of evasion.").

16

Plaintiffs will likely attempt to defend their claim by pointing out that Judge Mayeron's order only required them to reveal the "earliest date" for their claims (Ex. G, Hr'g Tr. 54:9), and that she acknowledged that plaintiffs may be "claim[ing] it was day two."  (*Id*. at 58:10–11.)  But the "earliest date" requirement or a mention of a "day two" theory by the Court does not excuse plaintiffs from ensuring their claim meets the summary judgment standard, which requires plaintiffs to show enough material support for their position to create a viable issue of fact for trial.  In order to support the distinct failure to remove theories plaintiffs claim to be bringing, plaintiffs must point to a material change in circumstances following the fiduciaries' initial action on the funds. Plaintiffs have failed to meet that obligation—indeed, plaintiffs have chosen dates for removal that leave no opportunity for plaintiffs to show a plausible change in circumstances.

## II.   PLAINTIFFS HAVE NOT OFFERED ANY TESTIMONY ESTABLISHING THAT THE PLAN WAS INJURED BY ANY LATER ALLEGED "FAILURE TO REMOVE."

Even if plaintiffs are released from their interrogatory responses and allowed to rely on the few vague suggestions from one of their experts, Mr. Fender, their claims still fail.

First, Mr. Fender's expert testimony cannot save the majority of plaintiffs' failure to remove claims.  Plaintiffs ostensibly assert a "failure to remove" theory of breach as to *every* affiliated fund ever included in the Plan (save for the Stable Value Fund).  But Mr. Fender's discussion of defendants' purported "Failure to Monitor and Replace Imprudent Investment Options" offers testimony of circumstances allegedly requiring removal for

*only two*—the RiverSource Balanced Fund and the Retirement Plus Funds.[10]  (Ex. C, Fender Report ¶¶ 168–230.)

Second, the uncontroverted evidence is that defendants' retention of these two funds in the Plan beyond the dates Mr. Fender identifies did not cause the Plan any injury.  Take the RiverSource Balanced Fund, for instance:  Mr. Fender cites ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████.  (*Id.* at ¶ 168.)  ███████████████

██████████████████████████████████████████

██████████.″  (*Id.* at 180.)  But neither Mr. Fender nor Dr. Pomerantz offers any evidence that the Plan was injured ████████████████████████████████

████████████████.  Dr. Pomerantz offers no such proof either.  The reason is that no such showing is possible:  defendants' expert has testified without contradiction that calculated against plaintiffs' own benchmark for the Balanced Fund's performance (a Vanguard index fund), ████████████████████████████████████████

██████████████████████████████████████████████.  (Ex. F, Conrad Report, ¶¶ 14, 43, Ex. 3.)

---

[10] Subsection C of this section of Mr. Fender's report compares KIC's monitoring of the RiverSource Balanced and Retirement Plus Funds with the monitoring done by another investment committee of an entirely different Plan and subsections D and E discuss KIC's conduct with respect to two fund mergers.  (Ex. C, Fender Report ¶¶ 218–230.)

The same problem of proof defeats plaintiffs' failure to remove claim as to the Retirement Plus Funds.  Although he does not identify a specific date by which a prudent fiduciary would have removed the funds from the line-up, Mr. Fender cites "numerous factors" that he believes should have prompted removal, ██████████████████████ ██████████████████████, specifically:

- "██████████████████████████████████████████." ██████████████ ██████████████████████████. (*Compare* Ex. C, Fender Report ¶ 217 *with* ¶ 183.)

- "████████████████████." The change in ownership of the Retirement Plus Funds' investment manager was announced in September 2009 and the transaction closed in 2010. (*Compare id.* at ¶ 217 *with* ¶¶ 192 and 197.)

- ██████████████████████████████████████." Mr. Fender first alleges that the ███████ ██████████████████████████████ (*Compare id.* at ¶ 217 *with* ¶¶ 200–201.)

- ██████████████████████████." Mr. Fender first refers to "changes" in the investment strategy when ████████████████████ ██████████████████████████████████, as quoted by Mr. Fender, "███ ██████████████████████████████." His earlier allegations confirm that the manager changes occurred, ██████████ ████████ (*Compare id.* ¶ 217 *with* ¶¶ 203 and 197–99, 202.)

- ██████████████████████████████████████████." By his own concession, ████████████████████████████ (*Compare id.* at ¶ 217 *with* ¶ 203.)

- ████████████████████████████████████████ ████████████████████████████████████████



.” As noted above,

.

(*Compare id.* at ¶ 217 *with* ¶ 194.)

Here again, however, plaintiffs have offered no evidence that the Plan and participants experienced any injury ███████████████████████████████████ ████████████████. To the contrary, the unrebutted testimony of defendants' damages expert, Dr. Conrad shows the opposite. When measured against the benchmark handpicked by plaintiffs' own expert, participants did not experience any injury through their investments ███████████████████████████████████████████. (Ex. F, Conrad Report, ¶¶ 14, 43, Ex. 3.)

Accordingly, even if plaintiffs are allowed to supplement the inherently implausible failure to remove claims in their interrogatory responses by trumpeting the allegations in Mr. Fender's report, the uncontroverted expert testimony is that ████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███.

\* \* \*

## PART B

### BACKGROUND

Plaintiffs' claims against individual defendants Brent Sabin, an Ameriprise Vice President for Benefits, and Michelle Rudlong, one of Mr. Sabin's direct reports and Director of Retirement Benefits, are based solely on the premise that the two were Plan fiduciaries under ERISA.  But employees in a company's benefits department are not subject to personal liability under ERISA's fiduciary standards merely because they assist in the routine operations of a retirement plan.  If they were, few would serve.  Instead, ERISA imposes fiduciary status on such persons only to the extent they exercise authority and control over the Plan or its assets.  Performing administrative tasks, and even making recommendations concerning matters of plan administration to the plan's named fiduciaries, do not convert a person into a fiduciary.

Here, discovery has shown that others served as the Plan's fiduciaries, and plaintiffs have expressly disavowed their initial contentions concerning Mr. Sabin.  While plaintiffs have not similarly renounced their claims concerning Ms. Rudlong, the evidentiary record makes clear that her role was to support the fiduciary committees responsible for the Plan by performing limited, ministerial duties, without the authority or control of a fiduciary.  Because plaintiffs cannot show that either Mr. Sabin or Ms.

Rudlong were fiduciaries, Mr. Sabin and Ms. Rudlong move for summary judgment on all claims against them.[11]

### STATEMENT OF FACTS

The Plan's governing documents assign fiduciary responsibility to two committees:  KIC and the Employee Benefits Administration Committee ("EBAC"). (*See* SAC ¶¶ 20 *et seq.; 26 et seq.*; Ex. H, AMER_KR2_000908983 (2010 Plan Document §§ 2.4 and 2.36) (appointing the two committees), 10.1 (providing that each committee is a named fiduciary), 10.3 and 10.4 (describing the two committees' duties).)

Though the committees delegated some of the Plan's day-to-day administrative operations to others, including Mr. Sabin and Ms. Rudlong, the delegates were required to act in accordance with "policies, interpretations, rules, practices and procedures" set by the committees or other fiduciaries, without exercising "discretionary authority or control."[12]  The language in these limitations is no accident.  It tracks Department of Labor guidance on what is fiduciary activity and what is not.  *See* 29 C.F.R. § 2509.75-8 at D-2.

Plaintiffs do not claim, nor could they, that Mr. Sabin or Ms. Rudlong were members of either committee.  Indeed, after having the benefit of discovery, plaintiffs

---

[11] Defendants contacted plaintiffs before filing this motion as to whether plaintiffs would agree to stipulate to the dismissal of Mr. Sabin and Ms. Rudlong.  Plaintiffs did not agree.

[12] (Ex. I, AMER_KR1_000035973 (3/15/2006 EBAC minutes); Ex. J, AMER_KR2_000631007 (3/15/2006 EBAC meeting items); Ex. K, AMER_KR1_000023151 (2/22/207 KIC minutes); and Ex. L, (2/22/2007 KIC meeting items.).)

disavowed their earlier allegations concerning Mr. Sabin's fiduciary status, representing

to the Court that "Brent Sabin is only a vice president of benefits at Ameriprise ***and is not***

***even a Plan fiduciary***."  (*See* Ex. M, Letter to Judge Mayeron, at 2 (arguing that Mr.

Sabin lacked the authority to opine on whether certain Plan information should be kept

confidential) (emphasis added).)[13]  This admission was consistent with the interrogatory

responses defendants had served earlier, which identified the committees and their

members as the fiduciaries, and identified Ms. Rudlong and Mr. Sabin as benefits staff

who performed ministerial functions supporting the committees.  (*See* Ex. N, Defs.

Objections and Resps. to Pls. First Set of Interrogs. at 10-12, 21).  It was also consistent

with Mr. Sabin's sworn testimony.  (*See, e.g*., Ex. O, Sabin Dep. 74:6-13 ) ("Q. The KIC

never delegated to you any responsibility or authorization or charge to do any work for

them, correct?"  "A. The committee has asked me to do work, but I don't make decisions

on behalf of the committee").)[14]  To the extent Mr. Sabin understood himself to have any

fiduciary authority, it was only in connection with being recently confirmed as an

---

[13] The Court accepted plaintiffs' argument that Mr. Sabin was not a fiduciary, but did not
agree that he was therefore unqualified to opine on confidentiality.  (*See* Dkt. 506, Order
on Pls.' Mot. to Redesignate and Unseal Docs., at 30 n.14 ("Plaintiffs[] . . . objected to
Sabin's declaration because Sabin is 'only a vice president of benefits' and not a Plan
fiduciary.  This objection is meritless.  Merely because Sabin, who has served KIC for
years, is not a Plan fiduciary does not mean that he is unqualified to opine on the effect of
the disclosure of these documents.").)

14 (*See also, e.g*., Ex. O, Sabin Dep. 93:17-94:10 ("A.  KIC is the party responsible for
making the investment selections for the Plan.  Q. Not you? A. Not me. … Q. Or your
department?  A. Correct.").)

appointing fiduciary to the committees, and that status bears no connection to the fiduciary acts challenged here regarding investment selection and recordkeeping fees.

Plaintiffs have not expressly abandoned their assertions of fiduciary status as to Ms. Rudlong, who reported directly to Mr. Sabin.  (*See, e.g*., Ex. P, Rudlong Dep. 89:13-22.)  But the SAC includes no specific allegations that Ms. Rudlong acted as a fiduciary with respect to the decisions plaintiffs challenge.  The SAC simply refers to Ms. Rudlong's job title, offers a conclusory paraphrase of the statutory definition of a fiduciary, and alleges that her administrative function as an EBAC delegate in signing certain of the Plan's Department of Labor filings qualify her as a Plan fiduciary.  (SAC ¶ 24.)  The SAC does not allege that EBAC gave her any decision-making authority, or that she had any role with KIC.  Despite amending their complaint twice, plaintiffs have never added more specific allegations concerning Ms. Rudlong.

Discovery confirms that Ms. Rudlong did not serve on either fiduciary committee, or have any responsibility for their decisions.  (*See* Ex P, Rudlong Dep. 265:15-25; 266:1-11.)  Instead, she served purely in a support capacity, performing ministerial tasks without the authority to make final decisions.  (*See, e.g.*, *id*. at 81:13-20 (duties included reviewing and approving invoices for fees others had determined); Ex. Q, AMER_KR1_0000255623149 (9/12/2006 KIC minutes) (providing KIC with participant data); Ex. R, 8/25/2009 KIC minutes (relaying feedback from plan participants).)

For example, when Ameriprise spun off from American Express to form a new, stand-alone company, Ms. Rudlong helped to complete the operational tasks required to set up the new Plan's recordkeeping system, but did not, *inter alia*, decide the Plan's fee

schedule or approve the terms of the Administrative Services Agreement between the Plan and its recordkeeper.  (Ex. P, Rudlong Dep. 29:5 -30:7; 35:2-22.)  Similarly, Ms. Rudlong supported Ameriprise's efforts to benchmark the Plan's recordkeeping fees and negotiate with its service provider, but did not directly participate in the negotiations or approve the results.  (Ex. P, Rudlong Dep. 232:7-15.)  Instead, EBAC approved the fee terms, and Mr. Sabin executed the updated agreement on the committee's behalf.  (Ex. S, (AMER_KR1_000035098) 5/21/2012 EBAC minutes; Ex. T, WF1447, 1149, 1172 (Master Services Agreement).)  Moreover, Ms. Rudlong testified that beyond providing information to KIC, she did not participate in the committee's investment selection discussions and had limited direct interaction with either committee.  (*See, e.g.,* Ex. P, Rudlong Dep. 74:15-24; 189:8-20; 188:22-189:6.)

Moreover, the responsibilities EBAC delegated to Ms. Rudlong concerned certain trust to trust transfers, the authority to execute certain documents, and the ability to issue certain participant communications—not tasks connected to the investment selections and recordkeeping fees plaintiffs have challenged.  (Ex. J, AMER_KR2_000631007.)  While EBAC reserved the right to assign other powers it might specifically approve (*see id*.), there is no evidence that EBAC added any relevant fiduciary activities to Ms. Rudlong's portfolio.  In short, to the extent Ms. Rudlong had any involvement with the conduct plaintiffs challenge, it was purely as a benefits department employee supporting the actual decision-makers.

<u>ARGUMENT</u>

Plaintiffs seek relief against Mr. Sabin and Ms. Rudlong solely on the grounds that they were Plan fiduciaries.  But because neither functions as a fiduciary with respect to the conduct challenged in the complaint, each is entitled to summary judgment on plaintiffs' claims.  It is well settled that ERISA makes an entity a fiduciary only "to the extent" that entity performs fiduciary functions.  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A); *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 252-53 (1993).  An entity that is a plan fiduciary as to one function is not necessarily a fiduciary with respect to other functions under the plan. *Pegram*, 530 U.S. at 225-26; *Maniace v. Commerce Bank, N.A.*, 40 F.3d 264, 267 (8th Cir. 1994) (holding that a plan trustee is not necessarily a fiduciary for all plan purposes).

Plaintiffs have altogether disavowed their allegation that Mr. Sabin served as a Plan fiduciary.  Whether this represented plaintiffs' conclusion on the merits, or a strategic choice to gain a litigation advantage in a particular context, plaintiffs are not privileged to argue to the contrary now.  And having represented to the Court that Mr. Sabin was not a fiduciary, plaintiffs are hardly in a position to argue that his direct report Ms. Rudlong was.

ERISA provides that persons not formally identified as fiduciaries may take on fiduciary status, but only "to the extent" that such persons exercise "discretionary authority or discretionary control respecting management of such plan or exercise[] any authority or control respecting management or disposition of its assets" or have "discretionary authority or discretionary responsibility in the administration of such

26

plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).[15]  A person who performs

ministerial, rather than discretionary, administrative functions, is not a fiduciary.  *See,*

*e.g.*, *Christensen v. Qwest Pension Plan*, 462 F.3d 913, 917 n.2 (8th Cir. 2006); *see also*

29 C.F.R. § 2509.75-8 (explaining that various ministerial tasks, including, *inter alia*,

preparation of employee communications material; preparation of reports required by

government agencies; and "making recommendations to others for decisions with respect

to plan administration" do not convey fiduciary status when performed under policies set

by others).

In light of the statute and regulatory guidance, courts have repeatedly rejected

claims against non-fiduciary employees and service providers who perform plan-related

tasks at the direction of those with fiduciary authority.  *See, e.g.*, *Anoka Orthopaedic*

*Assoc., P.A. v. Lechner*, 910 F.2d 514, 517 (8th Cir. 1990) (affirming summary judgment

for defendants whose responsibilities did "not entail discretionary authority or

responsibility within the meaning of 29 U.S.C. § 1002(21)(A)"); *Truman Bank 401(K)*

*Profit Sharing Plan v. Levin*, 2007 U.S. Dist. LEXIS 81917, *15-18 (E.D. Mo. Nov. 5,

2007) (finding that plan trustee was not a fiduciary where plan language explicitly

restricted trustee's authority).[16]  Preparing the annual Form 5500, the only specific

---

[15] The statute also contains provisions, not relevant here, concerning the status of certain mutual fund companies and persons who are compensated for providing investment advice.

[16] *See also, e.g.*, *Taylor v. Peoples Natural Gas Co*., 49 F.3d 982, 987 (3d Cir. 1995) (affirming judgment that defendant who had authority to "prepare reports concerning participants' benefits [] and calculate the costs of alternative plan amendments on behalf

conduct the SAC attributes to Ms. Rudlong, is not fiduciary activity.  *See, e.g., Searls v. Sandia Corp.*, 2014 WL 4793491, at *10 (E.D. Va. Sept. 25, 2014) (dismissing claims against purported fiduciary who prepared and filed a Form 5500); *Aloha Dog & Cat Hosp., P.C. v. Standard Ret. Servs., Inc.*, 2010 WL 5232950, at *8 (D. Or. Sept. 3, 2010) (preparation of Form 5500 a ministerial duty), *adopted by*, 2010 WL 5232997 (Dec. 16, 2010).

While Ms. Rudlong ably assisted the committees and performed a variety of operational tasks, she did so subject to processes and procedures determined by others. Plaintiffs cannot show she had any authority to make the final investment selection and recordkeeping decisions that plaintiffs challenge.  *See Groska v. N. States Power Co. Pension Plan*, 2007 WL 2791119, at *5 (D. Minn. Sept. 24, 2007) (citing 29 C.F.R. § 2509.75-8 and granting summary judgment where plaintiff presented no evidence that defendant "possessed power to make decisions as to plan policy, interpretations, practices or procedures").[17]  Consequently, she was not a fiduciary.  Moreover, because plaintiffs

---

of the plan administrator" was not a fiduciary); *Miller v. Mellon Long Term Disability Plan*, 721 F. Supp. 2d 415, 426 (W.D. Pa. 2010) ("[f]iduciary status does not simply attach to any administrative activity, but rather, only to the person (or entity) who has final authority" for, in that context, benefits decisions); *N.Y. State Teamsters Council Health and Hosp. Fund v. Centrus Pharm. Solutions*, 235 F. Supp. 2d 123, 127 (N.D.N.Y. 2002) (manager who could make benefit program recommendations was not a fiduciary where another entity bore "ultimate responsibility for all decisions" and must approve recommendations before adoption).

[17] Moreover, the limited authority EBAC delegated to Ms. Rudlong did not implicate the investment selection and recordkeeping decisions at issue here.  It is well settled that ERISA makes a person a fiduciary only "to the extent" that person performs fiduciary

cannot show that she or Mr. Sabin are fiduciaries, plaintiffs' claims that each fiduciary is liable for the other fiduciaries' breaches as an ERISA co-fiduciary are inapplicable to both and must be denied. (*See*, *e.g*., SAC ¶ 116 citing ERISA §405(a), 29 U.S.C. § 1105(a).)[18]

## CONCLUSION

For the reasons stated in Part A, plaintiffs' failure to remove claims under Count I of their Second Amended Complaint must be summarily adjudicated in defendants' favor. For the reasons stated in Part B, the Court should grant Ms. Rudlong's and Mr. Sabin's motion for summary judgment on all claims against them.

---

functions. *Pegram,* 530 U.S. at 225-26. Liability does not attach to particular conduct unless the person is a fiduciary with respect to the activity in question. *See, e.g.*, *Truman Bank 401(K) Profit Sharing Plan,* 2007 U.S. Dist. LEXIS 81917 at *15-18.

[18] Even if Ms. Rudlong were a fiduciary for some limited purpose, plaintiffs could not prevail on claims for co-fiduciary liability without showing that she ***knowingly*** breached her duties, or knowingly participated in other fiduciaries' breaches—a finding for which the SAC offers no specific factual contentions. *See* ERISA § 405(a); 29 U.S.C. § 1105(a); *Jones v. Sun Edison, Inc.*, 2014 WL 1213471, at *30 (E.D. Mo. Mar. 24, 2014) (granting motion to dismiss co-fiduciary liability claims concerning a plan investment), *citing Donovan v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983) (explaining that a "fiduciary must know the other person is a fiduciary with respect to the plan, must know that he participated in the act that constituted a breach, and must know that it was a breach").

Dated: October 24, 2014                    s/ Brian D. Boyle

                                           Brian D. Boyle (admitted *pro hac vice*)
                                           bboyle@omm.com
                                           Benjamin G. Bradshaw (admitted *pro hac vice*)
                                           bbradshaw@omm.com
                                           Shannon Barrett (admitted *pro hac vice*)
                                           sbarrett@omm.com
                                           O'Melveny & Myers LLP
                                           1625 Eye Street, NW
                                           Washington, D.C. 20006-4001
                                           (202) 383-5300


                                           Stephen P. Lucke (#154210)
                                           lucke.steve@dorsey.com
                                           Kirsten E. Schubert (#388396)
                                           schubert.kirsten@dorsey.com
                                           Dorsey & Whitney LLP
                                           50 South Sixth Street, Suite 1500
                                           Minneapolis, MN 55402-1498
                                           (612) 340-2600

                                           *Attorneys for Defendants*
                                           *Ameriprise Financial, Inc. et al.*